UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
GENERAL MOTORS CORPORATION and : 
ADAM OPEL GmbH; :
 :
        Plaintiffs, :
 :
     - against - : No. 08-CV-4999 (DAB)
 :
FIAT S.p.A; FIAT AUTO HOLDING B.V.; and :
FIAT AUTO S.p.A., :
 :
        Defendants. :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO STAY OR DISMISS THIS ACTION

SULLIVAN & CROMWELL LLP
1 New Fetter Lane
London EC4A 1AN, England
U.K. Tel: 011-44-207-959-8900
U.S. Tel: 212-558-4000

Attorneys for the Defendants
Fiat S.p.A., Fiat Holding B.V., and
Fiat Auto S.p.A.

July 23, 2008

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................ ii

PRELIMINARY STATEMENT ....................................................................... 1

BACKGROUND ............................................................................................. 4

ARGUMENT ................................................................................................... 11

I.    THIS ACTION SHOULD BE STAYED OR DISMISSED PENDING
      ARBITRATION. ...................................................................................... 11

      A.    The Court Should Stay This Action Until an Arbitration Panel
            Decides Whether This Dispute is Arbitrable. ................................... 11

      B.    Alternatively, the Court Should Find That the Dispute Is Covered
            by the Arbitration Clause in the ECSA and Stay or Dismiss This
            Action................................................................................................ 14

            1.    This Dispute Arises Under the ECSA, Not the Separation
                  Agreement. ............................................................................. 14

            2.    If the Court Finds That the ECSA Arbitration Clause
                  Covers This Dispute, It Must Not Only Stay, But Also
                  Dismiss, This Action.............................................................. 18

II.   THE COURT SHOULD DISMISS THIS ACTION FOR LACK OF
      PERSONAL JURISDICTION. ................................................................. 20

CONCLUSION................................................................................................. 22

# TABLE OF AUTHORITIES

## CASES

*Aerotel, Ltd.* v. *RSL Communs. Ltd.*,
99 F. Supp. 3684 (S.D.N.Y. 2000) ................................................................. 19

*Alfred* v. *Dean Witter Reynolds, Inc.*,
975 F.2d 1161 (5th Cir. 1992) ..................................................................... 19

*Anderson* v. *Docuport, Inc.*,
No. 06 Civ. 3769 (S.D.N.Y. 2007), 2007 WL 485342 ............................... 21

*AT&T Tech.* v. *Communications Workers of America*,
475 U.S. 643 (1986)...................................................................................... 15

*Berger* v. *Cantor Fitzgerald Secs.*,
967 F. Supp. 91 (S.D.N.Y. 1997) ................................................................. 19

*Collins & Aikman Prod.* v. *Bldg. Sys.*,
58 F.3d 16 (2d Cir. 1995)............................................................................. 15

*David L. Threlkeld & Co.* v. *Metallgesellschaft Ltd. (London)*,
923 F.2d 245 (2d Cir. 1991).......................................................................... 14

*Eastern Fish Co.* v. *South Pac. Shipping Co., Ltd.*,
105 F. Supp. 2d 234 (S.D.N.Y. 2000).......................................................... 19

*First Options of Chicago, Inc.* v. *Kaplan*,
514 U.S. 938 (1995)...................................................................................... 11

*Hays & Co.* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
885 F.2d 1149 (3d Cir. 1989)........................................................................ 18

*In re Magnetic Audiotape Antitrust Lit.*,
334 F.3d 204 (2d Cir. 2003).......................................................................... 20

*Lewis Tree Service, Inc.* v. *Lucent Tech.*,
239 F. Supp. 2d 332 (S.D.N.Y. 2002).......................................................... 19

*Massen* v. *Cliff*,
No. 02 Civ. 9282 (HBP) (S.D.N.Y. Apr. 25, 2003), 2003 WL 2012404 .............. 2, 19

*National Union Fire Insurance Company of Pittsburgh* v. *Belco Petroleum Corp.*,
88 F.3d 129 (2d Cir. 1996)....................................................................... 14, 15

*PaineWebber Inc.* v. *Bybyk,*
  81 F.3d 1193 (2d Cir. 1996)...................................................................... 12, 13

*Seus* v. *John Nuveen & Co., Inc.,*
  146 F.3d 175 (3d. Cir. 1998)...................................................................... 19

*Shaw Group Inc.* v. *Triplefine International Corp.,*
  322 F.3d 115 (2d Cir. 2003)...................................................................... 12, 13

*Smith* v. *Professional Security Bureau,*
  225 F. Supp. 2d 395 (S.D.N.Y. 2002)...................................................... 2, 19

**STATUTES**

Federal Arbitration Act,
  9 U.S.C. § 3............................................................................................ 18

The Defendants Fiat S.p.A., Fiat Auto Holding B.V., and Fiat Auto S.p.A. (collectively referred to herein as "Fiat") respond to the Complaint in this action (the "Complaint") filed by Plaintiffs General Motors Corporation and Adam Opel GmbH (collectively referred to herein as "GM") by submitting this memorandum of law in support of their motion to stay this action pending arbitration or to dismiss the Complaint.

## PRELIMINARY STATEMENT

The question on this motion is whether a dispute between the parties should be resolved under the dispute resolution procedures of a "Joint Venture Separation Master Agreement" (the "Separation Agreement") (attached to the Affidavit of John L. Hardiman, sworn to July 22, 2008, (the "Hardiman Aff.") as "Exhibit A-1" and "Exhibit A-2"). The answer is clearly "no." The dispute, as defined by the Complaint's own allegations, arises under an entirely different contract with its own dispute resolution provisions.

The Complaint labels the dispute at issue as the "Common Investment Dispute" and describes it at paragraphs 26-29. Paragraph 26 explains that the dispute relates to Fiat's decision to "cease purchasing certain products" from GM and Fiat's "corresponding obligation to pay common investment expenses." Paragraph 28 states that the dispute crystallized when GM sent Fiat an invoice (the "Invoice") (attached to the Hardiman Aff. as "Exhibit B") that Fiat "refused to pay." Paragraph 27 claims that Fiat was obligated to pay these expenses "[u]nder the express terms of a Schedule to the" Separation Agreement.

GM failed to attach the Invoice to the Complaint but it is quite telling. Even though drafted by GM, the Invoice makes no reference whatsoever to the Separation Agreement or to any Schedule attached thereto. Instead, the Invoice to which Fiat objects

references a schedule to an entirely different agreement -- the European Powertrain Cross-Supply Agreement ("ECSA") (attached to the Hardiman Aff. as "Exhibit C-1" and "Exhibit C-2"). Moreover, the Invoice on its face indicates that Fiat's notice of its decision to "cease purchasing products" was contained in a December 22, 2006 letter (the "Letter") (attached to the Hardiman Aff. as "Exhibit D") and that Letter, like the Invoice, only refers to the ECSA.[1]

One look at the ECSA and the Separation Agreement makes plain that this dispute, as the Invoice and Letter demonstrate, arises under the ECSA and not the Separation Agreement. In 2005, GM and Fiat agreed to terminate a joint venture that they had begun in 2000. The Separation Agreement and an Agreement to Liquidate Joint Ventures and Terminate Master Agreement (the "Termination Agreement") (attached to the Hardiman Aff. as "Exhibit E") detail the parties' respective rights and obligations in connection with the termination. However, the parties also agreed to continue purchasing certain products from one another after the discontinuance of the joint venture. The parties' respective rights and obligations with respect to the purchase and sale of these products are laid out in the ECSA and no mention is made of such rights and obligations in either the Separation Agreement or Termination Agreement. The ECSA contains provisions specifically providing for the discontinuance of such product purchases -- cited in the Letter -- and schedules detailing the costs owed by one party to another upon such discontinuance -- cited in the Invoice.

---

[1] The Court may consider "all the materials submitted in connection with" a motion to stay. *Massen v. Cliff*, No. 02 Civ. 9282 (HBP) (S.D.N.Y. Apr. 25, 2003), 2003 WL 2012404 at *3. Although the Court is more limited in the material it can consider on a motion to dismiss, it can consider documents that are "integral to" and "explicitly referenced in" the Complaint. *Smith v. Professional Security Bureau*, 225 F. Supp. 2d 395, 396 (S.D.N.Y. 2002). The Invoice, Separation Agreement, Termination Agreement, and the ECSA are all referenced in the Complaint (*see* ¶¶ 1, 3, 4, 19, 20, 21, 28). The Letter is not, but it is expressly referenced in the Invoice and, therefore, Fiat respectfully submits it is "integral to" the Complaint.

Most importantly for this motion, the ECSA also contains an express arbitration clause that states:

> All Disputes, arising out of or in connection with this Agreement or any Purchase Order hereunder, including the breach, termination or invalidity thereof, must be finally settled under the Rules of the ICC [International Chamber of Commerce] by three arbitrators appointed in accordance with the Rules.

(Hardiman Aff. Ex. C-1, ¶ 30.2)  The dispute outlined in the Complaint clearly falls under this arbitration clause.

In light of these undisputed facts which are apparent from the face of documents cited in the Complaint, one might ask why GM is arguing that this dispute arises under the Separation Agreement.  The answer lies in a merits strategy -- the ECSA limits a party's liability for discontinuance of product purchases to certain specific investments by the other party related to that product; it does not support GM's request for "common investment" costs.  GM is therefore relying on an errant paragraph in an attachment to the Separation Agreement, that is cited nowhere in the body of the agreement, but which refers to "common investments."  GM apparently believes that having this dispute resolved under the resolution procedures of the Separation Agreement enhances the chances of this paragraph controlling on the merits rather than the ECSA.  Yet, the strategy is foiled by GM's own Invoice, the Letter, and the broad arbitration clause in the ECSA.  Moreover, whatever application the paragraph in the Separation Agreement may have ever had on cross-supply issues was eliminated by a merger clause in the ECSA stating that it supersedes "all prior agreements," which includes the Separation Agreement.

By drafting the arbitration clause in the ECSA broadly, and incorporating the ICC arbitration rules which assign the arbitrators the responsibility for determining issues of arbitrability, the parties expressed their consent to have an arbitration tribunal decide the preliminary question of whether a dispute falls under the ECSA's arbitration clause. Thus, under the provisions of the Federal Arbitration Act ("FAA"), the Court should stay this action to allow an ICC arbitration tribunal formed under the ECSA to determine whether this dispute is covered by the ECSA's arbitration clause. Alternatively, if the Court is minded to address the question of arbitrability itself, it should reject GM's attempt to squeeze this action under the Separation Agreement and stay or dismiss it.

Finally, the Court may also dismiss this action for lack of personal jurisdiction because the Complaint's only basis for jurisdiction over Fiat, a group of non-U.S. corporations, is a consent-to-jurisdiction clause in the Termination Agreement that is not applicable either to the ECSA or the Separation Agreement.

## BACKGROUND

On March 13, 2000, GM and Fiat entered into a transaction (the "2000 Agreement"), pursuant to which they created "a series of separate cooperative agreements that combined various aspects of their operations in Europe and South America, and that created the Powertrain Joint Venture, the Purchasing Joint Venture, and the Brazil Joint Venture (collectively the 'Joint Ventures')." (Complaint, ¶ 16)  On February 13, 2005, the parties agreed to terminate and liquidate the Joint Ventures on the terms and conditions set forth in the Termination Agreement.  (*Id.*, ¶ 19)  On May 13, 2005, the parties executed the Separation Agreement, which sets forth "further understandings and agreements regarding liquidation of the Joint Ventures."  (*Id.*, ¶ 20)

- 4 -

The Termination Agreement states that, after liquidation, the parties had "an option, but not the obligation, to maintain its Group's then current purchase arrangements to the extent it is supplied from assets it did not receive in the liquidation, on the same terms and conditions as contained in the Supply Agreement . . . for a period of up to five (5) years from the date of completion of the liquidation of the Powertrain JV." (Hardiman Aff. Ex. E, ¶ 7.2) The ECSA, also executed on May 13, 2005, describes "the terms and conditions under which the Parties agree to provide the cross-supply arrangements" that were anticipated by paragraph 7.2 of the Termination Agreement. (Hardiman Aff. Ex. C-1, Recitals (B) and (D)) It is thus, by definition, something that was intended to follow the liquidation of the joint venture.

*Relevant Terms of the ECSA*

Paragraph 14.2 of the ECSA specifically addresses the parties' rights and obligations in the event that one party wishes to discontinue purchasing one or more products from the other party:

> The Customer may also discontinue to purchase one or more Cross Supply Products upon one year prior written notice to Supplier. Upon termination, in whole or in part, Customer guarantees to pay within 30 days from the expiry of the one year written notice period the net book value that has not been recovered in the piece price of the specific investments and capitalized FGP start-up and pre-production expenses that have been allocated to Customer on Cross Supply Products and Spare Parts as shown in Section 7 and Schedule 3.3B and 3.3C (based in part on Exhibit 3.1(v) and Schedule 3.1(a)(iv) of the Umbrella Agreement), but not yet fully paid for as part of the piece price.

(Hardiman Aff. Ex. C-1, ¶ 14.2)

- 5 -

The ECSA contains an "Entire Agreement" clause, which states that the

ECSA constitutes "the entire agreement among the Parties, Suppliers and Customers with

respect to the matters covered herein and, except as otherwise provided herein, supersede[s]

all prior agreements, covenants, arrangements, communications, representations and

warranties, whether oral or written, by any officer, employee or representative of any of the

Parties, Suppliers or Customers." (Hardiman Aff. Ex. C-1, ¶ 24)

Finally, the ECSA contains an arbitration clause that states:

> All Disputes, arising out of or in connection with this
> Agreement or any Purchase Order hereunder, including
> the breach, termination or invalidity thereof, must be
> finally settled under the Rules of the ICC [International
> Chamber of Commerce] by three arbitrators appointed in
> accordance with the Rules.

(Hardiman Aff. Ex. C-1, ¶ 30.2)

The Rules of the ICC (the "ICC Rules") referred to in the ECSA arbitration

clause specify that the arbitrators shall decide initial questions of arbitrability. Specifically,

article 6, section 2 of the ICC Rules (attached to the Hardiman Aff. as "Exhibit F") provides:

> If the Respondent does not file an Answer . . . or if any
> party raises one or more pleas concerning the existence,
> validity or scope of the arbitration agreement, the
> [International Court of Arbitration[2]] may decide, without
> prejudice to the admissibility or merits of the plea or
> pleas, that the arbitration shall proceed if it is *prima facie*
> satisfied that an arbitration agreement under the Rules
> may exist. In such a case, any decision as to the
> jurisdiction of the Arbitral Tribunal shall be taken by the
> Arbitral Tribunal itself. If the [International Court of
> Arbitration] is not so satisfied, the parties shall be

---

[2]  The International Court of Arbitration is "the arbitration body attached to the ICC." (Hardiman Aff. Ex. F, ¶ 1.1).

> notified that the arbitration cannot proceed.  In such a
> case, any party retains the right to ask any court having
> jurisdiction whether or not there is a binding arbitration
> agreement.

(Hardiman Aff. Ex. F, ¶ 6.2)

The ECSA does not contain any clause pursuant to which the parties consented to jurisdiction before this Court or any other court.

*The Relevant Terms of the Separation Agreement*

The Separation Agreement "reflects the understandings and agreements among the Parties, including the decisions of the Liquidation Committee with respect to effectuating the Termination Agreement." (Hardiman Aff. Ex. A-1, Recital (C)).  The topics covered by the Separation Agreement as reflected by its "Table of Contents" include: "Liquidation of Purchasing Joint Venture"; "Unwind of Powertrain Joint Venture"; "Conditions Precedent to Closing"; and "Events at Closing."  (Hardiman Aff. Ex. A-1) Notably, the "Entire Agreement" clause of the Separation Agreement describes the contract as setting forth "the general understanding of the Parties with respect to the liquidation of the Purchasing JV and the unwinding of the Powertrain JV . . . ." (*Id.*, ¶ 9.4); it makes no mention of future business between the parties.  Notably, the Separation Agreement expressly anticipates the parties entering into the ECSA.  It defines the ECSA, along with numerous other agreements, as "Ancillary Agreements" and states that these agreements are "to be entered into" and executed as a condition to closing the termination of the joint venture.  (*Id.*, ¶ 1.1(a) and ¶ 5.2(a).iii.)

The body of the Separation Agreement does not discuss future cross-supply arrangements between the parties or any provisions specifying amounts owed upon

- 7 -

termination of any cross-supply or other purchasing agreement. (*See* Hardiman Aff. Ex. A-1)

The only reference in the Separation Agreement to common investment costs owed upon

termination of any type of purchasing agreement appears in a paragraph in an attachment to

the Agreement entitled "Specific Investment Allocation for Depreciation and Obligation for

Payment" which says in its right hand corner "Exhibit 3.1(a)(iv)" (with the "(a)(iv)"

handwritten) and follows two pages that are identified as "Schedule 3.1(a)(iv)," (again in

handwriting). (*See* Hardiman Aff. Ex. A-2)  This document is not referenced anywhere in

the body of the Separation Agreement. (*See* Hardiman Aff. Ex. A-1)  The paragraph at issue

states:

> In the event of partial or full termination of the Supply
> Agreement for any product family (ie L850, Fam I, F40,
> JTD, M20/32), the remaining net book value of the
> associated common investment that has not been
> recovered in piece price are guaranteed to be paid in full
> at the time of partial or full termination for the specific
> product family by the respective customer that is
> partially or fully terminating the supply of this product.

(Hardiman Aff. Ex. A-2, Exhibit. 3.1(a)(iv), ¶ 3a.)  The "Supply Agreement" referred to in

this paragraph is not defined in the Separation Agreement. (*See* Hardiman Aff. Ex. A-1 and

Ex. A-2)  (The Termination Agreement contains references to a "Brazil Supply Agreement"

and "European Supply Agreement," both of which were terminated as part of the liquidation

of the joint venture.) (*See* Hardiman Aff. Ex. E, Schedule 1.0)

       The dispute resolution process set forth in the Separation Agreement is "as

provided in Article 16 of the Termination Agreement which is incorporated herein by

reference." (Hardiman Aff. Ex. A-1, ¶ 9.11)  The dispute resolution clause in the

Termination Agreement states, in relevant part:

> If a Request for Binding Dispute Resolution is delivered,
> the Parties shall jointly select a mediator (the 'Mediator')
> to facilitate a resolution to the Dispute. The Mediator
> shall give the Parties a reasonable opportunity to make
> written or oral presentations to the Mediator regarding
> the Dispute and suggested ways of resolving the Dispute.
> . . . The decision of the Mediator is final and binding
> upon the Parties, the JV Shareholders and the Joint
> Ventures and enforceable in accordance with Sections
> 16.5 and 20.9.

(Hardiman Aff. Ex. E, ¶ 16.2)

The Separation Agreement does not contain a "consent-to-jurisdiction" clause and it does not incorporate a "Consent to Jurisdiction Clause" contained in the Termination Agreement.[3] (*See* Hardiman Aff. Ex. A-1)

### *The Current Dispute Between The Parties*

The Complaint describes the current dispute as emanating from "Fiat's decision to cease purchasing certain products from General Motors" and alleged "obligation to pay common investment expenses as a result of Fiat's early termination of purchases." (*See* Complaint, ¶ 26) The Complaint goes on to state: "General Motors has sent an invoice for payment of such common investment expenses; Fiat has refused to pay." (*Id.*, ¶ 28)

The Invoice, dated January 31, 2008, contains a line item for the disputed charge that states "NBV associated invest. (Sched. 3 3B*)." (Hardiman Aff. Ex. B) This notation to "Sched. 3 3B*" is a reference to Schedule 3.3B of the ECSA, which is

---

[3]    The "Consent to Jurisdiction" clause in the Termination Agreement provides, in relevant part: "Fiat and General Motors hereby irrevocably submits to the exclusive jurisdiction of the United States District Court for the Southern District of New York, located in New York City, for the purpose of any action or proceeding arising out of or relating to this Agreement, and each of Fiat and General Motors hereby irrevocable agrees that all claims in respect to such action or proceeding may be heard and determined in such federal court." (Hardiman Aff. Ex. E, ¶ 20.9)

specifically referenced in Section 14.2 of the ECSA as setting out expenses to be paid in the

event of discontinuance of a product purchase.  (*See* Hardiman Aff. Ex. C-1, ¶ 14.2 and Ex.

C-2, Sched. 3.3B)[4]  The Invoice describes the charges contained therein as "Family 1

Cancellation Charges (Ref. to Fiat termination letter dated Dec.22, 2006)."  (Hardiman Aff.

Ex. B)  The Letter states:

> *Subject: European Powertrain Cross Supply Agreement*
> *("ECSA") dated as of May 13, 2005 by and among Fiat*
> *S.p.A., Fiat Auto Holding B.V., Fiat Auto S.p.A., and*
> *General Motors Corp and subsequent amendments*
> *thereto.*
>
> this letter is sent on behalf of all the Fiat Customers (term
> which, as any other capitalized terms used in this letter,
> has, unless otherwise specified, the meaning ascribed
> thereto in the ECSA).
>
> Reference is made to Section 14.2 of the ECSA and the
> provisions contained therein.
>
> This letter is the written notice required for the Fiat
> Customers to discontinue purchasing the Cross Supply
> Products as far as the product family Fam.1 is concerned
> ("Discontinued Products"). . . .
>
> Any other terms and conditions of the ECSA as well as
> the supply of any Cross Supply Products other than the
> Discontinued Products do remain in full force and effect.

(Hardiman Aff. Ex. D)  Thus, the Invoice and Letter are clearly related to the ECSA and not

the Separation Agreement.

---

[4]    The Separation Agreement does not have a Schedule 3.3B; it does have a Schedule 3.3, but that discusses
dividends, a topic clearly not related to the dispute at issue.  (*See* Hardiman Aff. Ex. A-2, Schedule 3.3)

**ARGUMENT**

**I.**

**THIS ACTION SHOULD BE STAYED OR DISMISSED
PENDING ARBITRATION.**

All of the contemporaneous documents cited by the Complaint demonstrate that this dispute arises under the ECSA and not the Separation Agreement and, therefore, should be resolved under the ECSA's dispute resolution procedures.

The Court, however, need not decide this issue because the breadth of the arbitration clause in the ECSA and its incorporation of the ICC Rules reflect the parties' intention to have an arbitration tribunal decide questions of arbitrability. Thus, this action should be stayed pursuant to the FAA until an arbitration tribunal formed under the ECSA arbitration provision can determine whether arbitration is appropriate here.[5]

Alternatively, if the Court determines that it should address the question of arbitrability, this action -- which seeks a declaration that the dispute over the Invoice be resolved under the Separation Agreement and not the ECSA, and an injunction requiring Fiat to comply with the Separation Agreement dispute resolution mechanism -- should not only be stayed but dismissed as well.

A.      The Court Should Stay This Action Until an Arbitration Panel Decides
         Whether This Dispute is Arbitrable.

Under the United States Supreme Court's decision in *First Options of Chicago, Inc.* v. *Kaplan*, 514 U.S. 938 (1995) (hereinafter "*First Options*"), "the arbitrability

---

[5]      In this case, it is particularly important that an arbitration panel decide which agreement applies to this dispute because the Complaint's basis for personal jurisdiction is premised solely on provisions in the Separation Agreement and the Termination Agreement.[5] (*See* Complaint, ¶ 15) If this dispute does not arise under the Separation Agreement but rather the ECSA, there is no pleaded basis for the Court's jurisdiction over Fiat as the ECSA does not have a consent-to-jurisdiction clause.

- 11 -

of a given issue is a question for the court *unless* there is 'clear and unmistakable evidence' from the arbitration agreement, as construed by the relevant state law, that the parties intended that the question of arbitrability shall be decided by the arbitrator." *PaineWebber Inc.* v. *Bybyk*, 81 F.3d 1193, 1198-199 (2d Cir. 1996) (citing *First Options*) (hereinafter "*Bybyk*").

In *Bybyk*, the Second Circuit, interpreting *First Options*, held that an arbitration clause that states that "any and all controversies . . . shall be determined by arbitration" demonstrated that "the parties intended to arbitrate issues of arbitrability." *Id.* at 1196, 1200. As the Second Circuit explained, the "any and all" language was "elastic enough to encompass disputes over . . . whether a claim is within the scope of arbitration." *Id.* at 1199.

In *Shaw Group Inc.* v. *Triplefine International Corp.*, 322 F.3d 115 (2d Cir. 2003) (hereinafter "*Triplefine*"), the Second Circuit built on the precedent established in *Bybyk* in the context of an arbitration clause stating that "[a]ll disputes . . . concerning or arising out of this Agreement shall be referred to arbitration to the International Chamber of Commerce . . . in accordance with the rules and procedures of International Arbitration." *Id.* at 120. The *Triplefine* Court noted that, under the arbitration clause at issue, "the parties' duty to arbitrate 'all disputes' is qualified only by the requirement that the matter be one 'concerning or arising under'" the agreement. *Id.* at 121. The Court then focused on the fact that the parties in that case had agreed "to refer all disputes to 'the International Chamber of Commerce . . . in accordance with the rules and procedures of International Arbitration'" and that article 6, section 2 of the ICC Rules, "specifically provides for the ICA, the arbitral body

- 12 -

of the ICC, to address questions of arbitrability, either sua sponte before an answer is filed or

at the specific request of any party." *Id.* at 122.  The Court then held:

> In sum, because the parties' arbitration agreement is
> broadly worded to require the submission of 'all
> disputes' concerning the Representation Agreement to
> arbitration, and because it provides for arbitration to be
> conducted under the rules of the ICC, which assign the
> arbitrator initial responsibility to determine issues of
> arbitrability, we conclude that the agreement clearly and
> unmistakably evidences the parties' intent to arbitrate
> questions of arbitrability.

*Id.* at 124-125.[6]

     The *Triplefine* holding is directly applicable here because the arbitration

clause in the ECSA contains both of the salient characteristics of the arbitration clause in

*Triplefine*: (1) broad language stating that "all disputes arising out of the agreement" are

subject to arbitration; and (2) incorporation of the ICC Rules ("All Disputes . . . must be

finally settled under the Rules of the ICC by three arbitrators . . . .  (Hardiman Aff. Ex. C-1,

¶ 30.2))

     Therefore, under *Bybyk* and *Triplefine*, the Court should find that the

arbitration clause in the ECSA provides clear and unmistakable evidence that GM and Fiat

---

[6]    The Courts in *Bybyk* and *Triplefine* applied principles of New York law to interpret the agreements at issue
in those cases.  These principles state that, in interpreting a contract, the intent of the parties should govern,
and the contract should be construed so as to give full meaning and effect to all of its provisions, with
words and phrases "given their plain meaning."  *See Triplefine*, 322 F.3d at 121 (citing *Bybyk* at 1199).

The ECSA is governed by Swiss law (*see* Hardiman Aff. Ex. C-1, ¶ 27), but that should not change the
outcome here from *Triplefine* because, under the Swiss law of contract interpretation, the intent of the
parties also governs and the language of the agreement "is the primary sign of the intention of the parties."
(*See* accompanying Affidavit of Paolo Bottini, sworn to July 22, 2008, ¶ 2 and Exhibits A-D attached
thereto.)  Under Swiss law any party seeking an interpretation of the contract that is at odds with the plain
language bears the burden of proving that the plain language was not intended to govern.  (*Id.*)  The
Complaint makes no effort to meet this burden as it does not even discuss the ECSA arbitration clause.

consented to an arbitration panel determining whether this matter is arbitrable, and this action should be stayed until an arbitration panel decides the issue.[7]

> **B.**    Alternatively, the Court Should Find That the Dispute Is Covered by the Arbitration Clause in the ECSA and Stay or Dismiss This Action.

If the Court chooses to decide the arbitrability issue, it not only should stay this action but also go further and dismiss because the only issue presented by the Complaint -- whether the dispute arises under the Separation Agreement -- can only be decided against GM based on its own allegations.

> **1.**    This Dispute Arises Under the ECSA, Not the Separation Agreement.

There is a strong federal policy in favor of arbitration in commercial disputes, which is especially pronounced in international business disputes. *See National Union Fire Insurance Company of Pittsburgh* v. *Belco Petroleum Corp.*, 88 F.3d 129, 133 (2d Cir. 1996) ("The FAA expresses a strong federal policy in favor of arbitration in . . . commercial disputes."); *David L. Threlkeld & Co.* v. *Metallgesellschaft Ltd. (London)*, 923 F.2d 245, 248 (2d Cir. 1991) ("[Federal] policy in favor of arbitration is even stronger in context of international business transactions.")  The Supreme Court has explained that, "'where the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers

---

[7]    Fiat has already begun the dispute resolution process envisioned by the ECSA.  Paragraph 29 of the ECSA requires the parties to attempt to informally resolve the dispute before proceeding to arbitration.  (Hardiman Aff. Ex. C-1, ¶ 29)  Pursuant to paragraph 30 of the ECSA, "[i]f the matter is not resolved within 30 days of the Request for Informal Dispute Resolution in accordance with Section 29 any Disputing Party may demand arbitration administered by the International Chamber of Commerce (the *ICC*) under its rules presently in force (the *Rules*)."  (*Id.*, ¶ 29)  In accordance with paragraph 29, Fiat sent GM a Request for Informal Dispute Resolution on July 1, 2008.

the asserted dispute. Doubts should be resolved in favor of coverage.'" *AT&T Tech.* v.

*Communications Workers of America*, 475 U.S. 643, 650 (1986) (citing *Steelworkers* v.

*Warrior & Gulf Nativation Co.*, 363 U.S. 574, 582-83 (1960)); *see also National Union Fire*,

88 F.3d at 133 ("[A]mbiguities as to the scope of an arbitration clause must be resolved in

favor of arbitration.")

      The presumption of arbitrability is particularly applicable where the

arbitration clause at issue is broad. *AT&T Tech*, 475 U.S. at 650; *Collins & Aikman Prod.* v.

*Bldg. Sys.*, 58 F.3d 16, 20 (2d Cir. 1995). In such a case, "'[i]f the allegations underlying the

claims 'touch matters' covered by the parties' . . . agreements, then those claims must be

arbitrated, whatever the legal labels attached to them.'" *Collins & Aikman Prod.*, 58 F.3d. at

21 (citing *Genesco, Inc.* v. *T. Kakiuchi & Co.*, 815 F.2d 840, 846 (2d Cir. 1987)) (emphasis

omitted).

      As discussed above, the arbitration clause in the ECSA is broad, covering

"[a]ll Disputes, arising out of or in connection with this Agreement or any Purchase Order

hereunder, including the breach, termination or invalidity thereof." (Hardiman Aff. Ex. C-1,

¶ 30.2); *see Collins & Aikman Prod.*, 58 F.3d at 20 (finding that an arbitration clause

covering "'any claim or controversy arising out of or relating to the agreement,' is the

paradigm of a broad clause.") Accordingly, if the allegations underlying GM's claims "touch

matters" covered by the ECSA, then this dispute must be arbitrated.

      In determining whether the dispute here "touches matters" covered by the

ECSA, the Court must look at the conduct alleged in the Complaint rather than GM's

characterization of it. (*See Collins & Aikman Prod.*, 58 F.3d at 20-21 ("[A]lthough claims

two and three seek relief under the 1988 Agreement, our analysis is not controlled by the

- 15 -

characterization of them in the pleading.  Instead, we look to the conduct alleged and determine whether or not that conduct is within the reach of the 1977 arbitration clause.")

The conduct alleged in the Complaint arises out of the ECSA, not the Separation Agreement.  The Invoice at the heart of this dispute *that GM sent Fiat* references the ECSA, not the Separation Agreement by referring to "Sched. 3 3B*," which is a schedule to the ECSA not the Separation Agreement, and the Letter, which expressly refers to Article 14.2 of the ECSA, not the Separation Agreement.  (*See* Hardiman Aff. Ex. B and Ex. D)

This is, of course, consistent with the nature of the agreements themselves. The ECSA's entire focus is the terms of the parties' cross-supply arrangements, including a specific provision that deals with the parties' rights and obligations upon termination of these arrangements.  (*See* Hardiman Aff. Ex. C-1, Recital (D) and ¶ 14.2)  The Separation Agreement, on the other hand, does not purport to govern the cross-supply relationship that the parties intended to continue after liquidation of the joint venture and instead lays out a procedural framework to effectuate liquidation of the joint venture.  (*See* Hardiman Aff. Ex. A-1, Recital (C)).

One exhibit to the Separation Agreement does contain a paragraph that discusses common investment payments owed upon "termination of the Supply Agreement." (*See* Hardiman Aff. Ex. A-2, Exhibit. 3.1(a)(iv))  However, the exhibit is not tied to any substantive clauses or mentioned in the body of the Separation Agreement and the term "Supply Agreement" is not defined anywhere in the Separation Agreement.  (*See* Hardiman Aff. Ex. A-1 and Ex. A-2)  In fact, this exhibit has a closer attachment to the text of the ECSA than the Separation Agreement, as Section 14.2 of the ECSA states that Schedule 3.3B

- 16 -

is based "in part" on Schedule 3.1(a)(iv) of the Separation Agreement to which the exhibit is attached. (Hardiman Aff. Ex. C-1, ¶ 14.2)

A dispute over expenses to be paid for termination of a cross-supply arrangement in the context of the specific agreement between the parties (the ECSA) governing the cross-supply arrangement and specifically addressing termination of the supply arrangement, where the Letter expressly cites that agreement, and the Invoice purporting to charge for the termination costs expressly refers to that agreement, is clearly governed by an "all disputes" arbitration provision in that agreement. The notion that GM may somehow transport this dispute to another agreement that does not purport to govern the cross-supply arrangements, merely because of one errant paragraph in an exhibit that refers generally to a supply agreement that is apropos of absolutely nothing in the agreement it is attached to, and undefined on its face, is misguided.[8]

Moreover, to the extent any ambiguity exists over the applicability of the exhibit to the Separation Agreement to this dispute, it is eliminated by the merger clause in the ECSA which states that it "supersede[s] *all prior agreements*, covenants, arrangements, communications, representations and warranties, whether oral or written, by any officer, employee or representative of any of the Parties, Suppliers or Customers." (Hardiman Aff. Ex. C-1, ¶ 24) (emphasis added). The Separation Agreement is a "prior agreement" to the ECSA: the Separation Agreement defines the ECSA as an agreement that is *"to be entered*

---

[8]    Whether or not the paragraph in the exhibit to the Separation Agreement has any bearing on Fiat's obligations to GM is not an issue for this motion.

*into"* and executed as a condition to Closing. (*See* Hardiman Aff. Ex. A-1, ¶ 1.1(a) and

¶ 5.2(a).iii) (emphasis added)

GM is apparently trying to fit this action under the Separation Agreement

because it perceives the exhibit to the agreement as the only piece of evidence supporting its

claim to reimbursement from Fiat. However, arbitrability is not determined by a party's

strategic desires but rather by the facts that give rise to the dispute. The presumption in favor

of arbitration is designed to forestall just this sort of forum-shopping. Here, the operative

facts, as pleaded by GM, clearly demonstrate that the dispute arises out of the ECSA, and

therefore the dispute should be resolved under the arbitration provision in the ECSA.

> 2.     If the Court Finds That the ECSA Arbitration Clause Covers This
>         Dispute, It Must Not Only Stay, But Also Dismiss, This Action.

Section 3 of the FAA states:

> If any suit or proceeding be brought in any of the courts
> of the United States upon any issue referable to
> arbitration under an agreement in writing for such
> arbitration, the court in which such suit is pending, upon
> being satisfied that the issue involved in such suit or
> proceeding is referable to arbitration under such an
> agreement, shall on application of one of the parties stay
> the trial of the action until such arbitration has been had
> in accordance with the terms of the agreement. . . .

9 U.S.C. § 3.

Although the language of the Act is written in terms of a stay -- and for the

reasons stated above, a stay would be appropriate here[9] -- numerous courts have found it

appropriate to dismiss the action where a stay would serve no useful purpose. *See, e.g.,*

---

[9]  The FAA "leaves a court without discretion" to deny a motion to stay an action involving an arbitrable
issue. *Hays & Co.* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1156 (3d Cir. 1989).

*Lewis Tree Service, Inc.* v. *Lucent Tech.*, 239 F. Supp. 2d 332, 340 (S.D.N.Y. 2002) ("Because all of [plaintiff's] claims are subject to arbitration, no useful purpose will be served by granting a stay of [plaintiff's] claims and thus its action against the defendants is dismissed."); *see also Seus* v. *John Nuveen & Co., Inc.,* 146 F.3d 175, 178 (3d. Cir. 1998) ("If all the claims involved in an action are arbitrable, the court may dismiss the action instead of staying it."); *Alfred* v. *Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir. 1992) (dismissing the case upon finding that staying the action when all issues must be arbitrated would serve no purpose); *Smith* v. *Professional Security Bureau*, 225 F. Supp. 2d 395 (S.D.N.Y. 2002); *Eastern Fish Co.* v. *South Pac. Shipping Co., Ltd.*, 105 F. Supp. 2d 234, 241-242 & n. 10 (S.D.N.Y. 2000); *Aerotel, Ltd.* v. *RSL Communs. Ltd.*, 99 F. Supp. 368, 372, 374 (S.D.N.Y. 2000); *Berger* v. *Cantor Fitzgerald Secs.*, 967 F. Supp. 91, 96 (S.D.N.Y. 1997); *but see Massen* v. *Cliff*, No. 02 Civ. 9282 (HBP) (S.D.N.Y. Apr. 25, 2003), 2003 WL 2012404 at * 8 (declining to dismiss the action "[g]iven the express language of Section 3 of the FAA, 9 U.S.C. § 3, which indicates that a stay is appropriate")).

In the instant case, if the Court determines that the arbitration clause in the ECSA governs the underlying dispute, it would be appropriate for the Court to dismiss this case because there will be no further issues left for the court to decide.  GM has not asked the court to resolve the underlying dispute between the parties; instead it seeks only a declaration from the Court that the dispute between the parties falls within the ambit of the dispute resolution provision of the Separation Agreement and an injunction requiring Fiat to comply with that dispute resolution provision.  (Complaint, Prayer for Relief A and B)  If the Court determines that the ECSA, and not the Separation Agreement, applies to the underlying dispute, the Court will have rejected GM's claims.

- 19 -

## II.
## THE COURT SHOULD DISMISS THIS ACTION FOR LACK
## OF PERSONAL JURISDICTION.

The face of the complaint admits that defendants are non-United States corporations and alleges no United States presence of any of them.  (*See* Complaint, ¶¶ 10-12)  GM bears the burden of establishing personal jurisdiction over these non-United States defendants. *See In re Magnetic Audiotape Antitrust Lit.*, 334 F.3d 204, 206 (2d Cir. 2003)

The Complaint's only attempt to meet this burden is an allegation that the parties "have expressly agreed that either party may apply to the United States District Court for the Southern District of New York for preliminary or injunctive remedies to enforce the dispute resolution provisions of Article 16 of the Termination Agreement." (Complaint, ¶ 15)  To support this assertion, GM cites paragraph 16.5 of the Termination Agreement, one of the dispute resolution provisions in the Termination Agreement which was expressly incorporated into the Separation Agreement pursuant to paragraph 9.11 of the Separation Agreement.  GM also asserts that the parties "agreed that this Court would have exclusive jurisdiction in such a proceeding," citing the Consent to Jurisdiction clause at paragraph 20.9 of the Termination Agreement. (*Id.*)  Neither of these clauses, however, establish personal jurisdiction for the claims at issue in this action.

Paragraph 16.5 of the Termination Agreement is not a consent-to-jurisdiction clause.  That paragraph simply confirms that the dispute resolution provisions of the Termination Agreement "*do not preclude* the disputing Parties from applying to [this Court] for preliminary or injunctive remedies to enforce this Section 16." (Hardiman Aff. Ex. E, ¶ 16.5 (emphasis added))  For this reason, the Termination Agreement also includes Paragraph 20.9 which is an express consent-to-jurisdiction clause and would have been unnecessary

- 20 -

were Section 16.5 a consent-to-jurisdiction clause. (*Id.*, ¶ 20.9) However, Paragraph 20.9

was *not* incorporated into the Separation Agreement. (*See* Hardiman Aff. Ex. A-1)

Therefore, while this clause may provide a basis for the exercise of personal jurisdiction for

claims arising out of the Termination Agreement, it does not provide a basis for personal

jurisdiction for claims arising out of the Separation Agreement or out of the ECSA. *See*

*Anderson* v. *Docuport, Inc.*, No. 06 Civ. 3769 (S.D.N.Y. 2007), 2007 WL 485342 at 10-11

("[W]hile it is well-established that a choice-of-forum or consent-to-jurisdiction clause

provides a proper basis for the exercise of personal jurisdiction, such a clause operates as a

consent to jurisdiction only with respect to claims on the agreement in which it is contained

or other agreements so closely related to the agreement containing the consent-to-jurisdiction

clause as to be part of the same transaction. That a party consents by contract to be sued in a

particular state on claims arising from *that* contract does not confer jurisdiction on the courts

of that state to hear suits brought by parties to other contracts that do not contain such a

clause when the contracts do not 'form [ ] part of a single transaction.'") (emphasis in

original) (internal citations omitted).

    Because neither the ECSA nor the Separation Agreement contains a consent-

to-jurisdiction clause, and GM has not alleged any other basis for personal jurisdiction over

Fiat, the Court should dismiss this action pursuant to Federal Rule of Civil Procedure

12(b)(2).

## CONCLUSION

For the reasons stated above, this action should be stayed pending arbitration, or in the alternative, dismissed.

Dated: July 23, 2008

Respectfully submitted,

**SULLIVAN & CROMWELL LLP**

John L. Hardiman (JH3872)

1 New Fetter Lane
London EC4A 1AN, England
U.K. Tel: 011-44 207-959-8900
U.S. Tel: 212-558-4000

Attorneys for the Defendants
Fiat S.p.A., Fiat Auto Holding B.V.,
and Fiat Auto S.p.A.

- 22 -