UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- x

GENERAL MOTORS CORPORATION and
ADAM OPEL GmbH;

                      Plaintiffs,

               - against -

FIAT S.p.A; FIAT AUTO HOLDING B.V.; and
FIAT AUTO S.p.A.,

                   Defendants.

------------------------------------- x

**AFFIDAVIT OF
PAOLO BOTTINI**

No. 08-CV-4999 (DAB)

PAOLO BOTTINI, declares:

    1. I am a partner at Bär and Karrer. I am a qualified Swiss lawyer and have practiced in Swiss law, including in the contractual area, for over 15 years.

    2. Attached hereto as Exhibits A - D are excerpts from Swiss treatises and cases that reflect the following well-settled principles of contract interpretation under Swiss law:

        i)     The fundamental principle of contract interpretation is to determine the intent of the parties.

        ii)    In making this determination, the language of the contract is the primary sign of the intention of the parties.

        iii)   That language should be given its plain meaning.

        iv)   Anyone alleging that a contract, or a contractual clause, should mean something different from what can be clearly understood from its wording has the burden of proving that the plain language does not govern.

I declare that the foregoing is true and correct.


Dated: July 22, 2008

_____
Paolo Bottini

WOLFGANG WIEGAND, Basler Kommentar Art. 1-519 OR, ed. Honsell/Vogt/Wiegand, 3rd ed., Basle and Frankfurt a.M., 2003, ad art. 18 CO N 18:

"... the language of the contract constitute the "primary sign of the intention of the parties" (BK-Kramer, N 22) and the language plays a predominant role with respect to the other means of interpretation when the latter do not clearly lead to another result".


WOLFGANG WIEGAND, *op. cit.*, ad art. 18 CO N 49:

"anyone alleging that the parties had a common intention that is divergent from the objective understanding – in particular from the language - has the burden of proving this allegation" (DTF 121 III 123 seqq; ZK-Jäggi/Gauch, N 33, 42, 46; BK-Kramer, N 102).

# BASLER KOMMENTAR

## zum Schweizerischen Privatrecht

# Obligationenrecht I

## Art. 1–529 OR

### 3. Auflage

Herausgeber

**Heinrich Honsell**
Professor an der Universität Zürich

**Nedim Peter Vogt**
Rechtsanwalt in Zürich

**Wolfgang Wiegand**
Professor an der Universität Bern



## Helbing & Lichtenhahn
Basel · Genf · München

**Art. 18** 16–18

Erster Titel: Die Entstehung der Obligationen

in der Rechtsprechung fest verankert ist und deshalb erhebliche praktische Konsequenzen hat. Diese Konsequenzen liegen im Beweisrecht: Nach der Rechtsprechung des BGer ist die Ermittlung des wirklichen Willens im Wege der empirischen Auslegung als Tatfrage zu betrachten. Das BGer ist insoweit nach Art. 63 Abs. 2 OG an die vorinstanzlichen Feststellungen gebunden (vgl.BGE 126 III 29, 59 und 379;125 III 308; 118 II 366; 115 II 269; 110 II 292). Die objektivierte Auslegung nach Treu und Glauben gilt dagegen als Rechtsfrage und ist vom BGer überprüfbar (so zuletzt BGE 126 III 379 f. m.Nw.; 125 III 266; 121 III 118 ff, m.Nw.; 118 II 366; 117 II 278 f.; vgl. im Übrigen u. N 42).

## III. Der Vorgang der Auslegung

### 1. Streitlage und Behauptungslast

16    a) Zu einem Auslegungsstreit im oben (N 9) dargelegten Sinne kommt es dann, wenn die Parteien unterschiedliche Vorstellungen über die Bedeutung eines Vertragstextes haben. Dabei ist es in der Regel so, dass eine Partei sich auf die «normale» Bedeutung des Vertragstextes stützt, während die Gegenpartei einen vom Wortlaut abweichenden Sinn des Vertrages behauptet. Dies ist die Konstellation, von der Art. 18 Abs. 1 im Falle der falsa demonstratio und der Simulation ausgeht (dazu u. N 44 ff.). Denjenigen, der sich auf den abweichenden Sinn beruft, trifft die Beweislast (BGE 97 II 208; 72 II 158 f.; 41 II 75; BK-KRAMER, N 13, 102 und 196 ff.; ZK-JÄGGI/GAUCH, N 33, 42 und 46; BUCHER, AT, 190). Das gilt auch im Fall des sog. externen Auslegungsstreites zwischen einem Dritten und einer oder beiden Vertragsparteien (dazu o. N 9).

Denkbar ist jedoch auch, dass beide Parteien eine unterschiedliche Deutung des Vertrages vertreten, die gleich weit vom Wortlaut entfernt ist, oder dass schlicht Zweifel über die Bedeutung eines bestimmten Wortes bestehen, die nicht ausgeräumt werden können (z.B. BGE 115 II 344 ff. = Pra 1990, 477 ff., «unentgeltlich»). In diesen Fällen kann über die Beweislast nur anhand der konkreten Streitlage entschieden werden (BGE 117 II 418).

17    b) Dem Richter, der im Streit über die Auslegung des Vertrages zu entscheiden hat, gibt das Gesetz keinerlei direkte Hilfsmittel an die Hand. Zwar geht das BGer in zahlreichen Urteilen von «allgemeinen Grundsätzen der Vertragsauslegung» (BGE 89 II 130) aus, hat diese jedoch nie präzisiert oder konkretisiert (ZK-JÄGGI/GAUCH, N 415). Gemeint ist damit die anerkannte Vorgehensweise bei der Auslegung von Verträgen, die zunächst auf den Wortlaut abstellt und von da ausgehend über weitere Indizien zur Ermittlung des wirklichen Willens schreitet. Die dabei einzusetzenden Erkenntnisquellen werden üblicherweise als *Mittel der Auslegung* bezeichnet. Die bei der Interpretation dieser Erkenntnisquellen anzuwendenden Grundsätze bezeichnet man als *Regeln der Auslegung*. Die Kommentierung folgt diesem Schema, wobei auch hier darauf hinzuweisen ist, dass es sich um eine Einteilung handelt, bei der die Übergänge fliessend sind.

### 2. Auslegungsmittel

18    Bei der Ermittlung des wirklichen Willens sind alle Tatsachen und Faktoren zu berücksichtigen, aus denen auf die Willenslage bei Abgabe der Vertragserklärung geschlossen werden kann. Infolgedessen gibt es *nicht eine eigentliche Hierarchie der Auslegungsmittel*. Wenn in der Literatur gelegentlich von *primären* und *ergänzenden* Auslegungsmitteln gesprochen wird (ZK-JÄGGI/GAUCH, N 344), so betrifft dies mehr die Reihenfolge der Prüfung als den Rang oder das Gewicht der Auslegungsmittel (so schliesslich

148

*Wolfgang Wiegand*

auch ZK-Jäggi/Gauch, N 367 ff.). Mit diesem Vorbehalt kann man sagen, dass der Wortlaut der Vertragserklärungen das «primäre Willensindiz» (BK-Kramer, N 22) darstellt und dass dem Wortlaut gegenüber den sonstigen Auslegungsmitteln dann ein Vorrang zukommt, wenn diese keinen sicheren Schluss auf einen anderen Sinn nahelegen (so zutreffend ZK-Jäggi/Gauch, N 369; Gauch, Auslegung, Ergänzung und Anpassung, 215; typisch etwa BGE 117 II 622; 104 II 281; 82 II 385 ff.; 72 II 377 ff.; ZR 1982, 121).

*a) Der Wortlaut*

Grundlage der Auslegung ist der **Wortlaut** entweder der von den Parteien abgegebenen Erklärungen oder des aufgrund solcher Erklärungen zustande gekommenen Vertragstextes. Bei dessen Interpretation ist zunächst auf den **allgemeinen Sprachgebrauch** abzustellen. Die Rechtsprechung verwendet Begriffe wie «Alltags- und Umgangssprache» oder etwa «populärer Sinn» (so BGE 72 II 232; vgl. z.B. BGE 118 II 345 = Pra 1993, 802, Obhutsklausel; BGE 116 II 347 = Pra 1991, 967; BGE 116 II 190; 115 II 169; 104 II 283, «Schlägerei bzw. Raufhandel»; 101 II 342 ff., «Bronchitis, Lumbago»; 97 II 74 f., «Taglohn»; 85 II 348 f., «Operation»; 82 II 453 f., «Einladen»; 82 II 385 «Verkauf, Gewinn»; 47 II 531, «nipoti»; vgl. auch BK-Kramer, N 22; ZK-Jäggi/Gauch, N 347 ff.; Gauch/Schluep/Schmid/Rey, N 1206). Prinzipiell ist also vom allgemeinen Sprachgebrauch zur Zeit des Vertragsschlusses auszugehen (BGE 99 II 304; 97 II 74). Zur Feststellung des Wortsinns können neben der allgemeinen Lebenserfahrung auch Hilfsmittel wie Lexika herangezogen werden (z.B. BGE 116 II 190, «Drogen»; 115 II 269, «bei»; 82 II 453 f., «Einladen»; 66 II 191, «rixes ou bagarres»).

– Ein **individueller Sprachgebrauch** kann jedoch unter Umständen *Vorrang* vor dem allgemeinen haben (BGE 87 II 239 ff., «Mitte September»; vgl. auch 82 II 385 f.; ZR 1986, 82). Traditionelles Schulbeispiel dafür ist die Verwendung einer Privatsprache (Bibliothek als Scherzbezeichnung für den Weinkeller, zum Ganzen BK-Kramer, N 25; ZWR 1968, 298, «Skonto» anstatt Rabatt). Von besonderer Bedeutung ist dies deshalb, weil in internationalen Verträgen, aber auch in zunehmendem Masse in der Schweiz die amerikanische Vertragstechnik übernommen worden ist, bei der zu Beginn des Vertrages bestimmte Begriffe definiert werden (z.B. «Maschine im Sinne dieses Vertrages bedeutet...»); diese Technik wird neuerdings auch in der schweizerischen Gesetzgebung verwendet (vgl. etwa Produkthaftpflichtgesetz, Konsumkreditgesetz und die Erläuterungen dazu u.). Diese «definitions», die gerade der Vermeidung von Auslegungsschwierigkeiten dienen, gehen selbstverständlich einem anderen allgemeinen Sprachgebrauch vor. Man kann sie mit Kramer auch als «authentische Vertragsinterpretation» bezeichnen (BK-Kramer, N 25; Gauch/Schluep/Schmid/Rey, N 1207).

– Ähnlich ist es, wenn alle Vertragsbeteiligten einem spezifischen Berufs- oder Lebenskreis angehören. Dieses Sprachverständnis hat dann Vorrang vor dem allgemeinen, das gilt z.B. bei der Verwendung von *technischen Ausdrücken* oder etwa im Bereich des Bankgeschäftes beim Gebrauch *bankspezifischer Fachausdrücke* (z.B. BGE 94 II 159 f., «geeignetes Wasser»; 89 II 130, «Beteiligung»; 87 II 239 ff., «about»; 64 II 11 ff.; SJZ 1995, 54 f., »unbezahlter Check»; BK-Kramer, N 23; ZK-Jäggi/Gauch, N 349; ZK-Schönenberger/Jäggi, Art. 1 N 260; Gauch/Schluep/Schmid/Rey, 1208).

– Das Gleiche gilt prinzipiell für die Verwendung juristischer Fachausdrücke. Sind die verwendeten Begriffe von vornherein nicht eindeutig, so müssen sie wiederum mit Hilfe anderer Auslegungsmittel präzisiert werden (Schulbeispiel dafür ist der «Rücktritt vom Vertrag gemäss Art. 107 OR», vgl. dazu Art. 107 N 15 m.Nw.; ausserdem BGE 126 III 119 «Akontozahlung», dazu Wiegand, ZBJV 2002, 317, sowie BGE 119 II 373; 113

19

20

21

22

*Wolfgang Wiegand*                    149

Art. 18    46–49                    Erster Titel: Die Entstehung der Obligationen

schen Überprüfung nicht standhält, und es ist ebenso klar, dass die Abgrenzung zwischen irrtümlich und absichtlich falsch gewählten Bezeichnungen nur schwer möglich ist. Da dies alles jedoch hinsichtlich der in Abs. 1 ausgesprochenen Rechtsfolge keinerlei Konsequenzen hat, wird im Folgenden an den traditionellen Kategorien festgehalten.

*2. Gemeinsames Missverständnis der Parteien (falsa demonstratio)*

*a) Tatbestand*

46    aa) Die Nichtübereinstimmung von Bezeichnung und Willen kann auf einem **gemeinsamen Missverständnis der Parteien** beruhen, das gelegentlich auch als «Irrtum» bezeichnet wird. Im Gegensatz zu dem in Art. 23 ff. geregelten Irrtum berührt die Falschbezeichnung nicht die Willensbildung. Die Parteien sind sich, was ja Voraussetzung für die Anwendung des Art. 18 Abs. 1 ist, über die angestrebten Rechtsfolgen einig.

47    bb) In Betracht kommen etwa folgende Fälle: Die Parteien *versprechen oder verschreiben* sich in gleicher Weise, sie meinen z.B. übereinstimmend «VW Golf Jahrgang 1991», schreiben im Kaufvertrag aber versehentlich «1981». Ähnlich ist die Konstellation, in der sich die Parteien über die Art der Berechnung des Preises vollkommen einig sind, sich aber versehentlich *verrechnen*. In diesem Fall kommt die Sonderregel von Art. 24 Abs. 3 zur Geltung, wonach das falsche Resultat einfach zu berichtigen ist («Kalkulationsirrtum», BGE 116 II 687; BK-KRAMER, N 85; vgl. auch BGE 119 II 341 = Pra 1994, 299 und Art. 24 N 30 f.). Möglich ist auch, dass sich die Parteien gemeinsam bestimmter Worte oder Ausdrucksweisen bedienen, die *objektiv betrachtet einen ganz anderen Sinn* haben, als die Parteien meinen. Sie irren somit gemeinsam und übereinstimmend über den objektiven Sinngehalt ihrer Erklärungen. Dies kann beispielsweise der Fall sein, wenn sie ein *(Fremd-)Wort* übereinstimmend falsch verstehen (vgl. hier den in der Lehre viel zitierten Fall in RGZ 99, 147 ff: beide Parteien sind sich einig über den Kauf einer Schiffsladung Walfischfleisch, nennen im Vertrag aber das Wort «Haakjöringsköd», was Haifischfleisch bedeutet), wenn sie einen *juristischen Sachverhalt* falsch qualifizieren (also z.B. einen Pachtvertrag schliessen wollen, statt dessen aber aus Unkenntnis «Mietvertrag» schreiben; vgl. z.B. BGE 115 II 355 f., «Zins»; 76 II 157, «Garagemiete») oder wenn sie ihren *Willen unvollständig äussern* (z.B. BGE 106 II 230). Der Richter hat im Rahmen der Vereinbarten von Amtes wegen zu ermitteln und die Wirksamkeit des Vertrages nach den dann anwendbaren Regeln zu prüfen (so zu Recht BK-KRAMER, N 84 m.Nw.; BGE 84 II 496).

48    cc) Abs. 1 regelt auch den Fall, dass sich *nur eine Partei falscher Worte* bedient und der Vertragspartner diesen Irrtum zwar erkennt, den Vertrag aber, ohne den Kontrahenten darauf aufmerksam zu machen, in dessen Sinne abschliesst und so gelten lässt. Will er sich hingegen trotz erkanntem Irrtum auf den Wortlaut berufen, so verstösst er gegen Treu und Glauben, wobei hier Abs. 1 mangels natürlichen Konsenses gar nicht zur Anwendung gelangt, die Rechtsfolge aber identisch ist.

*b) Beweislast und Rechtsfolge*

49    Wer den vom objektiven Verständnis – insbesondere vom Wortlaut – abweichenden («unrichtigen»), aber übereinstimmenden Willen der Parteien behauptet, hat ihn zu beweisen (BGE 121 III 123 f.; ZK-JÄGGI/GAUCH, N 33, 42, 46; BK-KRAMER, N 102).

Ist der tatsächliche übereinstimmende Wille bewiesen, so ist der Vertrag diesem subjektiven Willen entsprechend zustande gekommen. Der davon abweichende objektive Sinn-

156                        *Wolfgang Wiegand*

ERNST A. KRAMER, Berner Kommentar, Berne, 1986, ad art. 18 CO N 22:

"Language of the contract": it is the primary sign of the intention of the parties in case of expressly concluded contracts (Schönenberger/Jäggi, Art. 1 N 257 speak of a "primary means of the interpretation").

Schweizerisches Zivilgesetzbuch

# Das Obligationenrecht

**Band VI, 1. Abteilung**
**Allgemeine Bestimmungen**

1. Teilband
**Allgemeine Einleitung in das schweizerische
Obligationenrecht und Kommentar zu Art. 1–18
OR**

Erläutert von
**Dr. Ernst A. Kramer**
Professor an der Hochschule St. Gallen für Wirtschafts-
und Sozialwissenschaften
und
**Dr. Bruno Schmidlin**
Professor an der Universität Genf



Verlag Stämpfli & Cie AG, Bern 1986

21 Da sich der Vertrag aus *zwei Willenserklärungen* zusammensetzt, müssen beide nach der Regel des Art. 18 I interpretiert werden; d. h. es muss zuerst der *wirkliche Wille jedes einzelnen Kontrahenten* erforscht und erst anschliessend gefragt werden, ob die Parteien eine Willensübereinstimmung erzielen konnten. Bei Vertragsurkunden, die die Unterschriften beider Parteien tragen, geht es allerdings von vornherein nur um die Interpretation dieses gemeinsamen Vertragstextes. Aber auch hier ist selbstverständlich zu fragen, wie ihn jeder der beiden Kontrahenten für sich verstanden hat. Es ist daher theoretisch konsequent, wenn § 133 BGB (im Unterschied zu Art. 18 I, der sich auf Verträge als Ganzes bezieht) von der Auslegung der einzelnen Willenserklärung nach dem sie tragenden «wirklichen Willen» ausgeht; anderseits wiederum verwirrend, wenn der auf Treu und Glauben abstellende § 157 BGB (der von der Vertragsauslegung handelt) den Eindruck erweckt, der wirkliche Wille habe bei der Vertragsinterpretation keine Bedeutung (s. schon o. N 4).

### b) Mittel der Vertragsauslegung

22           aa) *Wortlaut:* Bei ausdrücklichen Vertragsschlüssen ist primäres Willensindiz (SCHÖNENBERGER/JÄGGI, Art. 1 N 257, sowie JÄGGI/GAUCH, Art. 18 N 345, sprechen von einem «primären Auslegungsmittel») der *Wortlaut der Vertragserklärungen.* Der Wortlaut ist nach Art. 18 I zwar nicht unbedingt massgebend; er kann «unrichtig» sein, doch spricht dies selbstverständlich nicht gegen sein Primat als Auslegungsmittel.

23 Bei der Wortinterpretation ist grundsätzlich davon auszugehen, dass die Parteien die von ihnen verwendeten Worte gemäss dem allgemeinen Sprachgebrauch, dem «sens habituel» zur Zeit und am Ort des Vertragsschlusses, «somit im Sinne der damaligen ‹Alltags›- oder ‹Umgangssprache› ... verwendet haben» (JÄGGI/GAUCH, Art. 18 N 348 mit zahlr. Nachw.; BGE *47* II 529 [531]; *72* II 225 [232]: «populärer Sinn»; *82* II 445 [452 f.]; *104* II 281 [283]). Zur Feststellung dieses Sprachgebrauchs sind unter Umständen auch einschlägige Wörterbücher heranzuziehen (vgl. etwa BGE *66* II 190 [191]; *82* II 445 [453 f.]). Der *landläufige Sinn eines Ausdrucks* (BGE *59* II 318 [322]: «sens dans le langage courant, vulgaire et laïque») setzt sich unter Umständen auch gegen dessen davon abweichenden *technischen Sinn* durch. Dies betont das BGer vor allem bei der Interpretation Allgemeiner Versicherungsbedingungen (s. etwa BGE *59* II 318 [322]; *66* II 190 [191]; *82* II 445 [452]; *97* II 72 [76]; *104* II 281 [283]; NAEF, 48 ff.). Die Begründung dafür

Decision of the Swiss Federal Tribunal (DTF) 117 II 622:

"because the language [of the contract] is the primary sign of the intention of the parties".

DT7   117 II   609 - 629

# Entscheidungen
## des Schweizerischen Bundesgerichts

(einschliesslich Entscheidungen des Eidgenössischen Versicherungsgerichts)

aus dem Jahre 1991

### AMTLICHE SAMMLUNG

117. Band

### II. Teil:
### Zivilrecht

# Arrêts du Tribunal Fédéral Suisse

(y compris les arrêts du Tribunal Fédéral des Assurances)

rendus en 1991

### RECUEIL OFFICIEL

117ᵉ volume

### IIᵉ partie:
### Droit civil

IRL IMPRIMERIES RÉUNIES LAUSANNE S.A.

# XI. STRASSENVERKEHR

## CIRCULATION ROUTIÈRE

**111. Auszug aus dem Urteil der I. Zivilabteilung vom 12. November 1991**
i. S. X. Versicherungs-AG gegen K. A. (Berufung)

*Selbstunfall einer Ehefrau mit dem Fahrzeug ihres Ehemannes, schwere Invalidität der Lenkerin, Haftung.*

1. *Art. 58 Abs. 1 SVG.* Die Frage, wer unter den Begriff des Halters oder Mithalters fällt, ist nach den konkreten Umständen des Einzelfalles zu beantworten (E. 3).

2. *Art. 48ter Satz 2 AHVG.* Die darin enthaltene Haftungsbeschränkung zu Gunsten der in Art. 44 Abs. 1 UVG erwähnten Familienangehörigen ist ein Regress- und kein Haftungsprivileg (Präzisierung der Rechtsprechung; E. 4c/aa).
Aus dem in Art. 44 UVG statuierten Haftungsprivileg von Familienangehörigen lässt sich kein allgemeines Prinzip im Haftpflichtrecht herleiten (E. 4c/bb).

3. *Art. 43 Abs. 1 OR.* Das Überlassen des Fahrzeugs an ein Familienmitglied zum Besuch von Verwandten stellt keine Gefälligkeit des Halters dar, die eine Herabsetzung des Schadenersatzes rechtfertigt (E. 5c).

4. *Art. 62 Abs. 3 SVG.* Leistungen aus der Insassenunfallversicherung sind anzurechnen, wenn der Versicherungsvertrag nichts anderes vorsieht (E. 6a). Auslegung vorgeformter Versicherungsbedingungen (E. 6c).

5. Ersatz für Dauerschaden ist grundsätzlich in Form einer Kapitalsumme zuzusprechen (E. 10).

*Accident sans implication de tiers causé par l'épouse avec le véhicule de son époux, invalidité grave de la conductrice, responsabilité.*

1. *Art. 58 al. 1er LCR.* Le champ d'application des termes de détenteur et de codétenteur doit être déterminé à la lumière des circonstances concrètes de l'espèce (consid. 3).

2. *Art. 48ter 2e phrase LAVS.* La limitation de responsabilité prévue à cette disposition en faveur des proches au sens de l'art. 44 al. 1er LAA constitue un privilège récursoire et non un privilège de responsabilité (précision de la jurisprudence; consid. 4c/aa).
On ne saurait tirer du privilège de responsabilité prévu à l'art. 44 LAA en faveur des proches un principe général du droit de la responsabilité civile (consid. 4c/bb).

3. *Art. 43 al. 1er CO.* Le fait de confier son véhicule à un membre de la famille pour une visite à des proches ne constitue pas un acte de complai-

39    AS 117 II — 1991

sance du détenteur justifiant une réduction des dommages-intérêts (consid. 5c).

4. Art. 62 al. 3 LCR. En l'absence de dispositions contraires du contrat d'assurance, il y a lieu d'imputer les prestations de l'assurance-occupants (consid. 6a). Interprétation de conditions générales d'assurance présumées (consid. 6d).

5. La réparation du dommage permanent doit en principe être allouée sous la forme d'un capital (consid. 10).

*Incidente della circolazione, senza il coinvolgimento di terze persone, provocato dalla moglie con la vettura del marito; invalidità grave; responsabilità.*

1. *Art. 58 cpv. 1 LCS.* Il quesito di sapere chi rientra nella nozione di detentore o di codetentore deve essere risolto in base alle circostanze della fattispecie.

2. *Art. 48ter seconda frase LAVS.* La limitazione della responsabilità prevista da questa norma a favore dei parenti ai sensi dell'art. 44 cpv. 1 LAINF è un privilegio di regresso o non un privilegio di responsabilità (precisazione della giurisprudenza; consid. 4c/aa).
Dal privilegio istituito dall'art. 44 LAINF a favore dei parenti non è possibile dedurre un principio generale del diritto della responsabilità civile (consid. 4c/bb).

3. *Art. 43 cpv. 1 CO.* La circostanza di affidare il proprio veicolo ad un membro della famiglia per una visita a parenti non rappresenta un favore del detentore giustificante una riduzione dell'indennizzo (consid. 5c).

4. *Art. 62 cpv. 3 LCS.* Le prestazioni dell'assicurazione occupanti, in assenza di disposizioni contrarie del contratto di assicurazione, devono essere imputate. Interpretazione delle condizioni generali di assicurazione presumate (consid. 6c).

5. In linea di principio il risarcimento del danno permanente deve essere assegnato sotto forma di prestazione in capitale (consid. 10).

A. — Am 1. März 1979 war K. A. mit dem Personwagen ihres Ehemannes unterwegs. In einer Waldpartie war die Strasse durch gefrorenes Schmelzwasser stark vereist, so dass das Fahrzeug schleuderte, von der Fahrbahn abkam und mit dem Wagendach voran gegen zwei Bäume prallte. K. A. erlitt dabei schwere Schädel- und Hirnverletzungen. Gemäss den medizinischen Gutachten wird sie dauernd 80% arbeitsunfähig bleiben. Die X.-Versicherungs-Aktiengesellschaft bezahlte aus der Fahrzeuginsassen-Versicherung die Heilungskosten, das Spitalgeld, eine Invaliditätsentschädigung sowie weitere Taggelder. Hingegen lehnte sie jegliche Leistung als Haftpflichtversicherer des Halters und Ehemannes der Geschädigten ab.

B. — K. A. klagte daher am 24. August 1984 beim Amtsgericht Solothurn-Lebern gegen die X.-Versicherungs-Aktiengesellschaft

auf Ersatz des aufgelaufenen Erwerbsausfalls sowie auf eine monatliche, lebenslängliche und indexgebundene Rente von Fr. 2500.— für die künftigen Nachteile der Arbeitsunfähigkeit; eventuell verlangte sie auch eine Genugtuung sowie anstelle der Rente eine vom Gericht zu bestimmende Kapitalzahlung. Mit Urteil vom 8. Januar/9. Februar 1987 sprach das Amtsgericht K. A. Fr. 21 764.— nebst Zins für den bisherigen Erwerbsausfall zu und verpflichtete die X.-Versicherungs-Aktiengesellschaft, für den künftigen Schaden eine indexierte Rente von monatlich Fr. 1960.—, abzüglich der jeweiligen IV-Renten, bis zum 62. Altersjahr zu bezahlen; ab dem 63. Altersjahr war noch eine Rente von Fr. 200.— unter Berücksichtigung der seit dem Januar 1987 eingetretenen Teuerung zu entrichten. Die Zahlung einer Genugtuung wurde abgelehnt.

Auf Appellation beider Parteien verwarf das Obergericht des Kantons Solothurn mit Urteil vom 8. November 1988/15. März 1990 die Einwände der X.-Versicherungs-Aktiengesellschaft gegen eine grundsätzliche Haftung, mithin die Behauptungen, die Geschädigte sei Mithalterin des Fahrzeugs gewesen, sie habe die Betriebsgefahr selbst verwirklicht und zudem gelte zwischen Ehegatten das Haftungsprivileg näher Verwandter. Hingegen erachtete das Obergericht die von der Versicherungsgesellschaft geltend gemachten Herabsetzungsgründe im Umfange von 20% als ausgewiesen, nämlich 10% für ein leichtes Selbstverschulden sowie 10% für das Nichttragen der Sicherheitsgurten; eine weitere Reduktion wegen unentgeltlicher Überlassung des Fahrzeugs wurde abgewiesen. Bei der Berechnung des Schadens wurde die Arbeitsunfähigkeit als Hausfrau mit 50%, jene als Serviertochter mit 100% bewertet. Den von der Geschädigten für die Erschwerung des wirtschaftlichen Fortkommens zusätzlich geltend gemachten Betrag sowie Nachteile der Besteuerung schützte das Gericht nicht. Abgewiesen wurde ferner das Begehren der Versicherungsgesellschaft, neben den Leistungen der IV jene aus der Insassenunfallversicherung an die Haftpflichtansprüche anzurechnen. Hingegen verneinte auch das Obergericht einen Genugtuungsanspruch der Fahrzeuglenkerin.

In teilweiser Gutheissung der Appellation von K. A. und in Abweisung derjenigen der X.-Versicherungs-Aktiengesellschaft verpflichtete daher das Obergericht letztere, der Verunfallten bis zum Urteilstag für den bisherigen Erwerbsausfall Fr. 180 574.80 nebst Zins zu 5% seit 8. September 1984 zu bezahlen. Für

613

ris des schweizerischen Strassenverkehrsrechts, Bd. II, Rz 871; Bussy/Rusconi, Commentaire CS/TR, S. 324 Ziff. 2.3; Deschenaux/Tercier, La responsabilité civile, 2. Aufl., S. 151 f., Rz 65 ff.). Bei mehreren Personen ist Mithalterschaft am gleichen Fahrzeug nur gegeben, wenn die Haltereigenschaft für sämtliche Personen zutrifft (BGE 99 II 319 E. 4). Der Begriff der Mithalterschaft ist zudem eng auszulegen (Deschenaux/Tercier, a. a. O., Rz 73 unter Hinweis auf BGE 101 II 136).

c) Das Obergericht hält in tatsächlicher Hinsicht für das Bundesgericht verbindlich fest (Art. 63 Abs. 2 OG), dass V. A. das Auto regelmässig für die Fahrt zur Arbeit benützt und es als Feuerwehrkommandant von Rüttenen dem Piketdienst zur Verfügung gestellt habe. Er sei für den eigentlichen Betrieb des Fahrzeugs verantwortlich gewesen und habe dessen Unterhalts- und Betriebskosten bestritten. Seine Ehefrau habe den Wagen nur benützen können, wenn er ihn nicht benötigt habe; im übrigen sei K. A. im Zeitpunkt des Unfalls erst kurze Zeit im Besitze des Führerausweises gewesen und habe den Wagen bis dahin nur wenige Male allein gefahren, so dass nicht von einer regelmässigen Benützung gesprochen werden könne.

Soweit die Beklagte in ihrer Berufungsschrift das Beweisergebnis in Abweichung von der Vorinstanz würdigt, kann darauf nicht eingetreten werden (Art. 55 Abs. 1 lit. c OG; BGE 116 II 93 mit Hinweisen). Materiell ist ihr Einwand abzuweisen, kann doch die Klägerin nach dem Gesagten weder als Halterin noch als Mithalterin des Unfallwagens bezeichnet werden. Ob sie Mithalterin wäre, wenn sie gemäss Keller (Haftpflicht im Privatrecht, Bd. II, S. 32) oder Bussy/Rusconi (a. a. O., S. 324, Ziff. 2.5, 2.6) nach Bedarf über das Fahrzeug ihres Ehemannes hätte verfügen können, ist nicht zu prüfen, da die Vorinstanz klar das Gegenteil festgehalten hat. Offen bleiben auch alle Fragen, die sich stellen, wenn etwa in einer Familie zwei Fahrzeuge vorhanden sind, die mehrheitlich von demselben Person gefahren werden, oder wenn Kinder, die mit ihren Eltern zusammenwohnen, das Fahrzeug eines Elternteils benützen. Generell gültige Antworten können nicht gegeben werden, muss doch in jedem Einzelfall auf die konkreten Umstände abgestellt werden. Dabei ist jeweils vom Halterbegriff auszugehen, der von Lehre und Rechtsprechung seit Jahren gleichbleibend umschrieben wird.

d) Nichts ändert an diesem Entscheid der Einwand der Beklagten, die Geschädigte habe sich in einer «mithalterähnlichen Situa-

---

den künftigen Invaliditätsschaden hat die Versicherungsgesellschaft für die Zeit vom 16. März 1990 bis zum Eintritt der Klägerin ins AHV-Alter eine monatliche, zum voraus zahlbare und indexgebundene Rente von Fr. 3109.— zu entrichten, wobei die jeweiligen IV-Leistungen anzurechnen sind; ab dem 63. Altersjahr hat sie dann noch eine monatliche Rente von Fr. 1421.—, welche an die seit März 1990 eingetretene Teuerung anzupassen ist, zu bezahlen. Schliesslich hat die Versicherungsgesellschaft einen Teil der vorprozessualen Anwaltskosten der Klägerin im Betrag von Fr. 3500.— nebst Zins zu 5% seit 31. Mai 1985 zu übernehmen.

C. — Die Beklagte führt eidgenössische Berufung gegen das Urteil des Obergerichts und beantragt, die Klage abzuweisen.

Die Klägerin schliesst auf Abweisung der Berufung, eventuell auf Rückweisung an die Vorinstanz zur Aktenergänzung und neuen Entscheidung. Das Obergericht beantragt, die Berufung abzuweisen. Das Bundesgericht heisst die Berufung teilweise gut und verpflichtet die Beklagte, der Klägerin für den zukünftigen Invaliditätsschaden eine Kapitalabfindung von Fr. 493'718.— anstelle einer Rente zu bezahlen.

Aus den Erwägungen:

3. — a) Nach Auffassung der Beklagten verkennt das Obergericht den Begriff des Motorfahrzeughalters und verletzt es dadurch Art. 58 SVG. Der Ehemann der Klägerin sei nicht alleiniger Halter, sondern nur Mithalter gewesen. In einer normalen Ehe werde das Auto als Familienfahrzeug eingesetzt, aus dem Familienvermögen finanziert und von der ganzen Familie benützt. Wenn eine Mithalterschaft schon durch eine einfache Gesellschaft oder eine längere Miete begründet werden könne, gelte das umso mehr für die Ehegemeinschaft. Unter Mithaltern bestehe keine Haftung nach Art. 58 SVG, weshalb die Klage abzuweisen sei.

b) Dem Strassenverkehrsgesetz liegt nicht ein formeller, sondern ein materieller Halterbegriff zugrunde. Danach ist als Halter derjenige aufzufassen, auf dessen eigene Rechnung und Gefahr der Betrieb des Fahrzeugs erfolgt und der zugleich über dieses und allenfalls über die zum Betrieb erforderlichen Personen die tatsächliche, unmittelbare Verfügung besitzt (BGE 92 II 42; 101 II 136; Oftinger/Stark, Bd. II/2, S. 59 f., Rz 90; Giger, Strassenverkehrsgesetz, 4. Aufl., S. 167; Schaffhauser/Zellweger, Grund-

tion» befunden, denn die Kriterien zur Bestimmung des Halters sind die gleichen.

4. – *a)* Die Beklagte bestreitet ihre Haftung auch mit der Begründung, gemäss einem im Haftpflichtrecht allgemein gültigen Grundsatz gelte unter nahen Verwandten, insbesondere unter Ehegatten, ein Haftungsprivileg, wonach ein Ehegatte gegenüber seinem Lebenspartner nur für grobe Fahrlässigkeit oder Absicht einzustehen habe. Das Prinzip der Haftungsprivilegierung von Familienangehörigen werde von namhaften Autoren wie auch vom Bundesgericht in BGE 112 II 167 ff. vertreten. Das Obergericht spreche zwar von einer Haftungsbeschränkung unter Ehegatten, schliesse aber gleichzeitig ein Haftungsprivileg aus. Darin liege ein Widerspruch, der gegen Art. 44 Abs. 1 UVG bzw. Art. 129 KUVG in Verbindung mit Art. 48ter Satz 2 AHVG und Art. 52 IVG verstosse.

*b)* Die Vorinstanz hat das von der Beklagten geltend gemachte absolute Haftungsprivileg abgelehnt. Nach ihrer Meinung lässt sich das Ergebnis von BGE 112 II 167 ff. unterschiedlich interpretieren. Aus dem Ingress könne abgeleitet werden, dass das für die obligatorische Unfallversicherung geltende Haftungsprivileg der Familienangehörigen auch auf Geschädigte anwendbar sei, die bei der AHV und IV versichert sind. Aus dem Inhalt des Urteils hingegen könne der Schluss gezogen werden, dass sich die Privilegierung der nahen Verwandten auf dem Gebiet der AHV und IV nicht auf die Haftung, sondern bloss auf den Regress beziehe. Das Obergericht vertritt die zweite Auffassung.

*c)* In BGE 112 II 167 ff., in welchem die Frage zu beantworten war, ob die in Art. 44 Abs. 1 UVG vorgesehene Einschränkung der Haftpflicht auch einer Regressforderung der Sozialversicherung gemäss Art. 48ter AHVG entgegengehalten werden könne, wenn es um Ansprüche unter Familienangehörigen gehe, ist das Bundesgericht davon ausgegangen, dass der Gesetzgeber nicht die Absicht gehabt haben könne, einen Schadensverursacher von einem dem Art. 129 Abs. 2 KUVG bzw. Art. 44 Abs. 1 UVG identischen Haftungsprivileg profitieren zu lassen, weil die Leistungen von AHV/IV den Schaden im allgemeinen bei weitem nicht decken würden. Selbst wenn der Geschädigte nicht bei der SUVA versichert sei, könne das Regressrecht von AHV/IV gegenüber Familienangehörigen des Geschädigten nicht ausgeübt werden.

*aa)* Streitig ist im vorliegenden Fall, ob die in Art. 48ter Satz 2 AHVG enthaltene Haftungsbeschränkung zu Gunsten der in

Art. 44 Abs. 1 UVG erwähnten Familienangehörigen als Haftungsprivileg oder als (blosses) Regressprivileg zu qualifizieren ist. In der Tat werden im angeführten Bundesgerichtsentscheid die beiden Begriffe nicht mit der wünschbaren Klarheit unterschieden. Das heute sowohl einem dem UVG unterstellten Unfallversicherer als auch der AHV und IV zustehende Regressrecht (Art. 41 ff. UVG, Art. 48ter ff. AHVG, Art. 52 IVG) bedeutet, dass der Sozialversicherer für seine Leistungen gegen einen Haftpflichtigen, der für identischen Schaden einzustehen hat, unabhängig vom Haftungsgrund, aus dem der Haftpflichtige verantwortlich ist, den vollen Rückgriff hat (statt vieler vgl. STARK, Ausservertragliches Haftpflichtrecht, S. 219, Rz 1049 ff. mit Hinweisen auf die massgebende Literatur). Dieser Regress beruht auf einem gesetzlichen Forderungsübergang, auf Subrogation. Den ungedeckten Schaden, welcher nach der Leistung des Sozialversicherers dem Geschädigten noch verbleibt, kann dieser beim Haftpflichtigen als sogenannten Direkt- oder Restanspruch geltend machen (KELLER, Haftpflichtrecht im Privatrecht, Bd. II, S. 191).

Gemäss Art. 44 Abs. 1 UVG steht dem obligatorisch Versicherten und seinen Hinterlassenen ein Haftpflichtanspruch gegen den Ehegatten, einen Verwandten in auf- und absteigender Linie oder eine mit ihm in häuslicher Gemeinschaft lebende Person nur zu, wenn der Belange den Unfall absichtlich oder grobfahrlässig verursacht hat. Nach dieser zugunsten der genannten Personen statuierten Beschränkung der Haftpflicht verliert der Versicherer seinen Rückgriff und der Geschädigte seinen Restanspruch gegenüber dem Haftpflichtigen, wenn der Schädiger den Unfall ohne Verschulden oder bloss leichtfahrlässig verursacht hat (BGE 104 II 261 ff. zu Art. 129 Abs. 2 KUVG; KELLER, a. a. O., S. 202; MAURER, Schweizerisches Unfallversicherungsrecht, S. 567, Ziff. 4). Art. 44 Abs. 1 UVG enthält demnach zugunsten der Familienangehörigen ein Haftungs- und ein Regressprivileg.

Aus der Begründung in BGE 112 II 167 ff. kann entgegen der Auffassung der Beklagten richtigerweise nur ein Regressprivileg abgeleitet werden. Dies geht zwar weder aus der Regeste noch aus dem Wortlaut der Begründung klar hervor. Das Bundesgericht betont aber, dass die Sozialversicherungen den Versorgerschaden in den wenigsten Fällen ausreichend decken, da sie nur das notwendige Mindesteinkommen sicherstellen wollen. Es könne daher nicht der Sinn des Gesetzes sein, den Geschädigten durch eine weiterreichende Haftungsbeschränkung noch mehr zu benachteili-

gen; das widerspräche nicht nur dem System, sondern liefe auch dem Grundgedanken des Gesetzes stracks zuwider. Die Sozialversicherung solle nicht mit der linken Hand zurücknehmen, was sie mit der Rechten gegeben hat, weil dies als stossend bezeichnet werden müsste (BGE 112 II 170 f. mit Hinweisen). Dieses Urteil wird sowohl von KELLER (Bd. II, S. 209) als auch von BOLLER (in SVZ 54/1986, S. 304 f.) in diesem Sinne ausgelegt und von beiden Autoren unterstützt. MAURER (Schweizerisches Unfallversicherungsrecht, Ergänzungsband, S. 82) entnimmt dem Entscheid, dass die Haftungsbeschränkung zugunsten von Familienangehörigen nur Platz greife, wenn der Verstorbene gemäss KUVG (heute UVG) gegen Unfall versichert gewesen sei; er setzt sich indessen mit dem Haftungsprivileg und seiner Abgrenzung zum Regressprivileg nicht auseinander. MERZ (ZBJV 1988, S. 201 f.) scheint dem Bundesgericht zuzustimmen. Im übrigen spricht bereits STÖSSEL (Das Regressrecht der AHV/IV gegen den Haftpflichtigen, S. 49 f.), auf den in BGE 112 II 170 und 171 verwiesen wird, von einem Haftungsprivileg nach Art. 129 Abs. 2 KUVG (heute Art. 48ter AHVG in Verbindung mit Art. 129 Abs. 2 KUVG anderseits, wobei beide Einschränkungen unabhängig davon gelten, ob der Schädiger gegen die Folgen seiner Haftpflicht versichert ist (STÖSSEL, a. a. O., S. 51; vgl. ferner BOLLER, a. a. O., S. 305, Ziff. 4 Abs. 3). Bei richtiger Interpretation von BGB 112 II 167 ff. wird durch das Regressprivileg nur der Rückgriff der AHV/IV, nicht aber der Direktanspruch des Geschädigten beschnitten. Die neuartige Erscheinung eines Regressprivilegs geht also hier nicht mit einem Haftungsprivileg einher (KELLER, Bd. II, S. 209).

bb) Die Beklagte behauptet unter Hinweis auf verschiedene Lehrmeinungen, das Haftungsprivileg von Familienangehörigen gelte heute als allgemeines Prinzip im Haftpflichtrecht. Die Beklagte verschweigt, dass sich die zitierten Autoren (KELLER, Bd. II, S. 201 f.; MAURER, Schweizerisches Unfallversicherungsrecht, S. 566 ff., sowie derselbe, Ergänzungsband, S. 82; SCHAFFHAUSER/ ZELLWEGER, Grundriss des schweizerischen Strassenverkehrsrechts, Bd. II, Rz 1848) vorab mit dem Haftungsprivileg gemäss Art. 129 Abs. 2 KUVG bzw. Art. 44 UVG auseinandersetzen und die Regressansprüche von AHV/IV ohne zu differenzieren nur am Rande erwähnen (MAURER, a. a. O., S. 567, Ziff. 4; SCHAFFHAUSER/ ZELLWEGER, a. a. O., Rz 1848). Einzig SCHAER (Grundzüge des Zusammenwirkens von Schadenausgleichssystemen, Rz 964 f.,

insbesondere Rz 979) fragt sich, ob wegen der engen persönlichen Beziehung unter Familienangehörigen nicht von einem grundsätzlich absoluten, Personenschäden betreffenden Haftungsprivileg ausgegangen werden müsste. Selbst wenn die haftpflichtrechtlichen Grundsätze zwischen nahen Familienangehörigen unverändert gelten sollten, sei es faktisch doch so, dass normalerweise Schadenersatzansprüche nicht geltend gemacht würden, und in den übrigen Haftpflichtversicherungsverträge derartige Ansprüche grundsätzlich ausschlössen, ganz abgesehen davon, dass dieses enge Verhältnis Genugtuungsansprüche von vornherein ausschliessen dürfte. Aus der Tatsache, dass die haftpflichtrechtliche Inanspruchnahme von Familienangehörigen selten ist und im UVG das Haftungsprivileg unter Familienangehörigen im Gesetz verankert ist, kann ausserhalb des Sozialversicherungsrechts nicht ein für das gesamte Haftpflichtrecht geltendes Prinzip abgeleitet werden. Hiefür bedürfte es einer Änderung der allgemeinen Normen (Art. 41 ff. OR). BGE 112 II 167 ff. ist mit der angebrachten Präzisierung zu bestätigen. Damit ist aber auch der Vorwurf abzuweisen, das Obergericht habe in Anwendung dieses Entscheides Bundesrecht verletzt, werden doch hier Leistungen der IV nicht solche eines Versicherers nach dem UVG entrichtet, womit eine Haftungsprivilegierung ausgeschlossen ist.

5. — a) Nach Meinung des Obergerichts ist kein die Haftung ausschliessendes Verschulden (Art. 59 Abs. 1 SVG) der Klägerin gegeben. Hingegen bejaht die Vorinstanz ein leichtes Selbstverschulden der Geschädigten (Art. 59 Abs. 2 SVG) im Umfang von 20%. Dieses Selbstverschulden liege erstens in einer unangepassten Fahrweise, weil für die ortskundige Klägerin das Gefrieren von geschmolzenem Schnee an der betreffenden Stelle voraussehbar gewesen sei, und weil sie aufgrund ihrer geringen Fahrpraxis hätte vorsichtiger fahren müssen. Sodann müsse der Klägerin das Nichttragen der Sicherheitsgurten als Verschulden angerechnet werden. Beide Herabsetzungsgründe seien mit je 10% in Anschlag zu bringen.

Die Beklagte rügt die Festsetzung der Haftungsquote als bundesrechtswidrig. Nicht nur das Selbstverschulden, sondern auch die unentgeltliche Überlassung des Fahrzeugs aus Gefälligkeit sowie die Selbstverwirklichung der Betriebsgefahr durch die Lenkerin mit nachfolgender Selbstschädigung seien als Herabsetzungsgründe zu berücksichtigen. Dabei würden bereits das Selbstverschulden und die Gefälligkeit für sich allein, auf jeden Fall aber

die Kumulierung der verschiedenen Reduktionsgründe zur gänzlichen Aufhebung der Haftung, mindestens aber zu einer ganz massiven Reduktion führen, umsomehr, als den Halter kein Verschulden treffe.

b) Nicht einzutreten ist auf den Vorwurf, das Obergericht habe das Selbstverschulden zufolge unangepasster Fahrweise mit 10% zu gering gewichtet, sowie auf die Bemerkung, ein Abzug müsse auch zufolge Nichttragens der Sicherheitsgurten erfolgen. Es fehlen jede Substanzierung und Begründung der Rügen (Art. 55 Abs. 1 lit. c OG).

c) aa) Vor der Revision des SVG vom 20. März 1975 bestimmte Art. 59 Abs. 3 SVG, dass der Richter die Entschädigung ermässigen oder bei besonderen Umständen ausschliessen konnte, wenn der Verletzte oder Getötete aus Gefälligkeit unentgeltlich mitgeführt oder ihm das Fahrzeug aus Gefälligkeit unentgeltlich überlassen worden war. Erfasst wurden mithin die beiden Tatbestände des «Mitführens» sowie der «Überlassens». Bei der erwähnten Gesetzesrevision wurde diese Bestimmung ersatzlos gestrichen. Das Gesetz schweigt sich also heute über die Folgen von Gefälligkeitsfahrten aus. Die im Parlament vorgetragenen Gründe waren rechtstatsächlicher und rechtspolitischer Natur — so etwa das Argument, das Mitführen anderer sei heutzutage eine Selbstverständlichkeit, allenfalls eine soziale Pflicht oder energiepolitische Notwendigkeit —, ferner versicherungspolitischer sowie rechtsdogmatischer Natur (GEISSLER, Haftpflicht und Versicherung im revidierten SVG, Diss. Freiburg 1980, S. 13 ff. mit Hinweisen auf die einschlägigen Stellen in den Amtl. Bull. sowie Kommissionsprotokollen). Seit der Revision wird diskutiert, ob die Berücksichtigung der Gefälligkeit des Halters gegenüber Fahrgästen oder Fahrzeugenlenkern als Umstand im Sinne von Art. 43 Abs. 1 OR zur Ermässigung der Ersatzpflicht führt. Gegen eine solche Möglichkeit der Reduktion spricht sich uneingeschränkt KELLER aus (Haftpflicht im Privatrecht, Bd. I, 4. Aufl., S. 245). Die Mehrheit der Autoren plädiert — allerdings in unterschiedlichem Umfang und mit zahlreichen Differenzierungen sowie Einschränkungen — für eine Ermässigung bei Gefälligkeit, so etwa SCHAFFHAUSER/ZELLWEGER (Grundriss des schweizerischen Strassenverkehrsrechts, Bd. II, Rz 1301), OFTINGER (Schweizerisches Haftpflichtrecht, Bd. I, 4. Aufl., S. 275 f.), OFTINGER/STARK (Schweizerisches Haftpflichtrecht, Bd. II/2, § 25 Rz 601 ff.), BUSSY/RUSCONI (N 4.6 zu Art. 59 SVG), BREHM (N 56 zu Art. 43

OR), DESCHENAUX/TERCIER (La responsabilité civile, S. 249 N 48), GEISSLER (a. a. O., S. 22 ff, insbesondere S. 38 f., 42 f.). Offengelassen wird die Frage von BUSSY (SJK 914, 1978, N 38). Das Bundesgericht hat sich seit der Revision des SVG mit dem Problem nicht befassen müssen. Die beiden Entscheide 59 II 465 und 101 II 139 f. betrafen Art. 37 Abs. 4 MFG bzw. Art. 59 Abs. 3 SVG.

bb) Das Obergericht schliesst sich der mehrheitlichen Lehrmeinung an, lehnt im vorliegenden Fall jedoch den Reduktionsgrund der Gefälligkeitsfahrt ab mit der Begründung, das Überlassen des Autos an die Ehefrau stelle einen Ausfluss der ehelichen Beistandspflicht dar. Zudem habe die Fahrt der Pflege verwandtschaftlicher Beziehungen gedient.

Die Beklagte sieht Art. 43 sowie Art. 44 OR verletzt. Die These der Vorinstanz schliesse bei Annahme einer solchen Beistandspflicht eine Gefälligkeitsfahrt unter Ehegatten aus, weil sich diese gegenseitig das Auto zu überlassen hätten. Verfüge nun aber bald der eine, bald der andere über das Auto, so liege Mithalterschaft vor, was das Obergericht verneint habe. Die Geschädigte habe in einem fremden Wagen eine Gratisreise angetreten, sei also von der Pflicht entbunden worden, die öffentlichen Verkehrsmittel zu benützen. Somit habe eine Gefälligkeitsfahrt vorgelegen, die eine Kürzung des Schadenersatzes um mindestens 50% bedinge.

cc) Die ganze Tragweite der Abschaffung von Art. 59 Abs. 3 SVG ist hier nicht zu erörtern. Das Problem beschränkt sich auf die Gefälligkeit des Halters gegenüber seinen Familienangehörigen, im speziellen gegenüber seiner Ehefrau. Dass vorliegend die Klägerin Mithalterin gewesen sei, ist bereits in E. 3 verneint worden. Gemäss den verbindlichen Feststellungen der Vorinstanz hat die Klägerin das Auto benutzt, um ihre Eltern zu besuchen und ihnen auf ihrem Landwirtschaftsbetrieb zu helfen. Kein Mensch käme im Ernst auf die Idee, von seinem Lebenspartner für ein solches Entgegenkommen im Entgelt zu verlangen. Das Überlassen des Fahrzeugs zur Pflege von verwandtschaftlichen Beziehungen ist eine Selbstverständlichkeit, selbst dann, wenn die betreffende Fahrt ausschliesslich dem einen Partner dient. Eine solche Gefälligkeit gegenüber Verwandten oder nahestehenden Personen, die das Alltägliche, das unter Menschen übliche Mass an Grosszügigkeit, an Freundlichkeit nicht übersteigt (GEISSLER, a. a. O., S. 42), stellt keinen Reduktionsgrund im Sinne von Art. 43 Abs. 1 OR dar.

*d)* Völlig zu Recht hat das Obergericht die Selbstverwirklichung der Betriebsgefahr durch die Lenkerin als Herabsetzungsgrund nach Art. 43 und Art. 44 OR abgelehnt. Es schliesst sich damit der geltenden Bundesgerichtspraxis an (BGE 113 II 329 f. E. 2a mit Hinweisen). Der von der Beklagten dagegen erhobene Einwand, die Geschädigte müsse aufgrund der von ihr gesetzten Betriebsgefahr einen Teil des Schadens selber tragen, ist unhaltbar und abzuweisen (vgl. dazu auch OFTINGER/STARK, a. a. o., § 25 N 632 mit Hinweisen).

*e)* Die Überlegungen der Vorinstanz zur Haftungsquote erweisen sich somit als bundesrechtskonform. Damit bleibt es bei der von ihr vorgenommenen Reduktion von insgesamt 20%.

6. — *a)* Gemäss Art. 62 Abs. 3 SVG sind die Leistungen aus einer Unfallversicherung, deren Prämien vom Halter bezahlt wurden, auf seine Ersatzpflicht anzurechnen, wenn der Versicherungsvertrag nichts anderes vorsieht.

Diese Bestimmung beruht auf dem Gedanken, dass die Verpflichtung des Halters zur Schadensdeckung gültig ist, soweit er durch den Abschluss einer privaten Versicherung, für die er die Prämien bezahlt hat, für eine solche Deckung gesorgt hat. Damit will eine doppelte Schadensdeckung verhindert werden, ohne dass sich dies zum Nachteil des Geschädigten auswirkt, der unter allen Umständen den Betrag erhalten soll, auf den er Anspruch hat. Der Grundsatz der Kumulation von Art. 96 VVG hat keine Berechtigung mehr, wenn der Schadenersatzpflichtige identisch ist mit demjenigen, der die Unfallversicherung zugunsten des Geschädigten abgeschlossen und die entsprechenden Prämien aus eigenen Mitteln bezahlt hat (BGE 97 II 273 E. 4a mit Hinweisen; OFTINGER/STARK, a. a. O., S. 273 f., Rz 615-620 mit Hinweisen). Daran ist unverändert festzuhalten, gehen doch seit Jahren die Bestrebungen dahin, durch Regress- und Subrogationsbestimmungen Doppelzahlungen und Überentschädigungen im Haftpflichtrecht auszuschliessen bzw. einzuschränken.

*b)* Die Beklagte bezahlte der Geschädigten aus der bei ihr vom Ehemann der Klägerin abgeschlossenen Insassenunfallversicherung mit Einschluss des Lenkers insgesamt Fr. 265 180.— — Sie verlangt nun gemäss Art. 62 Abs. 3 SVG die Anrechnung ihrer Leistungen für Spitalaufgeld, Taggeld und Invaliditätsentschädigung, jedoch mit Ausschluss der Heilungskosten, im Umfange von Fr. 220 680.— an die Ersatzforderungen aus der Haftpflichtversicherung. Art. 29 der AVB der Beklagten bestimmt:

«Anrechnung auf Haftpflichtansprüche.

Werden infolge Unfalls eines Mitfahrers gegen den Halter oder Lenker des deklarierten Fahrzeuges Entschädigungsansprüche aufgrund gesetzlicher oder vertraglicher Haftpflichtbestimmungen geltend gemacht, so werden die bezahlten Leistungen aus der Unfallversicherung an solche Haftpflichtentschädigungen angerechnet, für die der Halter oder Lenker selbst aufzukommen hat, sei es direkt dem Geschädigten gegenüber oder auf dem Weg des Rückgriffes des Haftpflichtversicherers.»

Das Obergericht ist durch Auslegung dieser Klausel zum Ergebnis gelangt, dass die Zahlung aus der Insassenunfallversicherung nur auf jene Haftpflichtentschädigung angerechnet werden solle, für die der Halter oder Lenker persönlich aufzukommen habe. Für die Haftpflichtansprüche des Lenkers dürfe nichts anderes gelten als für jene der übrigen Fahrzeuginsassen. Unter dem Begriff «Mitfahrer» falle nämlich auch der Lenker. Diese Auslegung sei nicht nur vom Wortlaut her möglich, sondern ergebe sich zudem aus der französischen Fassung der AVB der Beklagten, welche von «occupant» sprächen, worunter auch der Lenker falle.

Die Beklagte sieht in dieser Betrachtungsweise eine Verletzung von Art. 62 Abs. 3 SVG und eine falsche Auslegung ihrer Allgemeinen Versicherungsbedingungen. Die Anrechnung der Versicherungsleistungen entspreche sowohl der Bundesgerichtspraxis als auch dem allgemeinen Prinzip der Vorteilsanrechnung. Eine Unterscheidung zwischen direkter Belangung des Halters und Belangung der Versicherung sei weder den AVB noch dem SVG zu entnehmen. Die Interpretation des Begriffes «Mitfahrer» durch die Vorinstanz sei unhaltbar. Es sei nicht unüblich, den Lenker versicherungsrechtlich anders zu behandeln als den Mitfahrer; gerade bei der Insassenunfallversicherung könne der Lenker ausgeschlossen werden.

*c)* Die Auslegung vorgeformter Bestimmungen ist nach den gleichen Grundsätzen vorzunehmen wie die Auslegung anderer Vertragsbestimmungen (JÄGGI/GAUCH, Rz 464 zu Art. 18 OR). Kann der wirkliche Parteiwille nicht ergründet werden, ist auf den mutmasslichen Willen abzustellen. Letzterer ist nach dem Vertrauensgrundsatz aufgrund aller Umstände des Vertragsschlusses zu ermitteln (BGE 113 II 51; 107 II 418 und 476). Dabei hat der Richter zu berücksichtigen, was sachgerecht ist, weil nicht anzunehmen ist, dass die Parteien eine unangemessene Lösung gewollt haben. Da das dispositive Recht in der Regel die Interessen der Parteien ausgewogen wahrt, hat die Partei, die davon abweichen will, dies mit hinreichender Deutlichkeit zum Ausdruck zu brin-

gen. Schliesslich gilt nach konstanter Rechtsprechung, dass gemäss der sogenannten Unklarheitenregel zweideutige Wendungen in allgemeinen, formularmässig vorformten Vertragsbedingungen im Zweifel zu Lasten ihres Verfassers auszulegen sind (BGE 115 II 268 E. 5a mit zahlreichen Hinweisen auf Lehre und Rechtsprechung).

aa) Die Bestimmung steht im Abschnitt «Unfallversicherung der Insassen». Sie sagt klar, dass Leistungen an Mitfahrer nur auf Ansprüche angerechnet werden, die gegenüber dem Halter persönlich erhoben werden oder die dieser aufgrund eines Regresses den Haftpflichtversicherer erbringen muss, sowie auf solche, die die Versicherungsdeckung übersteigen. Keine Anrechnung soll erfolgen bezüglich der Ansprüche, die die Haftpflichtversicherung des Halters deckt. Zu prüfen bleibt damit die Frage, ob die Klägerin, die das Fahrzeug als einzige Insassin gelenkt hat, unter den Begriff «Mitfahrer» von Art. 29 AVB subsumiert werden kann.

bb) Haben wir hier zwei Begriffe, die unter einen gemeinsamen Oberbegriff (Insassen) fallen, eindeutig Unterscheidungsfunktion, kann nicht leichthin angenommen werden, es solle an einer bestimmten Stelle der allgemeine (Insasse) und nicht der spezielle Ausdruck (Mitfahrer) gedacht sein, denn der Wortlaut ist primäres Willensindiz (KRAMER, N 22 zu Art. 18 OR). Eine isolierte Interpretation einzelner Vertragselemente ist jedoch unstatthaft (KRAMER, N 26 zu Art. 18 OR); die einzelne Vertragsbestimmung ist anhand des Vertrages in seiner Gesamtheit auszulegen (JÄGGI/GAUCH, N 351 und 430 zu Art. 18 OR). Gemäss Art. 25 AVB gelten als «versicherte Personen die Insassen des deklarierten Fahrzeugs, mit oder ohne Einschluss des Lenkers, je nach der getroffenen Vereinbarung». Der Lenker kann somit von der Unfallversicherung ausgeschlossen werden. Daraus ist indessen noch nicht zu folgern, wie die Beklagte meint, der Lenker nach Art. 29 AVB einem wie hier unfallversicherten Lenker die Leistungen aus der Insassenversicherung anrechnen, mithin diesen von der für die Mitfahrer geltenden Regelung ausschliessen, ohne dies auch klar zu sagen. Vom Wortsinn her ist eindeutig, dass der Lenker Insasse (franz. «occupant») ist. Das Obergericht hat aus dem französischen AVB der Beklagten, wo der Begriff «Mitfahrer» mit «occupant» wiedergegeben werde (Art. 29: «Lorsque, en cas d'accident d'un occupant...»), geschlossen, es erscheine undenkbar, dass die Beklagte einen Unterschied zwischen deutsch- und französischsprechenden Versicherungsnehmern habe machen wollen. Ein ver-

nünftiger Sinn, den Lenker auszunehmen, ist nicht ersichtlich, jedenfalls nicht von Versicherungsnehmer aus; dieser hat ohne Zweifel jedes Interesse daran, dass Art. 29 AVB auch zur Anwendung kommt, wenn er das Fahrzeug einem Dritten als Lenker überlässt. Ins Gewicht fallen sodann die AVB der übrigen Haftpflichtversicherungen, die durchwegs auch für einen Lenker die Anrechnung auf die Ansprüche beschränken, die gegenüber dem Halter persönlich erhoben werden, wie das angefochtene Urteil verbindlich feststellt (Art. 63 Abs. 2 OG). Da die Beklagte im Vertrag den Lenker nicht in «bestimmter, unzweideutiger Fassung» von der für die übrigen Insassen geltenden Regelung ausgeschlossen hat (Art. 33 VVG; BGE 115 II 269 E. 5a), ist die Auslegung der Vorinstanz bundesrechtlich nicht zu beanstanden.

7. — a) Die Klägerin verlangt für die Nachteile ihrer Arbeitsunfähigkeit Schadenersatz. Nach den medizinischen Expertisen von Prof. Dr. M. M. beträgt die bleibende, unfallbedingte Arbeitsunfähigkeit der Geschädigten 80% sowohl für die Tätigkeit als Hausfrau als auch für die Erwerbstätigkeit. Aufgrund der Tatsache, dass die Klägerin viele leichtere Hausarbeiten und kleinere Einkäufe selber erledigen und weitgehend auch für sich selber sorgen kann, hat das Obergericht die konkrete Arbeitsunfähigkeit im Haushalt nur mit 50% bewertet, was von der Beklagten nicht mehr bestritten wird. Die Klägerin macht vorsorglicherweise geltend, diese Bewertung sei zu niedrig. Soweit sie damit höhere als die von der Vorinstanz zugesprochenen Leistungen beansprucht, sind ihre Vorbringen unzulässig. Im übrigen erschöpfen sich ihre Ausführungen in Kritik an der vorinstanzlichen Beweiswürdigung und verletzen damit Art. 55 Abs. 1 lit. c OG (BGE 116 II 93 E. 2).

b) Die Beeinträchtigung der Klägerin in der Haushaltführung berechnet das Obergericht in Anlehnung an BGE 108 II 434 konkret mit der Begründung, es mache für die Bewertung der Hausfrauenarbeit keinen Unterschied aus, ob es wie dort um einen Versorgerschaden oder wie hier um eine Invaliditätsentschädigung gehe. Zur Ermittlung des Zeitaufwandes für den Haushalt sei auf das Modell «Haushalt IV» der Studie von ANNA REGULA BRÜNGGER, Die Bewertung des Arbeitsplatzes in privaten Haushalten, abzustellen. Gestützt darauf ergebe sich vorliegend ein Aufwand der Geschädigten für den Haushalt von 36 Stunden pro Woche. Entsprechend der Arbeitsunfähigkeit von 50% betrage der zu entschädigende Ausfall 18 Stunden. Der Wert einer Arbeitsstunde belaufe sich heute auf Fr. 22.70.

624

c) Die Beklagte anerkennt den Stundenansatz und die Berechnung dieses Schadens (BGE 113 II 351 E. 2; 108 II 434 f.) gemäss «Haushalt IV» der Untersuchung BRÜNGGER sowie den Grundsatz, dass der Ausfall für die Angehörigen ebenfalls zu entschädigen ist. Hingegen verlangt sie, dass ein Teil der von den Familienmitgliedern übernommenen Haushaltarbeit mitberücksichtigt und der vom Obergericht errechnete Ausfall von 18 Stunden um 25% auf rund 13 Stunden pro Woche reduziert werde.

Es kann offenbleiben, ob die Behauptung der Beklagten, das Obergericht habe bundesrechtswidrig eine Schadenminderung von rund 25% nicht vorgenommen, überhaupt nach Art. 55 Abs. 1 lit. c OG genügend substanziert ist, denn es wird mit keinem Wort dargelegt, weshalb die Reduktion gerade einen Viertel ausmachen sollte. Die Rüge ist auf jeden Fall abzuweisen, wird doch im Sonderfall des Hausfrauenschadens von Lehre und Rechtsprechung nicht übersehen, dass die weiteren Familienangehörigen im Haushalt mithelfen (BREHM, N 118 zu Art. 46 OR; BGE 101 II 261 E. 1b). Diese Mithilfe ist nun aber in der Studie BRÜNGGER, welche der Ermittlung der Wochenstunden im angefochtenen Urteil zugrunde liegt, bereits erfasst (BRÜNGGER, a. a. O., S. 21 f., S. 32 f.). Ein doppelter Abzug indessen ist ausgeschlossen.

d) Der vom Obergericht bis zum Urteilstag berechnete Schaden aus Beeinträchtigung in der Haushaltführung im Betrag von Fr. 200 237.80 ist somit zu bestätigen.

8. — Nicht mehr zur Diskussion steht die Erwerbstätigkeit der Klägerin. Die Beklagte hat sich damit abgefunden, den Arbeitsausfall von Fr. 105 167.— bis zum Urteilstag zu ersetzen.

9. — Das Obergericht bemisst die Arbeitsunfähigkeit für die Erwerbstätigkeit mit 100%, weil die Klägerin die ihr nach dem Unfall verbleibende Arbeitsfähigkeit voll ausgeschöpft habe, wenn sie die Haushaltarbeit noch zu 50% besorge. Die Beklagte rügt die Vernachlässigung der Restarbeitsfähigkeit als Verletzung von Bundesrecht.

Nach schweizerischer Lehre und Rechtsprechung ist der Invaliditätsschaden konkret zu berechnen. Ausgehend vom abstrakten Invaliditätsgrad sind dessen Auswirkungen auf die Verminderung der Erwerbsfähigkeit oder die Erschwerung des wirtschaftlichen Fortkommens zu bestimmen. Aus dem wirtschaftlichen Schadensbegriff folgt, dass eine bei Teilinvalidität theoretisch verbleibende Erwerbsfähigkeit haftpflichtrechtlich unberücksichtigt bleiben muss, wenn sie wirtschaftlich nicht mehr nutzbar ist, der Geschä-

625

digte somit keine Möglichkeit mehr hat, mit der ihm aus medizinischer Sicht verbliebenen Erwerbsfähigkeit ein Einkommen zu realisieren (BGE 113 II 347 f. mit zahlreichen Hinweisen). Es müssen Aussichten auf eine relativ sichere Erzielung eines nicht unbedeutenden Erwerbes bestehen (BREHM, N 82 zu Art. 46 OR; SCHAFFHAUSER/ZELLWEGER, a. a. O., Rz 1218).

Das Bundesgericht hat im zitierten Entscheid eine theoretisch verbliebende Restarbeitsfähigkeit für die Erwerbstätigkeit von 15% als wirtschaftlich nicht nutzbar qualifiziert. Zum gleichen Ergebnis kommt man im vorliegenden Fall. Nach verbindlicher Feststellung des Obergerichts beträgt die Arbeitsfähigkeit der Klägerin auf dem Arbeitsmarkt 20%. Eine solch geringe Arbeitsfähigkeit wäre allenfalls in einem hochspezialisierten Beruf noch realisierbar. Die Klägerin war indessen in früheren Jahren im Service und nach der Geburt ihres Kindes als Heimarbeiterin beschäftigt. In diesen Wirtschaftszweigen ist eine Einsatzmöglichkeit von 20% schwerlich umzusetzen. Das gilt umsomehr, als die Klägerin nach wie vor unter sporadisch auftretenden Bewusstseinsstörungen, die zwei bis drei Tage dauern, sowie unter aggressiven Phasen, leidet.

10. — a) Die Vorinstanz hat den zukünftigen Invaliditätsschaden in Abweichung von der geltenden Rechtsprechung in Form einer indexierten Rente zugesprochen, wobei die Rente für die Hausfrauenarbeit lebenslänglich und diejenige für den Schaden aus der Beeinträchtigung der Erwerbsfähigkeit bis zum Eintritt der Klägerin ins AHV-Alter zu entrichten sind. Das Obergericht begründet seinen Entscheid lediglich damit, eine indexierte Rente ermögliche die effektive Entschädigung eines Dauerschadens am besten.

b) Unter Hinweis auf die in der Literatur und in einem Urteil des Zivilgerichts des Kantons Basel-Stadt vom 12. August 1985 (BJM 1986, S. 148 ff.) aufgezeigten überwiegenden Vorteile der Kapitalabfindung rügt die Beklagte eine weitere Bundesrechtsverletzung. Demgegenüber hält die Klägerin an der Zusprechung einer indexierten Rente fest.

c) Das Obergericht setzt sich weder mit den Vor- und Nachteilen der Kapital- oder Rentenlösung im allgemeinen noch mit der gefestigten Bundesgerichtspraxis und der mit dieser übereinstimmenden überwiegenden Lehrmeinung im speziellen auseinander, sondern schliesst sich kritiklos dem klägerischen Antrag auf Zusprechung einer indexierten Rente an. In der Tat äussert sich das Gesetz nicht darüber, in welcher Form der Schaden ersetzt werden

muss (Art. 43 OR). Es überlässt den Entscheid dem Richter, der nicht an die Parteianträge gebunden ist (vgl. die bei STAUFFER/SCHAETZLE in Rz 578 zusammengestellte Literatur und die in Rz 580 daran geübte Kritik). Das Bundesgericht hat mit einer Ausnahme bei einem dreijährigen Kind (BGE 81 II 168 E. 5) in ständiger Praxis der Kapitalabfindung den Vorzug gegeben und dies in BGE 112 II 129 E. 5f bestätigt. Bei aussergerichtlichen Erledigungen wird in aller Regel ebenfalls ein Kapital vereinbart (STAUFFER/SCHAETZLE, a. a. O., Rz 582 mit Hinweisen auf die übrige Literatur). OFTINGER hält fest, dass die Rente so schwere Nachteile, das Kapital so grosse Vorteile habe, dass die Rente nur ganz ausnahmsweise in Betracht falle (OFTINGER, Bd. I, S. 217, Ziff. ).

Es kann nicht bestritten werden, dass die beiden Schadenersatzformen sowohl Vor- als auch Nachteile aufweisen (vgl. die Zusammenstellungen bei STAUFFER/SCHAETZLE, a. a. O., Rz 583 ff, und bei BREM, N 8 ff. zu Art. 43 OR). Die Frage, in welcher Gestalt dem Geschädigten der Schadenersatz zuzusprechen ist, muss daher konkret, unter Abwägung aller Umstände, beantwortet werden. Vorliegend macht die Klägerin mehrfach geltend, es liege ein Ausnahmefall vor, welcher nach einer indexierten Rente rufe. Sie führt aber mit keinem Wort aus, welche Besonderheit die zu beurteilende Streitsache aufweist, die die Zusprechung einer Rente rechtfertigen würde. In der Tat ist denn auch nicht ersichtlich, welche Gründe für eine Ausnahme sprechen.

Wird an der bisherigen Bundesgerichtspraxis festgehalten, so muss nicht entschieden werden, ob im Falle einer Rente auch der Antrag auf deren Indexierung gutgeheissen werden könnte, spricht sich doch die Klägerin ausdrücklich gegen eine nicht indexierte Rente aus.

d) Damit ist die Berufung in diesem Punkt gutzuheissen, und der zukünftige Hausfrauenschaden sowie der zukünftige Erwerbsausfall sind in Form einer Kapitalsumme abzugelten.

11. — a) Das Obergericht hält fest, dass die Klägerin bis zum Urteilstag von der Invalidenversicherung Leistungen in der Höhe von Fr. 121'543.— bezogen hat. Es rechnet diese Leistungen auf die Ersatzansprüche voll an.

Unter Berufung auf Art. 48quater Abs. 1 AHVG, der nach Art. 52 IVG für die Invalidenversicherung gilt, bringt die Vorinstanz für den Rückgriff der IV das sogenannte Quotenvorrecht zur Anwendung. Ein Vergleich der Haftpflichtansprüche mit den

IV-Renten zeige sofort, dass der auf 20% festgesetzte Abzug für das Selbstverschulden der Klägerin nie die Leistungen erreiche, welche die IV für die entsprechende Zeit erbringe, weshalb auch kein Abzug vorzunehmen sei. Da die IV-Rente auf die Zeit vom 1. Februar 1980 bis zum Eintritt der Klägerin ins AHV-Alter beschränkt sei, sei das Selbstverschulden für die Zeit vom 1. März 1979 bis 31. Januar 1980 sowie nach dem Erreichen des AHV-Alters der Geschädigten zu berücksichtigen.

b) Die Beklagte rügt eine Verletzung von Art. 59 SVG sowie Art. 43 und 44 OR. Die Nichtberücksichtigung des Selbstverschuldens während der Zeit der IV-Leistungen verstosse gegen die Grundsätze der Schadensberechnung. Das Quotenvorrecht habe begrifflich nichts mit dem Selbstverschuldensabzug oder andern Kürzungsfaktoren zu tun, sondern sei ein Institut der Rückgriffsbeschränkung.

c) Der Vorwurf ist — sofern er überhaupt als genügend substanziiert entgegengenommen wird — haltlos. Wird einem Geschädigten durch Versicherungsleistungen der Schaden nicht voll gedeckt, so können Versicherer ihre Rückgriffsrechte gegen den Haftpflichtigen oder dessen Haftpflichtversicherer gemäss Art. 88 SVG nur geltend machen, soweit dadurch der Geschädigte nicht benachteiligt wird. Gemäss Art. 88 SVG steht dem aus einer Versicherung anspruchsberechtigten Geschädigten, der den haftpflichtigen Dritten oder dessen Haftpflichtversicherer belangt und dabei seinem eigenen, kraft Subrogation vorgehenden Versicherer in Konkurrenz tritt, bis zur Höhe seines vollen effektiven Schadens die Priorität zu, und zwar selbst im Falle eines leichten oder schweren Selbstverschuldens (BGE 93 II 407 ff., 423 E. 6). Dieses vom Bundesgericht aus Art. 88 SVG abgeleitete Quotenvorrecht des Geschädigten wurde später aus dem Bereich des SVG gelöst und auf das ganze Haftpflichtrecht angewendet (für Einzelheiten vgl. KELLER, Bd. II, S. 191 ff.; OFTINGER/STARK, a. a. O., § 26 Rz 428 f.) Dieses Privileg will den Geschädigten nicht bereichern, sondern vor ungedecktem Schaden bewahren. Von einer Bereicherung kann aber keine Rede sein, solange die Leistungen des Sozialversicherers und des Dritten oder dessen Haftpflichtversicherung den Schaden nicht voll decken; das lässt sich erst sagen, wenn ihre Leistungen über den zu ersetzenden Schaden hinausgehen (BGE 113 II 91 E. 2; vgl. ferner 113 II 330 E. 2b). Dies ist vorliegend — wie das Obergericht verbindlich (Art. 63 Abs. 2 OG) festgestellt hat — nicht der Fall.

12. — a) Wird die Berufung im Sinne der vorstehenden Ausführungen teilweise gutgeheissen (E. 10d), so stellt sich weiter die Frage, ob das Bundesgericht die Kapitalisierung selber vornehmen kann oder die Streitsache an die Vorinstanz zurückweisen muss. Grundsätzlich ist die Bestimmung des Schadens eine vom kantonalen Richter abschliessend zu beurteilende Tatfrage, und als Rechtsfrage kann das Bundesgericht im Berufungsverfahren bloss prüfen, ob die Vorinstanz den Rechtsbegriff des Schadens verkannt oder Rechtsgrundsätze der Schadensberechnung verletzt hat (BGE 116 II 444 E. 3a; 113 II 346 E. 1 mit Hinweisen). Vorliegend sind nun aber die für die Kapitalisierung massgeblichen Sachverhaltselemente — Alter der Geschädigten, Invaliditätsgrad, Erwerbsausfall — aus dem angefochtenen Entscheid ersichtlich. Es bedarf folglich keiner Rückweisung im Sinne von Art. 64 Abs. 1 OG.

b) Zu prüfen bleiben lediglich zwei vorsorglich erhobene Einwendungen der Klägerin.

aa) Nicht einzutreten ist auf die Rüge, bei der herkömmlichen Kapitalwertberechnung aufgrund eines Kapitalisierungszinses von 3½% würden zukünftige Reallohnerhöhungen nicht ausgeglichen. Ob die Klägerin mit einer realen Erhöhung ihres Lohnes hätte rechnen können, ist ein Element der Schadensermittlung und damit Tatfrage. Das Obergericht führt aus, die Geschädigte hätte kein wesentlich höheres Erwerbseinkommen erzielt. Mit dieser für das Bundesgericht verbindlichen Feststellung (Art. 63 Abs. 2 OG) werden auch Reallohnerhöhungen verneint. Zudem ist die klägerische Behauptung offensichtlich neu und deshalb unzulässig, wurde doch im kantonalen Verfahren lediglich geltend gemacht, die Geschädigte hätte einmal die Leitung eines Tea-Rooms übernehmen wollen.

bb) Abzuweisen ist die Behauptung, es müsse mit einem niedrigeren Kapitalisierungszins als 3½%, nämlich mit 0% oder sogar mit einem Negativzins, gerechnet werden.

Gemäss konstanter Rechtsprechung des Bundesgerichts ist die zukünftige Teuerung bei einer Kapitalabfindung nicht zu berücksichtigen (BGE 113 II 332 mit Hinweisen; ebenso die herrschende Lehre gemäss STAUFFER/SCHAETZLE, a. a. O., Rz 653). Der Grundsatz, die Geldentwertung bei der Schadensberechnung ausser acht zu lassen, wird insofern relativiert, als das Bundesgericht im Schadenersatzrecht seit 1946 einen Kapitalisierungszinsfuss von 3½% anwendet, welcher die Geldentwertung teilweise berücksichtigt

(BGE 96 II 446 E. 6 mit Hinweisen). Diese ständige Praxis hat sich bewährt und wirkt sich positiv auf die Rechtssicherheit aus (STAUFFER/SCHAETZLE, a. a. O., Rz 654 sowie insbesondere Rz 1132 ff. mit zahlreichen Hinweisen auf Rechtsprechung und Literatur), weshalb daran festzuhalten ist.

<u>Decision of the Swiss Federal Tribunal (DTF) 104 II 283:</u>

determinative is "the meaning, which the words used [in the contract] customarily have in the daily use of the language".

DTF 104 II 281 - 285 $_{8+iz}$

# Entscheidungen
# des Schweizerischen Bundesgerichtes

(einschliesslich Entscheidungen des Eidgenössischen Versicherungsgerichts)

aus dem Jahre 1978

## AMTLICHE SAMMLUNG

104. Band

## II. Teil: Zivilrecht

# Arrêts du Tribunal Fédéral Suisse

(y compris les arrêts du Tribunal Fédéral des Assurances)

rendus en 1978

## RECUEIL OFFICIEL

104e volume

## IIe partie: Droit civil

IMPRIMERIES RÉUNIES S.A. LAUSANNE

# VI. VERSICHERUNGSVERTRAG
## CONTRAT D'ASSURANCE

**47. Urteil der II. Zivilabteilung vom 5. Oktober 1978 i.S. Waadt-Versicherungen gegen Martinez Garcia und Lobato Gonzales**

*Versicherungsvertrag; Auslegung einer Ausschlussklausel bei einer Unfallversicherung (Art. 33 VVG).*
1. Die Auslegung einer gefahrenbeschränkenden Abrede richtet sich nach der Bedeutung, die den verwendeten Wörtern im täglichen Sprachgebrauch üblicherweise zukommt (E. 2).
2. Begriff der Schlägerei bzw. des Raufhandels (E. 3).

*Contrat d'assurance; interprétation d'une clause d'exclusion dans un contrat d'assurance-accidents (art. 33 LCA).*
1. L'interprétation d'une convention limitant le risque se fait selon le sens que les mots employés ont ordinairement dans l'usage quotidien du langage (c. 2).
2. Notion de bagarre, respectivement de rixe (c. 3).

*Contratto d'assicurazione; interpretazione di una clausola d'esclusione in un contratto d'assicurazione contro gli infortuni (art. 33 LCA).*
1. L'interpretazione di una clausola contrattuale che limita il rischio va effettuata secondo il senso che le espressioni usate hanno normalmente nell'uso quotidiano della lingua (consid. 2).
2. Nozione di zuffa e di rissa (consid. 3).

In der Nacht vom 14. auf den 15. August 1975 wurde der spanische Staatsangehörige Ramon Martinez Lobato im Personalhaus der Gärtnerei Rathgeb in Nürensdorf von einem Arbeitskollegen, dem Jugoslawen Sukri Serifi, erstochen, nachdem sich die beiden zuvor in einer tätlichen Auseinandersetzung gegenübergestanden hatten, an der auf seiten des Opfers auch dessen Bruder Eleuterio und Gonzalo Pedraz, ebenfalls ein Spanier, beteiligt gewesen waren. Ramon Martinez Lobato war durch eine Kollektiv-Unfallversicherung seines Arbeitgebers bei der «Waadt» versichert. Seine Eltern, Casimiro Martinez Garcia und Petra Lobato Gonzales, erhoben in der Folge Anspruch auf die für den Tod durch Unfall vorgesehene Versi-

cherungssumme, den tausendfachen Taglohn. Die «Waadt» hielt ihnen jedoch entgegen, die tödliche Verletzung ihres Sohnes sei auf einen Raufhandel zurückzuführen und daher gemäss Art. 5 lit. c der Allgemeinen Bedingungen für die Kollektiv-Unfallversicherung (AVB) von der Versicherung ausgeschlossen.

Mit Urteil vom 17. Mai 1977 hiess das Bezirksgericht Bülach (II. Abteilung) eine von Casimiro Martinez Garcia und Petra Lobato Gonzales gegen die «Waadt» eingereichte Klage gut und verpflichtete diese, den Klägern Fr. 50330.— nebst 5% Zins seit 14. August 1975 zu zahlen. Zur Begründung führte es im wesentlichen aus, der Messerstich von Sukri Serifi sei nicht als Teil eines Raufhandels zu werten, da die an der vorangegangenen Schlägerei Beteiligten zuvor durch Dritte getrennt worden seien und sich in verschiedene Räume des Personalhauses zurückgezogen hätten.

Das Obergericht des Kantons Zürich (I. Zivilkammer) erklärte am 13. März 1978 die von der Beklagten erhobene Berufung für unbegründet, änderte allerdings das erstinstanzliche Urteil insofern ab, als es festlegte, der den Klägern zugesprochene Betrag sei erst vom 21. Januar 1976, dem Tag der Inverzugsetzung, an zu verzinsen.

Die Beklagte hat gegen das obergerichtliche Urteil sowohl Nichtigkeitsbeschwerde an das Kassationsgericht des Kantons Zürich als auch Berufung an das Bundesgericht erhoben. Mit der Berufung stellt sie folgende Anträge:

«1. Ziff. 1 des Urteilsdispositivs der I. Zivilkammer des Obergerichtes des Kantons Zürich sei aufzuheben, und es sei die Klage vollumfänglich abzuweisen; eventuell sei die Klage im Ausmass von Fr. 12582.50 (1/4 der Versicherungssumme) gutzuheissen.

2. Eventuell sei die Streitsache zur Beweisabnahme und Neubeurteilung an die Vorinstanz zurückzuweisen.»

Die Kläger schliessen auf Abweisung der Berufung.

*Das Bundesgericht zieht in Erwägung:*

1. — Zu den Geschehnissen, die dem tödlichen Messerstich vorangegangen waren, verweist die Vorinstanz auf die Feststellungen des Bezirksgerichtes. Dieses hatte ausgeführt, man könne davon ausgehen, dass Sukri Serifi von Ramon Martinez Lobato, dessen Bruder Eleuterio und Gonzalo Pedraz im Ver-

laufe einer tätlichen Auseinandersetzung arg zusammengeschlagen worden sein müsse. Durch das Dazwischentreten weiterer Personen, namentlich des Onkels der Gebrüder Martinez, Florentino Martinez, seien die Streitenden alsdann getrennt worden. Die Spanier hätten sich in die für sie reservierte Küche begeben, während Serifi von seinem Landsmann Arif Limani und einem weiteren Hausbewohner in den Aufenthaltsraum geführt worden sei. In der Folge sei Serifi mit einem Messer in der Hand in die Küche eingedrungen und habe auf die Spanier eingestochen, wobei Ramon Martinez Lobato tödlich verletzt worden sei.

Das Bezirksgericht hatte weiter festgehalten, es habe nicht zweifelsfrei abgeklärt werden können, wieviel Zeit zwischen der Trennung der Streitenden und dem Angriff Serifis mit dem Messer verstrichen sei. Nach seiner Ansicht dürfte es sich um wenige Minuten gehandelt haben. Die Vorinstanz stellt unter Hinweis auf die Akten der Bezirksanwaltschaft Bülach, die die Strafuntersuchung gegen Serifi geführt hatte, fest, es seien wenige bzw. einige Minuten gewesen.

2. — Gemäss Art. 5 lit. c der AVB der Beklagten sind von der Versicherung unter anderem ausgeschlossen «die bei Schlägereien und Raufhändeln erlittenen Verletzungen». Eine gefahrenbeschränkende Abrede ist nur insofern wirksam, als sie einzelne Ereignisse in bestimmter, unzweideutiger Fassung von der Versicherung ausschliesst (Art. 33 VVG). Ob diese Voraussetzung im einzelnen Fall erfüllt sei, beurteilt sich nach der Bedeutung, die den verwendeten Wörtern im täglichen Sprachgebrauch üblicherweise zukommt (so BGE 66 II 191 E. 3; vgl. auch BGE 97 II 74 E. 4).

3. — a) Unter einer Schlägerei bzw. einem Raufhandel ist nach dem gewöhnlichen Sprachgebrauch eine tätliche Auseinandersetzung von einer gewissen Geschlossenheit zu verstehen, die sich in einem zeitlich und örtlich begrenzten Rahmen abspielt. Es herrscht demnach Übereinstimmung mit den hauptsächlichen objektiven Merkmalen des strafrechtlichen Tatbestandes des Raufhandels im Sinne von Art. 133 StGB (vgl. dazu AUDENBLATTEN, Die Beteiligung am Raufhandel, Diss. Bern 1955, S. 52 ff.).

b) Der Ausschluss der bei einer Schlägerei oder einem Raufhandel erlittenen Verletzungen aus dem Versicherungsschutz ist offensichtlich darin begründet, dass die Beklagte nicht für

Ereignisse einstehen will, die durch das Verhalten eines Versicherungsnehmers begünstigt wurden. Im vorliegenden Fall ist mithin zunächst zu prüfen, ob der Messerstich von Sukri Serifi als rechtserhebliche Folge der — auch nach Ansicht der Kläger als Schlägerei oder Raufhandel im oben angeführten Sinn zu qualifizierenden — tätlichen Auseinandersetzung erscheine, an der unter anderem auch Ramon Martinez Lobato und Sukri Serifi beteiligt waren.

Die Parteien weisen übereinstimmend darauf hin, dass Serifi den Sohn der Kläger gemäss Gutachten der kantonalen Psychiatrischen Klinik Rheinau in einem durch Gewalteinwirkungen bei der vorangegangenen tätlichen Auseinandersetzung verursachten Dämmerzustand erstochen habe und dass es sich bei dieser Tat nicht um eine bewusste Fortsetzung oder Wiederaufnahme des Kampfes, nicht um eine bewusste Rache gehandelt habe. Zugunsten der Kläger lässt sich daraus indessen nichts ableiten, denn Hiebe, wie sie Serifi bei der Auseinandersetzung mit Ramon Martinez Lobato, dessen Bruder Eleuterio und Gonzalo Pedraz eingesteckt hatte, sind nach dem gewöhnlichen Lauf der Dinge und der allgemeinen Lebenserfahrung durchaus geeignet, einen Menschen die Selbstbeherrschung verlieren zu lassen und dazu zu bringen, dass er seine Gegner im Raum, in den sie sich zurückgezogen haben, mit einem Messer bewaffnet aufsucht, auf sie einsticht und dabei einen von ihnen tödlich verletzt. Ob bis in alle Einzelheiten vorauszusehen gewesen sei, dass sich die Ereignisse, insbesondere hinsichtlich der Entwicklung der psychischen Verfassung Serifis, genau so abspielen würden, wie es in Wirklichkeit geschehen ist, und ob Serifi den Sohn der Kläger bewusst getötet habe oder nicht, ist für die Rechtserheblichkeit des Kausalzusammenhanges ohne Belang (vgl. BGE 80 II 344; im gleichen Sinne auch BGE 103 IV 291 f. E. 2 mit Hinweis).

c.) Ein rechtserheblicher Zusammenhang zwischen der tätlichen Auseinandersetzung, die zur Verletzung und zum Dämmerzustand Serifis führte, und dem tödlichen Messerstich reicht allerdings nicht aus, das ganze Geschehen als Schlägerei bzw. als Raufhandel zu qualifizieren. Merkmal der Schlägerei oder des Raufhandels ist auch eine zeitliche und örtliche Einheit. Bei objektiver Betrachtung des äusseren Ablaufs und der Entwicklung der psychischen Verfassung Serifis ist jedoch diese Einheit hier trotz der vorübergehenden Trennung der Streiten-

den zu bejahen, denn zwischen der ursprünglichen tätlichen Auseinandersetzung und dem tödlichen Stich vergingen nach den Feststellungen der Vorinstanz nur einige Minuten und die beiden Vorfälle trugen sich im gleichen Gebäude, nur wenige Meter voneinander entfernt zu. Dass für Arif Limani, Gonzalo Pedraz und Florentino Martinez die Feindseligkeiten mit dem Rückzug der Streitenden in verschiedene Räume beendet waren und dass die Spanier denn auch keine Sicherheitsmassnahmen trafen und insbesondere die Küchentüre unverriegelt liessen, ist entgegen der Auffassung der Vorinstanz unerheblich.

4. — Die tätliche Auseinandersetzung zwischen Sukri Serifi und den drei Spaniern und der Messerstich Serifis, durch den der Sohn der Kläger getötet wurde, stellen nach dem Gesagten ein Ganzes dar, das nach dem gewöhnlichen Sprachgebrauch als Raufhandel oder Schlägerei zu bezeichnen ist. Der Tod von Ramon Martinez Lobato ist somit durch die Versicherung der Beklagten nicht gedeckt. Dies führt zur Gutheissung der Berufung und zur Abweisung der Klage. Das Eventualbegehren der Beklagten, die Klage sei in der Höhe eines Viertels der Versicherungssumme gutzuheissen, wird dadurch gegenstandslos, weshalb es sich erübrigt, zur Frage seiner Zulässigkeit Stellung zu nehmen.

## VII. VERFAHREN
## PROCÉDURE

48. Auszug aus dem Urteil der II. Zivilabteilung vom 4. November 1978 i.S. Hadorn gegen Fischer

*Art. 48 Abs. 1 OG: Berufungsfähigkeit von Teilurteilen.*
Teilurteile sind grundsätzlich nicht berufungsfähig. Ausnahmsweise ist jedoch auf Berufungen gegen Urteile einzutreten, durch die einzelne Begehren, die zum Gegenstand eines besonderen Prozesses hätten gemacht werden können und deren Beurteilung für den Entscheid über die anderen Begehren präjudiziell ist, endgültig erledigt werden.