UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

GENERAL MOTORS CORPORATION and :
ADAM OPEL GmbH; :
                                                   :
                              Plaintiffs, :     **AFFIDAVIT OF**
                                                   :     **JOHN L. HARDIMAN**
                    - against - :
                                                   :     No. 08-CV-4999 (DAB)
FIAT S.p.A; FIAT AUTO HOLDING B.V.; and :
FIAT AUTO S.p.A., :
                                                   :
                              Defendants. :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JOHN L. HARDIMAN, being duly sworn, deposes and says:

1.    I am a member of Sullivan & Cromwell LLP ("Sullivan & Cromwell"), counsel

to Fiat S.p.A., Fiat Auto Holding B.V., and Fiat Auto S.p.A. (collectively "Fiat") in the

above-captioned action.  I submit this affidavit in support of Fiat's motion to stay or

dismiss this action.

2.    Attached hereto as Exhibit A-1 is a true and correct copy of the body of the Joint

Ventures Separation Master Agreement (the "Separation Agreement"), dated May 13,

2005.  Attached hereto as Exhibit A-2 is a true and correct copy of the schedules attached

to the Separation Agreement.

3.    Attached hereto as Exhibit B is a true and correct copy of an invoice dated

January 31, 2008 (the "Invoice").

4.    Attached hereto as Exhibit C-1 is a true and correct copy of the body of the

European Powertrain Cross Supply Agreement (the "ECSA"), dated May 13, 2005.

Attached hereto as Exhibit C-2 is a true and correct copy of the schedules attached to the

ECSA.

1

5.    Attached hereto as Exhibit D is a true and correct copy of a letter from Fiat to GM dated December 22, 2006 (the "Letter").

6.    Attached hereto as Exhibit E is a true and correct copy of the Agreement to Liquidate Joint Ventures and Terminate Master Agreement (the "Termination Agreement"), dated February 13, 2005.

7.    Attached hereto as Exhibit F is a true and correct copy of excerpts from the International Chamber of Commerce ("ICC") Rules of Arbitration that are contained on the ICC website.

I declare, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct.

Dated: July 22, 2008

_____
John L. Hardiman

Execution Copy Confidential

# JOINT VENTUREs SEPARATION MASTER AGREEMENT

Dated as of

May 13, 2005

by and between

Fiat S.p.A.

Fiat Auto Holding B.V.

Fiat Auto S.p.A.

General Motors Corporation

OnStar Corporation

Adam Opel A.G.

And

FIAT-GM Powertrain B.V.

1

Execution Copy Confidential

# SUMMARY

| | | |
|---|---|---|
| **1.** | **DEFINITIONS AND INTERPRETATION** | 4 |
| | 1.1 Definitions | 4 |
| | 1.2 Interpretation | 8 |
| **2.** | **LIQUIDATION OF PURCHASING JOINT VENTURE** | 8 |
| | 2.1 Procedure | 8 |
| | 2.2 Balancing Liquidation Distributions | 9 |
| | 2.3 Post Distribution Adjustment | 9 |
| **3.** | **UNWIND OF POWERTRAIN JOINT VENTURE** | 9 |
| | 3.1 Certain Specific Agreements between Fiat Auto and GM and Certain Actions Undertaken by the Parties | 9 |
| | 3.2 Repayment of Syndication Loan | 10 |
| | 3.3 Dividends From Legal Entities | 10 |
| | 3.4 Liquidation of PIS | 11 |
| | 3.5 Unwind Procedure | 11 |
| | 3.6 Price Adjustments | 13 |
| **4.** | **CONDITIONS PRECEDENT TO CLOSING** | 15 |
| **5.** | **EVENTS AT CLOSING** | 16 |
| | 5.1 Closing | 16 |
| | 5.2 Closing Events | 16 |
| | 5.3 Conditional Closing | 18 |
| **6.** | **OTHER OBLIGATIONS** | 18 |
| | 6.1 Corporate Names | 18 |
| | 6.2 Cooperation among the Parties | 19 |
| | 6.3 Indemnification | 21 |
| **7.** | **TERMINATION OF AGREEMENTS AND MUTUAL RELEASE** | 21 |
| | 7.1 Termination of Agreements | 21 |
| | 7.2 Release | 22 |
| **8.** | **PARENT COMPANY ASSURANCES** | 22 |
| | 8.1 Exercise of Rights and Powers | 22 |
| | 8.2 Performance by Subsidiaries | 22 |
| | 8.3 Expenses | 23 |
| **9.** | **MISCELLANEOUS** | 23 |
| | 9.1 Assignment | 23 |
| | 9.2 Waiver | 23 |
| | 9.3 Remedies | 23 |
| | 9.4 Entire Agreement | 23 |

Execution Copy Confidential

9.5    Amendment                                    24
9.6    Severability                                 24
9.7    Counterparts                                 24
9.8    Notices                                      24
9.9    Public Disclosure                            25
9.10   Applicable Law                               25
9.11   Dispute Resolution                           25

Execution Copy Confidential

# JOINT VENTURES SEPARATION MASTER AGREEMENT

This Agreement is made and entered into as of the ___th day of May, 2005 ("**Effective Date**"), by and among Fiat S.p.A., a corporation organized under the laws of the Republic of Italy ("**Fiat**"); Fiat Auto Holding B.V., a corporation organized under the laws of The Netherlands ("**FAH**"); Fiat Auto S.p.A., a corporation organized under the laws of the Republic of Italy ("**Fiat Auto**"), General Motors Corporation, a corporation organized under the laws of the State of Delaware, U.S.A. ("**GM**"), OnStar Corporation, a corporation organized under the laws of the State of Delaware, U.S.A.("**OnStar**"), Adam Opel A.G, a company organized under the laws of Germany ("**Opel**"), FIAT-GM Powertrain B.V., a company organized under the laws of The Netherlands (formerly known as PTC Holdings B.V.) ("**FGP**"), and GM-Fiat Worldwide Purchasing B.V. in liquidatie, a company organized under the laws of he Netherlands (formerly known as JVP Holdings BV) ("**GFWWP**").

WHEREAS

(A)    On the 13th day of February 2005, Fiat, FAH, Fiat Auto and GM entered into that certain "Agreement to Liquidate Joint Ventures and Terminate Master Agreement" (the "**Termination Agreement**") regarding, *inter alia*, the liquidation of the Powertrain JV, the Purchasing JV and the Brazil JV existing between the GM Group and the Fiat Auto Group.

(B)    On March 7, 2005, Fiat, FAH, GM and OnStar entered into the Agreement for the Implementation of the Agreement to Liquidate Joint Ventures and Terminate Master Agreement regarding, *inter alia*, the transfer by OnStar of its FAH shares, representing 10% of the outstanding stock of FAH, to FAH with the transfer of certain intellectual property relating to the JTD Diesel Engine (the "**Transferred Intangible Property**") from FAH to OnStar.

(C)    This Agreement reflects the understandings and agreements among the Parties, including the decisions of the Liquidation Committee with respect to effectuating the Termination Agreement. The actions required under the terms of this Agreement and the Ancillary Agreements constitute the Liquidation Plan for purposes of the Termination Agreement.

NOW, **THEREFORE**, in consideration of the foregoing and the mutual covenants and agreements herein contained, and intending to be legally bound hereby, Fiat, FAH, Fiat Auto, GM, OnStar, Opel, GFWWP, and FGP each agree, on its own behalf and on behalf of its Subsidiaries, as follows:

## 1.  DEFINITIONS AND INTERPRETATION

### 1.1    Definitions

(a) The following terms, as used herein, shall have the meanings ascribed to them below:

"*Accounting Principles*" means the accounting principles to be used as a basis for the balancing of the distributions in accordance with Sections 2.2, 2.3, 3.5(d), and 3.6 and preparation of the Closing Balance Sheets as set out in Schedule 3.6;

"*Ancillary Agreements*" means the agreements to be entered into to implement provisions of the Termination Agreement, specifically, a European Powertrain Cross Supply Agreement between

Execution Copy Confidential

Fiat, FAH, Fiat Auto, and GM; a Brazilian Powertrain Supply Agreement between General Motors do Brasil and FIAT Automoveis S.A. ("**FIASA**"); a Powertrain Engineering Support Services Agreement between Fiat, FAH, and Fiat Auto and GM; a Joint Venture Agreement between OnStar and FGP and Fiat Participazioni S.p.A relating to Bielsko-Biala, a Bielsko Biala Joint Venture Supply Agreement among Bielsko-Biala, GM, Fiat Auto and FAH; an Intellectual Property Agreement among FAH, Fiat Auto and OnStar and GM; a Termination Agreement between General Motors de Mexico ("**GMM**") and Fiat Automoveis S.A. relating to the termination of the distribution by GMM of the Fiat brand vehicles in Mexico; a Termination Agreement between GMM and Fiat Auto relating to the termination of the distribution by GMM of the Alfa Romeo brand vehicles in Mexico; an amendment to the Project Agreement Small Architecture between Fiat Auto, GM, and Opel; an amendment to the Project Agreement Large Architecture between Fiat Auto, GM, and Opel, a Premium Architecture Agreement between Fiat Auto and GM; and a Purchasing Services Agreement for use of the GM Global Purchasing Sourcing process by Fiat and its Affiliates for commodities and common components between GM, FAH and Fiat Auto.

"*Bielsko-Biala*" means FIAT-GM Powertrain Polska Sp. z.o.o., located in Bielsko-Biala, Poland;

"*Business Day*" means any day other than a Saturday, Sunday or other day that is a partial or full bank holiday in The Netherlands, London, or Turin;

"*Closing*" means the completion of the actions described in Article 5;

"*Closing Balance Sheet*" means the Fiat Auto Closing Balance Sheet or the GM Closing Balance Sheet or both.

"*Closing Date*" means the date Closing occurs and is also the Liquidation Date as defined in the Termination Agreement;

"*Fiat Auto Closing Balance Sheet*" means the consolidated balance sheet, prepared in accordance with the Accounting Principles, of assets and liabilities as of the Closing Date in respect of the Fiat Auto Powertrain Entities;

"*Fiat Auto Group*" means FAH and its Subsidiaries, excluding FGP and its Subsidiaries.

"*Fiat Auto Purchasing Entities*" means the entities which FAH originally contributed or transferred to the Purchasing JV and which have been distributed to FAH in accordance with Section 2.1, specifically GM-FIAT WWP Poland Sp. z.o.o., GM-Fiat WWP Italia S.r.l. and GM-Fiat WWP do Brasil Betim Ltda;

"*Fiat Auto Powertrain Entities*" means the entities which FAH originally contributed or transferred to the Powertrain JV and which will be held indirectly by FAH, in accordance with Section 3.5(d), on the Closing Date specifically FIAT-GM Powertrain Italia S.r.l. (including its Subsidiary F.M.A. S.r.l.), Bielsko-Biala, and Powertrain Mekanik Sanayi ve Ticaret Limited Sirketi, and F.A. Powertrain Ltda.

"*Fiat Group*" means Fiat and its Subsidiaries, excluding FGP and its Subsidiaries;

"*German Purchasing Entities*" means GM-Fiat Worldwide Purchasing Opel Germany GmbH and GM-Fiat Worldwide Purchasing Management Services GmbH, which have been distributed to Opel in accordance with Section 2.1;

"*German Powertrain Entities*" means Opel Powertrain GmbH and Opel Motoren Kaiserslautern GmbH which will be transferred to Opel in accordance with Section 3.5(d);

5

Execution Copy Confidential

*"GM Closing Balance Sheet"* means the consolidated balance sheet, prepared in accordance with the Accounting Principles, of assets and liabilities in respect of the GM Powertrain Entities and the German Powertrain Entities as of·the Closing Date, except for GM Powertrain Ltda, whose balance sheet will be prepared as of April 30, 2005;

*"GM Group"* means GM and its Subsidiaries, excluding FGP and its Subsidiaries;

*"GM Purchasing Entities"* means the entities which GM and its Subsidiaries other than Opel originally contributed to the Purchasing JV and which have been distributed to GM in accordance .with Section 2.1, specifically GM-Fiat Worldwide Purchasing Vauxhall Motors Ltd., GM-Fiat Worldwide Purchasing Opel Belgium N.V., GM-Fiat Worldwide Purchasing Opel Austria GmbH, GM-Fiat Worldwide Purchasing Opel España S.L., GM-Fiat Worldwide Purchasing Sweden AB, GM-Fiat Worldwide Purchasing Opel Hungary Ltd., and GM-Fiat Worldwide Purchasing do Brazil Sao Caetano do Sul Ltda.

*"GM Powertrain Entities"* means the entities which GM originally contributed to the Powertrain JV and which will be transferred to GM in accordance with Section 3.5(d), specifically Saab Automobile Powertrain AB, Opel Austria GmbH, Opel Powertrain Holding B.V. (including its Subsidiary Opel Hungary Powertrain Ltd.), and Vauxhall Powertrain Ltd., and GM Powertrain Ltda.

*"Group"* means the Fiat Group, the Fiat Auto Group or the GM Group, as the case may be;

*"JTD Engine"* means the engine described in  schedule 1(a)(18) to Intellectual Property Agreement ;

*"Law"* means any domestic or foreign or supranational government, or governmental, regulatory or administrative law, rule, regulation, order, judgment or decree;

*"Net Book Value"* means total assets minus total liabilities in accordance with the Accounting Principles;

*"OnStar's FAH Shares"* means the shares of FAH's common stock registered in the name of OnStar, which shares currently represent ten percent of FAH's total outstanding capital stock;

*"Party"* means any party to this Agreement, it being understood that for purposes of this Agreement Fiat, FAH, and Fiat Auto are one party and GM, OnStar, and Opel are one party;

*"Person"* means an individual, corporation, limited liability company, partnership, limited partnership, syndicate, person, trust, association or entity or government, political subdivision, agency or instrumentality of a government;

*"PIS"* means Powertrain Industrial Services S.c.p.a, a consortium established under Italian Law in which FGP and all of its Subsidiaries are currently quotaholders;

*"Powertrain JV"* means the joint venture formed pursuant to the Joint Venture Agreement, dated as of July 24, 2000, among Fiat, FAH, GM and FGP, as amended;

*"Purchasing JV"* means the joint venture formed pursuant to the Joint Venture Agreement, dated as of July 24, 2000, among Fiat, FAH, GM and GFWWP, as amended;

*"Representatives"* means, as to any Person, its directors, officers, employees, agents, advisors (including, without limitation, financial advisors, counsel and accountants); and

6

Execution Copy Confidential

"*Subsidiary*" of any Person means any corporation, partnership, joint venture or other legal entity of which such Person (either alone or through or together with any other Subsidiary) owns more than fifty percent (50%) of the stock or other equity interests and the holders of which are generally entitled to vote for the election of the board of directors or other governing body of such corporation or other legal entity.

(b) Other terms have the definitions as provided elsewhere in this Agreement as follows:

| Term | Section |
|------|---------|
| Effective Date | First Paragraph |
| Fiat | First Paragraph |
| FAH | First Paragraph |
| Fiat Auto | First Paragraph |
| GM | First Paragraph |
| OnStar | First Paragraph |
| Opel | First Paragraph |
| FGP | First Paragraph |
| GFWWP | First Paragraph |
| Termination Agreement | First Recital |
| Transferred Intellectual Property | Second Recital |
| FIASA | Definition of Ancillary Agreements |
| GMM | Definition of Ancillary Agreements |
| Special Items | 3.1 (a) |
| Volga Powertrain Project | 3.1(a)(v) |
| Volga Value | 3.1(a)(v) |
| Maximum Value | 3.1(a)(v) |
| Dividend Adjustment | 3.3 |
| Brazilian Note | 3.5(c)(iv) |
| GM Brazil Note | 3.5(c)(iv) |
| GM Provisional Price | 3.5(d)(i) |
| GM Note | 3.5(d)(i) |
| Opel Provisional Price | 3.5(d)(ii) |
| Opel Note | 3.5(d)(ii) |
| FAH Note 1 | 3.5(d)(iii) |

Execution Copy Confidential

| FAH Note 2 | 3.5(d)(iii) |
|---|---|
| FAH Provisional Price | 3.5(d)(iii) |
| Poland Provisional Price | 3.5(e) |
| FGP Italia | 6.2(c) |
| Costs | 6.3(a) |
| Fiat Parties | 7.2(a) |
| GM Parties | 7.2(b) |

### 1.2    Interpretation

In this Agreement, except to the extent that the context otherwise requires:

   i.  when a reference is made in this Agreement to an Article, Section, or Schedule, such reference is to an Article or Section of, or a Schedule to, this Agreement unless otherwise indicated;

   ii.  the table of contents and headings for this Agreement are for reference purposes only and do not affect in any way the meaning or interpretation of this Agreement;

   iii.  whenever the words "include," "includes" or "including" are used in this Agreement, they are deemed to be followed by the words "without limitation";

   iv.  the words "hereof," "herein" and "hereunder" and similar words, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement;

   v.  all terms defined in this Agreement have the defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein;

   vi. the definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms; and

   vii. the use of "or" is not intended to be exclusive unless expressly indicated otherwise.

## 2    LIQUIDATION OF PURCHASING JOINT VENTURE

### 2.1    Procedure

The Purchasing JV will be liquidated in accordance with Dutch Law and the Liquidation of the Purchasing JV Timetable attached hereto as Schedule 2.1(a). On March 30, 2005, GM, Opel and FAH resolved to dissolve GFWWP and appointed GM and FAH as liquidators. Effective April 1, 2005, the liquidators distributed the German Purchasing Entities to Opel, the GM Purchasing Entities to GM, and the FAH Purchasing Entities to FAH in accordance with the Liquidation and Transfer

Execution Copy Confidential

Agreement attached hereto as Schedule 2.1(b). GFWWP shall prepare the final liquidation accounts as soon as possible so that the liquidators can file the liquidation accounts and the liquidation plan with the Chamber of Commerce of Amsterdam.

## 2.2    Balancing Liquidation Distributions

Prior to the advance distribution on April 1, 2005, the GM Purchasing Entities and the German Purchasing Entities paid dividends to GFWWP in the total amount of € 9,926,226.00. The Parties intend that the advance distributions to GM and Opel on the one hand and FAH on the other hand on April 1, 2005 be equally balanced to the greatest extent possible using the cash on hand at GFWWP from the dividend payments, less required reserves for the post-distribution adjustment and known liabilities. For purposes of balancing the advance distributions, the GM Purchasing Entities, the German Purchasing Entities and the Fiat Auto Purchasing Entities were valued in accordance with the Accounting Principles using the estimated liquidation accounts which take into account the dividends that were paid in 2005 and other significant changes since the December 31, 2004 audited balance sheet and advance cash distributions were made in the amounts of: €4.5 million to FAH, €2.7 million to GM, and €1.8 million to Opel.

## 2.3    Post Distribution Adjustment

Following receipt of court confirmation that no creditor has raised claims during the sixty day notice period and satisfaction of all liabilities, GFWWP shall distribute the remaining cash to GM, Opel, and/or FAH. The distributions to FAH on this final distribution date when added to the distributions to FAH on April 1, 2005 shall exactly equal the aggregate distributions to GM and Opel on this final distribution date when added to the aggregate distributions to GM and Opel on April 1, 2005, based on the final liquidation accounts. The target date for this final distribution is July 8, 2005. Any shortfall in the post distribution adjustment shall be paid by the Party receiving more than its fair share to the extent necessary to equalize such payments.

## 3.  UNWIND OF POWERTRAIN JOINT VENTURE

### 3.1    Certain Specific Agreements between Fiat Auto and GM and Certain Actions Undertaken by the Parties

(a)    *"Special Items"*: Fiat Auto and GM have resolved certain special items relating to the Powertrain JV (*"Special Items"*) as follows:

i.    The Pricing mechanism from January 1, 2005 through the Closing Date under the European Supply Agreement dated June 29, 2001, as amended, with the elimination of the take or pay mechanism for the GM Group and theFiat Group as of January 1, 2005 is the average cost methodology;

ii.    The Parties have determined the assets write-offs and other special charges under the Costs Sharing Agreement through the Closing Date as provided in Schedule 3.1(a)(iii), but have been unable to agree on the allocation of such items under the Cost Sharing Agreement. This matter will be resolved in accordance with the dispute resolution provisions of the Termination Agreement;

iii.    The Parties have agreed that start up and pre-production costs currently on the books of FGP and its Subsidiaries will be amortized in the piece price under the Powertrain Cross Supply Agreement as described in Schedule 3.1(a)(iii); and

iv.    Specific investments will be amortized in the piece price over five years as provided in Schedule 3.1(v);

v.    FGP, GM and Fiat Auto have been in discussions with AO Avtovaz and the European Bank for Reconstruction and Development relating to the establishment of a powertrain joint venture in Togliatti ("*Volga Powertrain Project*"). Fiat Auto has paid fifty percent of the costs incurred by FGP and its Subsidiaries through December 31, 2004 related to the Volga Powertrain Project. GM shall pay one hundred percent of such costs incurred after January 1, 2005. If at the end of the dispute resolution process referenced in Clause 3.1(a)(ii), GM does not owe any amounts to FAH under the Cost Sharing Agreement (i.e. GM does not owe Fiat Auto any adjustment for re-allocation) then FAH is entitled to fifty percent of the transaction value for the transfer of the Bochum assets for the Volga Powertrain Project less the costs to maintain the Bochum assets until their transfer to Russia *("Volga Value")*. If at the end of the dispute resolution process referenced in Clause 3.1(a)(ii), GM owes FAH the full amount of FAH's claim for reallocation ("*Maximum Amount*"), then FAH is not entitled to any amount related to the transfer of the Bochum assets to Volgá Powertrain Project. For any outcome of the dispute resolution process referenced in Clause 3.1(a)(ii) between these two positions, FAH is entitled to a percentage of the Volga Value in line with the inverse ratio between the mediated amount and the Maximum Amount (for instance, if the mediated amount is 25% of the Maximum Amount, FAH is entitled to 75% of the Volga Value). This provision will remain effective for a period of 5 years from the Liquidation Date;

vi.    The parties have not yet reached agreement on the commercial terms for the sale of Fam I Engines to Fiat's affiliate in China as required by Section 11 of the Termination Section. The obligations under Section 11 of the Termination Agreement continue and the parties will endeavour to enter in the supply agreement by July 31, 2005; and.

vii.    Fiat has determined that it desires to purchase the HFV6 Turbo from Holdens instead of the Northstar engine from Cadillac. Section 10 of the Termination Agreement is amended accordingly and the obligations under such Section continue and the parties will endeavour to enter in the supply agreement by July 31, 2005. GM and Fiat have agreed that updates to the HFV6 Turbo will be made available to Fiat six months after the GM Group has launched products containing such updates in the market.

(b)    *Payment of FGP Receivables by Customers*: By April 28, 2005, the GM Group and the Fiat Auto Group as customers shall pay all outstanding undisputed receivables (whether or not due) existing of the books of FGP and its Subsidiaries as of March 31, 2005, which will allow FGP and its subsidiaries sufficient liquidity to repay the syndicated facility under Section 3.2. GM and Fiat Auto shall endeavour to resolve any disputes or issues relating to any outstanding receivables between the GM Group and the Fiat Auto Group so that the final agreed amount of such disputed receivables will be settled by no later than May 31, 2005.

Execution Copy Confidential

(c)    *Funding of FGP and its Subsidiaries.* Between April 28, 2005 and the Closing Date, GM shall provide any funding required by the GM Powertrain Entities and the German Powertrain Entities, including to pay the dividends under Section 3.3, and FAH shall provide any funding required by the Fiat Auto Powertrain Entities, excluding Bielsko-Biala. GM and FAH will jointly manage the funding requirements of Bielsko-Biala. Funding can be provided through management of trade receivables, loans, or other mechanisms agreed in writing between GM and FAH.

(d)    In completing the unwind of the Powertrain JV, the Parties recognize that there is an increased risk for double payments for costs such as special items, past due accounts receivable, and other receivables. To the extent that any double payments have been made for the same invoice, rebill, or costs incurred by FGP, these double payments will be reviewed as part of the post closing price adjustment procedure in Section 3.6 and adjustments will be made as appropriate.

(e)    GM and Fiat Auto shall, by May 31, 200, properly reallocate the amount that Fiat Auto paid for the CVT cancellation claim.

### 3.2    Repayment of Syndication Loan

On or before April 28, 2005, FGP and each FGP Subsidiary shall pay down its full outstanding balance under the powertrain syndicated credit facility as specified in Schedule 3.2 so that as of April 28, 2005, the powertrain syndicated credit facility will be fully paid. FGP will take the necessary actions to terminate the facility immediately thereafter.

### 3.3    Dividends From Legal Entities

For the purposes of reducing the value of the GM Powertrain Entities and German Powertrain Entities, thus reducing the amount of any payments under Paragraph 3.5(d)(v), each of the FGP Subsidiaries listed in Schedule 3.3 shall pay a dividend to FGP in the amount listed on Schedule 3.3 no later than May 13, 2005. The amount by which this dividend decreases the value of the relevant FGP Subsidiaries is referred to in this Agreement as the *"Dividend Adjustment"*.

### 3.4    Liquidation of PIS.

As soon as practicable, FGP shall transfer fifty percent of its quota capital in PIS to GM and the other fifty percent to FAH. Before Closing, FGP shall cause its Subsidiaries to hold an extraordinary meeting of the quota holders to approve the liquidation of PIS. The main steps of the liquidation process are listed in Schedule 3.4. FGP shall cause its Subsidiaries to take any and all necessary actions which are required to take place prior to the Closing Date to complete the liquidation in a timely manner. As from the Closing Date, GM and FAH shall cooperate and take all actions necessary to complete the liquidation in a timely manner.

### 3.5    Unwind Procedure

(a)    By no later than May 11, 2005, FGP shall provide to GM, FAH, and PriceWaterhouseCoopers unaudited consolidated balance sheets for FGP and its Subsidiaries and preliminary Closing Balance Sheets as of April 30, 2005 using the Accounting Principles, but taking into account the Dividend Adjustment. The GM Powertrain Entities, the German Powertrain Entities and the Fiat Auto

Powertrain Entities will be valued in accordance with the Accounting Principles using the unaudited balance sheet for FGP as of April 30, 2005, but taking into account the Dividend Adjustment.

(b)    *Austria* – Before Closing, FGP shall transfer one share of Opel Austria Powertrain GmbH to General Motors International Holdings Inc. in trust.

(c)    *Brazil* – Prior to April 30, 2005, the shares in F.A. Powertrain Ltda and GM Powertrain Ltda were held primarily by Fiat-GM Powertrain Ltda with cross shareholding by GM do Brazil, and FI-ASA. The Brazil JV will be unwound in accordance with the following steps in accordance with Schedule 3.5(c):

    i. On April 30, 2005, Fiat-GM Powertrain Ltda shall be spun off and its assets merged into F.A. Powertrain Ltda and GM Powertrain Ltda,;

    ii. On April 30, 2005, FIASA shall exchange its shares in GM Powertrain Ltda for GM do Brasil's shares in F.A. Powertrain Ltda;

    iii. On May 1, 2005, FGP shall sell its shares in GM Powertrain Ltda to GM do Brazil for a price equal to the Net Book Value as of April 30, 2005; and

    iv. GM do Brasil shall issue a promissory note in U.S. Dollars to FGP for the estimated net book value in accordance with Brazilian GAAP as of April 30, 2005 (*"Brazilian Note"*) and GM shall issue a promissory note in Euros to FGP for the difference between the estimated Net Book Value and the estimated net book value in accordance with Brazilian GAAP as of April 30, 2005 (*"GM Brazil Note"*). This transaction is governed by a side letter between GM, FGP, and FAH, attached hereto as Schedule 3.5(c)(iv).

(d)    *Netherlands* – GM and FAH have agreed to unwind the Powertrain JV through a series of share transfers and in a manner to implement the liquidation principles under Termination Agreement which contemplate that equal value should be provided to the GM Group and the Fiat Auto Group. On the Closing Date:

    i. GM shall purchase the Brazilian Note and the GM Brazil Note and all of the outstanding shares of the GM Powertrain Entities held by FGP, for a provisional price equal to the Net Book Value as of April 30, 2005 of the GM Powertrain Entities, taking into account the Dividend Adjustment (*"GM Provisional Price"*) and shall issue a promissory note in Euros to FGP in such amount (*"GM Note"*);

    ii. Opel shall purchase all of the outstanding shares of the German Powertrain Entities held by FGP for a provisional price equal to the Net Book Value as of April 30, 2005 of such German Powertrain Entities, taking into account the Dividend Adjustment (*"Opel Provisional Price"*) and shall issue a promissory note in Euros to FGP in such an amount (*"Opel Note"*);

    iii. FAH shall purchase the shares held by GM in FGP for an amount equal to 29.74% of the Net Book Value of FGP as of April 30, 2005 and shall issue a promissory note in Euros to GM in such an amount (*"FAH Note 1"*). FAH shall purchase the shares held by Opel in FGP for an amount equal to 20.26% of the Net Book Value of FGP as of April 30, 2005; and shall issue a promissory note in Euros to Opel in such an amount (*"FAH Note 2"*.) For the determination of the Net Book Value of FGP GM Powertrain Ltda will be valued at Net Book Value as of April 30, 2005 immediately before the purchase by GM

do Brasil, and the value of the GM Brazil Note and the Brazil Note will be excluded ("*FAH Provisional Price*");

iv.  FAH shall purchase the GM Note and the Opel Note from FGP at their nominal value;

v.  FAH, GM and Opel shall offset and cancel the notes. If the value of the FAH Note 1 plus the value of the FAH Note 2 is greater than the value of the GM Note plus the value of the Opel Note, FAH shall pay GM the difference by wire transfer of immediately available funds. If the value of GM Note plus the value of the Opel Note is greater than the value of the FAH Note 1 plus the value of the FAH Note 2, GM shall pay FAH the difference by wire transfer of immediately available funds. However, if the difference between the GM Note plus the Opel Note and the FAH Note 1 plus FAH Note 2 is less than €5 million, no payments will be made at Closing, and such difference shall be taken into account in the post closing price adjustment. This represents the balancing payment under the Termination Agreement; and

vi.  All notes will be non-interest bearing.

GM, FGP, and the GM Powertrain Entities shall complete as soon as possible all steps which are required in the local jurisdictions to transfer the shares of the GM Powertrain Entities, except GM Powertrain Ltd., to GM as of the Closing Date. Opel, FGP, and the German Powertrain Entities shall complete as soon as possible all steps which are required in the local jurisdictions to transfer the shares of the German Powertrain Entities to Opel as of the Closing Date. If there is any inconsistency between the terms and conditions of any transfer agreement for the transfer of the shares of the GM Powertrain Entities or the German Powertrain Entities and this Agreement, this Agreement prevails.

(e)  *Poland* – To continue the joint venture between Fiat Auto Partecipazioni S.p.A. and OnStar, FGP shall transfer fifty per cent of its interest in Bielsko-Biala to OnStar. If necessary for Dutch corporate law purposes to effect the transfer to OnStar of the Bielsko-Biala shares, OnStar shall make a cash payment to FGP by wire transfer of immediately available funds equal to the fifty per cent of the Net Book Value of Bielsko-Biala as of April 30, 2005 ("*Poland Provisional Price*"), otherwise GM shall make such payment.

(f)  *Ordinary Course* - Between April 30, 2005, and the Closing Date, FGP and its Subsidiaries may not:

i.  Make, revalue to appropriate Net Book Value, or write off any capital investments or do any special items, such cancellation charges or employee separations;

ii.  Sell goods or services other than in the ordinary course pursuant to agreements that were entered into prior to April 30, 2005;

iii.  Sell, transfer, or dispose of any fixed assets;

iv.  Scrap or revalue any inventory;

v.  Record any new liabilities for contingencies (including tax contingencies or materially change the basis for recorded contingencies);

vi.  Materially change the basis for other provisions and accruals;

vii.  Change accounting principles, policies or methodologies;

viii.  Enter into new contracts; or

13

Execution Copy Confidential

ix.    Take any other action other than in the ordinary course.

## 3.6    Price Adjustments

(a)    To implement the liquidation principles under Termination Agreement which contemplate that equal value should be provided to the GM Group and the Fiat Auto Group and recognizing that the transfers under Clause 3.5(d) are not being made on the basis of final audited accounts, the Parties have agreed to perform a post closing price adjustment in accordance with this Section, in addition to the balancing payment under Clause 3.5(d)(v).

(b)    As soon as practicable and, in any event, no later than 45 days after the Closing Date, GM shall provide to FAH and FAH shall provide to GM copies of their respective Closing Balance Sheets which have been audited by PriceWaterhouseCoopers together with the audit working papers in relation thereto. Prior to the delivery of the audited Closing Balance Sheets, PWC shall consult with GM and GM's accountants and FAH and FAH's accountants with a view to reducing the potential areas of future disagreement.

(c)    GM and FAH shall notify each other within 30 days of receipt of the other's Closing Balance Sheet whether it accepts it for the purposes of this Agreement.

(d)    If GM or FAH objects to the other Party's Closing Balance Sheet, by delivering a written notice of non-acceptance within such 30 day period, stating the reasons for disagreement in reasonable detail, GM and FAH and their accountants shall attempt, for a period of 30 days thereafter, to negotiate in good faith a resolution to such dispute. If GM and FAH are unable to resolve any disputed items within such time period, GM and FAH shall immediately upon the expiry of such 30 day period, jointly instruct Ernst&Young (assuming Ernst&Young have not already been engaged by GM or FAH to review the Closing Balance Sheets, in which case, GM and FAH shall jointly engage KPMG) to resolve each such disputed item within 30 days (such auditor (the "Reviewing Auditor") acting as an expert and not as an arbitrator) who shall take into consideration the amount of the Post Closing Adjustment initially suggested by GM and FAH, respectively. The Party who issues the notice of non-acceptance has the burden to demonstrate that in respect of any of it objection(s) to the other Party's Post Closing Balance Sheets, FGP or PriceWaterhouseCooper failed to follow the established accounting practices and procedures of FGP or the Accounting Principles. GM and FAH shall permit the Reviewing Auditor reasonable access to the personnel involved in the preparation of the Closing Balance Sheets of each of GM and FAH, including their respective auditors, and to any relevant accounts, documents and records within the possession of the GM Group or the Fiat Auto Group which are reasonably necessary for the purpose of verifying their respective Closing Balance Sheets or the Post Closing Adjustment. GM and FAH may consult with PriceWaterhouseCoopers and have reasonable access to the books, records and facilities of GM Powertrain Entities, German Powertrain Entities, and Fiat Auto Powertrain Entities to resolve the disagreement.

(e)    GM and FAH agree to be bound by, and to comply with, any decision made by the Reviewing Auditor of the amount of any Post Closing Adjustment which decision is final and binding upon the Parties. GM and FAH shall bear the expenses of PriceWaterhouseCooper and the Reviewing Auditor in equal proportions.

Execution Copy Confidential

(f)    If GM or FAH (as the case may be) is satisfied with the other's Closing Balance Sheet, or if it fails to notify the other in writing of its non-acceptance of such Closing Balance Sheet within such 30 day period, then such Closing Balance Sheet constitutes the final and binding Closing Balance Sheet of FAH or GM (as the case may be) for the purposes of this Agreement.

(g)    Once the Closing Balance Sheet has become final and binding pursuant to the above provisions:

      i.    the Net Book Value of the GM Powertrain Entities as of May 13, 2005 together with the Net Book Value of the German Powertrain Entities as of May 13, 2005 is the GM Final Price;

      ii.    fifty percent of the Net Book Value of FGP as of May 13, 2005 but excluding the GM Brazil Note and the Brazil Note, and including the Net Book Value of GM Powertrain Ltda, as of April 30, 2005, is the FAH Final Price;

      iii.    fifty percent of the Net Book Value of Poland is the Poland Final Price.

(h)    Unless otherwise agreed in writing by GM and the Fiat Parties, to the extent that:

      i.    any Final Price is higher than the corresponding Provisional Price, then the relevant purchaser shall pay to the relevant seller the amount by which the Final Price exceeds the Provisional Price plus interest at the three months Euribor rate for the period from the Closing Date to the date of payment;

      ii.    any Final Price is lower than the corresponding Provisional Price, then the relevant seller shall pay to the relevant purchaser the amount by which the Final Price is lower than the Provisional Price plus interest at the three months Euribor rate for the period from the Closing Date to the date of payment.

(i)    Each purchaser or seller (as the case may be) must make any payment required to be made pursuant to Clause 3.6(h) no later than 10 Business Days after the expiry of the 30 day period mentioned in Clause 3.6(d) except that, in the event of any dispute between GM and FAH in relation to their respective Closing Balance Sheets or the amount of any post closing adjustment under this Section, the post closing adjustment is payable within five Business Days of the resolution of such dispute as provided below.  For purposes of this post closing price adjustment clause, GM represents both itself and Opel, and GM and Opel will settle any payments separately between them.

## 4    CONDITIONS PRECEDENT TO CLOSING

The Closing will not take place until the following have occurred to the satisfaction of both GM and FAH:

      a)    The syndicated loan has been fully paid by the Subsidiaries of FGP in accordance with Section 3.2;

      b)    Each of the Ancillary Agreements is fully negotiated, including all necessary statements of work, purchase orders, and other documents, and execution versions have been agreed;

      c)    The relevant Parties have resolved and paid any Special Items due to FGP or the other Party in accordance with Section 3.1(a) unless the Parties have agreed to defer such payment until the resolution of the purchase price adjustment;

Execution Copy Confidential

d) The Brazilian Powertrain Operations have been separated in accordance with Section 3.5(c);

e) FGP has sold its shares in GM Powertrain Ltda to GM do Brasil for the GMB Price and GM do Brazil has issued the Brazilian Note and GM has issued the GM Brazil Note;

f) The GM Group and Fiat Auto Group have signed the agreements relating to the allocation among them of the diesel particulate filters sourced from Ibiden and NGK;

g) Fiat Auto has executed an agreement terminating its third party beneficiary rights in the Fam I Gen III Technology License Agreement with GM-Daewoo Automotive Technology Company;

h) General Motors Acceptance Corporation and FIDIS S.p.A. have executed the Termination Agreement for the Credit Cooperative;

i) The shares held by FGP in PIS have been transferred to GM and FAH;

j) FGP has executed documents transferring one share of Opel Austria Powertrain GmbH to General Motors International Holdings Inc. in trust;

k) FGP and its relevant Subsidiaries have signed an agreement with Elasis for services from January 1, 2005 to the Closing Date; and

l) Copies of technical data for all jointly owned Powertrain intellectual property and intellectual property developed pursuant to the Small Car Agreement has been provided to the applicable member of the GM Group and Fiat Auto.

## 5    EVENTS AT CLOSING

### 5.1    Closing

The Closing shall take place at the offices of Freshfields in Amsterdam, The Netherlands on May 13, 2005 provided that all the conditions precedent described in Article 4 have been satisfied before such date or on such date, or if not satisfied by May 13, 2005, on a date which has been agreed by the Parties following the satisfaction of all the conditions precedent described in Article 4.

### 5.2    Closing Events

On the Closing Date, the Parties specified below shall take the actions specified below in sequential order:

(a). *First Steps.*

i. FGP holds a Board meeting to approve all of the transactions to be undertaken by FGP at Closing;

ii. The FGP Shareholders resolution is executed by all shareholders, approving the transfer of GM's and Opel's shares in FGP to FAH and the liquidation of PIS;

iii. The execution of the following Ancillary Agreements:

a. European Powertrain Cross Supply Agreement between Fiat, FAH, Fiat Auto, and GM;

16

Execution Copy Confidential

    b.  Brazilian Powertrain Supply Agreement between General Motors do Brasil and FIAT Automoveis S.A.;

    c.  Powertrain Engineering Support Services Agreement between Fiat, FAH, Fiat Auto, and GM;

    d.  Intellectual Property Agreement among Fiat, FAH, Fiat Auto, OnStar, and GM

    e.  Joint Venture Agreement between OnStar and FGP and Fiat Participazioni relating to Bielsko-Biala;

    f.  Bielsko-Biala Joint Venture Supply Agreement among GM, FAH, Fiat and Bielsko-Biala or a side letter under which Bielsko-Biala, theGM Group and the Fiat Group agree to continue the terms and conditions of the existing European Supply Agreement until the Bielsko-Biala Joint Venture Supply Agreement is signed which the Parties agree is no later than May 31, 2005;

    g.  Termination Agreement between General Motors de Mexico ("GMM") and FIAT Automoveis S.A. relating to the termination of the distribution by GMM of the Fiat brand vehicles in Mexico;

    h.  Termination Agreement between General Motors de Mexico ("GMM") and Fiat Auto relating to the termination of the distribution by GMM of the Alfa Romeo brand vehicles in Mexico;

    i.  Amendment to the Project Agreement Small Architecture between Fiat Auto, GM, and Opel;

    j.  Amendment to the Project Agreement Large Architecture between GM, Opel and Fiat Auto;

    k.  Premium Architecture Agreement between Fiat Auto and GM;

    l.  Agreement for use of the GM Global Purchasing Sourcing process by Fiat Auto and its Affiliates for common buy parts between Fiat Auto and GM, if not signed previously; and

    m.  Agreement for use of the GM Global Purchasing Sourcing process by Fiat and its Affiliates and GM for the agreed commodities.

  iv.  Resignation of all Fiat directors from GM Powertrain Entities and German Powertrain Entities and resignation of all GM directors from Fiat Powertrain Entities; and

  v.  Execution by FGP and/or its Subsidiaries of assignment agreements for the agreements identified on Schedule 5.2(a);

(b) *Unwind of FGP in accordance with Clause 3.5(d)*

  i.  Execution of the Transfer Agreement by GM and FGP and purchase by GM of the shares of the GM Powertrain Entities, the Brazil Note, and the GM Brazilian Note for the GM Provisional Price and issuance of the GM Note;

  ii.  Purchase by Opel of the shares of the German Powertrain Entities for the Opel Provisional Price and issuance of the Opel Note;

  iii.  Purchase by FAH of all of the shares held by GM and Opel in FGP pursuant to a deed of transfer for the FAH Provisional Price and issuance of FAH Note 1 and FAH Note 2;

Execution Copy Confidential

iv. Resignation of all GM directors from FGP;

v. Purchase by FAH from FGP of the GM Note and the Opel Note;

vi. Set off and settlement of the GM Note and the Opel Note against the FAH Note 1 and the FAH Note 2;

*(c) Liquidation of OnStar's Interest in FAH*

i) Execution of a share transfer agreement and Transfer by FGP of fifty percent of the shares of Bielsko-Biala to OnStar ;

ii) If required by Dutch corporate law, payment by OnStar to FGPof the Poland Provisional Price, otherwise payment by GM under clause (d)(i) by wire transfer of immediately available funds to the account designated by FGP;

iii) Approval by FGP and OnStar as shareholders of BielskoBiala of the amended articles and election of 3 OnStar directors and 3 FGP directors and the management board in Bielsko-Biala;

iv) Payment by OnStar to FAH of € 50,000,000 (fifty million Euros) in accordance with the Implementation Agreement dated March 7, 2005, by wire transfer of immediately available funds to the account designated by FAH;

v) Transfer by FAH of the Transferred Intangible Property to OnStar in accordance with the Implementation Agreement dated March 7, 2005; and

vi) Execution of Deed of Transfer for transfer of OnStar's FAH Shares to FAH in the form attached as Schedule 5.2(c) and transfer of OnStar's FAH Shares.

d)    *Second Payment*

Payment by GM to Fiat of  € 135,000,000 (one hundred thirty–five million Euros) for the remainder of the Second Payment due under the Termination Agreement, plus any amounts required to be paid by GM to FGP under Clause (c)(ii) above, by wire transfer of immediately available funds to the account designated by Fiat.

### 5.3.   Conditional Closing

The Closing is conditional on all steps listed above having taken place. Unless the Parties otherwise agree, if the Closing cannot be completed for any reason, the Parties shall immediately unwind any steps which have been completed.

# 6    OTHER OBLIGATIONS

### 6.1    Corporate Names

(a)    GM shall take all actions necessary to cause the GM Purchasing Entities and the German Purchasing Entities, at their expense, to: i) change their corporate names to ones that do not include "Fiat" as soon as practicable, and in no event later than May 1, 2005, and ii) discontinue as soon as practicable, and in no event later than June 30, 2005, all other use of "Fiat" or any name or words confusingly similar, in signs, stationery, and external communications.  FAH shall take all actions necessary to cause the Fiat Auto Purchasing Entities, at their expense to: i) change their corporate name to ones that do not include "GM", "Opel", or "Worldwide Purchasing" as soon as practicable,

Execution Copy Confidential

and in no event later than May 1, 2005, and ii) discontinue as soon as practicable, and in no event later than June 30, 2005, all other use of "GM", "Opel", or "Worldwide Purchasing" or any name or words confusingly similar, in signs, stationery, and external communications (except for GM-FIAT WWP Poland Sp. z.o.o. which shall comply with the provisions contained in this Section 6.1.(a) no later that thirty days after receipt of the Antimonopoly approval of the transfer to FAH).

(b)     GM shall take all actions necessary to cause the GM Powertrain Entities and the German Powertrain Entities, at their expense to: i) change their corporate names to ones that do not include "Fiat" or "FGP" as soon as practicable, and in no event later than thirty days after the Closing Date, and ii) discontinue as soon as practicable, and in no event later than ninety days after the Closing Date, all other use of "Fiat" and "FGP" or any name or words confusingly similar, in signs, stationery, and external communications. FAH shall take all actions necessary to cause the Fiat Auto Powertrain Entities, at their expense to: i) change their corporate name to ones that do not include "GM" or "FGP" as soon as practicable, and in no event later than thirty days after the Closing Date, and ii) discontinue as soon as practicable, and in no event later than ninety days after the Closing Date, all other use of "GM" and "FGP" or any name or words confusingly similar, in signs, stationery, and external communications.

(c)     *FGP mark on Powertrains and components*:  All appropriate steps should be taken to assure that the "FGP" designation is no longer placed on products or used in any other manner by the Parties, within a reasonable period of time from Closing. Following the Closing, the Fiat Powertrain Entities should promptly take the aforementioned steps to assure that "FGP" designations are replaced with appropriate FIAT-owned designations, and the GM Powertrain Entities and the German Powertrain Entities should promptly do the same using appropriate GM-owned designations.  Bielsko-Biala should promptly act to assure that "FGP" designations on products are replaced with "FIAT        GM", making sure that there is an adequate space or separation between the customers' marks. Each Party shall promptly advise its own suppliers to promptly take all appropriate steps to remove any "FGP" designations from products previously supplied to FGP and its Subsidiaries. If either the GM Group or the Fiat Auto Group becomes aware of any potential complaint about the past usage of the "FGP" designation, it shall promptly notify the other.  In the event of any dispute with a third party regarding the usage of the "FGP" designation, the GM Group and the Fiat Group shall cooperate in jointly defending such disputes and will share equally all costs expended in such efforts.

### 6.2    Cooperation among the Parties

(a)     GM, FAH, and GFWWP shall cooperate to complete the liquidation of GFWWP in a timely manner.  GM, FAH, and GFWWP shall coordinate any response to any claims raised by creditors of GFWWP.

(b)     GM, FAH, and FGP shall cooperate to complete the separation of the Brazilian Powertrain operations in accordance with Section 3.5(a) and the unwinding of the Powertrain JV in accordance with Section 3.5 (b). GM and FAH, as the case may be, shall promptly provide the other copies of records and other documents that are reasonably required by the requesting Party. Without limiting the foregoing, GM shall provide FAH with a complete copy of the corporate books of GFWWP, including share register and board and shareholders meeting minutes and resolutions.  FAH shall provide GM with a complete copy of the corporate books of FGP, including share register and board and shareholders meeting minutes and resolutions.

(c)    GM and FAH implemented Sections 12.3(i)-(iv) of the Termination Agreement.  GM and FAH determined that the movement of employees from PIS to the GM Group and the Fiat Group and the movement of employees from FIAT-GM Powertrain Italia s.r.l ("*FGP Italia*") to the GM Group do not constitute transfers of business.  On or before the Closing, FGP Italia and General Motors Powertrain Europe S.r.l. will execute an agreement for the sale of certain assets.

Nothing in this Agreement, the Ancillary Agreements, or the Termination Agreement may be interpreted as precluding former employees of FGP and its Subsidiaries or GFWWP and its Subsidiaries from making use of their general knowledge, in the performance of their employment on behalf of their employers, even if such knowledge has been furthered by having had access to confidential information, while employed by FGP and its Subsidiaries or GFWWP and its Subsidiaries, provided however that the Parties shall issue instructions and guidelines to FGP employees as attached as Schedule 6.2(c) as to the protection of the technical and business confidential information proprietary to GM or to Fiat or to both of them and ensure compliance by their respective employees with such instructions and guidelines.

(d)    Promptly after Closing, GM and Opel will provide FAH with documents evidencing that the transfer of legal ownership of the GM Powertrain Entities and the German Powertrain Entities from FGP to GM or Opel, respectively has been completed, including any actions required in the local jurisdictions of such entities.

(e)    As soon as practicable after Closing:
    (i)    PIS shall calculate and pay to the relevant employees the TFR for those employees moving from PIS to the GM Group and to the Fiat Group;
    (ii)    FGP Italia shall calculate and pay to the relevant employees the TFR for those employees moving from FGP Italia to the GM Group; and
    (iii)    No later than five days Business Days from the payment by PIS or FGP Italia, Fiat Auto shall reimburse PIS and FGP Italia for the TFR for those employees moving from PIS and FGP Italia to the GM Group who were former employees of the Fiat Group according to Schedule 6.2(e) and the Terms of the Reimbursement Agreement.

(f)    Tax Cooperation/Exchange of Information.  The GM Group, the Fiat Group, and FGP and its Subsidiaries shall provide each other with the cooperation and information reasonably requested by the other party in connection with the preparation or filing of any tax return or claim for refund, or the conduct of any audit or other examination by any tax authority, protest, appeals or other administrative or judicial proceeding relating to liability for or refunds or adjustments with respect to taxes for any tax period; provided, however, that neither party is required to disclose privileged and confidential information.  Such cooperation and information includes but is not limited to:
    (i) providing copies of records concerning the ownership and tax basis of property and records concerning liabilities,
    (ii) providing other relevant information which either party may possess, including explanations of documents and information provided under this Agreement, as well as access to appropriate personnel,
    (iii) the execution of any document that may be necessary or reasonably helpful in connection with the filing of tax elections for U.S. tax purposes with respect to Bielsko-Biala, and

(iv) the use of the parties' reasonable efforts to obtain any documentation from a governmental authority or a third party that may be necessary or reasonable helpful in connection with any of the foregoing.

(g) Information Confidential. The GM Group, the Fiat Group, and FGP and its Subsidiaries shall hold and cause its consultants and advisors to hold in strict confidence, unless compelled to disclose by judicial or administrative process or, in the opinion of its counsel, by other requirements of law, all information (other than any such information relating solely to the business or affairs of such party) concerning the other party furnished to it by the other party or its representatives pursuant to this Paragraph 6.2(g) (except to the extent that such information was (i) in the public domain through no fault of the party to which it was furnished, or (ii) lawfully acquired from other sources by such party), and shall not release or disclose such information to any other person, except its auditors, attorneys, financial advisors, bankers and other consultants and advisors who shall be advised of the provisions of this Section 6.2(g).

(h) Stock options. GM and Fiat shall continue to honor any and all stock options granted to employees of FGP and its Subsidiaries and GFWWP and its Subsidiaries. No later than May 31, 2005, GM and Fiat shall jointly develop a plan and procedures for effecting this Clause.

(i) Getrag  GM, Fiat, FGP and its Subsidiaries shall cooperate in the defense of the Getrag claim for patent infringement relating to the M20/32 transmission.

### 6.3    Indemnification

(a)    GM and FAH shall each indemnify and hold harmless the other and its officers, directors, employees, agents, Subsidiaries, and Representatives for any amount in excess of fifty per cent of any and all costs, expenses, losses, liabilities, damages, fines and penalties including, without limitation, interest, court costs, reasonable fees of attorneys, accountants and other experts ("Costs") to the extent they relate to acts or omissions occurring or circumstances existing within FGP at or prior to Closing in connection.

(b)    GM and FAH shall each indemnify and hold harmless the other and its officers, directors, employees, agents, Subsidiaries, and Representatives for any amount in excess of fifty per cent of any and all Costs to the extent they relate to acts or omissions occurring or circumstances existing at or prior the date of final liquidation of PIS or GFWWP.

(c)    GM shall indemnify and hold harmless FGP and/or the Fiat Group from all Costs (including any foreign exchange rate change impact) which would not have been incurred if GM do Brasil's purchase of GM Powertrain Ltda had been consummated on the Closing Date for a purchase price in Euro equal to the Net Book Value of GM Powertrain Ltda. on the Closing Date.

(d)    GM and FAH shall share any tax Costs resulting from the movement of employees from PIS to the GM Group or the Fiat Group or from FGP Italia to the GM Group, provided however if the GM Group and/or Fiat Group has failed to materially comply with the jointly agreed employee plan or has acted unilaterally with respect to the movement of persons from PIS or FGP Italia to the detriment of the other Group, such Party shall pay any Costs resulting from or relating to such action.

21

(e) Except as indicated above, GM Group is solely responsible for Costs involving the German Purchasing Entities, the GM Purchasing Entities, the German Powertrain Entities, and the GM Powertrain Entities, and the Fiat Auto Group is solely responsible for Costs relating to the Fiat Auto Purchasing Entities and the Fiat Auto Powertrain Entities. The indemnification contemplated in Section (a) and (b) of this Article 6.3. do not apply to the extent the Claims directly or indirectly pertain to Subsidiaries of FGP or GFWWP. As a limited exception to the foregoing, GM and FAH shall each indemnify and hold harmless the other and its officers, directors, employees, agents, Subsidiaries, and Representatives for any Costs relating to the failure to properly deduct and pay income tax and social secureity contributions from the salaries of individuals who have moved to the other Party, excluding, excluding PIS which remains a joint company until its liquidation. The Parties intend that the foregoing provisions implement Section 5.1.3(b) of the Termination Agreement, and this Section 6.3 is to be interpreted and applied consistent with such Section 5.1.3(b).

## 7    TERMINATION OF AGREEMENTS AND MUTUAL RELEASE

### 7.1    Termination of Agreements

The Parties agree that on the Closing Date the agreements listed on Schedule 7.1(a) and all rights and obligations thereunder automatically terminate without any further action, provided however that.this termination does not prejudice the Parties' respective positions in the dispute resolution process referenced in Clause 3.1(a)(ii).

### 7.2    Release

(a)    On the Closing Date, Fiat, FAH and Fiat Auto, each acting on behalf of itself and its respective present or former Subsidiaries, successors, and Representatives ("**Fiat Parties**") release and forever discharge GM, FGP, and GFWWP, and each of their present or former Subsidiaries, predecessors, successors, and Representatives from any and all claims, demands, causes of action, liens, obligations, debts, damages, suits, costs, fees, judgments, and liabilities of every kind, nature and description, whether known or unknown that any of the Fiat Parties has or may have under any of the agreements terminated pursuant to Section 7.1 or related in any way to the implementation of the Termination Agreement, including the allocation of engineering and headquarter resources, other than receivables that have arisen in the ordinary course of business under such agreements prior to their termination.

(b)    On the Closing Date, GM, acting on behalf of itself and its respective present or former Subsidiaries, successors, and Representatives ("**GM Parties**") releases and forever discharges Fiat, Fiat Auto, FAH, FGP, and GFWWP, and each of their present or former Subsidiaries, predecessors, successors, and Representatives from any and all claims, demands, causes of action, liens, obligations, debts, damages, suits, costs, fees, judgments, and liabilities of every kind, nature and description, whether known or unknown that GM or FGP has or may have under any of the agreements terminated pursuant to Section 7.1 or related in any way to the implementation of the Termination Agreement, including the allocation of engineering and headquarter resources, other than receivables that have arisen in the ordinary course of business under such agreements prior to their termination.

22

Execution Copy Confidential

(c)    This Section 7.2 is not intended to affect the provisions of the Release entered into among the Fiat, FAH, Fiat Auto and GM on February 13, 2005.

# 8    PARENT COMPANY ASSURANCES

## 8.1    Exercise of Rights and Powers

To the extent it is legally able to do so, each Party shall exercise all voting rights and powers (direct or indirect) available to it in relation to any Person so that the provisions of this Agreement (and the other agreements referred to in this Agreement) are completely and punctually fulfilled, observed and performed and, generally, that full effect is given to the principles set out in this Agreement.

## 8.2    Performance by Subsidiaries

Each Party shall, to the extent it is legally able to do so, cause each member of its Group to perform all obligations under this Agreement, the Ancillary Agreements, and  any agreement referenced in such agreements.

## 8.3    Expenses

Except as otherwise specifically set forth in this Agreement or any of the Ancillary Agreements, each Party shall bear and pay its own expenses (including any fees for legal services) incurred in connection with the preparation and the entering into of this Agreement and the Ancillary Agreements.  OnStar shall pay the Polish stamp tax for the transfer of fifty percent of the Biesko-Biala shares from FGP to OnStar.

# 9    MISCELLANEOUS

## 9.1    Assignment

No Party may assign its rights or obligations under this Agreement without the prior written consent of the other parties hereto.  Except with respect to the shareholding in Bielsko Biala as governed by the Joint Venture Agreement relating to Bielsko Biala, each of GM and Fiat recognizes the other's right to internally reorganize and restructure its operations.  GM and Fiat shall cause any Subsidiaries which succeeds to the assets or business of a Subsidiary that is a party to an Ancillary Agreement to become a party to such relevant Ancillary Agreement.  GM and Fiat shall accept the assignment by the other Party and cooperate with respect to implementing the documentation necessary for the foregoing.

## 9.2    Waiver

Failure of any Party hereto to enforce any of the provisions of this Agreement or any right with respect thereto, or failure to exercise any election provided for herein is not to be considered a waiver of such provision, right or election, or in any way affect the validity of this Agreement.

Execution Copy Confidential

The failure of any Party to enforce any of such provisions, rights or elections does not preclude or prejudice such Party from later enforcing or exercising the same or other provisions, rights or elections which they may have under this Agreement.

### 9.3    Remedies

All rights and remedies of the Parties hereunder shall be in addition to all other legal rights and remedies belonging to them and the same shall be deemed to be cumulative and not alternative to such legal rights and remedies, except that there shall be no right or remedy involving termination of this Agreement, and no Party to this Agreement may terminate this Agreement, except in accordance with the express provisions of this Agreement.

### 9.4    Entire Agreement

This Agreement (including Schedules hereto), sets forth the general understanding of the Parties with respect to liquidation of the Purchasing JV and the unwinding of the Powertrain JV and, except as otherwise provided herein, supersedes all prior agreements, covenants, arrangements, communications, representations and warranties, whether oral or written by an officer, employee or representative of either of the parties, except for the Termination Agreement. As of the Closing Date, this Agreement and the Ancillary Agreements supersedes Sections 2.2, 3.1, 4.1, 5 through 9, 12.1, 12.2, 13, 14, and 15 of the Termination Agreement, except as such are necessary for the resolution of the dispute relating to the Cost Sharing Agreement. The remaining provisions of the Termination Agreement, including for the avoidance of doubt Section 11 remain in effect.

### 9.5    Amendment

No amendment to any provision of this Agreement is effective or binding on any Party unless set forth in writing and executed by a duly authorized representative of each Party.

### 9.6    Severability

If any provision of this Agreement is found to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions will not in any way be affected or impaired thereby. The invalidity, illegality or unenforceability of any provision in this Agreement in any jurisdiction does not invalidate or render illegal or unenforceable such provision in any other jurisdiction.

### 9.7    Counterparts

This Agreement may be executed in two or more counterparts, each of which is deemed to be an original, and all constitute one and the same Agreement.

### 9.8    Notices

All notices, requests, consents, approvals, waivers and other communications hereunder shall be deemed to have been duly given and made if in writing, in English, and if served by personal delivery upon the Party for whom they are intended, if delivered by registered or certified mail, return receipt requested, or by an international courier service. Or if sent by facsimile, provided that the

Execution Copy Confidential

facsimile is promptly confirmed by telephone confirmation thereof, to the person at the address set forth below, or such other address as may be designated in writing hereafter, in the same manner, by such person and shall be effective upon receipt:

To Fiat, FAH, and Fiat Auto:

Fiat S.p.A.
Via Nizza 250
Turin, Italy 10126
Telephone:(39) 011 686 1111
Facsimile:     (39) 011 686 1340
Attention:     Chief Financial Officer

To GM, OnStar and Opel:

General Motors Europe AG
Stelzenstrasse 4
CH-8152 Glattbrugg/Zurich
Telephone:     (41) 44 828 2306
Facsimile:     (41) 44 828 2307
Attention:     Vice President Finance

To FGP:
FIAT-GM Powertrain B.V.
World Trade Center Amsterdam Airport,
Schiphol Boulevard 217
1118 BH Luchthaven Schiphol
Telephone:     (31) 10224 0000
Facscimile:    (31) 10414 8444
Attention:     Bart Th. Dérogée

To GFWWP:
World Trade Office Amsterdam Airport
Schilpol Boulevard 217
118 BH Luchthaven
Schilpol, The Netherlands

### 9.9    Public Disclosure

No press release or similar public announcement or communication may be made or caused to be made concerning the execution or performance of this Agreement or the matters contemplated hereby unless specifically approved by GM and Fiat in writing, except as may be required to comply with the requirements of any applicable Laws or the rules of any stock exchange on which the securities of GM, or Fiat (as the case may be) are listed (in which case GM or Fiat (as the case may be) shall, as far as practicable, provide the other with copies of such release, publication or communica-

Execution Copy Confidential

tion prior to its publication or release in order to take account of any reasonable requests of the other made in relation thereto).

### 9.10   Applicable Law

The validity, interpretation and implementation of this Agreement shall be governed by and construed in accordance with the Laws of New York, excluding any conflict of law provisions which would require application of another law.

### 9.11   Dispute Resolution

The dispute resolution process is as provided in Article 16 of the Termination Agreement which is incorporated herein by reference.


IN WITNESS WHEREOF, Fiat, FAH, Fiat Auto, GM, OnStar, Opel, FGP, and GFWWP have caused this Agreement to be executed as of the Effective Date by their respective officers thereto duly authorized:

Fiat S.p.A.                                     General Motors Corporation

By:                                             By:
_____                         _____


Fiat Auto Holdings B.V.                         FIAT-GM Powertrain B.V.

By:                                             By:
_____                         _____
                                                A Director

                                                _____
                                                B Director


Fiat Auto S.p.A.                                GM-FIAT Worldwide Purchasing B.V.

By:                                             By:
_____                         _____
                                                A Director

                                                _____
                                                B Director

26

**Execution Copy Confidential**

Adam Opel AG                                    OnStar Corporation

By:                                            By:

_____                        _____

27

Execution Copy Confidential

### 9.9    Public Disclosure

No press release or similar public announcement or communication may be made or caused to be made concerning the execution or performance of this Agreement or the matters contemplated hereby unless specifically approved by GM and Fiat in writing, except as may be required to comply with the requirements of any applicable Laws or the rules of any stock exchange on which the securities of GM, or Fiat (as the case may be) are listed (in which case GM or Fiat (as the case may be) shall, as far as practicable, provide the other with copies of such release, publication or communication prior to its publication or release in order to take account of any reasonable requests of the other made in relation thereto).

### 9.10    Applicable Law

The validity, interpretation and implementation of this Agreement shall be governed by and construed in accordance with the Laws of New York, excluding any conflict of law provisions which would require application of another law.

### 9.11    Dispute Resolution

The dispute resolution process is as provided in Article 16 of the Termination Agreement which is incorporated herein by reference.

IN WITNESS WHEREOF, Fiat, FAH, Fiat Auto, GM, OnStar, Opel, FGP, and GFWWP have caused this Agreement to be executed as of the Effective Date by their respective officers thereto duly authorized:

Fiat S.p.A.

By:

General Motors Corporation

By:

Fiat Auto Holdings B.V.

By:

FIAT-GM Powertrain B.V.

By:

A Director

B Director

Fiat Auto S.p.A.

GM-FIAT Worldwide Purchasing B.V.

26

By:

_____

Adam Opel AG

By:

*Teresa Holden*
*Attorney in fact*

By: *Giorgio Rossi*

A Director  FAH (FIAT AUTO HOLDINGS)
AS LIQUIDATOR

_____

B Director

OnStar Corporation

By:

*Teresa Holden*
*Attorney in fact*



27

## Schedule 2.1(a)

### Timetable for Liquidation of the Purchasing JV

| # | Date | Step |
|---|------|------|
| 1 | Mar 22 | Finalize local 2004 accounts to pay dividends |
| 2. | Mar 24 | Subsidiaries with sufficient cash will pay dividends to the Dutch holding company GM Fiat WWP B.V. The most important subsidiaries for dividend payment are Germany and Sweden |
| 3. | | Complete all local steps required as prereq to transfer shares, e.g. Works council notifications |
| 4. | | Terminate/amend Purchasing Consultancy Agreements |
| 5. | Mar 30 | Shareholders resolve to dissolve and appoint liquidators |
| 6. | Mar 30 | Finalize BV 2004 unaudited accounts |
| 7. | Mar 31 | 1. Liquidators resolve to distribute all legal entities and most of the cash to FAH, Opel, and GM effective April 1, 0h01<br>2. GFWWP signs a share transfer agmt with each of FAH, Opel, and GM; effct. March 31<br>GM, Opel, and FAH sign side letter referencing Joint Ventures Separation Master Agreement on Unwinding the Alliance |
| 8. | Mar 31 | Local legal entities to execute all local steps required to transfer shares effective April 1 |
| 9. | April 1 | Terminate/amend Purchasing Consultancy Agreements |
| 10. | 30-60 days | Prepare liquidation accounts as of Mar 31 and Liquidation Plan; Complete Polish antimonopoly filing etc |
| 11. | Target April 30 | File accounts and Liquidation Plan with Chamber of Commerce and Place Ad in Dutch newspaper |
| 12 | May 31 | adoption and filing of 2004 audited accounts |
| 13. | June 30 | 60 Day waiting period for creditor objections |
| 14. | July 5 | Court confirms no creditor claims |
| 15. | July 8 | Satisfy remaining liabilities and distribute remaining assets (cash) to shareholders adjusting in accordance with liquidation accounts |
| 16 | August 31 | Liquidation complete<br>Filing with Chamber of Commerce stating liquidation is complete<br>Notifying shareholders |

Schedule 2.1 (B)

Executed on 31 March 2005

Effective as of 1 April 2005

**General Motors Corporation**

**Adam Opel AG**

**Fiat Auto Holdings B.V.**

**GM-Fiat Worldwide Purchasing B.V. in liquidatie**

## LIQUIDATION AND TRANSFER AGREEMENT

in respect of the assets of

GM-Fiat Worldwide Purchasing B.V.

in liquidatie

**THIS LIQUIDATION AND TRANSFER AGREEMENT** is made on 31 March 2005 and becomes effective on April 1, 2005.

BETWEEN

(1)    **General Motors Corporation**, a corporation incorporated under the laws of the State of Delaware, United States of America, having its registered offices at 300 Renaissance Center, Jefferson Avenue, Detroit, Michigan, United States of America (*GM Corp*);

(2)    **Adam Opel AG**, a company (*Aktiengesellschaft*) organised under the laws of the Federal Republic of Germany, having its registered offices at Bahnhofsplatz 1, D-65423 Rüsselheim, Federal Republic of Germany (*Adam Opel*);

(3)    **Fiat Auto Holdings B.V.**, a private limited liability company (*besloten vennootschap met beperkte aansprakelijkheid*) incorporated under the laws of the Netherlands, having its official seat in Amsterdam, the Netherlands, and its office address at World Trade Center Amsterdam Airport, Schiphol Boulevard 217, 1118 BH Luchthaven Schiphol, the Netherlands (*FAH*);

GM Corp, Adam Opel and FAH hereinafter together also referred to as: the *Transferees*; and

(4)    **GM-Fiat Worldwide Purchasing B.V. in liquidatie**, a private limited liability company (*besloten vennootschap met beperkte aansprakelijkheid*) in liquidation incorporated under the laws of the Netherlands, having its official seat in Amsterdam, the Netherlands, and its office address at World Trade Center Amsterdam Airport, Schiphol Boulevard 217, 1118 BH Luchthaven Schiphol, the Netherlands (the *Transferor*).

WHEREAS

(A)    On the 13th day of February 2005, GM Corp and FAH, amongst other parties, entered into an "Agreement to Liquidate Joint Ventures and Terminate Master Agreement" (the *Termination Agreement*) regarding, *inter alia*, the liquidation of the Powertrain JV, the Purchasing JV and the Brasil JV (as defined in the Termination Agreement) existing between Fiat and General Motors.

(B)    In the Termination Agreement, the parties to the Termination Agreement agreed what each of the JV Shareholders (as defined in the Termination Agreement) would receive as part of the implementation of the Liquidation Principles (as defined in the Termination Agreement).

(C)    In order to effectuate the Termination Agreement as to the Purchasing JV, the parties to this Agreement wish to dissolve and to liquidate the Transferor under the terms and conditions of this Agreement.

(D)    The Transferees are the sole shareholders of the entire share capital of the Transferor, consisting of 150 class A shares and 150 class B Shares with a nominal value of € 1,000 each, as follows:

    (i)    GM Corp is the holder of 90 class A shares;

    (ii)    Adam Opel is the holder of 60 class A shares; and

    (iii)    FAH is the holder of 150 class B shares.

(E)    In their capacity as the sole shareholders of the Transferor, the Transferees resolved to dissolve and to liquidate the Transferor on 30 March 2005, which resolution will become effective on 31 March 2005. A copy of the dissolution and liquidation resolution (the *Resolution*) has been attached to this Agreement as Annex I.

(F)    In the Resolution, FAH and GM Corp. have been appointed as the liquidators of the Transferor (together hereinafter referred to as: the *Liquidators*).

(G)    In the Resolution, the Transferees adopted the preliminary liquidation accounts of the Transferor, which liquidation accounts state the financial situation of the Transferor as of March 31, 2005 (the *Preliminary Liquidation Accounts*). A copy of the Preliminary Liquidation Accounts has been attached to this Agreement as Annex II. In the Resolution, the Transferees further inserted in the recitals their wish to adopt the final liquidation accounts ultimately on 30 April 2005 (the *Final Liquidation Accounts*). ). The Final Liquidation Accounts will also reflect any balancing payments that may have to be made between the Transferees.

(H)    On March 31, 2005, the Liquidators shall file a certified copy of the Resolution with the trade register of the Chamber of Commerce in Amsterdam where the Transferor has been registered. The filing of the certified copies of the Resolution and of the Final Liquidation Accounts has not yet been announced in a Dutch daily newspaper as of the date hereof.

(I)    As of March 31, 2005, except for the amounts owed to creditors as listed in Annex III to this Agreement (the *Known Creditors Amount*), there are no known creditors of the Transferor to whom the Transferor owes cash or anything else. The Transferor has made a reservation in the Preliminary Liquidation Accounts equal to the aggregate amount owed to the Known Creditors Amount.

(J)    It appears from the Preliminary Liquidation Accounts that the current assets (other than the amount reserved for the Known Creditors Amount) of the Transferor consist of:

    (i)    a cash amount of nine million nine hundred twenty-six thousand Euro – 9,926,000 Euro - (the *Cash Amount*);

(ii)    the entire share capital of GM-Fiat Worldwide Purchasing Opel Germany GmbH (the *Opel Germany Shares*);

(iii)    the entire share capital of GM-Fiat Worldwide Purchasing Management Services GmbH (the *German Management Services Shares*);

(iv)    the entire share capital of GM-Fiat Worldwide Purchasing Sweden AB (the *Sweden Shares*);

(v)    6,199 shares (out of 6200 issued shares) of GM-Fiat Worldwide Purchasing Opel Belgium N.V. (the *Belgium Shares*);

(vi)    the entire share capital of GM-Fiat Worldwide Purchasing Vauxhall UK Ltd (the *United Kingdom Shares*);

(vii)    the entire share capital of GM-Fiat Worldwide Purchasing Poland sp.z.oo with corporate seat in Bielsko Biala (Poland) at ul. M. Grazynskiego 141, share capital:PLN 300,000 divided into no. 600 shares of PLN 500 par value registered at District Court in Bielsko Biala, VIII Business Department of the National Registry at number 0000015369 (the *Poland Shares*);

(viii)    the entire share capital of GM-Fiat Worldwide Purchasing Opel Hungary Ltd. (the *Hungary Shares*);

(ix)    the entire share capital of GM-Fiat Worldwide Purchasing Opel Austria GmbH (the *Austria Shares*);

(x)    the entire share capital of GM-Fiat Worldwide Purchasing Italia S.r.l., with the corporate seat in Turin (Italy), at Corso Giovanni Agnelli 200 with share capital of Euro 600,000, represented by no. 1 (one) quota of Euro 600,000 par value, registred into "Registro delle Imprese- ufficio di Torino" at no. 07882790012 (the *Italy Shares*);

(xi)    the entire share capital of GM-Fiat Worldwide Purchasing Opel Espana S.L. (the *Spain Shares*);

(xii)    29,998 shares (out of 30,000 issued shares) of GM-Fiat Worldwide Purchasing do Brasil Betim Ltda. (the *Brasil Betim Shares*); and

(xiii)    29,998 shares (out of 30,000 issued shares) of GM-Fiat Worldwide Purchasing do Brasil Sao Caetano do Sul Ltda. (the *Brasil Sao Caetano Shares*);

The Cash Amount, the Opel Germany Shares, the German Management Services Shares, the Sweden Shares, the Belgium Shares, the United Kingdom Shares, the Poland Shares, the Hungary Shares, the Austria Shares, the Italy Shares, the Spain Shares, the Brasil Betim Shares and Brasil Sao Caetano Shares are hereinafter together also referred to as the *Assets*.

(K)    Before making the announcement in a daily Dutch newspaper as described under (H), the Transferees and the Transferor, represented for the purposes hereof by the Liquidators, wish to transfer the Assets from the Transferor to the Transferees in accordance with Section 2:23b paragraph 6 of the Dutch Civil Code under the legal title of liquidation under the terms and conditions set out in this Agreement, as follows:

    (i)    one million eight hundred thousand Euro (1,800,000 €) of the Cash Amount, the Opel Germany Shares and the German Management Services Shares to Adam Opel (the *Adam Opel Assets*);

    (ii)    two million seven hundred thousand Euro (2,700,000 €) of the Cash Amount, the Sweden Shares, the United Kingdom Shares, the Hungary Shares, the Belgium Shares, the Austria Shares, the Spain Shares and the Brasil Sao Caetano Shares to GM (the *GM Assets*); and

    (iii)    four million five hundred thousand Euro (4,500,000 €) of the Cash Amount, the Cash Amount, the Poland Shares, the Italy Shares and the Brasil Betim Shares to FAH (the *FAH Assets*).

(L)    The Liquidators approved the transfer of the Assets from the Transferor to the Transferee in accordance with Section 2:23b paragraph 6 of the Dutch Civil Code under the legal title of the liquidation as appears from a resolution, dated 31 March 2005, a copy of which has been attached to this Agreement as <u>Annex IV</u>.

IT IS AGREED as follows:

## 1.    HEADINGS

Clause headings in this Agreement are inserted for convenience of reference only and do not in any way define or affect the meaning, construction or scope of any of the provisions hereof.

## 2.    LIQUIDATION TRANSFER

2.1    The Transferor hereby transfers the Assets to the Transferees in accordance with Section 2:23b paragraph 6 of the Dutch Civil Code under the legal title of liquidation, as follows:

(i)    the Transferor hereby transfers the GM Assets to GM Corp in accordance with Section 2:23b paragraph 6 of the Dutch Civil Code under the legal title of liquidation, which GM Assets GM Corp hereby accepts from the Transferor. The transfer of the GM Assets takes place under the terms and conditions of this Agreement;

(ii)    the Transferor hereby transfers the Adam Opel Assets to Adam Opel in accordance with Section 2:23b paragraph 6 of the Dutch Civil Code under the legal title of liquidation, which Adam Opel Assets Adam Opel hereby accepts

from the Transferor. The transfer of the Adam Opel Assets takes place under the terms and conditions of this Agreement; and

(iii)    the Transferor hereby transfers the FAH Assets to FAH in accordance with Section 2:23b paragraph 6 of the Dutch Civil Code under the legal title of liquidation, provided that the legal ownership of the Poland Shares is only transferred immediately after the relevant approval of the Polish antitrust authorities has been obtained. FAH hereby accepts from the Transferor. The transfer of the FAH Assets takes place under the terms and conditions of this Agreement.

2.2     The Transferees and the Transferor hereby mutually agree and state (i) that, except for the Known Creditors for whom a reservation has been made in the Preliminary Liquidation Accounts, there are no known creditors of the Transferor whom have not yet been paid, as a result of which there are no other parties, except for the Transferees, entitled to the Assets as part of the Liquidation and (ii) that the announcement in a daily Dutch newspaper as described in recital (E) has not yet taken place as a result of which this transfer of the Assets may be implemented without the approval of the District Court as described in Section 2:23b paragraph 6 of the Dutch Civil Code.

3.    COMPLETION

The Transferor and the Transferees hereby agree that any further formalities or transactions which, pursuant to rules of the laws of the Republic of Germany, Sweden, Belgium, England and Wales, Poland, Hungary, Austria, Italy, Spain and/or Brasil or other rules applicable to the Assets, are required for a transfer of the full and unencumbered ownership to the Assets from the Transferor to the Transferees shall be effected forthwith.

With respect to Poland, FAH hereby warrants and undertakes to GM Corp and Adam Opel to submit any necessary filing to the Polish antitrust authorities as soon as reasonably possible.

In respect of the Cash Amount, the Transferor shall procure that the applicable Cash Amount will be transferred by means of a wire transfer to the bank accounts of each of the Transferees to whom part of the Cash Amount will be distributed in accordance with this Agreement.

4.    WARRANTIES

The Transferor represents and warrants to each of the Transferees (but only in respect of the Assets such Transferee is receiving pursuant to this Agreement) that:

(i)    the Transferor is the legal and beneficial owner of the Assets and owns the Assets free and clear of all liens and encumbrances;

(ii)    the Transferor has all corporate power and authority to enter into this Agreement and to transfer full legal and beneficial ownership of the Assets to the Transferees in accordance with this Agreement;

(iii)  the execution and delivery of this Agreement by the Transferor has been duly authorized by the Transferor and it constitutes a legally binding obligation of the Transferor in accordance with its terms; and

(iv)  the shares that are part of the Assets are fully paid up.

## 5.  REPRESENTATIONS AND WARRANTIES OF TRANSFEREE

Each of the Transferees represents and warrants to the Transferor that it has the corporate power and authority to enter into this Agreement and the execution and delivery of this Agreement by each of the Transferees has been duly authorized by each of the Transferees and that it constitutes a legally binding obligation of the Transferees in accordance with its terms.

## 6.  CHANGE OF NAME

6.1   GM Corp and Adam Opel undertake with respect to the legal entities whose share capital is transferred to them in accordance with Sections 2.1 (i) and (ii), to ensure that any reference to Fiat in the company name of these legal entities will be deleted as soon as practically possible, but ultimately within one month, after the 1st of April 2005.

6.2   FAH undertakes with respect to the legal entities whose share capital is transferred to it in accordance with Sections 2.1 (iii), to ensure that any reference to GM, Opel or Worldwide Purchasing in the company name of these legal entities will be deleted as soon as practically possible, but ultimately within one month, after the 1st of April 2005 or in the case of the Poland Shares within one month after the relevant approval of the Polish antitrust authorities will have been obtained.

## 7.  ENTIRE AGREEMENT

This Agreement sets out the entire agreement and understanding between the parties in respect of the transfer of the Assets.

## 8.  VARIATION

No variation of this Agreement (or of any of the documents referred to in this Agreement) shall be valid unless it is in writing and signed by or on behalf of each of the parties to it. The expression "variation" shall include any variation, supplement, deletion or replacement however effected.

VI    LiquidationandTransfer Agreement310305.doc

9.    NO THIRD PARTY BENEFICIARIES

This Agreement shall binding upon and inure solely to the benefit of the parties hereto and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.


10.    NOTICES

All notices or other communications which may be or are required to be given pursuant to this Agreement must be in writing and delivered by hand, or mailed by express mail, or transmitted by facsimile transmission, addressed as follows:

(i)     General Motors Corporation
        C/o General Motors Europe AG
        Attn Gerd T. Becht
        CH 8152 Glattbrugg
        Switzerland

(ii)    Adam Opel AG
        C/o General Motors Europe AG
        Attn Gerd T. Becht
        CH 8152 Glattbrugg
        Switzerland

(iii)   Fiat Auto Holding
        C/o Fiat Auto S.p.A.
        Attn Giorgio Fossati
        Corso Giovanni Agnelli, 200
        10136 Torino
        Italy

(iv)    the Company
        GM-Fiat Worldwide Purchasing B.V.
        World Trade Center Amsterdam Airport
        Schiphol Boulevard 217
        1118 BH Luchthaven Schiphol
        The Netherlands

11.    GOVERNING LANGUAGE

This Agreement has been prepared and executed in the English language. All notices delivered hereunder must be prepared and furnished in the English language, which the parties acknowledge to understand.


12.    GOVERNING LAW

This Agreement and the relationship between the parties pursuant to this Agreement shall be governed by, and interpreted in accordance with, Netherlands law. All parties agree that the competent courts of Amsterdam, the Netherlands, are to have the exclusive jurisdiction to settle any disputes, which may arise in connection with this Agreement.


13.    COSTS

Each party shall pay its own costs and expenses incurred in connection with the execution and/or preparation of this Agreement.  Each of the Transferees shall be solely liable for payment of any stamp duty, stamp duty reserve tax or other transfer tax under applicable law in respect of the transfer of Assets to it.



AS WITNESS this Agreement has been signed on behalf of the parties the day and year first before written.

**General Motors Corporation**

By: Lucas O.M. Aelen

Its: authorized representative

**Adam Opel AG**

By: Lucas O.M. Aelen

Its: authorized representative

**Fiat Auto Holdings B.V.**

By: Bart Th. Dérogée

Its: authorized representative

**GM-Fiat Worldwide Purchasing B.V. in liquidatie**
By: General Motors Corporation

By: Lucas O.M. Aelen

Its authorized representative

By: Fiat Auto Holdings B.V.

By: Bart Th. Dérogée

Its: authorised representative

ANNEX 1

**Shareholders´ Resolution to liquidate**



| | |
|---|---|
| **AANDEELHOUDERSBESLUIT** | **SHAREHOLDERS' RESOLUTION** |
| ONDERGETEKENDEN | THE UNDERSIGNED |
| **General Motors Corporation**, een vennootschap opgericht naar het recht van de Staat Delaware, Verenigde Staten van Amerika, met kantooradres 300 Renaissance Center, Jefferson Avenue, Detroit, Michigan, Verenigde Staten van Amerika (GM); | **General Motors Corporation**, a corporation incorporated under the laws of the State of Delaware, United States of America, having its registered offices at 300 Renaissance Center, Jefferson Avenue, Detroit, Michigan, United States of America (GM); |
| **Adam Opel AG**, een vennootschap (*Aktiengesellschaft*) opgericht naar het recht van de Bondsrepubliek Duitsland, met kantooradres Bahnhofsplatz 1, D-65423 Rüsselheim, Bondsrepubliek Duitsland; | **Adam Opel AG**, a company (*Aktiengesellschaft*) organised under the laws of the Federal Republic of Germany, having its registered offices at Bahnhofsplatz 1, D-65423 Rüsselheim, Federal Republic of Germany; |
| **Fiat Auto Holdings B.V.**, een besloten vennootschap met beperkte aansprakelijkheid, opgericht naar Nederlands recht, statutair gevestigd te Amsterdam, Nederland, en kantoorhoudende te World Trade Center Amsterdam Airport, Schiphol Boulevard 217, 1118 BH Luchthaven Schiphol, Nederland (FAH); | **Fiat Auto Holdings B.V.**, a private limited liability company (*besloten vennootschap met beperkte aansprakelijkheid*) incorporated under the laws of the Netherlands, having its official seat in Amsterdam, the Netherlands, and its office address at World Trade Center Amsterdam Airport, Schiphol Boulevard 217, 1118 BH Luchthaven Schiphol, the Netherlands (FAH); |
| Hierna tezamen tevens te noemen: de *Aandeelhouders*. | Hereinafter together also referred to as: the **Shareholders**. |
| HIERBIJ handelend in hun hoedanigheid van enige aandeelhouders van **GM-Fiat Worldwide Purchasing B.V.**, een besloten vennootschap met beperkte aansprakelijkheid, opgericht naar Nederlands recht, statutair gevestigd te Amsterdam, Nederland, en kantoorhoudende te World Trade Center | HEREBY acting in their capacity of the holders of the entire issued share capital of **GM-Fiat Worldwide Purchasing B.V.**, a private limited liability company (*besloten vennootschap met beperkte aansprakelijkheid*) incorporated under the laws of the Netherlands, having its official seat in Amsterdam, the Netherlands, and its |

1    shareholderresolution2903.doc

Amsterdam Airport, Schiphol Boulevard 217, 1118 BH Luchthaven Schiphol, Nederland (hierna te noemen: de **Vennootschap**),

office address at World Trade Center Amsterdam Airport, Schiphol Boulevard 217, 1118 BH Luchthaven Schiphol, the Netherlands (hereinafter: the **Company**),

OVERWEGENDE

WHEREAS

a. De jaarrekening van de Vennootschap over het boekjaar 2004 is nog niet vastgesteld, maar verwacht wordt dat de vaststelling en deponering bij het handelsregister van de Kamer van Koophandel zullen geschieden aan het eind van mei 2005.

a. The annual accounts of the Company over the financial year 2004 have not yet been adopted, but are expected to be adopted and filed with the trade register of the Chamber of Commerce at the end of May 2005.

b. De Aandeelhouders wensen te besluiten tot het ontbinden en liquideren van de Vennootschap met inachtneming van de toepasselijke bepalingen van het Burgerlijk Wetboek, zulks met ingang van de datum waarop dit besluit effectief wordt.

b. The Shareholders wish to resolve to dissolve and to liquidate the Company in accordance with the applicable sections of the Dutch Civil Code, effective as per the date this resolution becomes effective.

c. Overeenkomstig het bepaalde in artikel 22 paragraaf 1 van de statuten van de Vennootschap worden de leden van de directie automatisch aangewezen als vereffenaars indien er een aandeelhouderbesluit wordt genomen tot het ontbinden van de Vennootschap. Omdat de leden van de directie niet de wens hebben om vereffenaars van de Vennootschap te zijn en de Aandeelhouders daarmee instemmen, wensen de Aandeelhouders om de leden van de directie te ontslaan van hun functie als vereffenaars zoals bepaald in de statuten van de Vennootschap en om andere vereffenaars in de plaats van hen te benoemen.

c. In accordance with Article 22 paragraph 1 of the Company's articles of association, the members of the management board will be automatically appointed as the liquidators upon the adoption of a shareholders' resolution to dissolve the Company. As the members of the management board do not wish to be the liquidators of the Company and the Shareholders have agreed to that, the Shareholders wish to dismiss the members of the management board from their duty to be liquidators in accordance with the Company's articles of association and to appoint other liquidators instead in this resolution.

d. In verband met de voorgenomen ontbinding en liquidatie van de

d. In respect of the contemplated dissolution and liquidation of the

2    shareholderresolution2903.doc

Vennootschap, wensen de Aandeelhouders (i) ontslag en decharge te verlenen aan de huidige leden van de directie, (ii) ontslag te verlenen aan de leden van de directie voor hun automatische benoeming tot vereffenaars volgens artikel 22 van de statuten van de Vennootschap (iii) om GM en FAH te benoemen als vereffenaars en (iv) General Motors Nederland B.V. (*GM Netherlands*) als bewaarder van de boeken en bescheiden van de Vennootschap aan te wijzen.

Company, the Shareholders wish (i) to dismiss and grant discharge to the current members of the management board, (ii) to dismiss the current members of the management board from their automatical appointment as liquidators in accordance with Article 22 of the Company's articles of association, (iii) to appoint GM and FAH as liquidators and (iv) to appoint General Motors Nederland B.V. (*GM Netherlands*) as custodian of the Company's books and records.

e. De Aandeelhouders wensen verder de voorlopige liquidatiebalans van de Vennootschap vast te stellen, die de financiële situatie van de Vennootschap met ingang van 31 March 2005 weergeeft, welke voorlopige liquidatiebalans in definitieve vorm uiterlijk op 30 april 2005 zal worden vastgesteld.

e. The Shareholders further wish to adopt the preliminary liquidation accounts of the Company, stating the financial situation of the Company as per 31 March 2005, which preliminary liquidation accounts will be adopted in final form ultimately on 30 April 2005.

f. Voor zover er sprake is van een tegenstrijdig belang tussen de vereffenaars en de Vennootschap met betrekking tot de ontbinding en de vereffening, wensen de Aandeelhouders hierbij zichzelf aan te wijzen en te benoemen tot bijzondere vertegenwoordigers (de *Bijzondere Vertegenwoordigers*) met het recht om de Vennootschap gezamenlijk te vertegenwoordigen (waaronder begrepen het verlenen van volmachten), zulks op basis van artikel 2:256 van het Burgerlijk Wetboek.

f. To the extent that there is a conflict of interest between the liquidators and the Company in respect of the dissolution and liquidation in the broadest sense, the Shareholders wish to designate and appoint themselves as special representatives (the *Special Representatives*) with the power to represent the Company acting jointly (including the granting of powers of attorney), such in accordance with Section 2:256 of the Dutch Civil Code.

g. Op geen van de aandelen in de Vennootschap rust een vruchtgebruik, noch is er enig pandrecht gevestigd op de aandelen in de Vennootschap en er

g. No shares in the Company have been made subject to a right of pledge, usufruct and no depository receipts have been issued in respect of any shares with

3     shareholderresolution2903.doc

zijn geen certificaten van aandelen uitgegeven met medewerking van de Vennootschap.

the co-operation of the Company;

h. De directie van de Vennootschap heeft de gelegenheid gehad om een raadgevende stem uit te brengen omtrent de aanhangige besluiten, zulks overeenkomstig het bepaalde in artikel 2:227 van het Burgerlijk Wetboek.

h. The management board of the Company has had the opportunity to advise on the resolutions as referred to in Section 2:227 of the Dutch Civil Code.

i. Overeenkomstig het bepaalde in artikel 18 van de statuten van de Vennootschap kunnen er aandeelhoudersbesluiten worden genomen buiten vergadering.

i. As permitted by article 18 of the Articles of Association of the Company, shareholder's resolutions may be adopted without holding a meeting of shareholders.

**BESLUITEN HIERBIJ:**

**HEREBY RESOLVE:**

1. De Vennootschap te ontbinden en in vrijwillige liquidatie te laten treden met ingang van de datum waarop dit besluit effectief wordt en om te beginnen met de ontbindingsprocedure overeenkomstig het bepaalde in het Burgerlijk Wetboek.

1. To dissolve the Company and to put the Company into voluntary liquidation as per the date this resolution becomes effective and to commence the dissolution procedure in accordance with Dutch statutory law.

2. De voorlopige liquidatiebalans van de Vennootschap met ingang van de datum waarop dit besluit effectief wordt, vast te stellen.

2. To adopt the preliminary liquidation balance sheet of the Company as per the date this resolution becomes effective.

3. Ontslag en decharge te verlenen aan de huidige leden van de directie, zijnde Gianni Coda, Bo Inge Andersson, Hans Demant, Bart Theodoor Derogee, Lucas Otto Maria Aelen, Sergio Marchionne, Roger Jan Johansson, Frederick Arthur Henderson, Carl Peter Edmund Mortiz Forster, Antonio Bene, Harald Jakob Wester, Stefan Ketter met ingang van de datum waarop dit besluit effectief wordt.

3. To dismiss and to grant discharge to Gianni Coda, Bo Inge Andersson, Hans Demant, Bart Theodoor Derogee, Lucas Otto Maria Aelen, Sergio Marchionne, Roger Jan Johansson, Frederick Arthur Henderson, Carl Peter Edmund Mortiz Forster, Antonio Bene, Harald Jakob Wester, Stefan Ketter as managing directors of the Company as per the date this resolution becomes effective.

4. ontslag te verlenen aan de leden van de directie voor hun automatische benoeming tot vereffenaars volgens artikel 22 van de statuten van de Vennootschap.

5. GM en FAH te benoemen als vereffenaars van de Vennootschap met ingang van de datum waarop dit besluit effectief wordt.

6. Voor zover er sprake is van een tegenstrijdig belang tussen de vereffenaars en de Vennootschap met betrekking tot de ontbinding en de vereffening, zichzelf aan te wijzen en te benoemen tot Bijzondere Vertegenwoordigers met het recht om de Vennootschap gezamenlijk te vertegenwoordigen (waaronder begrepen het verlenen van volmachten), zulks op basis van artikel 2:256 van het Burgerlijk Wetboek.

7. GM Netherlands te benoemen als bewaarder van boeken en bescheiden zodra de liquidatieprocedure van de Vennootschap is beëindigd, zulks met inachtneming van het bepaalde in artikel 2:24 van het Burgerlijk Wetboek.

Dit aandeelhoudersbesluit zal geacht te zijn genomen indien getekend door of namens alle Aandeelhouders. Het is niet noodzakelijk dat alle ondertekenaars dezelfde kopie van het besluit tekenen. Indien dit besluit op verschillende exemplaren is getekend, zullen de verschillende exemplaren één besluit vormen.

4. to dismiss the current members of the management board from their automatical appointment as liquidators in accordance with Article 22 of the Company's articles of association.

5. To appoint GM and FAH as liquidators of the Company as per the date this resolution becomes effective.

6. To the extent that there is a conflict of interest between the liquidators and the Company in respect of the dissolution and liquidation in the broadest sense, to designate and appoint themselves as Special Representatives with the power to represent the Company acting jointly (including the granting of powers of attorney), such in accordance with Section 2:256 of the Dutch Civil Code.

7. To appoint GM Netherlands as custodian of the Company's books and records once the liquidation of the Company has been finalised, such in accordance with Section 2:24 of the Dutch Civil Code

This shareholders' resolution shall be passed, if duly signed by or on behalf of all the Shareholders. It shall not be required for all signatories to sign the same copy of this resolution. If this resolution is signed in counterparts, such counterparts shall jointly constitute one resolution.

| | |
|---|---|
| Dit besluit zal effectief worden op 31 maart 2005. | This resolution shall become effective on 31 March 2005. |
| Getekend op 30 maart 2005 | Signed on the 30th day of March 2005 |

| | | | | |
|---|---|---|---|---|
| General Motors Corporation | | | General Motors Corporation | |
| Door | : | | By | : |
| Titel | : | | Title | : |

| | | | | |
|---|---|---|---|---|
| Adam Opel AG | | | Adam Opel AG | |
| Door | : | | By | : |
| Titel | : | | Title | : |

| | | | | |
|---|---|---|---|---|
| Fiat Auto Holdings B.V. | | | Fiat Auto Holdings B.V. | |
| Door | : | SERGIO MARCHIONNE | By | : SERGIO MARCHIONNE |
| Titel | : | | Title | : CHAIRMAN AND C.E.O. |

6    shareholderresolution2903.doc

ADAM OPEL AG RECHT/LEGAL                    ⌀007

| | |
|---|---|
| Dit besluit zal effectief worden op 31 maart 2005. | This resolution shall become effective on 31 March 2005. |
| Getekend op 30 maart 2005 | Signed on the 30th day of March 2005 |

General Motors Corporation

Door    :

Titel    :

Adam Opel AG

Door    :

Titel    :

Fiat Auto Holdings B.V.

Door    :

Titel    :


General Motors Corporation

By    :

Title    :

Adam Opel AG

By    :    Michael Sarnecki

Title    :    Attorney-in-fact

Fiat Auto Holdings B.V.

By    :

Title    :

6    shareholderresolution3003.doc

Dit besluit zal effectief worden op 31 maart 2005.

This resolution shall become effective on 31 March 2005.

Getekend op 30 maart 2005

Signed on the 30th day of March 2005

General Motors Corporation

General Motors Corporation

Door   :

By   :   Anne T. Lavin

Titel   :

Title   :   Assistant Secretary

Adam Opel AG

Adam Opel AG

Door   :

By   :

Titel   :

Title   :

Fiat Auto Holdings B.V.

Fiat Auto Holdings B.V.

Door   :

By   :

Titel   :

Title   :

6      shareholderresolution3003.doc

ANNEX II

**Preliminary Liquidation Account**

**Eur/000**

_Gm-Fiat Worldwide Purchasing B.V._

| | Balance sheet |
|---|---|

**Assets**
**Fixed assets**

| | |
|---|---|
| Goodwill | 11 |
| Investment in subsidiaries | 2,928 |
| **Total Fixed assets** | **2,939** |
| **Current assets** | |
| Cash and banks | 9,926 |
| Advanced to subsidiaries | 0 |
| **Total Current assets** | **12,865** |

| | |
|---|---|
| **Current Liabilities** | |
| Amount due to group companies | 128 |
| Accrued interest and other liabilities | 45 |
| **Total current liabilities** | **173** |
| **SHAREHOLDER'S EQUITY** | |
| Paid in capital | 300 |
| Additional paid in capital | 701 |
| Accumulated other comprehensive gain (loss) | (78) |
| Retained earnings | 8,761 |
| Retained earnings - Current Year | 3,008 |
| **Total shareholder' equity** | **12,692** |

| | |
|---|---|
| **Total Liabilities** | **12,865** |

ANNEX III

**Known Creditors Amount**

|  | 000 EUROS |
|---|---|
| AMOUNT DUE TO GROUP COMPANIES | **173** |
| - Amounts due to group companies        (i) | *128* |
| - Accrued interest and other liabilities | *45* |

(i) position of current interest account with FIAT FINANCE AND TRADE LTD

ANNEX IV

**Liquidators´ resolution**

**Written resolution of the liquidators of GM-Fiat Worldwide Purchasing B.V. in liquidatie**

**The undersigned:**

1.  **General Motors Corporation,** a corporation incorporated under the laws of the State of Delaware, United States of America, having its registered offices at 300 Renaissance Center, Jefferson Avenue, Detroit, Michigan, United States of America (*GM Corp*); and

2.  **Fiat Auto Holdings B.V.,** a private limited liability company (*besloten vennootschap met beperkte aansprakelijkheid*) incorporated under the laws of the Netherlands, having its official seat in Amsterdam, the Netherlands, and its office address at World Trade Center Amsterdam Airport, Schiphol Boulevard 217, 1118 BH Luchthaven Schiphol, the Netherlands (*FAH*),

acting as - and being all of - the liquidators (*vereffenaars*) (the *Liquidators*) of GM-Fiat **Worldwide Purchasing B.V. in liquidatie,** a private limited liability company (*besloten vennootschap met beperkte aansprakelijkheid*) in liquidation, incorporated under the laws of the Netherlands, having its official seat in Amsterdam, the Netherlands, and its office address at World Trade Center Amsterdam Airport, Schiphol Boulevard 217, 1118 BH Luchthaven Schiphol, the Netherlands (the *Company*),

**CONSIDERING THAT:**

-   On 30 March 2005 the shareholders of the Company adopted a resolution in writing (the *Resolution*), resolving to dissolve and liquidate the Company effective as per 31 March 2005. A copy of the Resolution is attached hereto as <u>Annex I</u>.

-   In the Resolution, the Liquidators have been appointed as liquidators (*vereffenaars*) of the Company.

-   The Liquidators have reviewed the assets and liabilities of the Company as per 31 March 2005 and have drawn up the preliminary liquidation accounts (the *Preliminary Liquidation Accounts*), attached hereto as <u>Annex II</u>, stating the assets and the liabilities of the Company as per 31 March 2005, it being understood that the Preliminary Liquidation Accounts are preliminary accounts and contain a preliminary balance sheet, partly based on projections, so that it is therefore likely that the assets and liabilities of the Company as per 31 March 2005 as included in the final liquidation accounts of the Company (the *Final Liquidation Accounts*) will differ in certain respects from the assets and liabilities included in the Preliminary Liquidation Accounts.

-   Based on the Preliminary Liquidation Accounts, the Liquidators believe that financial condition of the Company justifies that certain interim distributions (as referred to in article 2:23b paragraph 6 of the Dutch Civil Code (the *DCC*) and as further described in the Liquidation and Transfer Agreement (as defined hereinafter) (the *Interim Distributions*)) are made to the shareholders of the Company, whereby the Liquidators have taken into account that:

    (a)  they do not believe that the amendments to the Preliminary Liquidation Accounts, resulting in the Final Liquidation Accounts, shall be such that the Interim Distributions may not legally be made; and

(b)      sufficient assets will remain in the Company following effectuation of the Interim Distributions to be able to fully repay all known creditors of the Company as at the date hereof.

- In order to effectuate the Interim Distributions, it is proposed that the Company enters into an agreement with its shareholders, being GM Corp, Adam Opel AG (*Adam Opel*) and FAH, in which further details of the Interim Distributions will be laid down and in which, to the extent possible, such Interim Distributions will already be effected (the *Liquidation and Transfer Agreement*), a draft of which is attached hereto as Annex III. In order to ensure that the Interim Distributions will also be fully effective under the laws applicable to the assets that will be distributed as part of the Interim Distributions, the Company will also perform all formalities and/or enter into the required agreements under local laws to ensure a valid transfer of the assets contemplated to be distributed as part of the Interim Distributions (the *Local Transfer Agreements*, and together with the Liquidation and Transfer Agreement also the *Agreements*).

- Based upon the Liquidation and Transfer Agreement, the Assets will be transferred to GM Corp, Adam Opel and FAH as follows:

to FAH:

      GM-FIAT Worldwide Purchasing Italia S.r.L.;
      GM-FIAT Worldwide Purchasing do Brasil Betim Ltda.;
      GM-FIAT Worldwide Purchasing Poland sp. z.oo; and
      a cash amount of four million five hundred thousand Euro;

to GM Corp:

      GM-FIAT Worldwide Purchasing Sweden AB;
      GM-FIAT Worldwide Purchasing Vauxhall UK Ltd.;
      GM-FIAT Worldwide Purchasing Opel Hungary Ltd.;
      GM-FIAT Worldwide Purchasing Opel Belgium B.V.;
      GM-FIAT Worldwide Purchasing Opel Austria GmbH;
      GM-FIAT Worldwide Purchasing Opel Espana S.L.;
      GM-FIAT Worldwide Purchasing do Brasil Sao Caetano do Sul Ltda.;
      a cash amount of two million seven hundred thousand Euro;

to Adam Opel

      GM-FIAT Worldwide Purchasing Germany GmbH
      GM-FIAT Worldwide Purchasing Management Services GmbH
      a cash amount of one million eight hundred thousand Euro

- The transactions referred to above are hereinafter also collectively referred to as the *Transaction*.

- The Liquidators now wish to approve of the Company entering into the Transaction and to resolve upon the execution by the Company of the Agreements.

**HEREBY CONFIRM:**

1.  that they have duly noted and carefully considered the Transaction and the Agreements and that they deem the Transaction and the entering into the Agreements to be:

    (a)  for the commercial benefit and in the best interests of the Company;

    (b)  arm's length transactions; and

    (c)  not prejudicial to the interests of present and future creditors of the Company.

2.  that, to the extent the Liquidators would have a conflict of interest with the Company in respect of the Transaction or the execution of the Agreements, they have in the Resolution been appointed by the general meeting of shareholders of the Company as special representatives of the Company (in accordance with article 2:256 of the DCC) in respect of the entering into the Transaction and the execution of the Agreements by the Company.

**HEREBY RESOLVE:**

1.  to approve the (terms of the) Transaction.

2.  to approve the execution by the Company of the Agreements (in whatever form, including by way of deed) and delivery and/or execution by the Company of any documents and any other certificates, agreements and documents and the performance by the Company of any other actions necessary or desirable pursuant to or in connection with the Transaction and/or the Agreements and/or the transactions contemplated by the Agreements.

3.  to ratify, to the extent necessary, any Agreements or other documents already executed, delivered or entered into on behalf of the Company in connection with the Transaction at the date hereof.

This written resolution is signed on 31 March 2005.

A copy of this resolution shall be sent to the Company for filing.


**General Motors Corporation**

By: Lucas O.M. Aelen

Its: authorized representative

_____

**Fiat Auto Holdings B.V.**

By: Bart Th. Dérogée

Its authorized representative

_____

4

Case 1:08-cv-04999-DAB    Document 8-3    Filed 07/23/2008    Page 28 of 73

Schedule 3.1 (a) (ii)

## Special Charges Jan 2003 - April 2005 - Split by Customer

12/05/2005 8.03

| € Thousands | Asset Writeoff | Separations | Cancellation Charges | Decomms | Banking | Total | Alloc* Key | FIAT AUTO | SATA | FAP | Total PAT | AOAG | Opel Engine | Opel Powtrn | Vauxhall | SAAB | Nth America | Total GM |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FSP Info | 90,148 | 28,021 | 8,516 | 5,967 | 870 | 130,552 | CS | 41,444 | 16,947 | 9,885 | 68,276 | 37,552 | 19,218 | 513 | 6,381 | 4,711 | - | 68,275 |
| FMA | 14,070 | 637 | 3,388 | - | - | 18,082 | CS | 5,488 | 1,527 | 2,028 | 9,041 | 4,973 | 2,319 | 294 | 832 | 823 | - | 9,041 |
| Turkey | 13,477 | 982 | - | 44 | - | 14,503 | CS | 4,402 | 1,912 | 938 | 7,252 | 3,988 | 2,077 | 19 | 667 | 501 | - | 7,252 |
| Total Ex-PAT | 117,704 | 29,640 | 11,882 | 6,041 | 870 | 166,137 | CS | 51,334 | 20,385 | 12,849 | 84,569 | 46,513 | 23,614 | 826 | 7,880 | 6,035 | - | 84,568 |
| GPT | 33,748 | 52,172 | 1,289 | 3,271 | - | 90,478 | CS | 27,460 | 10,042 | 7,738 | 45,240 | 24,891 | 12,360 | 714 | 4,101 | 3,121 | - | 45,237 |
| CHK | 6,667 | 4,247 | - | - | - | 11,114 | CS | 3,274 | 1,350 | 934 | 5,558 | 3,059 | 1,565 | 42 | 511 | 380 | - | 5,557 |
| CDK | 28,304 | 11,289 | 3,037 | 792 | 792 | 43,432 | CS | 13,182 | 5,385 | 3,151 | 21,718 | 11,944 | 6,011 | 165 | 1,927 | 1,498 | - | 21,715 |
| Vauxhall Powertrain | 36,114 | 17,176 | 34,085 | 16,070 | - | 103,445 | CS | 31,396 | 11,418 | 8,609 | 51,723 | 28,445 | 14,111 | 835 | 4,759 | 3,559 | - | 51,723 |
| Total Ex-GM | 105,031 | 84,884 | 35,374 | 22,378 | 792 | 248,469 | CS | 75,412 | 28,225 | 20,602 | 124,239 | 66,328 | 34,147 | 1,707 | 11,428 | 8,571 | - | 124,232 |
| Total | 222,735 | 114,534 | 47,256 | 31,419 | 1,662 | 417,600 | | 126,746 | 48,611 | 33,451 | 208,808 | 114,842 | 67,761 | 2,569 | 19,309 | 14,606 | - | 208,800 |

Schedule 3.1(a)(iv)

## Allocation Methodology for FGP Capitalized Start-Up and Pre-Production Net Book Values

a. FGP <u>Capitalized SU/PP up to December 31, 2004</u> - Allocations to each parent company remain as allocated by FGP based on the CY04 Take Or Pay percentages, excluding the Kaiserslautern JTD module SU/PP which will be allocated to GM (see point c below).

b. <u>FGP Capitalized SU/PP for CY05</u>  The FGP SU/PP expense incurred and capitalized from January 1, 2005 to the unwind date will be allocated to each parent company based on the average volume ratios for the period of the Cross Supply Agreement (CY05-10).

c. <u>Kaiserslautern JTD SU/PP</u>  - GM will be allocated the capitalized SU/PP for the KL JTD module (Note: it is expected that some normal amortization amounts may be allocated in piece price under the Cross Supply Agreement Pricing Methodology for the block production which FMA may also purchase).

d. <u>Re-Starting the 36 Month Period for FGP Capitalized SU/PP</u>
The Net Book Value amounts remaining at the date of the FGP unwind will be amortized over 36 months from the unwind.  These SU/PP items will be charged out in piece price also based on the 36 month amortization methodology described in the Cross-Supply Agreement.

e. In the event of partial or full termination of the Supply Agreement for any specific product family SU/PP, the remaining net book value that has not been recovered in piece price of the SU/PP at the time of partial or full termination for the product family are guaranteed to be paid in full by the by the respective customer that is partially or fully terminating the supply of this product. 2005

Schedule 3.1 (a.) (ττ)

| Euro 000's | Y/E Bal | 2004 Y/E Split ToP @ 2004 | | Jan - April (from 2004) Amortisation | | Balance 2004 To be settled ToP | | J-A 2006 Capitlised To be settled ave | | Total @ April 06 To be settled | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | FIAT | GM | FIAT | GM | Fiat | GM | Fiat | GM | Fiat | GM |
| *Powertrain Italia* | | | | | | | | | | | |
| C510/C513 | 875 | 875 | - | 100 | - | 775 | - | - | - | 775 | - |
| C514 | 673 | 673 | - | 128 | - | 545 | - | 119 | - | 654 | 312 |
| C530 | 280 | 280 | - | 34 | - | 258 | - | - | - | 258 | - |
| Fire 8V | 5,883 | 5,883 | - | 1,125 | - | 4,758 | - | 810 | - | 5,568 | - |
| Fire 16V | 1,941 | 1,941 | - | 339 | - | 1,602 | - | - | - | 1,802 | - |
| Torque | - | - | - | - | - | - | - | - | - | - | - |
| M40 | - | - | - | - | - | - | - | 412 | - | 412 | - |
| *FMA* | | | | | | | | | | | |
| Diesel | 6,197 | 4,576 | 1,621 | 726 | 257 | 3,851 | 1,363 | 91 | 33 | 3,941 | 1,397 |
| Gasoline | 876 | 876 | - | 70 | - | 806 | - | 9 | - | 815 | - |
| *FGP Turkey* | | | | | | | | | | | |
| C514 | - | - | - | - | - | - | - | - | - | - | - |
| *FGP Polske* | | | | | | | | | | | |
| SDE (Note split always on ToP) | 12,008 | 6,316 | 5,892 | 1,052 | 948 | 5,264 | 4,744 | 119 | 108 | 5,384 | 4,851 |
| *FGP Germany* | | | | | | | | | | | |
| F13 | 434 | 434 | - | - | 122 | - | 312 | - | - | - | 312 |
| F40 | 15,846 | 1,551 | 14,295 | 285 | 2,405 | 1,286 | 11,660 | - | - | 1,286 | 11,860 |
| L850 | 2,050 | 537 | 1,513 | 121 | 341 | 416 | 1,172 | 135 | 138 | 551 | 1,510 |
| L850 - Longblock | 269 | - | 269 | - | 68 | - | 201 | - | - | - | 201 |
| Engine Rework | 332 | - | 332 | - | 54 | - | 278 | - | 98 | - | 376 |
| Family 1 | - | - | - | - | - | - | - | - | - | - | - |
| DI Diesel | 384 | - | 384 | - | 256 | - | 128 | - | - | - | 128 |
| Fam B Diesel | 9,296 | - | 9,296 | - | - | - | 9,296 | - | 7,187 | - | 18,483 |
| *Opel Austrie* | | | | | | | | | | | |
| F13 | - | - | - | - | - | - | - | - | - | - | - |
| F17 | 994 | - | 894 | - | 249 | - | 745 | - | - | - | 745 |
| M20/32 | 32,000 | 18,000 | 16,000 | - | - | 16,000 | 16,000 | 909 | 1,791 | 16,909 | 17,791 |
| Fam 0 | 2,884 | - | 2,684 | - | 361 | - | 2,323 | - | 31 | - | 2,354 |
| *Opel Hungary* | | | | | | | | | | | |
| CVT | | | | | | | | | | | |
| Family 1 | 348 | 81 | 267 | - | - | 81 | 267 | 30 | 208 | 111 | 473 |
| *Vauxhall Pwt* | | | | | | | | | | | |
| V6 - 54 degrees | - | - | - | - | - | - | - | - | - | - | - |
| *SAAB Pwt* | | | | | | | | | | | |
| F25/35 | - | - | - | - | - | - | - | - | - | - | - |
| Family 111 | - | - | - | - | - | - | - | - | - | - | - |
| L850 Turbo | 478 | - | 478 | - | 222 | - | 256 | - | - | - | 256 |
| Total | 93,658 | 33,599 | 54,059 | 3,359 | 5,264 | 35,839 | 48,776 | 2,604 | 9,592 | 33,274 | 59,557 |
| Exclude Poland | 81,650 | 33,282 | 48,368 | 2,907 | 4,338 | 30,375 | 44,032 | 2,615 | 9,484 | 32,890 | 53,516 |
| Ex FIAT | 16,735 | 15,114 | 1,621 | 2,522 | 257 | 12,593 | 1,383 | 1,441 | 33 | 14,033 | 1,387 |
| Ex GM | 64,915 | 18,168 | 48,747 | 386 | 4,078 | 17,782 | 42,659 | 1,074 | 9,451 | 18,857 | 52,119 |

Ea

*Schedule 3.1 (a) (iv)* (handwritten)

# CROSS INVESTMENTS: reflects March 2005 actual status; to be updated for April 2005 actuals

NET BOOK VALUES

€/000

ME + VT

CY 2001 - 2009

| Att. | Product | Description | FGP AR | Project | Categories | Before 30.4.2005 | | | | | After 30.4.2005 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Fiat Specific | GM Specific | Specific For Fiat but fully Integrated | Specific For GM but fully Integrated | Common | Fiat Specific | GM Specific | Specific For Fiat but fully Integrated | Specific For GM but fully Integrated | Common |
| 3 | L850 | JV specific Alfa requirements for L850 | 20 | 8714 | M&E | 1,707 | 0 | 11,303 | 0 | 17,908 | 857 | 0 | 2,016 | 0 | 1,182 |
| | | L850 for Fiat and Lancia Car | 57 | 8740 | VT | 2,832 | 0 | 0 | 0 | 0 | 7,789 | 0 | 0 | 0 | 0 |
| 4 | Fam1 | Fam. 1 Z 1,8 XER | 178 | 6121 | M&E | 628 | 0 | 1,650 | 0 | 80,979 | 956 | 0 | 3 | 0 | 30,548 |
| | | Fam. 1 Gen 3 Fiat/Suio | 4 | 8221 | VT | 3,895 | 1,282 | 0 | 0 | 16,516 | 0 | 6,955 | 0 | 0 | 31,271 |
| | | Fam. 1 Z 1,6 XER | 409 | 6176 | | | | | | | | | | | |
| 5 | F40 MT | JV F40/6 Fiat Specific Changes | 3 | 8706 | M&E | 680 | 0 | 2,580 | 0 | 3,970 | 0 | 0 | 114 | 0 | 0 |
| | | | | | VT | 1,885 | 805 | 0 | 0 | 0 | 2,226 | 0 | 0 | 0 | 0 |
| 6 | F40 AWD | F40/6 AWD for Premium Platform | 145 | 6122 | M&E | 770 | 0 | 845 | 0 | 3,130 | 1,217 | 0 | 539 | 0 | 1,500 |
| | | | | | VT | 1,234 | 0 | 0 | 0 | 0 | 661 | 0 | 0 | 0 | 0 |
| 10 | M 20/32 MT | M 20/32 Manual Transmission | 41 | 8314 | M&E | 2,079 | 288 | 0 | 0 | 281,675 | 430 | 0 | 0 | 0 | 36,585 |
| | | | | | VT | 576 | 0 | 0 | 0 | 6,102 | 0 | 0 | 0 | 0 | 6,321 |
| A | | TOTAL Investments In GM Plants Europe | | | | 15,696 | 2,375 | 16,291 | 0 | 392,059 | 14,136 | 6,955 | 2,672 | 0 | 107,417 |
| 8 | B/C Diesel | FAM B/C ENG. EURO 4 DSL Convergence | 53 | 20011020 | M&E | 0 | 3,597 | 0 | 5,256 | 40,781 | 0 | 834 | 0 | 38 | 20,057 |
| | | (FMA ONLY) | | | VT | 0 | 0 | 0 | 0 | 21,989 | 0 | 0 | 0 | 0 | 19,287 |
| 9 | B/C Diesel | Dress up | 198 | 20033001 | M&E | 0 | 0 | 0 | 2,817 (1) | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | VT | | | | | | | | | | |
| B | | TOTAL Investments In Fiat Plants Europe | | | | 0 | 3,597 | 0 | 8,073 | 62,750 | 0 | 834 | 0 | 38 | 39,354 |
| A + B | | GRAND TOTAL EUROPE | | | | 15,696 | 5,972 | 16,291 | 8,073 | 454,809 | 14,136 | 7,789 | 2,672 | 38 | 146,771 |
| 7 | Fire Brazil | BC10 Fire for GMB Cars Cells CP 530K | 59 | F5012BR | M&E | 0 | 3,899 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | Conc Changes | | 8,681 | | | | | 1,400 | | | |
| | | | | | VT | | 1,540 | | | | | | | | |
| C | | TOTAL Investments In Fiat Plants Brazil | | | | 0 | 12,120 | 0 | 0 | 0 | 0 | 1,400 | 0 | 0 | 0 |
| A + B + C | | GRAND TOTAL EUROPE + BRAZIL | | | | 15,696 | 18,092 | 16,291 | 8,073 | 454,809 | 14,136 | 9,189 | 2,672 | 38 | 146,771 |
| | | GRAND TOTAL BEFORE AND AFTER 30 APRIL 2005 | | | | 29,831 | 27,281 | 18,983 | 8,111 | 601,580 | | | | | |

(1) This item will be split 50:50 between the parents

(ω)(iv)

Exhibit 3.1(v)

**Specific Investment Allocation for Depreciation and Obligation for Payment**

a. As agreed with Fiat and GM, the remaining open items regarding the common investment per the attached document will be allocated as follows:

1. All Specific and Specific, Fully Integrated Investment depreciation will be allocated to the respective company identified (ie: GM or Fiat) with the exception of Item 9 below.
   a. Item 9 - Fam B/C Investment – this depreciation will be split 50/50 between Fiat and GM
   b. In the event of partial or full termination of the Supply Agreement for any specific product family (ie: L850, Fam I, F40, JTD, M20/32), the remaining net book value that has not been recovered in piece price of the specific investment at the time of partial or full termination for the product family are guaranteed to be paid in full by the by the respective customer that is partially or fully terminating the supply of this product.

2. For Common Investment, the following allocations will be as follows:

   a. **Item 3.** L850 - this depreciation will be split 50/50 between Fiat and GM

   b. **Item 5** F40 AWD - this depreciation will be allocated 37% to Saab and 63% to Fiat.

   c. **Item 6** F40/6 - this depreciation will be allocated based on the annual BP05-3 volume commitment ratios between Fiat and GM

   d. **Item 8** - Fam B/C - this depreciation will be allocated based on the annual BP05-3 Volume Commitment ratios between Fiat and GM. The BP05-3 volumes will be split based on the 2v vs. 4v products that GM and Fiat will use, as well as the other engine variants (1.6 and gas engines) that Fiat use, and the component sales to KL. The annual depreciation for the specific products (ie: 2v vs. 4v, 1.6, heads, etc.) will be allocated to GM and Fiat based on the annual volume commitment ratios that are used for each product per the Cross Supply Pricing Methodology process.

   e. All other common investments will be allocated based on the annual BP05-3 Volume Commitment ratios between Fiat and GM as defined in the Supply Agreement.

3. **General**
   a. In the event of partial or full termination of the Supply Agreement for any product family (ie: L850, Fam I, F40, JTD, M20/32), the remaining net book value of the associated common investment that has not been recovered in piece price are guaranteed to be paid in full at the time of partial or full termination for the specific product family by the respective customer that is partially or fully terminating the supply of this product.
   b. 1.6 JTD equipment – it is understood that in the future (estimated CY08/09), this equipment may be utilized for the 1.9 JTD Euro V and the 1.9 JTD HP engines. It is agreed that this issue will be handled via the change management process in the supply agreement and specific language will be added to the Supply Agreement draft to high-light this issue. For the 1.9JTD HP engines, current volumes indicate all most all the volume is for Fiat, and only minimal volume for Saab, as such, the assumption is that this potential 1.6 investment would be allocated to Fiat. If this assumption changes and GM takes more volume, this issue will also be addressed in the change management process
   c. The Specific Investment schedule is based upon March 31, 2005 values. The final values as of April 30, 2005 will be provided by the May 31st, 2005 the respective legal entities that produce these products and will be validated by the Parties.

4. **Brazil Items**
   a. GM Specific Investment and related cancellations for the Fire Engine will be validated and agreed upon by the parties. These amounts will be paid by GMB in 5 yearly instalments plus an appropriate interest rate to be agreed upon by the parties by May 31, 2005

# Schedule 3.2

## Accounts/Receivable March & Price Adj. as cash in-
## Syndicated Loan Repayment & Operating Payments as cash out

| Cash Flow - Euro mln | OPT | MOT | HUNG | AUS | SAAB | UK | TOT: GM (1) | ITA | FMA | TOT: FIAT (2) | BV | TOT | POL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Opening Balance – April 14th | (20.6) | 4.2 | 0.5 | 8.0 | 2.9 | 3.8 | (1.1) | 157.1 | 58.6 | 215.7 | 59.9 | 274.5 | 12.4 |
| **Cash in** | | | | | | | | | | | | | |
| A/R March | 56.7 | 9.8 | 41.3 | 50.0 | 17.4 | - | 175.2 | 115.9 | 107.0 | 222.9 | - | 398.1 | 82.5 |
| Price Adj. Q1 - 05 | 6.8 | 12.9 | (3.6) | 9.0 | 3.9 | - | 29.0 | 10.0 | 9.6 | 19.6 | - | 48.6 | 6.9 |
| A/R April | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other | 1.3 | - | 10.4 | - | - | 1.9 | 13.6 | 0.3 | - | 0.3 | - | 13.9 | - |
| Special items - cross | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Special items - non cross | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Start - up costs | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Cash in | 64.9 | 22.7 | 48.1 | 59.0 | 21.3 | 1.9 | 217.9 | 126.2 | 116.6 | 242.7 | - | 460.6 | 89.4 |
| **Cash out** | | | | | | | | | | | | | |
| Operating Cash flows | (6.8) | (0.4) | (41.3) | (18.5) | (20.2) | - | (87.2) | (104.5) | (91.6) | (196.1) | - | (283.3) | (52.7) |
| Syndicated Loan | (50.0) | - | - | - | (54.7) | - | (104.7) | (300.0) | - | (300.0) | (60.0) | (464.7) | - |
| Other financing repayment | (30.0) | - | - | (2.1) | - | - | (32.1) | (131.5) | - | (131.5) | - | (163.6) | - |
| Other financing funding | - | 30.1 | 43.6 | - | - | 10.2 | 83.9 | - | 135.3 | 135.3 | - | 219.2 | - |
| Dividends | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Cash out | (86.8) | 29.7 | 2.3 | (20.6) | (75.0) | 10.2 | (140.2) | (536.0) | 43.7 | (492.3) | (60.0) | (692.5) | (52.7) |
| Ending Balance – April 28 | (42.4) | 56.6 | 50.9 | 46.4 | (50.7) | 15.9 | 76.6 | (252.7) | 218.8 | (33.9) | (0.1) | 42.6 | 49.1 |
| Outstanding overdues (cross) | 21.8 | 0.2 | - | 0.4 | 4.0 | - | 26.4 | 10.8 | 29.4 | 40.2 | | 66.6 | 6.4 |
| Ending Balance – April 28th | (20.6) | 56.8 | 50.9 | 46.8 | (46.7) | 15.9 | 103.0 | (241.9) | 248.2 | 6.3 | (0.1) | 109.2 | 55.5 |

*Opening balance is estimate as of April 22. Some of the issues relating to the overdue accounts have subsequently been resolved.*

**SCHEDULE 3.3**

**DIVIDENDS TO BE PAID TO FIAT-GM POWERTRAIN B.V BY ENTITY**

| | |
|---|---|
| Opel Hungary Powertrain Ltd. | 141 |
| Opel Powertrain Holding B.V. | 71 |
| Opel Austria Powertrain GmbH | 26 |
| Saab Automobile Powertrain AB | 22 |

Amounts in EUR millions

Schedule 3.4

**Action list to liquidate PIS**

PIS to be placed starting from the Liquidation Closing Date under the control of a joint committe compraised of 1 Fiat Finance and 1 GM Finance and 1 Fiat Legal and 1 GM legal

**Personnel issues**

PIS will waive its termination notice entitlement with all those employees who will resign on or before the Closing Date.

**Financial issues**

A PIS provisional balance sheet (evidencing the debts and credits up to a certain date) has to be prepared in order to facilitate an expedite liquidation procedure. To this end, all purchase orders concerning on-going activities and services provided by third parties (whether belonging to GM or Fiat Group) shall cease form a certain date onward. Similarly all third party providers (whether belonging to GM or Fiat Group) have to be noticed and requested to issue invoice as soon as possible and in any event no later than June 30. After this date the provision of services should be paid exclusively by the assignee party. The request shall be contained either in the termination/assignment letter addressed to any third party or separately.

**Termination/Assignment of the agreements in force**

All PIS agreements currently in force have to be either assigned or terminated with effect no later that the PIS liquidation date with the request to the various services providers to issue invoice no later than a certain date before June 30, 2005. Particularly, the assignment involves third party sales accounts as well as IT agreements. This has to be done on expedite basis since in certain circumstances the assignment might require the other party consent.

**Transfer of quota**

As soon as practicable, FGP BV shall transfer 50% of the quota it holds in PIS to GM and the other 50% to FAH.

The transfer of quotas shall occur in accordance with Article 5 of the Articles which establishes that quota-holdes my be only companies subject to the to the direct or indirect control of Fiat S.p.A. or GM operating in the same field of activities.

Quota Transfer Agreement to be signed by the legal representatives before the Notary

The Notary has to register the Quota Transfer Agreement at the Local Commercial Register within 30 days from the signature date

The quota transfer shall be recorded in the quotaholders' corporate book on request either by the Transferor or by the Transferee.

The transfer is subordinated to the demonstration of the requisites provided by article 5;

otherwise, the transfer is not effective towards the consortium.

A declaration containing corporate details has to be submitted to the Local Commericla Register on new quotaholder/s

The Transfer produces effects vis-a-vis the company and third parties as of the date of its registration in the quotaholders' corporate book

**Corporate steps to liquidate PIS**

As per Section 3.1 (d) (vii) of the Joint Venture Agreement, Quotaholders' resolution at FGP BV level is required to liquidate PIS.

Extraordinary quotaholders' meeting to approve the liquidation of PIS, being all PIS personnel transferred. As of April 27, 2005 an ordinary quotaholders' meeting occurred to approve the financial statements.

PIS quotaholders' meeting have to appoint the Liquidators; the resolution shall determine their powers, their number decision process) - Their appointment is subject to registration at the Local Commercial Register

It is advisable to appoint at least two liquidators (one designated by Fiat Auto and the other one by GM) who will jointly make decisions on the liquidation items

PIS directors promptly shall deposit to the Local Commercial Register the quotaholders' resolution resolving the liquidation (the liquidation produces its effects as of the date of such registration)

The Directors (who are automatically dismissed upon the liquidation) shall submit to the Liquidators the corporate books and a report of their management of the Company starting from the latest financial statements' approval

Liquidators maintain their duties and powers till the end of the liquidation process.

Particularly during the liquidation process liquidators' Powers and Duties consist of:

Running the company, but with the only view of liquidating

Assuring that all the outstanding creditors are satisfied

Drafting yearly the annual accounts to be submitted to the shareholders' approval

Draft the final liquidation accounts and distribution of assets plan to be submitted to the shareholders

At the end of the liquidation process, PIS shareholders shall approve both the final liquidation accounts and the distribution plan

Once approved the final liquidation accounts and distribution plan, liquidators shall cancel the Company from the Local Commercial Register

Creditors not satisfied by the Liquidators have the right to ask for the bankruptcy of the Company within one year from the cancellation of the Company from the Commercial Register

CONFIDENTIAL



PWT BRAZIL RESTRUCTURING
Schedule 3.5(r)

Current Structure

CONFIDENTIAL

# PWT BRAZIL RESTRUCURING
## PROPOSED PLAN

STEP 1 - Total spin-off of FGP Brasil and merger of spun-off assets into GM PWT and FIAT PWT
Effective April 30, 2005



CONFIDENTIAL

# PWT BRAZIL RESTRUCURING PROPOSED PLAN

STEP 2 - FIASA and GMB exchange shares of GM PWT and FIAT PWT to enable separation of the groups in Brazil Effective April 30, 2005
(FIASA gives 0,01% of GM PWT in exchange of GMB' 0,01% ownership in FIAT PWT)



# PWT BRAZIL RESTRUCURING

**STEP 3**
- FGP BV sells its GM PWT shares to GMB at Brazilian GAAP book value effective May 1, 2005
- GMB pays FGP BV with a Promissory Note on May 1, 2005
- GM Pays FGP the difference between Brazilian GAAP and Common GAAP on May 1, 2005
- GM Pays FGP BV with a Promissory Note on May 1, 2005



# Schedule 3.6

## Accounting Principles

### Closing Methodology under the Joint Venture Separation Master Agreement

Preliminary Closing Balance Sheets as of April 30, 2005

FGP will prepare preliminary Closing Balance Sheets as of April 30, 2005. The Preliminary Closing Balance Sheets as of April 30, 2005 should be prepared on the following levels:

1. FGP consolidated (Preliminary FGP Closing Balance Sheet) with a consolidation schedule covering the Preliminary GM Closing Balance Sheet (per 2a.) and the Preliminary Fiat Auto Closing Balance Sheet (per 2b.) with any consolidation adjustments.
2a. Consolidated for GM Powertrain Entities and German Powertrain Entities (Preliminary GM Closing Balance Sheet) with a consolidation schedule covering the balance sheets of each separate legal entity and any consolidation adjustments
2b. Consolidated for Fiat Auto Powertrain Entities (Preliminary Fiat Auto Closing Balance Sheet) with a consolidation schedule covering the balance sheets of each separate legal entity and any consolidation adjustments

For the avoidance of doubt, the Preliminary Closing Balance Sheets, as initially prepared before the adjustments noted herein, shall include all tax assets and liabilities accruing at the Closing Date including deferred tax assets and deferred tax liabilities (Deferred Tax Items).

The Preliminary Closing Balance Sheets should be prepared under the accounting principles described in the section entitled "Accounting Principles" herein, with adjustments for the following item for the purpose of determining the Net Book Value.

1) The Preliminary Closing Balance Sheets shall be adjusted to exclude the remaining book value ("the unrealized value") of Deferred Tax Items originally contributed to the Joint Venture by the parties, and that have not been compensated for in the post completion (and delayed completion) balancing payment, and or in the Settlement agreed between the Shareholders in December 2003. The unrealized value of such Deferred Tax Items that should be excluded from the Preliminary Closing Balance Sheets are agreed to and listed within Annex II to this Schedule.  The amounts in Annex II related to Deferred Tax Items are to be an addition to the Net Book Value (if positive) or a subtraction from the Net Book Value (if negative) for each party.  The amounts in Annex II related to Deferred Tax Items shall be audited and adjusted as necessary by Deloitte & Touche utilizing the same scope and general methodologies as in their previous analysis used as the basis for the unequal dividend settlement agreed between the Shareholders in December 2003.  Any resulting changes in the schedule would be compensated for in the Post-Closing

Adjustment. For the avoidance of doubt, such adjusted amounts as determined by Deloitte & Touche are binding and not subject to further adjustments under Section 3.6d.

<u>Closing Balance Sheets as of the Closing Date</u>

The Closing Balance Sheets as defined by the Joint Ventures Separation Master Agreement, should be prepared as of the Closing Date using the specific methodology and principles described herein and in Annex I to this Schedule.

The Closing Balance Sheets should be unchanged from the Preliminary Closing Balance Sheets with an adjustment to Equity reflecting Net Income between April 30, 2005 and the Closing Date. Net Income for this period should be established according to the methodology in Annex I and in compliance with section 3.5(f) of the Joint Venture Separation Master Agreement. Equity should be adjusted against Other Assets (if Net Income is positive) or Other Liabilities (if Net Income is negative).

**Accounting Principles**

General Accounting Principles

Both parties agree to prepare the Preliminary Closing Balance Sheets in accordance with Accounting Principles Generally Accepted in the United States (U.S. G.A.A.P.) unless a deviating principle has been mutually agreed to between the parties and under the condition that such principle has been consistently applied during the joint venture period. Any such deviating principle should be included as a Specific Accounting Principle below and included as a note to each applicable Preliminary Closing Balance Sheet. Accounting policies, procedures and methodologies utilized in preparing the Preliminary Balance Sheet should be consistent with those utilized in preparation of the audited FGP balance sheet as of December 31, 2004, unless otherwise agreed to by GM and FAH. For avoidance of doubt, these accounting policies, procedures, and methodologies include, but are not limited to, calculation of inventory reserves, bad debt reserves, accrued expenses and pension and other post-retirement liabilities.

GM and FAH will jointly appoint an independent auditor to audit the Preliminary Closing Balance Sheets and to perform mutually agreed upon procedures to verify that the methodology used to prepare the Closing Balance Sheets follows the procedures described in this agreement.

The method to translate foreign currency amounts should be consistent with the methodology used by FGP during the Joint Venture Period, or where there has been a change in this methodology during this period, the methodology applied in the last formal accounting period shall apply.

<u>Specific Accounting Principles</u>

1) <u>Income Tax</u>

<u>Net Income for the period from January 1, 2005 until April 30, 2005 and for the period between 30 April 2005 and Closing Date should be calculated using the effective tax rates established in the 2005 budget for FGP .</u>

<u>For the avoidance of doubt, movements (or estimated movements) in deferred tax balances relating to the period from 30 April 2005 to Closing Date will not be reflected in the Tax charge for this period, other than to the extent that they are already anticipated in the above effective tax rates.</u>

2) <u>Fixed Assets</u>

The basis for calculation of the net book value has been agreed to be the gross book value of assets less the cumulative annual depreciation that has been calculated on the basis of the following rates:

| | | |
|---|---|---|
| Land improvements and buildings | 3.33% (?) | (33 year economic life) |
| Plants and machinery | 8.33% | (12 year economic life) |
| Industrial and commercial equipment | 16.67% | ( 6 year economic life) |
| Office equipment and furniture | 12.50% | ( 8 year economic life) |
| Other assets | 20.00% | ( 5 year economic life) |
| Special Tooling | 16.67% | ( 6 year economic life) |
| Software | 33.33% | (3 year economic life) |
| Construction work in progress | 0.00% | |

The minimum threshold level for capitalizing a fixed asset will be based on a gross book value of $2000 for each asset. The minimum gross book value level for each country will be calculated as the equivalent value of $2000 translated to the foreign currency used for accounting purposes in each specific country. A lower threshold can be used in countries where local legislation requires the capitalization of lower amounts and such lower threshold has been agreed to and been consistently applied during the Joint Venture Period.

The date when the assets begin to be depreciated will be the first day of the first month following the start of use or, if start of use date is unknown, July 1 of the year of first use.

## Schedule 3.6 Annex I Mid-Period Net Income Calculation

"Mid Period" is defined as the period between the preceding calendar month end and the closing date, if this closing date falls on a date other than a calendar month end.

Net Income for the mid-period is to be calculated for each operating FGP legal entity using the following method:

**Level of Detail**
EBIT (Earnings Before Interest and Taxes) to be calculated at a product line level (as defined in the Transfer Pricing Guidelines)

> *EBIT = Cost of Capital Amount + profit on third party sales + profit on Engineering Services.*

**Cost of Capital Amount**
Same methodology as per the Transfer Pricing Guidelines.  The opening balances to be prior month end actuals and the closing balances to be latest forecast for current month. (e.g if closing date is May 13 then opening balances would be April 30, 2005 and the closing balances would be 3+9 forecast for May 31, 2005)  Balances to be averaged by dividing sum by 2. The net averaged result to be multiplied by the WACC percentage (same as used in 2004 calculations) divided by 12.

The one month Cost of capital amount result produced from above to be allocated to the mid-period based on the relative number of working days in the mid period versus the total calendar month. (Working day formula)

**Price Adjustment**
For each product line a price adjustment will need to be calculated for the difference between the Cost of the Capital Amount and the estimated EBIT before price adjustment.

> *The EBIT before price adjustment = Contribution Margin less Fixed Cost.*

Contribution Margin is to be calculated by multiplying the average per unit price less the average direct material cost by the estimated unit volumes for the mid-period. For spare parts or engine rework facilities an estimate is to be made based on the January-March actual period.

Fixed cost includes Manufacturing Cost, SG&A, and Other Operating cost. Latest forecast for month of closing (e.g. if May 13 is closing date = 3+9 forecast for month of May) is to be used and allocated to the mid-period using the working day formula. Allocations to product lines are to be made on the same basis as in the Transfer Pricing Guidelines.

Note the price adjustment once agreed to by FIAT Auto and GM will be invoiced.

**Profit on Third Party Sales**
Contribution margin to be calculated as above. Cost of Capital amount and Fixed cost to be allocated based on the total unit sales of the product line (i.e. Parent and Third Party Sales).

**Profit of Engineering Services**

Latest forecast for month of closing apportioned to mid period using working day formula.

> *Net Income = EBIT less financial charges less income tax*

**Financial Charges**
Latest forecast for month apportioned to mid period using working day formula.

**Income Tax**
EBT (Earnings Before Taxes) multiplied by the effective tax rate (statutory rate adjusted for any permanent differences)

**Special Charges**
No special charges such as Asset write-offs, accelerated depreciation, cancellation costs, separation charges, decommissioning costs, and banking costs are to be booked in the mid-period with the written agreement of FIAT Auto and GM.

DRAFT

# FGP Preliminary Closing Balance Sheets

Annex II to Schedule 3.6

May 13th, 2005
(€ million)

FGP Balance Sheet (4-30-05 UNAUDITED)

| Entity | NBV (Includes Current DTIs) | Adjust: Unrealized DTIs from Contribut*** | Total NBV | Dividend Adjustment | NBV w/ Dividend Adjustment | Post-Dissolution Ownership |
|---|---|---|---|---|---|---|
| Germany | 516 | 30 | 545,9 | (71) | 474,9 | GM |
| Sweden | 57 | 4 | 60,8 | (22) | 38,8 | GM |
| UK | 82 | - | 82,0 | - | 82,0 | GM |
| Austria | 329 | 97 | 426,2 | (26) | 400,2 | GM |
| Hungary | 305 | (15) | 289,7 | (141) | 148,7 | GM |
| Brazil – Sao Jose | 108 | - | 108,0 | - | 108,0 | GM |
| Italy**** | 526 | 13 | 539,3 | - | 539,3 | FA |
| Industrial Services | 1 | - | 1,0 | - | 1,0 | JV |
| Brazil-Betim | 120 | - | 120,0 | - | 120,0 | FA |
| Turkey | 88 | - | 88,0 | - | 88,0 | FA |
| Poland | 243 | - | 243,0 | - | 243,0 | FA |
| Consolidation | | | | 260 | 260,0 | FA |
| **FGP Consolidated** | 2.375 | 129 | 2.503,8 | | 2.503,8 | |

*** Unrealized DTIs from contribution estimated per schedule used for prior FGP dividend payments verified by D&T; amounts to be confirmed
**** Italy Unrealized DTI value includes EUR 25m adjustment (increase) from unequal dividend received by Fiat from FGP

| | | | | | |
|---|---|---|---|---|---|
| Current NBV Interest in FGP | 1.188 | 64 | 1.251,9 | | 1.251,9 |
| GM Interest | 1.398 | 116 | 1.513,0 | (260) | 1.253,0 |
| Fiat Interest | 978 | 13 | 990,8 | 260 | 1.250,8 |

| | | | | |
|---|---|---|---|---|
| Theoretical GM Payment (Fiat Payment) Prior to Dividend Adjustments | 210 | 51 | 261,1 | 261,1 |

**Transaction Amounts / Values**

| | | |
|---|---|---|
| Opel Provisional Price | 474,9 | German Entities including Dividend Adjustment |
| GM Provisional Price | 778,1 | Remainder ex-GM Entities including Dividend Adjustment |
| Total | 1.253,0 | |

| | | |
|---|---|---|
| FAH Note 1 | 744,6 | 29,74% of Total NBV of FGP BV |
| FAH Note 2 | 507,3 | 20,26% of Total NBV of FGP BV |
| Total | 1.251,9 | |

| | | |
|---|---|---|
| Excess of aggregate GM Notes vs. FAH Notes | 1,1 | (Positive balance is GM payment to Fiat; Negative is Fiat to GM) |
| | | <5m deferred until Post-Closing Adjustment |

GM CONFIDENTIAL

Schedule    5.2 (a)

| NON-DISCLOSURE AGREEMENTS | | |
|---|---|---|
| OTHER PARTIES | SUBJECT | ASSIGNMENT |
| AISIN | AT 6 transmission | Assignment from FGP BV to Opel Powertrain GmbH and FIAT-GM Powertrain Italia |
| BOSCH | Bosch metal diesel particulate filters on FGP engines | Assignment from FGP BV to GMPE and FIAT-GM Powertrain Italia |
| BOSCH/ALIX PARTNERS | Technical proposals to reduce cost | Assignment from FGP BV to GMPE and FIAT-GM Powertrain Italia |
| BMW | Diesel engines | Assignment from FGP BV to Opel Powertrain GmbH and FIAT-GM Powertrain Italia |
| MARUBENI | Localization diesel engine in South Korea | Assignment from FGP BV to FIAT-GM Powertrain Italia |
| GMDAT/GME/AVTOVAZ/ GM-AVTO. | GMDAT D16 Transmission | Assignment from FGP BV to Opel Powertrain GmbH |
| FHI | General cooperation on powertrains | Assignment from FGP BV to Opel Powertrain GmbH |
| NAMCO | Family I engines + F13 transmissions | Assignment from FGP BV to Opel Powertrain GmbH |
| PSA | Fire engines | Assignment from FGP BV to FIAT-GM Powertrain Italia |
| PSA | Benchmarking on SDE 1.3. engine vs 1.4 PSA engine | Assignment from FGP BV to FGP Polska |
| PROTON | General cooperation on powertrains | Assignment from FGP BV to Opel Powertrain GmbH |
| RENAULT | V6 diesel engine | Assignment from FGP BV to Opel Powertrain GmbH |
| SAINT-GOBAIN CREE | Saint-Gobain ceramic diesel particulate filters on FGP engine | Assignment from FGP BV to FIAT-GM Powertrain Italia |
| VALEO, HELLA, PANASONIC | Hybrid vehicle feasibility study | Assignment from FGP BV to GMPE |
| VARTA, BRUSA, ALCATEL, ZF | Hybrid vehicle feasibility study | Assignment from FGP BV to GMPE |
| VM MOTORI | 1.9.diesel engines | Assignment from FGP BV to Opel Powertrain GmbH and FIAT-GM Powertrain Italia |
| VM MOTORI | V6 diesel engines | Assignment from FGP BV to Opel Powertrain GmbH |
| PSA | Dual clutch systems | Assignment from FGP BV to FIAT-GM Powertrain Italia |

| | | |
|---|---|---|
| | | |

## PURCHASE ORDERS

| OTHER PARTIES | SUBJECT | ASSIGNMENT |
|---|---|---|
| **Global Value S.p.A.** | Information technology services | Assignment of the PIS purchase orders listed below to the FGP Italy:<br>- order n. 70835430 issued on December 7, 2004;<br>- order n. 70835480 issued on December 31, 2004;<br>- order n. 70823878 issued on September 13, 2004;<br>- order n. 70823339 issued on October 13, 2004;<br>- order n. 70828328 issued on October 13, 2004;<br>- order n. 70828339 issued on October 21, 2004;<br>- order n. 70776970 issued on October 3, 2004;<br>- order n. 70825219 issued on September 29, 2004;<br>- order with C.E.F. n. 1251 |
| **Hewlett Packard Italiana S.p.A.** | Information technology and related services | Assignment of the PIS purchase orders listed below to the FGP Italy:<br>- order n. 70842800 issued on February 18, 2005;<br>- order n. 70843182 issued on February 18, 2005;<br>- order n. 70842806 issued on February 18, 2005;<br>- order n. 70846660 issued on March 14, 2005;<br>- order n. 70844211 issued on March 7, 2005;<br>- order n. 70852732 issued on April 28, 2005;<br>- order n. 70852736 issued on April 28, 2005;<br>- order n. 70731054 issued on June 6, 2002.<br><br>Assignment of the PIS purchase order n. 70842794 issued on February 18, 2005 to GM PWT Europe |

| Hewlett Packard Financial Services | Information technology and related services | Assignment to the PIS purchase orders listed below to FGP Italy:<br>- order n. 70805789 issued on April 4, 2004;<br>- order n. 70798640 issued on April 2, 2004;<br>- order n. 70814767 issued on July 8, 2004;<br>- order n. 70829162 issued on October 28, 2004;<br>- order n. 70745778 issued on November 25, 2002;<br>- order n. 70800114 issued on March 4, 2004. |
|---|---|---|
| Atos Origin | | Assignment of the PIS purchase order n. 70847278 issued on March 14, 2005 to GM PWT Europe.<br><br>Assignment of the PIS purchase order n. 70768522 issued on July 7, 2003 to FGP Italy. |
| EDS Electronic Data Systems Italia | | Assignment of the PIS purchase orders listed below to GM PWT Europe:<br><br>- order n. 70853086 issued on April 27, 2005;<br><br>- order n. 70852076 issued on April 20, 2005. |
| Gruppo Sisge S.p.A: | | Assignment of PIS purchase order n. 70842340 issued on February 3, 2005 to FGP Italy |
| Reply S.p.A. | | Assignment of the PIS purchase orders listed below to FGP Italy:<br><br>- order n. 70849824 issued on April 6, 2005;<br><br>- order n. 70849820 issued on April 6, 2005. |
| Nestola F.lli & Coppola S.n.c. | | Assignment of PIS purchase orders listed below to FGP Italy: |

| | | |
|---|---|---|
| | | - order n. 70853850 issued on May 10, 2005; |
| | | - order n. 70853863 issued on May 10, 2005. |
| **Ovit Video S.r.l.** | | Assignment of PIS purchase orders listed below to FGP Italy: |
| | | - order n. 70817072 issued on July 23, 2004; |
| | | - order n. 70817077 issued on July 23, 2004; |
| | | - order n. 70847735 issued on April 6, 2005; |
| | | - order n. 70817090 issued on July 23, 2004. |
| **RSI Sistemi S.p.A.** | | Assignment of PIS purchase orders listed below to FGP Italy: |
| | | - order n. 70850575 issued on April 18, 2005; |
| | | - order n. 70847160 issued on March 14, 2005. |
| **ESPIN S.p.A.** | | Assignment of PIS purchase order n. 70718598 issued on January 10, 2002 to FGP Italy. |

### IT AGREEMENTS

| OTHER PARTIES | SUBJECT | ASSIGNMENT |
|---|---|---|
| **Global Value (Formerly with ITS, a company merged into Global Value)** | Information technology services | Assignment of PIS rights and obligations to the other recipients FMA and FGP Italy. |
| **Global Value (Wan)** | Information technology and related services | Assignment of the agreement from PIS to FGP Italy and GM Pwt Europe. |
| **Unigraphics** | Software licenses | Assignment of the agreement from PIS to FGP Italy. |
| **Atlanet** | Telephone services | Assignment of PIS rights and obligations to FGP Italy. |

| ETAS | Calibration software | Assignment of twenty-five of the fifty software licenses of "Calibration Software Inca" from FGP Italy to GM Pwt Europe. FGP will keep the remaining twenty-five licenses. |
|---|---|---|
| SAP | Software licenses | Assignment of General Terms and conditions and of MySAP Business Suite License from PIS to FGP Polska; assignment of the licenses currently sublicensed to Opel Hungary Pwt, Opel Austria Pwt, and Opel Pwt under the GM-SAP global license agreement |
| Microsoft | Computer software programs and licenses | Assignment of the licenses purchased by PIS to FGP Italy |
| EDS (Master Service Contract) | Information technology and related services | Assignment of the agreement from PIS to GM PWT Europe; Assignment of the agreement from PIS to FGP-Polska. |
| EDS (Service Contract) | Information technology and related services | Assignment of the agreement from PIS to GM PWT Europe |
| EDS (TA -17 TA between EDS Hungary and Opel Hungary Pwt; 3 TA between EDS Poland and FGP Polska; 9 TA between EDS GmbH Germany and Opel Powertrain GmbH; 8 TA between EDS Austria and Opel Powertrain Austria; 1 TA between EDS do Brasil and GM Powertrain do Brasil) | Information technology and related services | Assignment of the agreement from PIS to GM PWT Europe |

| Mathworks | Software licenses | Assignment of seven of the fourteen software licenses from FGP Italy to GM Pwt Europe. FGP Italy will keep the remaining seven licenses. |
|---|---|---|

**THIRD-PARTY SALES**

| OTHER PARTIES | SUBJECT | ASSIGNMENT |
|---|---|---|
| **Suzuki Motor Corporation – Magyar Suzuki** | SDE-ECU-F17/WagonR Ignis | |
| | | SA to be assigned from PIS to FGP Polska and Opel Austria Pwt |
| | | Tooling Agreement signed by PIS to be assigned to FGP Polska |
| | | ESA signed by PIS to be assigned to Opel Pwt and FGP Italy |
| **CMD Marine** | Fam B/C Diesel | SA signed by FMA also on behalf of Fiat Auto and Adam Opel. Fiat Auto is the actual only seller since 2004. Position to be clarified in by written notice to the client. |
| **Lombardini Industriale** | C514 Transmission Kit | SA signed by FGP Italia also on behalf of all companies of Fiat Auto Group and General Motors Group. Fiat Auto is the actual only seller since 2004. Position to be clarified in by written notice to the client. |
| **Lombardini Marine** | Fam B/C Diesel | SA signed by FMA also on behalf of all companies of Fiat Auto Group and General |

| | | Motors Group. Fiat Auto is the actual only seller since 2004. Position to be clarified by written notice to the client |
|---|---|---|
| **GMDAT** | Fam 1 Gen 3 | ESA signed by PIS to be assigned to Opel Pwt |
| **Suzuki Maruti** | SDE | ESA signed by PIS to be assigned to Opel Pwt and FGP Italy as per the draft of the notice assignment |
| **Fuji Heavy Industries** | Trionic 8 (Subaru Impreza STI) | ESA signed by PIS to be assigned to SAAB Pwt |

1

**Schedule 5.2(b)**

**Draft 4/04/05**

**DEED OF TRANSFER**

On this [    ] day of [    ] two thousand five appeared before me, Bart Theodoor Dérogée, civil law notary officiating in Rotterdam:

[    ], for the purpose hereof acting as attorney authorized in writing of:

1. **OnStar Corporation**, a company organized under the laws of State of Delaware, United States of America with principal address at 300 Renaissance Center, Detroit, Michigan 48265-3000, United States of America, hereinafter called: "**OnStar**";

2. **Fiat Auto Holdings B.V.**, a private company with limited liability, (besloten vennootschap met beperkte aansprakelijkheid), incorporated under the laws of the Netherlands, whose corporate seat is at Amsterdam, the Netherlands, and registered office at World Trade Center Schiphol Airport, Schiphol Boulevard 217, 1118 BH Luchthaven Schiphol, the Netherlands, trade register number 34135642, hereinafter called: "the **Company**"; and

3. **Fiat Partecipazioni S.p.A.**, a company organized under the laws of Italy with principal address at Corso G. Agnelli, hereinafter called: "**FP**".

The person appearing, acting as aforesaid, has declared as follows:

WHEREAS, OnStar is the owner of one hundred (100) shares of a par value of one thousand Euro (€ 1,000) each in the capital of the Company, numbered 401 through 500, hereinafter referred to as the "**Shares**";

WHEREAS, pursuant to the Agreement to Terminate the Joint Ventures and Terminate the Master Agreement dated the thirteenth day of February two thousand five (the "**Agreement**"), among **Fiat S.p.A.** ("**Fiat**"), the Company, Fiat Auto S.p.A. and General Motors Corporation ("**GM**") it has, *inter alia*, been agreed that GM shall cause OnStar to transfer the Shares to the Company as the transferee and GM has directed OnStar to transfer the Shares to the Company; and

WHEREAS, OnStar and the Company wish to proceed to the transfer of the Shares upon the terms and conditions set forth herein,

NOW THEREFORE, in consideration of the premises and of the mutual covenants herein contained, the parties hereto agree as follows,

**I. TRANSFER OF THE SHARES**

1.1   OnStar hereby surrenders and transfers the Shares to the Company as provided for in the first alternative of article 2:207 paragraph 2 of the Dutch Civil Code and the Company hereby accepts the Shares from OnStar.

1.2   The Shares shall be for account of the Company as from the date of the present Deed.

**II. TITLE OF ACQUISITION**

The Shares were acquired by OnStar pursuant to a deed of transfer executed before a deputy

80037074 RTD C 257215 / 1

of Steven Perrick, civil law notary officiating in Amsterdam, the Netherlands, on the sixth day of September, two thousand and two.

### III. REPRESENTATIONS AND WARRANTIES

OnStar represents and warrants to the Company that:

a.     OnStar has the full power and authority to transfer the Shares;

b.     the Shares are not subject to any pledge or other right, nor can such a pledge or other right rightfully be demanded, nor has an attachment been levied on any of the Shares;

c.     following execution of the present deed, neither General Motors Corporation, OnStar nor any other entity wholly owned directly or indirectly by GM will retain any interest in the Shares;

### IV. SHARE TRANSFER RESTRICTIONS

In order to comply with the blocking clause as set out in article 8 of the articles of association of the Company, OnStar and FP, acting as the sole shareholders of the Company, hereby, in accordance with article 14 of the articles of association of the Company, resolve to approve the transfer of the Shares. The management board of the Company has had the opportunity to advise on the resolution to approve the transfer of the Shares in accordance with section 2:227 paragraph 4 of the Dutch Civil Code. No depository receipts of shares in the share capital of the Company have been issued with the co-operation of the Company. No shares in the share capital of the Company have been pledged nor encumbered with a right of usufruct.

### V. DISCHARGE

OnStar grants the Directors of the Board of the Company discharge for the duties carried out until the date hereof and waives any claim it may have in this respect.

### VI. NO RESCISSION

The parties waive their rights pursuant to section 6:265 and 6:267 of the Dutch Civil Code to rescind or to claim from the court the rescission of this deed in whole or in part.

### VII. NON-APPLICABILITY OF ARTICLE 2:204c OF THE DUTCH CIVIL CODE

The parties declare that the provisions referred to in article 2:204c of the Dutch Civil Code do not apply to the present transfer.

### VIII GOVERNING LAW

This deed shall be governed by and construed in accordance with the laws of the Netherlands.

### AUTHORIZATION

The person appearing has been authorized to represent each of the parties by three private powers of attorney, which will be attached hereto immediately after the passing of this deed.

### CONCLUSION

The person appearing is known to me, civil law notary.

IN WITNESS WHEREOF the original of this deed was passed at Rotterdam on the date mentioned at the head of this deed.

After the material contents of this deed had been conveyed and explained to the person appearing by me, civil law notary, she declared that she had taken note of the contents of this deed, was in agreement therewith and did not require that it be read out in full.

80037074 RTD C 257215 / 1

3

Thereupon, after a limited part of this deed had been read out, it was signed by the person appearing and by me, civil law notary.

10 May 2005

## SCHEDULE 6.2(C)

## Guidelines for Data Retention and Archiving

Proprietary Information of GM mean any technical information relating to (i) powertrain products whose IP is owned exclusively by GM (ii) projects funded exclusively by GM, and (iii) any other competitive data relating exclusively to GM (i.e. vehicle applications; competitive scenario). GM proprietary information shall be treated according to the principles set forth herein and shall in any event remain proprietary to GM.

Proprietary Information of Fiat mean any technical information relating to (i) powertrain products whose IP is owned exclusively by Fiat (ii) projects funded exclusively by Fiat, and (iii) any other competitive data relating exclusively to Fiat (i.e. vehicle applications; competitive scenario).Fiat proprietary information shall be treated according to the principles set forth herein and shall in any event remain proprietary to Fiat.

**1. Data held electronically on individuals' laptops.**

<u>Action by all</u>: Beginning now and targeted to be completed not more than six weeks after closing, each individual must review the data held on his laptop. "Closing" means the date on which the termination of the FGP Joint Venture becomes effective.

(a) Individuals moving to GM will delete any business or technical data which in their reasonable, good faith opinion is proprietary to Fiat; and

(b) individuals moving to (or staying with) Fiat will delete any business or technical data which in their reasonable, good faith opinion is proprietary to GM.

NOTE: it is understood that this exercise will not be completed by closing. At closing, individuals moving to GM will have access to electronic data on their new laptops, which may include "Fiat data" described above. Similarly, individuals moving to (or staying with) Fiat will continue to have access to "GM data" currently stored on their laptops. In either case such data should not be used or disclosed to third parties and should be deleted, whether discovered during or even after the target six week period.

**2. Hard copy files kept by individuals in their offices.**

<u>Action by all</u>:  Beginning now and targeted to be completed not more than six weeks after closing, each individual must review the hard copy files kept in his office.

(a) Individuals moving to GM will destroy any business or technical data which in their reasonable, good faith opinion is proprietary to Fiat; and

(b) individuals moving to (or staying with) Fiat will destroy any business or technical data which in their reasonable, good faith opinion is proprietary to GM.

10 May 2005

NOTE: it is understood that this exercise will not be completed by closing. Therefore, at closing the individuals moving to GM will take all their hard copy files currently in their offices, even though these may include some "Fiat data". Similarly, those individuals moving to (or staying with) Fiat will continue to retain possession of all the hard copy files currently in their offices, even though these may include some "GM data". In either case such data should not be used or disclosed to third parties and should be destroyed, whether discovered during or even after the target six week period.

**3. Copies of all <u>general business and commercial data</u> relating to PIS/FGP and of all <u>technical information</u> relating to powertrain products whose IP is co-owned by GM and Fiat.**

This data will be provided to both GM and Fiat. Most of it is stored electronically, although some may be held in hard copy form only. The following process will be followed:

<u>Action by IT department (to be completed by cob 13th. May):</u>

(a) Divide electronic information stored on File Servers and FGP Portal by Functions.

(b) Provide an electronic copy to both representatives of each Function appointed by GM and Fiat.

<u>Action by functional heads:</u> Beginning now and targeted to be completed by cob on 13th. May, but continuing thereafter if necessary, functional heads must identify and arrange to have copied general business and commercial data relating to PIS/FGP, and all technical information relating to powertrain products whose IP is co-owned by GM and Fiat, where such data is kept only in hard copy form.

The above principles shall apply also to information retained by individuals at FGP plants or subsidiaries (to the extent this information falls on one of the above categories)

## Linee guida per la ritenzione e archiviazione dei dati

Per informazioni di proprietà di GM si intende ogni informazione tecnica concernente (i) prodotti "powertrain" i cui diritti di proprietà intellettuale appartengano esclusivamente a GM (ii) progetti finanziati esclusivamente da GM e (iii) ogni altro dato di natura o rilevanza concorrenziale concernente esclusivamente GM (ad esempio, applicazioni dei veicoli; scenari concorrenziale). Le informazioni di proprietà di GM saranno trattate nel rispetto dei principi indicati nel presente documento e rimarranno in ogni caso di proprietà di GM.

Per informazioni di proprietà di Fiat s'intende ogni informazione tecnica concernente (i) prodotti "powertrain" i cui diritti di proprietà intellettuale appartengano esclusivamente a Fiat (ii) progetti finanziati esclusivamente da Fiat, e (iii) ogni altro dato di natura o rilevanza concorrenziale concernente esclusivamente Fiat (ad esempio, applicazioni dei

10 May 2005

veicoli; scenari concorrenziale). Le informazioni di proprietà di Fiat saranno trattate nel rispetto dei principi indicati nel presente documento e rimarranno in ogni caso di proprietà di Fiat.

**1.    Dati conservati elettronicamente su laptop appartenenti a singoli individui.**

Azione richiesta a tutti gli individui: a cominciare da ora e con l'obiettivo di concludere le operazioni descritte di seguito entro lo scadere delle sei settimane successive alla data di perfezionamento dell'accordo avente ad oggetto lo scioglimento della Joint Venture Powertrain (il "Closing"), ciascun individuo deve rivedere i dati conservati sul proprio laptop e:

(a) gli individui in procinto di trasferirsi presso GM sono tenuti a cancellare ogni dato di natura aziendale o tecnica che, secondo la loro ragionevole opinione e buona fede, contenga informazioni di proprietà di Fiat; e

(b) gli individui in procinto di trasferirsi (o di rimanere) presso Fiat sono tenuti a cancellare ogni dato di natura aziendale o tecnica che, secondo la loro ragionevole opinione e buona fede, contenga informazioni di proprietà di GM.

NOTA: si intende che questo dovere non cesserà alla data del Closing. Alla data del Closing gli individui destinati a trasferirsi presso GM avranno accesso ai dati elettronici sui loro nuovi laptop, che potranno includere informazioni di proprietà di Fiat, come descritte sopra. Parimenti, gli individui destinati a trasferirsi (o a rimanere) presso Fiat continueranno ad avere accesso a informazioni di proprietà di GM, attualmente memorizzate sui loro laptop. In entrambi i casi, tali informazioni non dovranno essere usate né essere comunicate a terzi e dovranno essere cancellate, tanto nell'ipotesi in cui siano state rilevate durante il periodo di sei settimane successivo alla data del Closing quanto nell'ipotesi in cui siano rilevate successivamente.

**2.    File conservati su supporto rigido e tenuti dagli individui nei loro uffici.**

Azione richiesta a tutti gli individui: a cominciare da ora e con l'impegno di concludere le operazioni descritte di seguito entro lo scadere delle sei settimane successive alla data del Closing, ciascun individuo dovrà rivedere i files cartacei che sono presenti nel suo ufficio e:

(a) gli individui in procinto di trasferirsi presso GM dovranno distruggere ogni dato di natura aziendale o tecnica che, secondo la loro ragionevole opinione e buona fede, contenga informazioni di proprietà di Fiat; e

(b) gli individui in procinto di trasferirsi (o di rimanere) presso Fiat sono tenuti a distruggere ogni dato di natura aziendale o tecnica che, secondo la loro ragionevole opinione e buona fede, contenga informazioni di proprietà di GM.

NOTA: si intende che questo dovere non cesserà alla data del Closing. Perciò, alla data del Closing gli individui destinati a trasferirsi presso GM porteranno con sé la documentazione che si trova attualmente nei loro uffici, anche se tale documentazione

10 May 2005

potra' includere alcune informazioni di proprietà di Fiat. Parimenti, gli individui destinati a trasferirsi (o a rimanere) presso Fiat continueranno a disporre di tutti la documentazione che si trova attualmente nei loro uffici, anche se tale documentazione potra' contenere informazioni di proprietà di GM. In entrambi i casi, tali informazioni non dovranno essere usate né essere comunicate a terzi e dovranno essere distrutte, tanto nell'ipotesi in cui siano state rilevate durante il periodo di sei settimane successivo alla data del Closing quanto nell'ipotesi in cui siano state rilevate successivamente.

**3.    Copie di tutti i <u>dati generali di natura aziendale e commerciale</u> concernenti PIS/FGP e di tutte le <u>informazioni tecniche</u> concernenti prodotti "powertrain" i cui diritti di proprietà intellettuale sono condivisi da GM e Fiat.**

Tali dati saranno a disposizione sia di GM che di Fiat. La maggior parte di questi dati è archiviata elettronicamente, sebbene sia possibile che alcuni siano conservati esclusivamente su supporti cartacei. Con riferimento a tali dati, dovrà essere rispettata la seguente procedura:

<u>Azione richiesta al dipartimento IT (e da completarsi entro la fine della giornata lavorativa del 13 maggio 2005):</u>

(a) dividere e raggruppare le informazioni elettroniche archiviate sui File Servers e sul FGP Portal per ciascuna funzione aziendale cui sono relativi;

(b) fornire una copia elettronica di tali informazioni, cosi' suddivise, a entrambi i rappresentanti di ciascuna funzione aziendale, nominati rispettivamente da GM e da Fiat.

<u>Azione richiesta ai dirigenti di ciascuna funzione aziendale:</u> a cominciare da ora e con l'obiettivo di concludere entro la fine della giornata lavorativa del 13 maggio 2005, ma con l'impegno a proseguire l'attivita' anche successivamente, se necessario, i responsabili di ciscuna funzione aziendale dovranno identificare, e provvedere affinché siano copiati, i dati generali di natura aziendale e commerciale concernenti PIS/FGP e tutte le informazioni tecniche concernenti prodotti "powertrain" i cui diritti di proprietà intellettuale siano condivisi da GM e Fiat, qualora tali dati siano disponibili soltanto in forma cartacea.

I principi sopra menzionati si applicheranno anche alle informazioni in possesso degli individui impiegati presso stabilimenti di, o società controllate da, FGP (nella misura in cui tali informazioni rientrino in una delle categorie sopra menzionate).



## Dipendenti di Powertrain Ind.Serv. a Fiat

| | Nome | Cognome | Assunto |
|---|---|---|---|
| 1 | Guiot Pin | Marina | FIAT |
| 2 | Piccioni | Mario | FIAT |
| 3 | Odone | Paola | FIAT |
| 4 | Strino | Roberta | FIAT |
| 5 | Ugaglia | Carlo  Gianluigi | FIAT |
| 6 | Condini | Tarcisio | FIAT |
| 7 | Balderi | Massimo | FIAT |
| 8 | Agnesone | Daniela | FIAT |
| 9 | Modaffari | Francesco | FIAT |
| 10 | Saglimbeni | Renato | FIAT |
| 11 | Fusco | Lily | FGP |
| 12 | Asti | Sergio | FIAT |
| 13 | Lo Meo | Salvatore | FGP |
| 14 | Tonon | Maurizio | FIAT |
| 15 | Beltramino | Ezio | FIAT |
| 16 | Mascellini | Rosamaria | FIAT |
| 17 | Gallone | Giuseppe | FGP |
| 18 | Prati | Massimo | FIAT |
| 19 | Zachara | Sylwia | FGP |
| 20 | Favro | Stefano | FIAT |
| 21 | Abbati Marescotti | Andrea | FIAT |
| 22 | Chiari | Daniele | FIAT |
| 23 | Ferro | Giovanni | FIAT |
| 24 | Musizza | Giovanni | FIAT |
| 25 | Gandolfo | Aldo | FIAT |
| 26 | Tonnarelli | Valeria | FIAT |
| 27 | Blundetto | Fulvio | FIAT |
| 28 | Di Martino | Paolo | FIAT |
| 29 | Barbieri | Gianpaolo | FGP |
| 30 | Flamini | Maurizio | FIAT |
| 31 | Scaglia | Marco | FIAT |
| 32 | Mangiarino | Massimo | FIAT |
| 33 | Sabbadini | Marco | FIAT |
| 34 | Garello | Massimo | FIAT |
| 35 | Inglese | Daniela | FIAT |
| 36 | Massucco | Marco | FIAT |
| 37 | Basso | Lucia | FGP |
| 38 | Testa | Dario | FIAT |
| 39 | Grazioli | Roberto | FGP |
| 40 | Bertello | Giorgio | FIAT |
| 41 | Sorrenti | Sebastiano | FIAT |
| 42 | Interlandi | Massimo | FIAT |
| 43 | Serafino | Mauro | FIAT |
| 44 | Di Carlo | Giovanni | FIAT |
| 45 | Massucco | Sergio | FIAT |
| 46 | Biondi | Lucia | FIAT |
| 47 | Carniani | Elena | FGP |
| 48 | Vallotti | Paolo | FGP |
| 49 | Montagnani | Renzo | FIAT |
| 50 | Bartoli | Sarina | FGP |

**Dipendenti di Powertrain Ind.Serv. a Fiat**

| | Nome | Cognome | Assunto |
|---|---|---|---|
| 51 | Pisciotta | Francesco | FIAT |
| 52 | Comino | Marika | FIAT |
| 53 | Comba | Paola | FIAT |
| 54 | Pietrangioli | Luigi | FIAT |
| 55 | Cucchietti | Flavio | FIAT |
| 56 | Calonghi | Paola | FIAT |

## Dipendenti di Fiat-GM Powertrain Italia (P.E.) a GM

| N° | Cognome e Nome | Assunto | Note |
|----|----------------|---------|------|
| 1 | AGRICOLA Ulderico | FGP | |
| 2 | ALESSIO Valeria | FIAT | |
| 3 | AMEGLIO Enzo | FIAT | |
| 4 | ANTONIOLI Pier Paolo | FIAT | |
| 5 | BARBERO Simone | FIAT | |
| 6 | BASSO Giovanni | FIAT | |
| 7 | BASTIANELLI Michele | FGP | |
| 8 | BELAKOVA Luba | FGP | |
| 9 | BELTRANDO Giacomino | FIAT | |
| 10 | BORETTO Gianmarco | FIAT | |
| 11 | BRUCATO Aldo | FGP | |
| 12 | BRUNO Morena | FIAT | |
| 13 | CACCAMO Consolato Fabio | FGP | |
| 14 | CAPRIO Stefano | FIAT | |
| 15 | CAPUTO Giovanni | FIAT | |
| 16 | CARDINIO Filippo | FIAT | |
| 17 | CASASSO Paolo | FGP | |
| 18 | CASSANI Stefano | FGP | |
| 19 | CATANESE Alessandro | FGP | |
| 20 | CICERI Maurizio | FGP | |
| 21 | CILIBERTO Giuseppe | FIAT | |
| 22 | CIPOLLA Giovanni | FIAT | PIS |
| 23 | CISTERNINO Maurizio | FIAT | |
| 24 | COLOMBO Alberto | FGP | |
| 25 | COLOMBO Giovanni | FGP | |
| 26 | DAVIDE Cristiana | FIAT | |
| 27 | DE CARLO Vincenzo | FIAT | |
| 28 | DETA Angelo | FIAT | |
| 29 | DI FRANCO Alessandro | FGP | |
| 30 | DI NUNNO Davide | stage | |
| 31 | D'INTINO Maura | FGP | |
| 32 | DONATO Andrea | FGP | |
| 33 | ESPOSITO Francesco | FIAT | |
| 34 | FADDA Patrizio | FIAT | |
| 35 | FECHINO Paolo | FIAT | |
| 36 | FERRARIS Riccardo | FIAT | |
| 37 | FIERRO Emiliano | FGP | |
| 38 | FOSSATI Luca | FGP | |
| 39 | FRANCO Silvano | FIAT | |
| 40 | GIRAUD Massimo | FIAT | |
| 41 | GOLISANO Roberto | FGP | |
| 42 | GRAGLIA Riccardo | FGP | |
| 43 | KANEV Andrei Gheorghi | FGP | |
| 44 | LA TORRE Saro | FIAT | |
| 45 | LOUDJERTLY Lidia | stage | |
| 46 | MAGRO Lorenzo | FIAT | |
| 47 | PARISI Filippo | FIAT | |
| 48 | PEIRANO Roberto | FIAT | |
| 49 | PELIZZONI Ivan | FGP | |
| 50 | PENSATO Michele | FGP | |
| 51 | PISONI Eugenio | FIAT | |
| 52 | RAMUNDO Fabio | FGP | |
| 53 | RELLECATI Pierluigi | FIAT | |
| 54 | ROLLE' Gianpaolo | FIAT | |
| 55 | ROVATTI Giovanni | FGP | |
| 56 | SALA Massimiliano | FIAT | da Luglio '05 |
| 57 | SANGUEDOLCE Andrea | FIAT | |
| 58 | TISSELLI Filippo | FGP | |
| 59 | TORTORICI Massimo | FGP | |
| 60 | TUNINETTI Alessia | FGP | |
| 61 | VENNETTILLI Nando | FGP | |
| 62 | VISAGGI Francesco | FGP | |

**Dipendenti di Powertrain Ind.Serv. a GM**

| N. | Cognome | Nome | Assunto |
|----|---------|------|---------|
| 1 | Piper | David | ISP ASSUNTO FGP |
| 2 | Jost | Dieter | ISP ASSUNTO FGP |
| 3 | Flynn | Peter | ISP ASSUNTO FGP |
| 1 | Campra | Rosalena | FIAT |
| 2 | Seia | Manuela | FGP |
| 3 | Spizzo | Emanuela | FGP |
| 4 | Altrocchi | Roberta | FGP |
| 5 | Piccinini | Pier Luigi | FGP |
| 6 | Gugliemetti | Barbara | FGP |
| 7 | Baghurst | Neil | FGP |
| 8 | D' Errico | Anna | FGP |
| 9 | Cardinale | Antonella | FGP |
| 10 | Perron | Paolo Ennio | FGP |
| 11 | Pincetti | Giovanni | FGP |
| 12 | Cora | Francesca | FGP |
| 13 | Nebbia | Claudio | FGP |
| 14 | Peretto | Fernandino | FIAT |
| 15 | Chiorino | Luigi | FIAT |
| 16 | Landi | Orfeo | FIAT |
| 17 | Rossi | Monica | FGP |

**Dipendenti di Fiat-GM Powertrain Italia (Enti centr.) a GM**

| N. | Cognome | Nome | Assunto |
|----|---------|------|---------|
| 1 | Bighi | Mauro | FGP |
| 2 | Caramassi | Riccardo | FGP |
| 3 | Mancino | Roberto | FIAT |
| 4 | Gokal | Ram | FGP |
| 5 | Varesano | Marco | FGP |
| 6 | Ruotolo | Romualdo | FGP |

# Schedule 7.1(a)  PROJECT AGREEMENT LIST (terminating)

| Ref # | CONTRACT TYPE | Description | Parties | RESOLUTION | | REMARKS |
|---|---|---|---|---|---|---|
| | | | | Terminated at liquidation | To be terminated now | |
| | | **POWERTRAIN** | | | | |
| 1 | PWT | Joint Venture Agreement (and all amendments) | Fiat SpA; FAH; GM; FGP | X | | |
| 2 | PWT | Consents (list attached - A) | Fiat SpA; FAH; GM | | X | |
| 3 | PWT | Various Side Letters (list attached - B) | Fiat SpA; FAH GM; FGP | X | | |
| 4 | PWT | Master Intellectual Property Agreement | Fiat Auto; GM; FGP | X | | |
| 5 | PWT | Powertrain Engineering Services Agreement | FGP; FAH; GM | X | | |
| 6 | PWT | European Supply Agreement | FGP; FAH; GM | X | | |
| 7 | PWT | Powertrain Master Services and Facilities Agreement - Fiat | Fiat Spa; FAH; GM; FGP | X | | |
| 8 | PWT | Powertrain Master Services and Facilities Agreement GM | GM; FGP | X | | |
| 9 | PWT | Master Spare Parts Supply Agreement | FGP; FAH; GM | X | | |
| 10 | PWT | Cost Sharing Agreement | GM (Various); Fiat Auto; Fiat Auto Poland; SATA; PIS | X | | |
| 11 | PWT | Interim Coordination Agreement | Fiat; Fiat Auto; FAH; GM | | already performed | |
| | | **BRAZIL POWERTRAIN** | | | | |
| 12 | PWT | Brazilian Joint Venture Agreement | FIASA; GM do Brasil | X | | |
| 13 | PWT | Brazilian Powertrain Engineering Services Master Agreement | FGP Ltda; FIASA; GM do Brasil | X | | |
| 14 | PWT | Brazilian Supply Agreement | FGP Ltda; FIASA; GM do Brasil | X | | |
| | | **PURCHASING** | | | | |
| 15 | PUR | Joint Venture Agreement | Fiat; FAH; GM; GFPWWP | X | | |
| 16 | PUR | Master Purchasing Services Agreement | FAH; FGP; GM; GFPWWP | | X | termination agreement being negotiated eff. April 1,'05 |
| 17 | PUR | Purchasing Consultancy Services Agreement | GM (various); Fiat Auto (various); FGP; GFPWWP | | X | termination agreement being negotiated eff. April 1,'05 |
| 18 | PUR | Purchasing Master Services and Facility Agreement - Fiat | Fiat SpA; FAH; GM; GFPWWP | X | | |
| 19 | PUR | Purchasing Master Services and Facility Agreement - GM | GM; GFPWWP | X | | |
| 20 | PUR | Interim Coordination Agreement | Fiat SpA; FAH; Fiat Auto; GM; GFPWWP | | already performed | |
| 21 | PUR | Purchasing and GME Services and other services agreements | various | | X | termination agreement being negotiated eff. April 1,'05 |
| | | **VEHICLE PROGRAMS** | | | | |
| 22 | VEH | Common Architecture Agreement | Fiat Auto; GM; ACAG; Saab | | X | terminates w/MA |
| | | **OTHER PROJECT AGREEMENTS** | | | | |

| Rel. | CON-TRACT TYPE | Description | Parties | Terminates at (liquidation) | To be terminated now | REMARKS |
|---|---|---|---|---|---|---|
| 23 | OTH | Credit Cooperative Agreement | FIDIS; GMAC | | X | Separate termination agmt to be executed |
| 24 | OTH | Engineering and Development Cooperation Agreement (a.k.a. "Teaming Agreement") | Fiat Auto; GM | | X | terminates w/MA |
| 25 | OTH | Reimbursement Agreement | FGP Italic; FAH | X | | Fiat to provide proposal; need to determine whether transfer of business |

## Schedule 7.1 (a) NON-PROJECT AGREEMENT LIST (terminating)

| Ref # | CONTRACT TYPE | Description | Parties | RESOLUTION Termination at liquidation | RESOLUTION To be terminated now | REMARKS |
|---|---|---|---|---|---|---|
| | | **POWERTRAIN** | | | | |
| 1 | PWT | Powertrain Contribution Agreement | Fiat; FAH; GM; FGP | X | | Except for Poland - reps and warranties to be incorporated into share transfer |
| 2 | PWT | Brazilian Powertrain Contribution Agreement | FIASA; GM do Brasil | X | | |
| 3 | PWT | FGP-GM Powertrain Engineering Services Agreement | FGP; GM | X | | This is GM providing services to FGP |
| 4 | PWT | Elasis Services Agreement | Elasis; FGP Italia; Opel PWT | X | | Extension letter for FGP services agmt required (Fiat to draft) |
| 5 | PWT | M2 NDA | CRF; Fiat Auto; GM; FGP | X | | |
| 6 | PWT | Secondment - GME group/FGP | GMOC; PIS | X | | |
| | | **PURCHASING** | | | | |
| 7 | PUR | Contribution Agreement | FAH; Fiat; GM; FGP | X | | |
| 8 | PUR | Secondment - from GME group and from WWP to GME | GPWWP Mgmt Serv; GME | X | | |
| | | **OTHER** | | | | |
| 9 | OTH | Fiat Import and Distribution Agreement | | X | | Separate agmt at closing with respect to termination |
| 10 | OTH | Alfa Romeo Import and Distribution Agreement | | X | | Separate agmt at closing with respect to termination |
| 11 | OTH | GM/Fiat Insurance Agreement | GM; Fiat; FGP | X | | |
| 12 | OTH | GM-Fiat IT contract for Argentina P&A | | X | | |
| 13 | OTH | Thailand Assembly | | | X | Fiat to pay agreed cancellation. Termination agreement being executed. |

## Schedule 7.1(a)    NEW AND CONTINUING AGREEMENTS LIST

| Ref. | CON- TRACT TYPE | Description | REMARKS |
|---|---|---|---|
| | | **POWERTRAIN** | |
| 1 | PWT | BB Entity Joint Venture Agreement | |
| 2 | PWT | BB Supply | |
| 3 | PWT | BB Articles | |
| 4 | PWT | Fiat Services Agmt | |
| 5 | PWT | BB Share Transfer Agreement | |
| 6 | PWT | IP Agreement providing for joint ownership of SDE, JTD and M20/32; no royalties for use of Initial PWT Technology; royalties for future use of PWT technology | |
| 7 | PWT | Cross Supply Agreement(s) for Powertrains and Spare parts - Europe | |
| 8 | PWT | Cross Supply Agreement(s) for Powertrains and Spare Parts Brazil | |
| 9 | PWT | Mutual Engineering Services Support Agreement, including CRF and Elasis | |
| 10 | PWT | | |
| 11 | PWT | | |
| 12 | PWT | Supply Agreement for V8 Northstar Engine | |
| 13 | PWT | Supply Agreement for Fam I, gen. 3 GM Engine | |
| | | **VEHICLE PROGRAMS** | |
| 14 | VEH | Premium Agreement | |
| 15 | VEH | Small Car Project Agreement and consent related to license to PSA and Tofas | |



| Ref. | CON-TRACT TYPE | Description | REMARKS |
|---|---|---|---|
| 16 | VEH | Epsilon/Fiat Large Project Agreement | |
| | | **OTHER** | |
| 17 | OTH | Umbrella joint venture unwinding agmt | |
| 18 | OTH | ESA for US Emissions compliance | |
| 19 | OTH | Articles of Association | |
| | | **PURCHASING** | |
| 20 | OTH | Purchasing Services Agreement for Agreed Commodities | |



Schedule 7.1(a) Agreement list (Project and Other) apr 29.xls

## Schedule 7.1(a) OTHER AGREEMENTS (terminating) (FGP incl PIS)

| Ref. | CON-TRACT TYPE | Description | Parties | RESOLUTION | | REMARKS |
|---|---|---|---|---|---|---|
| | | | | Terminated (indicated) | To be terminated now | |
| | | **POWERTRAIN** | | | | |
| 1 | PWT | Services Agreement - ATLANET | PIS; Atlanet; FGP Italia | X | | |
| 2 | PWT | Services Agreement - Fiat GESCO SPA | FMA; PIS; FGP Italia; Gesco | X | | |
| 3 | PWT | Services Agreement - Fiat GEVA SPA | FGP Italia; PIS; FMA; GEVA | X | | |
| 4 | PWT | Services Agreement - SEPIN | FGP Italia; PIS; FMA; SEPIN | X | | |
| 5 | PWT | Consulting Services Agrmts. + Acceptance (12 QUOTA-HOLDERS | PIS; Various FGP | X | | |
| 6 | PWT | Pure Secondment Agreement - GMOC | PIS; GMOC | X | | |
| 7 | PWT | FX Services Agreement | FGP; GM Coordination Center (GMCC) | X | | |
| 8 | PWT | Agreement on Insurance services for FGP BV | GM; FGP | X | | |
| 9 | PWT | Insurance Services Agreement | Fiat; FGP | X | | |
| 10 | PWT | Trade Name and TM License Agreement | Fiat; FGP | X | | |
| 11 | PWT | Loan Deposit Agreement (cash pool) | FGP; GMCC | X | | |
| 12 | PWT | Services Agreement on provision of offices and utilities | FGP; FAH | X | | |
| 13 | PWT | Loan Deposit Agreement (cash pool) | FGP Italy; GMCC | X | | |
| 14 | PWT | Loan Deposit Agreement (cash pool) | FMA; GM; GMCC | X | | |
| 15 | PWT | FGP Sales Terms to GM North America | FGP Various; GM | X | | |
| 16 | PWT | PWT Lease and Services Agreement | PIS; FGP Italia | X | | |
| 17 | PWT | PWT Services Agmt - Security | PIS; Sirio | X | | |



Draft March, 4, 2005
For Discussion Purposes only

## Powertrain Joint Venture – Side Letters

| Date | Description | Termination? | Comments |
|---|---|---|---|
| July 20 00 | GM willing to review proposals in good faith for contribution of FGP prior to year end | performed | |
| July 24 00 | Cost reductions in FGP research and development operations | Upon termination of JVA | |
| Mar 29 02 | Significant issues relating to FGP Completion | performed | |
| Mar 29 02 | Sharing of Tax Holidays and amortization of excess capacity according to ToP | Upon termination of JVA | Tax holiday provision should be include in Poland agreements |
| Dec 19 03 | GDI Cancellation Costs – split 12.5% Fiat Auto/87.5% GM.  If Fiat Auto opts in, payment is credited to royalties | Upon termination of JVA | Any amounts outstanding should be paid |
| May 28 04 | Confirmation of ownership of IP developed by Elasis | Continue unless incorporated into new IP agreements | |
| July 30 04 | Mirafiori Cost Sharing | Upon termination of JVA | Any amounts incurred to date should be paid |
| Nov 12 04 | Hybrid side letter – *see consents* | | |
| **Purchasing Side letters** | | | |
| Dec 22 00 | Modified conditions and procedures for Purchasing Completion | Performed | |
| | | | |
| | | | |

# SUMMARY OF CONSENTS*
As of November 24, 2004

| DATE | ENTITY | DESCRIPTION |
|---|---|---|
| November 12, 2002 | GM | To license Ford to produce the X22F transmission in the Territory |
| April 4, 2003 | GM do Brasil | Sale of Fam II engines to Isuzu Group, GM Egypt, Delta Motors and other third party assemblers for incorporation in the I-190 light duty truck. |
| May 15, 2003 | | Delegation of Authority under Master Intellectual Property Agreement and § 8.3 of JVA for supply of powertrains to 3rd parties or licensing of powertrain technology to President of GME and CEO of Fiat Auto jointly (doesn't include exceptions to exclusive purchase obligations) |
| May 15, 2003 | GM Group & Fiat Auto Group | Sales of powertrains to third parties as part of CKD kits |
| May 28, 2003 | Fiat Auto Group & GM Group | Sales of powertrains to third parties as part of CKD kits prior to May 15, 2003 |
| | GM do Brasil | Past and future sales of Fam II engines to SGM |
| | Saab | Past and future sales of F25 transmissions to SGM |
| | Fiat Auto | Past and future sales of Fire engines to Yuejin Motor - |
| October 7, 2003 | Opel or another member of the GM Group | Sale to Lotus of up to 6000 total units of 200HP Fam II engines for use in Lotus or Proton badged vehicles based on Opel Speedster |
| | Opel | Purchase of engineering services from Lotus for the base engine development of a 240HP (approx) version of Fam II engine for Opel Speedster |
| | Fiat Auto | Purchase of R3024 V6 engines from VM Motori for premium segment and purchase of related engineering services from CRF |
| | Fiat Auto | Purchase of engineering services for base 400HP (approx) version of V6Arese gas engine for Alfa Romeo GTA from third parties |
| December 19, 2003 | Fiat Auto & GM Group | Sale of engines to Lombardini Marine pursuant to supply agreement dated Nov 30, 2003 (50% each) |





*Consent letter listing FGP

| DATE | ENTITY | DESCRIPTION |
|---|---|---|
| | Fiat Auto & GM Group | Sale of transmission components to Lombardini Marine pursuant to supply agreement dated Nov 30, 2003 (50% each) |
| | Vauxhall – expires Dec 31, 2004 | Sale of powertrains to low volume OEMS through an OE distributor/agent in UK of up to €3million |
| February 9, 2004 | GM do Brasil | Sale of Fam I 1.8L Gen II cylinder heads to GMDAT |
| | Fiat Auto | Sale of powertrain components to Nanya to support Nanya's productions of the JTD 1.9 8v |
| February 12, 2004 and side letter dated February 12 | GM Group | Licensing of powertrain technology incorporated in Fam I Gen III engine or any component to GMDAT for manufacture of engines in Korea; Includes sublicense to SGM to enable SGM to produce the engine, cylinder head or other components in China.  The Addendum allows sublicense to AvtoZAZ and Daewoo Romania under certain future conditions |
| Addendum June 30, 2004 | | |
| June 30, 2004 | GM Group & Fiat Auto | License to Alliance Partners of Joint Future Powertrain Technology relating to D-1 and subsequent derivatives controls technology; |
| June 30, 2004 | GM Group & Fiat Auto | License to Alliance Partners of Joint Future Powertrain Technology relating to S-0 and subsequent derivatives controls technology |
| July 29, 2004[1] | Fiat Auto | Production of torque 1.6L gas engine at Fiat's plant in Cordoba, Argentina |
| July 30, 2004 | Fiat Auto | Sale to Nanya of gearbox 514R to support local production of Fiat 223 family |
| July 30, 2004 | Adam Opel AG – expires December 31, 2004 | Interim sale of Fam I (Z1.8XE) engines to CJSC GM-Avtovaz |
| August 9, 2004 | GM Group | License of Fam I engine to proposed FGP JV in Russia |
| October 29, 2004 | Fiat Auto | Purchase by Tofas of certain engines from PSA for MCV |
| October 29, 2004 | GM Group & Fiat Auto Group | Hybrid carve out |

[1] Fiat's position is that "No Consent" is required

Consent letter listing FGP



93170 N39

**ORIGINAL/ORIGINAL**

General Motors Powertrain - Germany GmbH
Friedrich-Lutzmann-Ring
D-65423 RÜSSELSHEIM

**INVOICE /RECHNUNG**

| | |
|---|---|
| DUNS no. /Unsere Lieferantennr | 329715986 |
| EU VAT ID /UID-Nr. | DEB14315264 |
| Tax ID /Lokale Steuernummer | 00722500021 |

| | |
|---|---|
| Page /Seite | 1/2 |
| Document no. /Belegnummer | 8919101766 |
| Document Date /Belegdatum | 31.01.2008 |
| Reference doc. /Referenzbeleg | Gianfranco Baldi |
| Performance date /Referenzbelegdatum | 31.01.2008 |
| Charge-to DUNS /Zahler DUNS | 437633162 |
| VAT ID /UID | IT07973780013 |
| Currency /Währung | EUR |
| Gross Amount /Gesamtbetrag | 21.556.500,00 |

**Bill-To-Party/Rechnungsempfänger**
FIAT GROUP AUTOMOBILES S.p.A.
Corso Giovanni Agnelli 200
I-10135 TORINO

**Customer   /Zahler**
FIAT GROUP AUTOMOBILES S.p.A.
Corso Giovanni Agnelli 200
I-10135 TORINO

| Item Position | Material/Description Material/Bezeichnung | Quantity Menge | UM ME | Unit Price Einzelpreis | Value Wert |
|---|---|---|---|---|---|
| | Family 1 Cancellation Charges (Ref to Fiat termination letter dated Dec22, 2006 | | | | |
| | Reference:  Fiat :Gianfranco Baldin GM: Francesca Cora | | | | |
| | SBR1550 | | | | |
| | Contact Person : Michael Schaft | | | | |
| | Contact Number : 76799 | | | | |
| 10 | Z-SUNDE001 | 1 | EA/EA | 2.703.000,00 | 2.703.000,00 |
| | Spec. Invest. Deprec.Sum.(Sched. 3 3B*)/ | | | | |
| 20 | Z-SUNDE001 | 1 | EA/EA | 143.500,00 | 143.500,00 |
| | SU & PP (Schedule 3 3C*)/ | | | | |
| 30 | Z-SUNDE001 | 1 | EA/EA | 18.710.000,00 | 18.710.000,00 |
| | NBV associated invest. (Sched. 3 3B*)/ | | | | |

| | | |
|---|---|---|
| **Net amount/Nettobetrag** | | 21.556.500,00 |
| **VAT/MWSt**  0,000 % | | 0,00 |
| **Gross Amount/Gesamtbetrag** | | 21.556.500,00 |

Tax free inter EC delivery

**tax free Inter EU-delivery**

| | |
|---|---|
| Goods delivered to /Anlieferadresse | FIAT GROUP AUTOMOBILES S.p.A. - Corso Giovanni Agnelli 200 - 10135 - TORINO - Italy |
| Payment terms /Zahlungsbedingungen | 30 days after inv date |

General Motors Powertrain - Germany GmbH
D-65423 Rüsselsheim
Telefon +49 (6142) 7-70
Telefax: +49 (6142) 7 - 7 88 00

Geschäftsführung:
Reinhold Metzger, Anton Meurer,
Daniel E. Nicholson, Cyril Rauscher
Aufsichtsrat:
Rita Forst (Vorsitzende)

Sitz der Gesellschaft: Rüsselsheim
Handelsregister
Amtsgericht Darmstadt, HRB 84287

Deutsche Bank AG, Frankfurt / M
Kto. 940 700 00
BLZ 500 700 10
S.W.I.F.T DEUTDEFF



**ORIGINAL/ORIGINAL**

General Motors Powertrain · Germany GmbH
Friedrich-Lutzmann-Ring
D-65423 RÜSSELSHEIM

**INVOICE /RECHNUNG**

| DUNS no. /Unsere Lieferantennr | 329715886 |
|---|---|
| EU VAT ID /UID-Nr. | DE814315264 |
| Tax ID /Lokale Steuernummer | 00722500021 |

| | |
|---|---|
| Page /Seite | **2/2** |
| Document no. /Belegnummer | **8919101766** |
| Document Date /Belegdatum | **31.01.2008** |

| Item Position | Material/Description Material/Bezeichnung | Quantity Menge | UM ME | Unit Price Einzelpreis | Value Wert |
|---|---|---|---|---|---|
| | Due date /Fälligkeitsdatum        01.03.2008 | | | | |

General Motors Powertrain · Germany GmbH
D-65423 Rüsselsheim
Telefon +49 (6142) 7-70
Telefax: +49 (6142) 7 - 7 88 00

Geschäftsführung:
Reinhold Metzger, Anton Meurer,
Daniel E. Nicholson, Cyril Reuscher
Aufsichtsrat:
Rita Forst (Vorsitzende)

Sitz der Gesellschaft: Rüsselsheim
Handelsregister
Amtsgericht Darmstadt, HRB 84287

Deutsche Bank AG, Frankfurt / M.
Kto. 940 700 00
BLZ 500 700 10
S.W.I.F.T DEUTDEFF

EUROPEAN POWERTRAIN CROSS SUPPLY
AGREEMENT


dated May 13, 2005

by and among

Fiat S.p.A.

Fiat Auto Holdings, B.V.

Fiat Auto S.p.A.

and

General Motors Corporation

CONTENTS

1.  DEFINITION AND INTERPRETATION.................................................3

2.  SUPPLY AND PURCHASE..........................................................6

3.  PURCHASE ORDERS, ORDERING SYSTEM.............................7

4.  FORECAST AND CAPACITY ALLOCATION.............................7

5.  BRANDING, LABELING, PACKAGING, AND DELIVERY.............8

6.  QUALITY.........................................................................................9

7.  PRICING........................................................................................11

8.  CROSS SUPPLY PRODUCT –CONFORMANCE TO SPECIFICATIONS.........17

9.  AFTERSALES – CROSS SUPPLY SPARE PARTS........................18

10. ONGOING PURCHASING OBLIGATIONS.................................21

11. PAYMENT.......................................................................................21

12. PRODUCT AVAILABILITY........................................................22

13. CHANGE MANAGEMENT...........................................................23

14. TERM AND TERMINATION........................................................24

15. WARRANTIES;LIMITATIONS OF LIABILITY.........................24

16. RECALL CAMPAIGNS................................................................25

17. FORCE MAJEURE.......................................................................25

18. CONFIDENTIAL INFORMATION.............................................25

19. AMENDMENTS............................................................................26

20. SUB-CONTRACTED....................................................................26

21. ASSIGNMENT..............................................................................26

22. SEVERABILITY...........................................................................26

23. WAIVER........................................................................................26

24. ENTIRE AGREEMENT................................................................27

25. SEVERAL LIABILITY................................................................27

26. PUBLIC DISCLOSURE...............................................................27

27. GOVERNING LAW........................................................................................27

28. RIGHT TO AUDIT.......................................................................................27

29. INFORMAL DISPUTE RESOLUTION.....................................................27

30. ARBITRATION.............................................................................................28

31. SURVIVAL....................................................................................................29

32. PARENT COMPANY ASSURANCES.......................................................29

SCHEDULE 1
Opt-in Letter to Supply Agreement – Customer

SCHEDULE 2
Opt-in Letter to Supply Agreement – Supplier

SCHEDULE 3
Pricing

SCHEDULE 3.1:  Business Plan by Cross Supply Product family including rules
SCHEDULE 3.2:  WACC by Country
SCHEDULE 3.3.A:  Material, manufacturing and other operating cost improvements by Cross Supply Product family.
SCHEDULE 3.3.B:  Specific Investment Depreciation
SCHEDULE 3.3.C: Summary of start-up and preproduction costs
SCHEDULE 3.3.D: List of Prices for all production Cross Supply Product part numbers at committed volumes including also  target prices for non-production Cross Supply Products at committed volume levels.
SCHEDULE 3.4:  Band pricing summary for all Cross Supply Product families
SCHEDULE 3.5: Volumes used for Price calculation
SCHEDULE 3.6: Non Utilization Fee numerical example
SCHEDULE 3.7: Supplier cancellation – Specific variants causing cancellation

SCHEDULE 4
Motor Vehicles

SCHEDULE 5
Existing Third Parties

SCHEDULE 6
Installed capacity 2005-2010

EXHIBIT 1
Cross Supply Products

EXHIBIT 2
Volume Commitments for Cross Supply Products and Components

EXHIBIT 3.2A
Fiat Purchase Order

EXHIBIT 3.2B
GM Purchase Order

EXHIBIT 3.6
Common Supply Chain Requirements

EXHIBIT 3.6A
GM Supply Chain Requirements

EXHIBIT 3.6B
Fiat Supply Chain Requirements

EXHIBIT 6
Quality Requirements, Target and Feedback

EXHIBIT 8
List of Conformity of Production procedures

EXHIBIT 9
List of the Shared Tooling

EXHIBIT 10
Change Letter of Aftersales

EXHIBIT 11.4A
List of Banks GM

EXHIBIT 11.4B
List of Banks Fiat Auto

EXHIBIT 13
Change Management Procedures

THIS AGREEMENT *("Agreement"),* is made and entered into as of  May 13, 2005) effective on the same date (*"Effective Date"*) by and among Fiat S.p.A., a corporation organized under the laws of the Republic of Italy for the sole purpose of Section 32 (*"Fiat"*), Fiat Auto S.p.A., a corporation duly organized and validly existing under the laws of Italy and having its registered office in Turin, Corso Giovanni Agnelli 200, Fiat Auto Holdings B.V., a corporation duly organised and validly existing under the laws of The Netherlands, having its registered office   in Amsterdam, The Netherlands (jointly Fiat Auto Holding and Fiat Auto S.p.A. *"Fiat Auto"*), and General Motors Corporation, a corporation duly organised and validly existing under the laws of Delaware USA, having its principal place of business at The Renaissance Centre, Jefferson Street, Detroit, Michigan 48265-3000 (*"GM"*).

**WHEREAS**

(A)    On the 13th day of February 2005, Fiat , Fiat Auto, and GM entered into an "Agreement to Liquidate Joint Ventures and Terminate Master Agreement" (the **Termination Agreement**) regarding, *inter alia*, the liquidation of the Powertrain JV (as defined in the Termination Agreement), the Purchasing JV (as defined in the Termination Agreement), and the Brazil JV(as defined in the Termination Agreement), existing between the GM Group and the Fiat Auto Group.

(B)    Pursuant to the Termination Agreement, the Parties had the option to maintain purchase arrangements on the same terms and conditions contained in the European Supply Agreement, effective on June 29, 2001 for a period of up to five (5) years from the date of completion of the liquidation of the Powertrain JV; and

(C)    GM acknowledges and agrees that Fiat Auto and its Subsidiaries may transfer their powertrain operations and assets ("**Fiat Auto Powertrain Operations**") to a Fiat S.p.A. Subsidiary; in this event this Agreement shall become automatically applicable to such Fiat S.p.A Subsidiary but only with respect to the Fiat Auto Powertrain Operations

(D)    This Agreement sets forth the terms and conditions under which the Parties agree to provide the cross-supply arrangements described herein.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements set forth herein, the Parties agree as follows:

1.    DEFINITIONS AND INTERPRETATION

1.1    Capitalised terms in this Agreement have the same meaning as set forth in the Powertrain Joint Venture Agreement unless otherwise defined in this Agreement. The following terms, as used herein, shall have the meanings ascribed to them below:

*Business Day* means any day other than a Saturday, Sunday or other day that is a partial or full bank holiday in Italy and in Germany;

*Control* (including the terms *'Controlled by'* and *'under Common Control with'*) means the possession, directly or indirectly or as trustee or executor, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, as trustee or executor, by contract or credit arrangement or otherwise;

*Cross Supply Products* means those product lines of engines and transmissions and associated components as identified in Exhibit 1 to this Agreement

*Cross Supply Spare Parts* or *Spare Parts* mean any aftersales parts of Cross Supply Products, which have been produced, are currently produced or will be produced by a Supplier;

*Customer* means a Fiat Customer or a GM Customer buying the Cross Supply Products or Spare Parts under this Agreement, or a Subsidiary of the Customer that has signed an Opt-in Letter as set out in Schedule 1;

*Customers* means all Fiat Customers and all GM Customers;

*Customer Group* means all of the Fiat Customers or all of the GM Customers, as the case may be;

*Defect* means any material, workmanship, design, engineering, production, or manufacturing defect in Cross Supply Products or Spare Parts and which is not attributable to improper installation by Customer into the Motor Vehicle or Customer's improper handling;

*Defective* means a Cross Supply Products or Spare Parts affected by a Defect;

*Existing Third Party* means a Third Party customer listed in Schedule 5;

*Fiat Customer* means Fiat Auto, a Subsidiary of Fiat Auto or the Subsidiary of Fiat S.p.A. to which the Fiat Auto Powertrain Operations are transferred (and which may purchase only in relation to such Fiat Auto Powertrain Operations) that has signed an Opt-in Letter as set out in Schedule 1;

*GM Customer* means GM or a Subsidiary of GM that has signed an Opt-in Letter as set out in Schedule 1;

*INCOTERMS* means the Incoterms published by the International Chamber of Commerce edition 2000;

*Interests* mean any Shares or similar equity interest in a company or other Person;

*Motor Vehicles* has the meaning set forth in Schedule 4 of this Agreement;

*Party(ies)* mean Fiat, Fiat Auto and GM, as the case may be;

*Person* means an individual, corporation, limited liability company, partnership, limited partnership, syndicate, person, trust, association or entity or government, political subdivision, agency or instrumentality of a government;

*Prices* means the prices determined in accordance with Section 7 and Schedule 3 of this Agreement;

*Purchase Order* is the specific order sent for each Cross Supply Product and Cross Supply Spare Parts referred to in Section 3;

*Recall Campaign* means any action or any service rework deemed necessary by a Customer to remedy a Defect in Motor Vehicles already sold to the consumer, irrespective of whether or not the Defect is safety related;

*Shared Tooling* means the tooling required for Fiat Auto and GM when the investments are used by both Parties and jointly owned as further described in the Vendor Tooling Agreements executed by Fiat and GM and which are listed in Exhibit 9;

*Subsidiary* of any Person means any corporation, partnership, joint venture or other legal entity of which such Person (either alone or through or together with any other Subsidiary) owns more than 50% of the Interests, and the holders of which are generally entitled to vote for the election of the board of directors or other governing body of such corporation, partnership, joint venture or other legal entity;

*Supplier* means the Party supplying Cross Supply Products or Cross Supply Spare Parts under this Agreement, and/or a Subsidiary of the Supplier and/or the Subsidiary of Fiat S.p.A. to which the Fiat Auto Powertrain Operations are transferred (and which supplies only in relation to such Fiat Auto Powertrain Operations) that has signed an Opt-in Letter as set out in Schedule 2;

*Third Party* means a Person that is not a Party or a Subsidiary of a Party;

*Total Volumes* means the volumes for each Cross Supply Product family and referred to in Section 4.3 and detailed in Schedule 3.5;

*Unique Cross Supply Spare Parts* mean any branded parts, parts with specific Customer part numbering and packaging, or parts stemming from a specific parts break down of assemblies of one party only;

*Unique Tooling* means the tooling required for Fiat Auto or GM for unique investments or tooling owned by a Third Party supplier for exclusive use on Fiat or GM parts;

*Volume Commitments* means the volumes set forth in Section 4.3 and detailed in Exhibit 2;

*Year* means the period from 1 January to 31 December.

1.2     Each of the following terms is defined in the Section mentioned opposite the term:

| Term | Section |
|------|---------|
| Agreement | Preamble |
| Business Plan | Section 7 –Schedule 3.1 |
| Dispute | 29 |
| Disputing Parties | 29 |
| Due Date | 11.1 |
| Effective Date | Heading of the Agreement |
| Fiat Auto | Preamble |
| Prices | Section 7 |
| GM | Preamble |
| ICC | 30.1 |
| Request for Informal Dispute Resolution | 29 |
| Rules | 30.1 |
| Volume Commitments | Section 4.3 and Exhibit 2 |
| W.A.C.C. | Section 7.2 -- Schedule 3.2B |

1.3.    In this Agreement, except to the extent that the context otherwise requires:

(a)    As used herein, "Supplier" refers to the Party that is supplying the relevant Cross Supply Product and Spare Parts, and "Customer" refers to the Party (and/or its participating Subsidiaries) that is purchasing the relevant Cross Supply Product and Spare Parts from the Supplier.

(b)    when a reference is made in this Agreement to a Section, Schedule or Exhibit, such reference is to a Section of, a Schedule or Exhibit to, this Agreement unless otherwise indicated;

(c)    the table of contents and headings for this Agreement are for reference purposes only and do not affect in any way the meaning or interpretation of this Agreement;

(d)    whenever the words "include," "includes" or "including" are used in this Agreement, they are deemed to be followed by the words "without limitation";

(e)   the words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement;

(f)   all terms defined in this Agreement have the defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein;

(g)   the definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms;

(h)   any law defined or referred to herein or in any agreement or instrument that is referred to herein means such law or statute as from time to time amended, modified or supplemented, including by succession of comparable successor laws ;

(i)   references to a Person are also to its permitted successors and assigns; and

(j)   the use of "or" is not intended to be exclusive unless expressly indicated otherwise.

## 2.   SUPPLY AND PURCHASE

2.1    Subject to the terms and conditions of this Agreement, the Suppliers shall manufacture and supply to the Customers and the Customers shall purchase from the Suppliers their Cross Supply Products requirements, in accordance with the Volume Commitments set forth in Exhibit 2, and the relevant Cross Supply Spare Parts.

2.2    The Suppliers shall endeavour to provide to the Customers the most competitive Cross Supply Products and Spare Parts in terms of quality, cost and appropriate technology.

2.3    Each Party will cause its Subsidiaries, as appropriate, to enter into and adhere to the terms and conditions of this Agreement by signing the Opt-in Letter as set out in Schedules 1 and 2 hereto. Both Parties acknowledge that Subsidiaries may own certain assets necessary for the performance of its obligations hereunder. Each Party will ensure that to the extent such assets are transferred within a Customer Group, the Party will ensure that the Subsidiary to which assets are transferred, will sign an Opt-in Letter to be bound by this Agreement.

2.4    The Parties agree that the Cross Supply Product Volume Commitments set forth in Exhibit 2 represent the agreed to volumes as of the Effective Date.  Supplier is not obligated to supply Cross Supply Products above the Volume Commitments set forth in Exhibit 2.   The Volume Commitments are fixed and binding for all purposes of this Agreement, however, Customer has no obligation to purchase the Volume Commitments. Additional investment or cost generated by whatsoever addition of new volume, shall be managed through the Change Management Process. It is understood that the Existing Third Parties volumes set forth in Exhibit 2 shall have the priority in respect to the volumes committed by the Customer or Supplier. Any future Third Party volumes shall be included in the Volume Commitments of the Customer Group requesting such volumes.

2.5    Within a reasonable time before the start date of deliveries of a Cross Supply Product and Spare Parts, the Suppliers shall provide to the Customers all information and documentation reasonably required by the Customers to organize and implement the distribution and sale of Cross Supply Products and Spare Parts as well as the related aftersales service.  The relevant information shall include information that may help the Customers with respect to repairing, servicing, handling, inventory, marketing, selling, distributing and advertising.  Customer shall request such information

to the Supplier prior to delivery with enough lead time to allow the Supplier to perform under this Agreement.

2.6     Supplier has no obligation to supply any Cross Supply Products or Spare Parts under this Agreement if such supply could, violate any export laws or regulations, including but not limited to regulations of the U.S. Commerce Department, Office of Foreign Asset Control, Department of State, Treasury Department or EU or Italian regulations.

2.7     Supplier shall be solely responsible for providing the floor space, equipment, personnel, and working capital required to manufacture Cross Supply Products and Spare Parts hereunder. Customer will be responsible for future specific investment in, and have full ownership rights to, both specific tooling and equipment, even if located in the Supplier's facility.

2.8     Unless otherwise agreed herein, and subject to Section 2.1, Supplier shall be free to retain or dispose of its machinery and equipment as it sees fit, at its sole discretion.  Should Supplier propose to dispose of machinery and equipment used in the production of Cross Supply Products, it will first grant to Customer a right of first refusal to purchase such machinery and equipment for book value, and Customer shall notify the Supplier of its intent to purchase within 45 days of communication from Supplier, unless the Supplier confirms the equipment will continue to be used to produce the Cross Supply Spare Parts as scheduled.

## 3     PURCHASE ORDERS, ORDERING SYSTEM

3.1     The Supplier shall manufacture and supply the Cross Supply Products and Spare Parts in accordance with the relevant Purchase Order issued by the Customer to the Supplier.

3.2     The Purchase Orders shall be substantially in the form attached hereto as Exhibit 3.2A and 3.2B and, as a minimum, set out:

(a)     the name of the Customer;

(b)     the identity and quantity of Cross Supply Products and Spare Parts to be purchased by the Customer;

(c)     the delivery date or, in case of long term arrangements supplied over a period of time, expected duration of the Purchase Order; and

(d)     the place of delivery.

3.3     No pre-printed or standardized terms and conditions of purchase or sale used by any Customer or Supplier shall be applicable, unless specifically and expressly agreed to in writing by the respective Customer and the respective Supplier.

3.4     In the event of any conflict between the terms of a Purchase Order and the terms of this Agreement, the terms of this Agreement prevail.

3.5     Without prejudice to any rights a Customer may have under a Purchase Order, a breach of the terms and conditions of a Purchase Order shall not be deemed to be a breach of this Agreement. A pattern or series of breaches under Purchase Orders issued pursuant to this Agreement may constitute a breach of this Agreement.

3.6     The Parties agree to comply with the supply chain requirements set forth in Exhibits 3.6, 3.6A, and 3.6B as updated and agreed from time to time.

4.    FORECAST AND CAPACITY ALLOCATION

4.1    The forecast and ordering procedure, scheduling and capacity planning process and responsibilities, including the manner in which forecasts will be formatted and reconciled, will be as attached in Exhibit 3.6, 3.6A and 3.6B.

4.2    The Parties have jointly developed certain assumptions regarding production capacity for the Cross Supply Products, as detailed in Schedule 6, which will be yearly reviewed and confirmed or modified by the Parties.

4.3    Customer shall firmly reserve a defined amount of Supplier's production capacity for the term of this Agreement (Volume Commitments). The Volume Commitments together with the Supplier volumes (jointly "Total Volumes" as set forth in Schedule 3.5) will form the basis for the allocation of structural costs. Any change to the Volume Commitments shall be agreed upon in writing by the Parties.

4.4 In the event of a requirement for a reduction of the installed capacity as set forth in Schedule 6 by more than 30%, the Parties agree to review the Volume Commitments and the Price of Cross Supply Products as required by the circumstance.

4.5    GM shall limit the number of JTD Diesel Engines produced annually at its facility in Kaiserslautern, Germany to 150,000 units per Year, provided that such annual production limit shall remain in effect only so long as Fiat provides supply of JTD Diesel Engines, in accordance with GM's schedule, in sufficient quantities to satisfy the requirements of GM for each derivative of the JTD Diesel Engine listed in Exhibit 1. If the Fiat Auto Group fails to meet the foregoing requirements, the GM Group may increase production at the Kaiserslautern facility to cover this shortfall, and the new production amount when added to the 150,000 will become the new production limitation for the purposes of this Section. 4.5. GM's rights to produce and sell the JTD diesel engines is further described and detailed in the Intellectual Property Agreement, effective May 13, 2005, Section 3.1 among Fiat, Fiat Auto, FAH, GM and OnStar.

5.    BRANDING LABELLING, PACKAGING, AND DELIVERY

5.1    Unless otherwise agreed between the Supplier and the Customer concerned, all Cross Supply Products will be packaged and labelled in accordance with the Customer's standard packaging and labelling specifications, as further described in Exhibit 3.6A and 3.6B. The Cross Supply Products shall be branded pursuant to Article 6.1c of the Joint Ventures Separation Master Agreement and according to the applicable laws. The Parties agree to maintain the existing branding status, as referred to in the technical documentation exchanged between the Parties in the Intellectual Property Agreement. In the event a Party requests or needs to modify the branding versus such status, such modification shall be carried out according to the Change Management Process and the relevant costs shall be borne by the Party requesting the modification.

5.2    Unless otherwise agreed between the Supplier and the Customer concerned, all Cross Supply Spare Parts shall be packaged and labelled as follows:

a)All Cross Supply Spare Parts supplied to any Customer shall be provided in neutral packaging with the appropriate Customer's part number label attached.

b) No Cross Supply Spare Parts shall be received by any Customer with Supplier's brand, logo, trademark etc. In case of modification versus the current branding status, such

modification shall be carried out according to the Change Management Process and the relevant costs shall be borne by the Party requesting the modification.

5.3    Supplier shall deliver Cross Supply Products and Spare Parts  FCA INCOTERMS at the ramp of the Supplier's plant (named place),

5.4    The Supplier shall timely deliver each of the Customer's orders for Cross Supply Products and Spare Parts on the date specified in the Purchase Order.

## 6.    QUALITY

This Section sets forth the exclusive terms and conditions under which the Supplier shall supply and Customer shall purchase Cross Supply Products and Spare Parts as specified herein.

### 6.1    Shipping Requirements

Consistent with specifications described in Exhibits 3.6, 3.6A, 3,6B and 6, Supplier agrees to the following:

- Apply First In First Out Concept
- Pack
- Protect from shipping/transport impact
- Protect from corrosion and dirt impact
- Mark each rack according to Customer traceability requirements

### 6.2    Quality Systems Requirements

Supplier agrees to comply with all Quality Requirements and Procedures set forth in Exhibit 6 "Quality Requirements", specified by the Customer, as revised from time to time, including those applicable to Supplier as set forth in Quality System Requirements ISO TS16949. Further, in the event of quality Defect that causes a major plant disruption, Customer has the right to enter Supplier's facility at a reasonable time, upon consultation and agreement with Supplier, to inspect / audit the facility.

### 6.3    Defective Cross Supply Products or Spare Parts

Cross Supply Products or Spare Parts identified by the Customer as Defective respectively in the Customer plant and in the Customer warehouse will be, at Supplier's cost, held by the Customer in accordance with Supplier's instructions at Supplier's risk or directly shipped back to Supplier, pending respective Supplier instructions. Supplier's failure to provide written instructions within ten (10) days, or such shorter period as may be commercially reasonable under the circumstances, after notification of non-conformity shall entitle the Customer, in its sole discretion, to charge Supplier for storage and handling or disposal of the Cross Supply Products or Spare Parts.

Supplier must replace any confirmed Defective Cross Supply Product or Spare Part with a non-Defective Cross Supply Product or Spare Part, free of charge.

Any costs associated with Defective Cross Supply Products or Spare Parts, such as from removal of a Cross Supply Product from the Motor Vehicle (pull) or any rework activity (such as rework or repair activity done in accordance with Supplier instructions and specifications) will charged to and paid by Supplier. The same principles apply for selection or inspection activities if agreed between Supplier and Customer as containment to protect the Customer activity.  The Supplier shall provide

the Customer with all reasonable assistance and support, including technical expertise, documents, standards and any other support that is identified as helpful for managing such activities/claims. Supplier must respond to any non-conformity within a reasonable time using an appropriate format and in compliance with the Fast Response procedure as per the Customer instructions. In addition, communications related to Defective Cross Supply Products or Spare Parts will be handled directly via Global Quality Tracking System (Problem Resolution Report) for Fiat Cross Supply Products and discrepancy list for GM's Cross Supply Products. The Customer is responsible to provide respective access, as well as training, to the Supplier to assure application feasibility.

Customer agrees to provide Defective Cross Supply Products and Spare Parts returned from the field to enable the Supplier to perform proper root cause analysis and introduction of appropriate improvement measures. Related handling and transportation charges, covering transport from Customer's Cross Supply Product or Spare Part return facility to Supplier are the Supplier's responsibility.

6.4     Product Quality Objectives

1. The Supplier agrees to and acknowledges the need for establishing certain product quality targets as set forth in Exhibit 6 "Quality Targets 2005". Such targets shall be specified in detail by Customer and updated on a yearly basis, including a three year glide path. The first three year glide path will be agreed between the Parties by September 2005. For future calendar years the development of targets and three year glide path must be completed and agreed to between July and December each year.

2. The Supplier shall establish and update a sufficiency plan on a monthly basis. Such Plan shall include the glide path to target and benchmark as it relates to Product Quality as shipped (pulls and assembly defects) and Warranty Performance, as described below.

    a.  Product Quality as shipped:
        i.  Assembly Defect and Pull Standard Tracking Chart, each displaying actual and 6 month rolling average assembly defect cases and corresponding ppm values; and
        ii. A detailed Pareto Analysis, including the intended sufficiency plan action list with problem description, immediate containment activity and breakpoint, planned permanent production solution including scheduled breakpoint and effectiveness evaluation.

    b.  Warranty Performance
        i.  Standard TIS Curve Chart (Incidents per thousand vehicles as well as cost per car) indicating 2 MIS, 6 MIS, 12 MIS, 24 MIS actual data (as provided by the customer) and the corresponding sufficiency glide path to target and benchmark.
        ii. A detailed sufficiency plan action list including problem description, planned countermeasure and scheduled countermeasure breakpoint as well as the calculated effectiveness impact need to be attached for the targeted Quality Performance Indicators as listed in Exhibit 6 under Target Values.

3. If Supplier fails to meet the agreed upon Target Values by (1) not being on the glide path, or (2) if it does not meet the Product Quality met by another plant producing the same Cross Supply Product, the Parties agree to revisit and revise the Quality Plan and related activities, including comprehensive quality improvement programs to be implemented promptly.

6.5    Product Quality Performance Feedback

The Customer must provide fast response and regular quality feedback as a fundamental requirement for enabling the Supplier to continuously improve the Cross Supply Products and Spare Parts.

Such regular feedback shall be in compliance with Suppliers instructions and must include the items described in Exhibit 6 "Quality Feedback":

6.6    Technical Support on Vehicle Assembly Plant Site

The Supplier shall, at its expense and upon Customer's request:

      1)   assign a resident engineer to the Customer assembly plant for the purpose of technical assistance and timely resolution of specific quality issues that may arise.
      2)   assign support personnel to the Customer's vehicle assembly plant for the period of launch (3 months after start of production as minimum requirement )
      3)   provide other support necessary to effect the requirements of this Agreement.

Modalities and resources related to such activities will be agreed between Customer and Supplier

7.    **PRICING**

**7.1 Characteristics of Price.**

Prices are established for each Cross Supply Product listed in Exhibit 1 with the following characteristics:

      a.   Prices are built annually based on the Business Plan 2005-2010 ("**Business Plan**") attached hereto as Schedule 3.1 for each family of Cross Supply Product and Total Volumes set forth in Schedule 3.5.  These Prices are adjusted for startup and preproduction and specific investment depreciation for the Supplier and Customer as described in Section 7.3 below.  Supplier and Customer develop Prices for each Cross Supply Product for the Year 2005 based on the Business Plan and Total Volumes for the months of July through December.
      b.   Annual Prices are fixed, except for the band pricing adjustments as detailed in Section 7.4 and other possible adjustments related to materials cost set forth in Section 7.6. Any other changes on the Price shall be agreed upon in writing and documented pursuant to the Change Management Process.
      c.   Prices are subject to the band pricing mechanism set forth in Section 7.4 in the event of volume changes to Volume Commitments.
      d.   Prices are in Euro.
      e.   Prices do not  include any VAT or other applicable sales tax or duty required by law.
      f.   Prices are  FCA INCOTERMS.
      g.   Prices are based on the current manufacturing footprint.  Customer and Supplier shall develop and agree to new Prices through the Change Management Process if the production location of the Cross Supply Product Changes.

Prices are applied starting from the first Business Day after the Effective Date of this Agreement through calendar year 2010. In the event  of any extension of the Agreement or of any Purchaser Order in relation to one or more Cross Supply Products, Supplier and Customer shall negotiate new

Prices. Prices will be adjusted retroactively back to the Effective Date if such Prices cannot be implemented into the pricing systems as of the Effective Date. During the period up to May 31st, 2005, current Fiat GM Powertrain (FGP) prices shall be applied and any difference between the current FGP prices and the Prices will be adjusted within the post-closing price adjustment set forth in Art. 3.6 of the Joint Venture Separation Master Agreement. The adjustment will be calculated multiplying the above differences by the volumes taken for each Cross Supply Products in this period. The Prices by part number for Calendar Year 2005 are agreed as per Schedule 3.3D. If either Party fails to apply the correct bill of material costs for the initial Price calculations, the Parties agree to correct such errors by May 31, 2005. The Prices for Calendar Year 2006 to 2010 will be completed by May 31, 2005, after final validation by the Parties of the proper application of the material manufacturing and other operating annual cost improvements for each Calendar Year starting in 2006 and using Calendar Year 2005 as the agreed to starting base.

SCHEDULE 3.1: Business Plan by Cross Supply Product family including rules
SCHEDULE 3.3.B: Specific Investment Depreciation
SCHEDULE 3.3.C: Summary of start-up and preproduction costs
SCHEDULE 3.3.D: List of Prices for all production Cross Supply Product part numbers at committed volumes including also target prices for non-production Cross Supply Products at committed volume levels.
SCHEDULE 3.4: Band pricing summary for all Cross Supply Product families

**7.2  Contents of Price.**

Prices are established based on a Cost Plus Approach detailed below. Prices are based on the Business Plan and will only be revised through the Change Management Process:

a    **Total Cost Per Unit** are developed pursuant to Section 7.3 below.

b.   **Cost of Capital Employed Amount:** The cost of capital employed is added to the Total Cost Per Unit to obtain the Price for each year. This cost of capital employed consists of the value of all non-financial assets minus non-financial liabilities (accounts receivable, inventory, real estate, plant and equipment, deferred tax credits, prepayments (expense and asset), accounts payable, accrued liabilities, other liabilities, deferred tax liabilities) per the Weighted Average Cost of Capital (W.A.C.C.), which is expressed in different percentages country by country as specified in Schedule 3.2. The cost of capital employed is allocated per unit based on Total Volumes of the Fiat Customer Group, GM Customer Group, and the Existing Third Parties, and is considered a fixed amount per year and is handled within the band pricing mechanism set forth in Section 7.4.

c.   **Band Pricing Adjustment:** Prices are subject to adjustment when volumes requested by the Customer exceed or go below the Volume Commitments as specified in Section 7.4. According to the band pricing mechanism, Prices shall be changed based on increases or decreases in fixed costs plus cost of capital employed on a per unit basis while the total fixed costs and cost of capital employed remain fixed each year, as it was allocated based on the total of: Total Volumes of the Fiat Customer Group, GM Customer Group, and of the Existing Third Parties.

**7.3  Total Cost per Unit.**

a.   **Material Cost per Unit** (including freight, insurance, duty, scrap revenue):

1. For production Cross Supply Products (to which there are specific part numbers and quoted bills of material), the material cost per unit is established by part number based on the bills of material of March 2005

   For non-production Cross Supply Products (in relation to which there are no specific part numbers and quoted bills of material), the material cost per unit is fixed in the latest evaluation based on known material content and represents a target until the final bill of material will become available. The final bill of material will be used to establish the price and any difference between the target material cost and the final material cost will be documented and approved through the Change Management Process.

2. For new applications that may be introduced in future years and which are not currently known, Prices shall be agreed upon through the Change Management Process.

For both production and non-production Cross Supply Products, commencing with year 2006, material cost include the cost reduction ratio as set forth in Schedule 3.3A.

**b.    Variable Manufacturing Costs Per Unit:**

Variable plant added cost includes direct labor, reworked labor applicable to Fiat Auto only, overtime, indirect materials, 40% of total maintenance (material and external supply), and scrap. These variable manufacturing costs are set forth in the Business Plan. For each family of Cross Supply Products, a variable manufacturing cost per unit is calculated by dividing the total variable costs per year by the total of Total Volumes of Fiat and GM Customer Group and of Existing Third Parties.

With specific reference to the JTD family, the total variable manufacturing cost is split between the 2 (two) and 4 (four) valve versions.

**c.    Fixed Costs per Unit:**

1. The fixed cost includes:
   a. fixed manufacturing costs: indirect labor, salaries, energy/utilities, residual maintenance (60% of total maintenance), project operations, depreciation, amortization, start-up and preproduction; and
   b. other fixed operating costs: SG&A expense, inventory adjustments, excess and obsolete material, contract cancellations, state and local taxes, and other income and deductions.

2. Fixed costs per unit are calculated as follows:
   a. For each family of Cross Supply Products, the fixed costs per unit are calculated by dividing the total fixed costs per year in the Business Plan by the total of Total Volumes of Fiat and GM Customer Group and of Existing Third Parties.

    b. Depreciation in the Business Plan shall be adjusted for specific Supplier and Customer Cross Supply Product investment as follows: ·

       i. Depreciation for specific investment related to Customer and Supplier Cross Supply Products is removed from the Business Plan depreciation;

      ii. The remaining depreciation is split based on GM and Fiat Total Volumes;

     iii. Depreciation for specific Customer Cross Supply Product investment is added to the allocated amount to calculate the total depreciation as set forth in Schedule 3.3B; and

     iv. The Business Plan depreciation amount on a per unit basis which was allocated on Total Volumes (GM and Fiat Volume Commitment and volume commitment of Existing Third Party) will be adjusted based on the above.

3. Customer and Supplier agree to review the specific and remaining depreciation and amortization by the end of June 2005 to verify that depreciation and amortization has been correctly allocated between the Customer and Supplier. Prices shall be adjusted if the variance is plus or minus 5 Euros on a per unit basis.

4. Startup and preproduction expense in the Business Plan shall be adjusted as follows:

    a. Startup and preproduction expense incurred through December 31, 2004 is allocated between the Customer and Supplier based on FGP 2004 Take or Pay percentages. In addition, start up and preproduction expense incurred in January through April, 2005 is allocated between the Customer and the Supplier based on committed average volumes ratios for a calendar year 2005 to 2010. The sum of these costs above for the Customer is amortized over a 36 month period from May 2005 through mid-2008. For developing the Price with the per unit amounts arrived at by dividing the cost by the Customer volumes for each time period.

    b. Startup and preproduction expenses after April 30, 2005 are allocated between the Customer and Supplier based on Customer Volume Commitments for 2005 through 2010, and calculated on a per unit basis over 36 months after start of production of Cross Supply Products (see Schedule 3.3C for a summary of start up and preproduction expenses split between the Customer and Supplier for the Cross Supply Products).

    c. The allocated Business Plan amounts for startup and preproduction on a per unit basis are adjusted to the sum of these startup and preproduction amounts for each year as calculated above.

5. The total fixed costs per unit will be changed when volumes requested by the Customer exceed or go below the committed volumes as specified in Section 7.4.

6. Schedule 3.3D includes Prices for all production Cross Supply Product part numbers pursuant to the Total Volumes by family set forth in Schedule 3.5. It also

includes target prices for non-production Cross Supply Products at the family committed volume levels.

### 7.4 Band Pricing Mechanism.

a. Subject to Section 4 of this Agreement, this band pricing mechanism determines the amount of fixed costs and cost of capital employed that the Customer must pay in each year, starting from the Effective Date through the calendar year 2010. Band pricing shall apply only within the limits of the installed capacity.

b. Prices shall change for each 10% volume fluctuation to the Volume Commitments. A different amount per unit for fixed costs and for cost of capital employed shall be added to the variable material and manufacturing costs for each volume level listed below:
    i. +20% to +30% volume increase to the Customer Volume Commitment
    ii. +10% to +20% volume increase to the Customer Volume Commitment
    iii. +/- 10% volume changes to the Customer Volume Commitment will not impact on the Price
    iv. -10% to -20% volume decrease to the Customer Volume Commitment
    v. -20% to -30% volume decrease to the Customer Volume Commitment
    vi. -30% to -40% volume decrease to the Customer Volume Commitment
    vii. -40% to -50% volume decrease to the Customer Volume Commitment

Schedule 3.4 includes the fixed cost amount and cost of capital employed on a per unit basis that should be included in the Price at various volume levels for each family of Cross Supply Product, including a split for the 2 (two) valve and 4 (four) valve versions of the JTD.

c. If the volume increases more than 30% in respect to the Customer Volume Commitment, the Parties shall adjust the Prices based on the additional costs and potential savings generated due to added shift operations, added heads, excess overtime worked, and/or added investment costs to be able to produce the additional volumes. The volumes increase and Price changes will be managed through the Change Management Process.

d. If the volume decreases more than 50% in respect of the Customer Volume Commitment, the Price for the "minus 40% to 50%" shall be used and the Customer will pay a "non-utilization fee" to cover at least 75% of the total fixed costs, excluding specific investment depreciation and startup/preproduction amortization, both of which will be entirely paid according to the original program timing, and cost of capital employed originally calculated based on the Volume Commitment. Calculation example detailed in Schedule 3.6.

e. Within each 10% volume variance range, the Price is established at the midpoint of the range to minimize profit and cost fluctuations for the Supplier and Customer within that range.

f. In the event of termination of the Agreement by the Customer after the one year notice period has expired pursuant to Section 14, the Customer shall remain responsible exclusively for the costs set forth in Section 14 of this Agreement.

g. The yearly volumes (detailed by month) shall be the base to apply the appropriate band pricing for the year 'n' and shall be submitted by the Customer to the Supplier by November 1st of year 'n-1'.

h. Each quarter the Supplier shall compare the accumulated purchased volumes with the requested volumes (for the relevant quarter) and will issue a credit or debit note to the Customer if necessary.

### 7.5 Cost Deviations.

For the variable and fixed manufacturing cost and the other fixed operating costs, the cost reductions are foreseen in the Business Plan, and are summarized in Schedule 3.3A.

Any deviation from the costs included in the Business Plan shall be absorbed by the Supplier with the exception of a cost change requested by the Customer and approved through the Change Management Process. The Supplier owns the risk of cost inefficiencies versus the Business Plan and therefore should also realize the rewards for cost reductions.

### 7.6 Price Changes.

a. Any Changes to Cross Supply Product impacting Price shall be documented through the Change Management Process.

   i. If the Change is only for the benefit of one Party, such Party shall pay upfront 100% of any required investment and base research and development costs (R & D costs). If subsequently the other Party decides to utilize this Cross Supply Product Change, such Party shall reimburse the Party initiating the Change for its share of the investment and base R & D costs based on its Volume Commitments.

   ii. It is understood between the Parties that some of the machinery and equipment which will be utilized for the production of the 1.6 JTD diesel engine will also be utilized for the production of the JTD 1.9 HP (180 hp). According to the original capital appropriation request, the depreciation related to these investments will be charged entirely to Fiat Auto. It has been agreed that this provision will remain valid although Customer (GM) has already submitted requirements for the JTD 1.9 HP (180 hp) in the BP 05-3 in consideration of the limited volumes concerned. It is agreed between the Parties that should the Customer (GM) requirements for the years 2007 onward be significantly higher than those in the BP 05-3 (100% or more) than the Price to Customer (GM) will be adjusted in order to comprise the relevant depreciation portion of the 1.6 JTD diesel engine assets. It is also understood between the Parties that some 1.6 JTD diesel engine machinery and equipment (including but not limited to the above) are likely to be used in the future production of the JTD 1.9 diesel engine Euro 5 (only 4 valves versions). In connection with this, but due to the uncertainty on which assets will actually be used, the Parties have agreed that as a soon as Final Design Release will be finalized for these engines and, anyway, before the start of production, they will review the relevant

Page 17

assets allocation of depreciation and modify Prices for the Customer after approval through the Change Management Process;

   iii.  If the Change benefits both the Customer and the Supplier, the investment and base R & D costs shall be split based on committed volumes, and the Customer shall pay its share of investment and base R & D costs upfront.

   **c.**   If material supply cancellations or volume reduction penalties are incurred due to volume reductions or cancellations by either the Customer or the Supplier, the following rules will apply:

- Volume reduction or cancellation is generated solely by one Party: that Party will bear all of these costs.

- Volume reduction or cancellation is generated by both Parties for specific applications/variants: the allocation of these costs will be based on the ratio of the Customer and Supplier actual volume variance from the original sourcing volume used for each Party (see Schedule 3.7 for example)

7.7    Design and Release.

For the specific parts that the Customer designs and releases for its sole use in the Cross Supply Products, the Customer will have the option to have Supplier to source these parts with the component supplier of the Customer choice at the price and on the terms directly negotiated by the Customer (i.e, actual cost will not be subject to any performance improvement projections for the Supplier). The Supplier will also not be responsible for any design related defects for the Customer direct sourced parts. This product change will be documented and managed through the Change Management Process.

8.    CROSS SUPPLY PRODUCT – CONFORMANCE TO SPECIFICATIONS

8.1  The specific content of each Cross Supply Product program will be defined through the Powertrain Engineering Support Services Agreement signed on May 13, 2005 and the specific joint project plans ('Joint Project Plans') or Purchase Orders created for each program. This content will define what will be part of the base Cross Supply Product as shipped and which Party will be responsible for the design of the various product sub-systems.

Upon specific request, the Supplier shall provide to the Customer a formal written certification that:
a. the Cross Supply Product has been successfully tested and verified by the Supplier in order to ensure the conformity of the Cross Supply Products to the technical specifications set forth in Exhibit 1 (included, but not limited to, quality and reliability standards) and the national/international laws and regulations (included, but not limited to, safety and environmental regulations)
b. the production process used to assemble the Cross Supply Product is final and definitive. Supplier shall provide the Customer with the necessary data for regular Conformity of Production data records and declaration, according to the requirements set forth in Exhibit 8

8.2 Niche flexibility

Customer may modify Cross Supply Products to develop special performance version (Niche Cross Supply Products) for volumes up to 5.000 per year for each Cross Supply Products family listed in Exhibit 1. Customer shall be solely responsible for such Niche Cross Supply Products, including all necessary engineering and manufacturing activities in connection therewith and such activities shall be performed by Customer at its own expenses and outside of the Supplier's facilities. In no event shall Supplier be liable for any damages or actions arising out of the manufacture, sale or use of the Niche Cross Supply Products

## 9.    AFTERSALES – CROSS SUPPLY SPARE PARTS

### 9.1    Direct Sourcing from Third Party Suppliers

Notwithstanding Section 2.1, Customer is entitled to change supply source from the Supplier to a Third Party supplier for any Cross Supply Spare Part(s) at any time during the term of this Agreement. If Customer elects to resource to a Third Party supplier, Customer is responsible to conduct all necessary validation, to confirm that the Third Party supplier meets all requirements and specifications. The following process shall apply to changes of a supply source to a Third Party supplier by Customer:

a. Customer shall notify Supplier in writing of its intention to contact the Third Party supplier for the purpose of purchasing directly the Cross Supply Spare Parts, which must be specified in writing;

b. Customer will be responsible for negotiating its own agreement with the Third Party supplier;

c. Once Customer has made an agreement with the Third Party supplier, Customer must give Supplier ninety (90) days written notice, or as soon as reasonably practicable, of the change of supply source for the Cross Supply Spare Part(s). Customer will continue to buy Cross Supply Spare Parts at its normal average demand from Supplier during this notice period unless otherwise agreed with Supplier; and

d. Upon Supplier and Customer's agreement, Customer may change supply from Third Party supplier back to Supplier.

### 9.2    Production Stoppage at a Third Party supplier

If a Third Party supplier stops producing a Cross Supply Spare Part, Customer and Supplier may seek alternative suppliers individually for the relevant Spare Parts and to enter into an individual contract for supply of the Cross Supply Spare Parts with a new Third Party supplier. However, once either Customer or Supplier has found a new Third Party supplier, the Supplier or the Customer, as the case may be, shall be obliged to supply the item or items to the other Party if requested to do so. Should this be the case, the following process shall be used:

a. The party who has not found the new Third Party supplier ("Requesting Party") shall notify the other party, who has found the new Third Party supplier ("Providing Party") that it wishes to purchase the item or items from the Providing Party, and

b. The Providing Party shall be obliged to begin supply of the item or items to the Requesting Party one calendar month from the date of receiving notice from the Requesting Party of intention to purchase the item or items from the Providing Party, or sooner if mutually

agreed provided that the new Third Party supplier has assumed delivery of items to the Providing Party

In the cases above, the costs for such activities shall be equally divided based upon a fair share of required volume.

9.3    Service Periods

a.    Supplier shall supply to Customer Cross Supply Spare Parts for a period of ten (10) years after the date of the last vehicle production using the relevant Cross Supply Products, or after the use of Cross Supply Spare Parts is discontinued due to a design change. At the end of the ten year supply period, should Customer require additional supply for its customer base, or if a certain Supplier's Third Party spare parts supplier stops its regular production prior to the end of the 10 years, Supplier shall notify Customer in advance, and Supplier and Customer shall agree to a course of action, which may include purchase by Customer of such quantity of Cross Supply Spare Parts as Customer determines necessary to satisfy its service requirements for the entire service period (life time buy). The Supplier will endeavour to give the Customer six (6) months advance notice of the date when it will no longer offer a Spare Part. Upon the completion of a life time buy pursuant to this Section 9.3, Supplier shall have no further obligations to supply Customer such Cross Supply Spare Parts.

The supply period of complete Cross Supply Spare Parts after the date of Supplier's last vehicle production using such Cross Supply Spare Parts, shall be two (2) years. For short engine blocks and cylinder heads, this supply period is five (5) years. After these supply periods, remanufactured Cross Supply Spare Parts shall be offered. Participation of the Customer in Supplier's remanufactured parts program may be agreed to by the Parties and documented in a separate agreement, provided that the Parties agree to provisions on branding of Spare Parts. In the event of participation, Customer will be responsible to organize the logistics to collect used Spare Parts (cores) from its dealer network and arrange for consolidated shipment of these Spare Parts to a collection point to be determined by the Customer (core return centre). Customer shall be free to elect to run its own remanufacturing program and fully responsible for operations of such remanufacturing program.

9.4    Customer Unique Parts

Customer Unique Cross Supply Spare Parts shall be purchased by Customer directly from the Third Party supplier and will not be stocked at Supplier's warehouse. Supplier has no obligation to provide any service commitments for Customer Unique Cross Supply Spare Parts.

9.5    Bottleneck Management

For Unique Tooling, each Party will be responsible for payment of its own set of tools and will have full ownership of such tooling. In the case of a bottleneck, the owner of the tools must propose a split of the parts volumes which have to be delivered to both Parties. The split must be mutually agreed and based on objective criteria such as number of Motor Vehicles in the field fitted with affected Spare Parts Notwithstanding the foregoing, in the first six (6) months following commercial launch of a new model, both Parties agree to make reasonable efforts to guarantee supply of the requested quantities. For Shared Tooling, in addition to the obligations set forth above, the Parties must mutually agree which of the Parties will instruct the Third Party supplier on the agreed split of Spare Parts to be provided

9.6    Sharing of Tool Cost

For Unique Tooling, if a Party chooses to source Spare Parts directly from a Third Party supplier of the other Party, the Party opting for direct sourcing must bear an adequate share of the tooling costs, if the tools are owned by the other Party. In that case, costs of the tools [net asset value on the books of the Supplier at the time Customer will start direct sourcing from the Third Party supplier] will be shared based on the relationship of volumes to be manufactured with the tools over the lifetime of the tools for both Parties If there is not enough supply to meet request of Cross Supply Spare Parts manufactured on Unique Tooling, then the Party controlling such Unique Tooling shall propose a split of the parts volume between the Parties. If the additional volume cannot be accommodated within the existing toolset, the Party opting for direct sourcing must pay for an additional toolset. If a toolset co-owned by both Parties has to be replaced by a new one, both Parties share in the costs for it in the relation of the volumes the Parties intend to manufacture over the lifetime of the replacement tool. If the service period of a Spare Part ends at one of the Parties, the toolset shall be made available to the other Party to allow for continuation of production of the Spare Part until the end of the service period.

9.7    Issue Resolution on Spare Parts

The Supplier shall nominate single points of contacts by functions (Marketing & Sales, Logistics & Distribution, Purchasing, Engineering, Training, Customer Care) to whom Customer should communicate regarding all in-service problems.

9.8    Service Information

   a. Supplier will provide existing commercial catalogue graphics at least in one of the following formats [TIF, CGM, JPG, DWGA] free of charge

   b. Supplier shall provide its standard, existing service information equivalent to the information supplied to its dealer network and Customer shall pay the standard cost paid by dealers for such information. Customer will specify any unique requirements to the Supplier and Supplier will quote on its ability to provide the specific deliverables and the fees to be charged. Based upon that information, Customer may decide whether to proceed with such unique requirements.

   c. To ensure that service information supports required launch timings, if a deliverable is to be provided to either Party, the Parties will agree to a specific number of weeks before or after either Party's start of sale to be specified for a preliminary and a final delivery of such deliverable.

9.9    Communication on Cross Supply Spare Parts changes.

In the event that the Supplier changes the configuration in which it sells Cross Supply Spare Parts (i.e. offers 2 components in place of 1 sub-assembly) an Aftersales a "Change Letter" will be completed and will be made available by the Supplier to the Customer as further described in Exhibit 10.

9.10    Definition of 100% Warranty Costs

Supplier will reimburse Customer for Defective Cross Supply Spare Parts with the purchase price as defined in Section 9.14, plus a mark-up of 20% covering inbound logistics and warehouse handling of the Customer.

9.11    Service Training

Should Customer request that Supplier provide training the following process shall apply. Customer shall request that Supplier "trains the trainer". . Where training has been developed, Supplier shall cause its Third Party training provider to supply the relevant training to Customer, to the extent possible, on the same terms and conditions as Supplier has in place with such Third Party provider, including provision of existing training materials, such training materials to be provided to Customer free of charge. Where the requested training has not been developed, Supplier shall endeavour to provide an- equivalent training course and materials to Customer, prepared and delivered through its Third Party training provider on the same terms and conditions Supplier has in place with its Third Party training provider, or allow the Customer to develop and source the training from Supplier's Third Party provider.

9.12    Diagnostic Information

Supplier shall provide its standard, existing diagnostic information equivalent to the information supplied to its dealer network and Customer shall pay the standard cost paid by dealers for such information. Customer will specify any unique requirements to the Supplier and Supplier will quote on its ability to provide the specific deliverables and the fees to be charged. Based upon that information, Customer may decide whether to proceed with such unique requirements.

In case of Electronic Control Unit (ECU) software changes, besides the "Change Letter" the Supplier will provide the upgraded software version to implement the ECU.

9.13    Diagnostic Equipment and Specific Repair Tools

The Parties shall source diagnostic equipment and specific repair tools directly from Third Party suppliers and each Party will be solely responsible for any associated costs. The Parties agree to transfer data relating to jointly funded Euro V work developed prior to the Effective Date.

9.14    Cross Supply Spare Parts Pricing.

Cross Supply Spare Parts shall be supplied FCA as defined in INCOTERMS from the Supplier's aftermarket warehouses at a selling price calculated on the basis of cost plus a mark up of 30 %, including warehouse handling. Cost means the cost of the Cross Supply Spare Parts when they arrive at the aftersales warehouse plus the cost of packaging.

9.15 Service Levels and Ordering Process

The standard service level is the stock order with a 10 day turnaround time. In exceptional cases rush order service at 24 hour turnaround is provided at a surcharge to be mutually agreed. Customer and Supplier will mutually agree on the ordering process to be set up.

**10. ONGOING PURCHASING OBLIGATIONS**

The Parties mutually acknowledge that certain purchasing services activities related to common components are subject to negotiation between the same Parties and a written agreement will be reached as soon as possible. The undertakings contained in such future agreements will apply only to common components of Cross Supply Products and Spare Parts which both Parties produce. The future agreements will not apply to Cross Supply Products produced by only one Party or whose intellectual property rights only belongs to one Party, unless otherwise agreed by the Parties. In the

event of a conflict between the provisions of this Agreement and those related to purchasing services agreement related to common components, the provisions of this Agreement shall prevail.

## 11.   PAYMENT

11.1    Invoices for Cross Supply Products and Spare Parts rendered hereunder shall be issued monthly or as otherwise agreed by Customer and Supplier. Customer shall pay the invoiced amount in Euro, which shall be due and payable according to GM Customer's worldwide common payment date (Multilateral Netting System or MNS-2), occurring on or about the 2nd day of the 2nd month following issuance of invoice (*Due Date*) or, (if so agreed in writing, on a case-by-case basis) the delivery note. Customer may pre-pay any invoice. The invoicing Party may exercise a right of setoff for any and all amounts that are due and unpaid for a period longer than thirty days after the Due Date. If Customer fails to pay any invoices for two consecutive Due Dates, Supplier may exercise its right of set off for any and all amounts that are due and unpaid without regard to the aforementioned 30 days period after the Due Date. Without prejudice to the above set off rights, in no event shall Customer be entitled to withhold payment without Supplier's prior written approval (including the case of debit notes, issued for any reason, not yet approved by the Supplier).

11.2    If any amount due and payable hereunder is not made on the Due Date, then, without prejudice to any other rights of the Supplier, interest shall be charged on such outstanding amount at the rate of 4 per cent per annum above the one year EURIBOR rate from the Due Date until the date of payment.

11.3    Customer acknowledges that Supplier may  transfer the receivables arising from the sale of Cross Supply Products and Spare Parts to any Third Party, except to the banks identified in Exhibits 11.4A (GM Banks) and 11.4B (Fiat Banks).  In the event that Supplier factors to any of the GM Banks or Fiat Banks, respectively, Supplier shall provide Customer prior notice of such factoring. No other action or approval is required, unless the assignment is for a value in excess of 5 million euro for each bank or the aggregate outstanding factoring amounts exceed 5 million euro, and if so, the procedure set forth in Section 11.4 below shall be followed. However, in no event shall the transferring of the receivables impair either Parties' rights (including set-off) under this Agreement.

11.4    If any single factoring transaction is in excess of 5 million euro or the aggregate outstanding factoring amounts exceeds 5 million with any one GM Bank or Fiat Bank, then such factoring must be agreed in advance by the Parties. Supplier shall advise Customer no later than 10 business days prior to entering into a final factoring commitment with the bank.  Customer shall respond within 5 Business Days, and in the event of no response, Supplier shall send a second notice indicating non response, and in such case Customer shall have 5 calendar days from this notice date to respond.  If Supplier receives no response from Customer within the stated period, then Supplier may proceed with the factoring.

## 12.   PRODUCT AVAILABILITY

12.1    The Suppliers shall use commercially reasonable measures to maintain sufficient, but not excessive, stocks of the Cross Supply Products to fulfil their obligations under this Agreement.

12.2    Should the Customers total demand for a particular Cross Supply Product be higher than their Total Volumes and if the Supplier agrees to supply additional volume but is not able to satisfy such excess demand fully by putting into place extra shifts, overtime work, work on holiday or other short term efforts, but without making an additional investment, then the available supply shall be allocated between the Fiat Customers and GM Customers according to the following principles:

(a)    no Customer Group shall be entitled to greater than its Total Volume of a particular Cross Supply Product unless the other Customer Groups' Total Volume for that particular Cross Supply Product has been fully satisfied; and

(b)    to the extent that each Customer Group's Total Volume for a particular Cross Supply Product has been fully satisfied, if both Customer Groups have further requirements for that Cross Supply Product, the Supplier shall satisfy such further requirement proportionally to their Total Volume.

12.3    In the event of a temporary reduction of the installed capacity of the Supplier, the available Cross Supply Products volumes will be allocated by the Supplier to each Customer Group in proportion to their respective Total Volume for that particular Cross Supply Product. The Parties shall cooperate in good faith to arrange through the respective purchasing organizations for alternative sources of supply for as long as the temporary reduction of the installed capacity continues. Each Customer Group at its discretion (through Fiat Auto or GM, as the case may be) may direct the Supplier as to which of the Customers of its Customer Group shall be supplied.

12.4    In case of Sections 12.2 and 12.3, the Suppliers will examine their supply obligations with Existing Third Parties set forth in Schedule 5 to establish whether any Cross Supply Products intended for a Existing Third Party can be allocated to the Customer, provided that in no event shall Supplier be obligated to allocate if such allocation would constitute a breach of any supply agreements it has with any Existing Third Party.

## 13.    CHANGE MANAGEMENT

For the purposes of this Agreement, Changes to Cross Supply Products and Spare Parts might consist of either various continuous improvement changes or product evolution changes whose specific description is detailed in Exhibit 13 ("Change")

13.1    Changes to Cross Supply Products and Spare Parts may be initiated by either Customer or Supplier. Change Management will be administered according to the Change Management Process documented and attached as Exhibit 13.

13.2    Subject to the operational rules described in Exhibit 13, either Party shall have the right to request that Supplier adopt Changes in the design, process, materials or specifications, including, but not limited to, specifications pertaining to new, more stringent emission requirements or volumes increase (if request exceeds the Total Volumes), applicable to the Cross Supply Products and Spare Parts. Development and approval of such requests will follow the process set forth in Exhibit 13.

13.3    For joint Cross Supply Products and Spare Parts (Cross Supply Product with intellectual property rights jointly owned by Supplier and Customer e.g. M 20-32 , JTD ), Supplier shall inform Customer in advance of any proposed modification to the joint Cross-Supply Products and Spare Parts influencing the function, dimensions, installation, performance, safety, emission characteristics, servicing, packaging, delivery, price or the interchangeability of components. Supplier may not implement such Changes without prior approval of the Customer through the Change Review Board ("CRB"). It is understood that the approval of the Customer shall not be unreasonably withheld.

13.4    For Cross Supply Products and Spare Parts, whose intellectual property rights are owned exclusively by one Party and supplied by the other (products not jointly owned), Supplier shall inform Customer in advance of any Change that may have an impact to the Customer, such as

performance, vehicle accommodation, emissions, price, service delivery or affecting IP owned by Customer. Supplier will not implement such Changes without prior approval of the Customer through the Change Review Board ("CRB"). It is understood that the approval of the Customer shall not be unreasonably withheld.

13.5    If a Change is implemented that necessitates a deviation from the description of the Cross Supply Products and Spare Parts set forth in Exhibit 1, such Cross Supply Product or Spare Part shall be deemed to have been modified accordingly.

13.6    Future specific investment for Customer's unique variants or Customer's future capacity increase requirements will be handled on a case by case basis through the Change Management Process.

## 14.    TERM AND TERMINATION

14.1    Subject to Section 14.2, this Agreement shall become effective on the Effective Date and shall terminate five (5) years from the Effective Date.

14.2    Notwithstanding Section 14.1, the Customer may terminate this Agreement upon one (1) year prior written notice to Supplier. The Customer may also discontinue to purchase one or more Cross Supply Products upon one year prior written notice to Supplier. Upon termination, in whole or in part, Customer guarantees to pay within 30 days from the expiry of the one year written notice period the net book value that has not been recovered in the piece price of the specific investments and capitalized FGP start-up and pre-production expenses that have been allocated to Customer on Cross Supply Products and Spare Parts as shown in Section 7 and Schedule 3.3B and 3.3C (based in part on Exhibit 3.1(v) and Schedule 3.1(a)(iv) of the Umbrella Agreement), but not yet fully paid for as part of the piece price.

14.3    Upon the termination of this Agreement pursuant to Section 14.2, Supplier and Customer shall have no further obligation to any other Supplier or Customer under this Agreement except as provided in Section 31 (Survival).

15.    Warranties; Limitation of Liability

15.1    Supplier warrants that Cross Supply Products and Spare Parts will be free of Defects and such warranty will apply up to the time the Cross Supply Product or Spare Part is in the Customer plant or warehouse as further described in Section 6.3.

15.2    Except as provided in Section 15.1, no term, condition or warranty (whether express or implied) as to the nature, quality or fitness of the Cross Supply Products and Spare Parts for any purpose or their conformity with any sample shall be part of this Agreement or any Purchase Order hereunder.

15.3    Without prejudice to any warranty liability under Section 15.1 and with the exception of Section 16 below, the Supplier shall not be liable for any direct or indirect, special, incidental or consequential damages (including loss of profit) resulting from the Supplier's performance or failure to perform hereunder or under any Purchase Order or the furnishing, performance or use of any Cross Supply Products, Spare Parts or services sold pursuant hereto whether due to a breach of contract, breach of warranty, the negligence of the Supplier or otherwise other than in the case of wilful behaviour or gross negligence.

15.4  The Supplier to the extent permitted by the agreements in place as of the Effective Date with its sub-suppliers, hereby assigns to the Customer and the Customer hereby accepts assignment of all rights and claims against any Third Party arising from any defect or any non-compliance in relation to any Cross Supply Product, Spare Part or component thereof delivered to the Customer with respect to quality, quantity or time of delivery. The Customer shall pursue such claims at its cost and to this end the Supplier shall provide the Customer with all reasonable assistance and support, including any documents, information, witnesses, technical experts and any other support which may be of help for the management of such rights or claims.

## 16.  RECALL CAMPAIGNS

The costs associated with any Recall Campaign in relation to a Defective Cross Supply Product will be borne solely by the Customer who has purchased the Cross Supply Products. For the purposes of a Recall Campaign the Supplier will provide the Customer with:

(a)    any information considered necessary by the Customer;

(b)    access to and the availability of the Supplier's engineers; and

(c)    the supply of replacement parts assembled by the Supplier.

## 17.  FORCE MAJEURE

Each Customer and each Supplier shall be relieved of its obligations hereunder if and to the extent that any of the following events or conditions directly or indirectly hinder, limit or make impracticable the performance by that Customer or Supplier of any of its obligations hereunder as a result of: Act of God, war, riot, fire, earthquake, explosion, flood, sabotage, national defence requirement, strike, lockout, job action, injunction, act or order of a governmental agency or instrumentality thereof (whether of fact or law), act of a public enemy, embargo or other concerted act of workers, telecommunications failures or electrical failure; provided that a Supplier shall continue to have in place at all times disaster recovery procedures consistent with current practices of the Supplier to enable rapid recovery from any such event or condition. Such procedures may be subject to revision by the Supplier from time to time as may be required in the ordinary course of business, provided that such revisions do not adversely affect the levels of protection afforded by such procedures. Prior to being relieved of any obligations hereunder, the Supplier shall have used commercially reasonable efforts (consistent with past practices) to remove or otherwise address the effects of any such event or condition as soon as practicable.

## 18.  CONFIDENTIAL INFORMATION

18.1    If the Supplier and a Customer exchange Confidential Information as defined in Section 18.3 in performing their respective obligations under this Agreement, such Confidential Information shall be used solely for purposes consistent with this Agreement.

18.2    Except as may be otherwise agreed to in writing, such Confidential Information shall be maintained as confidential by the recipient using the same procedures it uses to protect its own Confidential Information.  The recipient may disclose Confidential Information on a need-to-know basis to its employees who agree in writing to maintain the confidentiality of the disclosing Person's Confidential Information with the same degree of care as applies to the recipient's own Confidential Information.

18.3    For the purpose of this Section, *Confidential Information* means any information which relates to product planning and volume, or is expressly marked as "confidential" or as agreed upon between the Parties from time to time, and (x) in case of a Supplier obtaining the information, concerns a Customer and (y) in case of a Customer obtaining the information, concerns a Supplier or a Customer belonging to another Customer Group, save that neither Supplier or Customer shall be obligated to maintain in confidence any information received from another Supplier or Customer if the information:

(a)     is independently developed by the recipient without the utilisation of such Confidential Information;

(b)     is or becomes public knowledge without the fault of the recipient; or

(c)     is or becomes available to the recipient from a source other than another Supplier or Customer.

18.4    Under this Agreement the Customer Groups shall not share with each other or with the Suppliers any information that is not relevant to the supply and purchase of Cross Supply Products as contemplated herein. In particular, no information on the marketing, sale, launching or pricing of their respective Motor Vehicles may be shared.

18.5    The terms and conditions of this Section 18 shall survive the termination for any reason whatsoever of this Agreement.

## 19.    AMENDMENTS

No amendment to any provision of this Agreement is effective or binding unless set forth in writing and executed by a duly authorised representative of each Party.   The representatives will be acting also on behalf of all Customers and Suppliers, unless a Customer or Supplier has notified the Parties otherwise in writing.

## 20.    SUB-CONTRACTED

The Supplier may carry out its obligations under this Agreement through any sub-contractors appointed by it in its absolute discretion for this purpose, provided that Supplier remains entirely responsible, but subject to the limitation of its liability as set forth in this Agreement.

## 21.    ASSIGNMENT

Unless allowed under the terms of this Agreement, neither the Suppliers, nor the Customers may assign their rights or obligations under this Agreement without the prior written consent of all the Parties.

## 22.    SEVERABILITY

In case any provision in this Agreement is invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby. Upon determination that any term or other provision is invalid, illegal or unenforceable, the Parties hereto shall negotiate in good faith and acting on behalf of all Customers and Suppliers (unless a Customer or Supplier has notified the Parties otherwise in writing) to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the Agreement be consummated as originally contemplated to the fullest extent possible.

The invalidity, illegality or unenforceability of any provision in this Agreement in any jurisdiction shall not invalidate or render illegal or unenforceable such provision in any other jurisdiction.

### 23. WAIVER

Failure of any Supplier or Customer to enforce any of the provisions of this Agreement or any right with respect thereto, or failure to exercise any election provided for herein shall not be considered a waiver of such provision, right or election, or in any way affect the validity of this Agreement.

The failure of any Supplier or Customer to enforce any of such provisions, rights or elections shall not preclude or prejudice such Supplier or Customer from later enforcing or exercising the same or other provisions, rights or elections which they may have under this Agreement.

### 24. ENTIRE AGREEMENT

This Agreement and its Schedules and Exhibits attached hereto constitute the entire agreement among the Parties, Suppliers and Customers with respect to the matters covered herein and, except as otherwise provided herein, supersede all prior agreements, covenants, arrangements, communications, representations and warranties, whether oral or written, by any officer, employee or representative of any of the Parties, Suppliers or Customers.

### 25. SEVERAL LIABILITY

All the rights and obligations of each Supplier and each Customer under this Agreement shall be several.

### 26. PUBLIC DISCLOSURE

Notwithstanding anything herein to the contrary, each of the Suppliers and Customers hereby agrees that, except as may be required to comply with the requirements of any applicable laws, no press release or similar public announcement or communication shall, prior to and after the date hereof, be made or caused to be made concerning the execution or performance of this Agreement unless specifically approved by all Parties.

### 27. GOVERNING LAW

The validity, interpretation and implementation of this Agreement and any Purchase Order hereunder shall be governed by and construed in accordance with the laws of Switzerland without giving effect to its rules on conflict of laws. Both Parties acknowledge that the United Nations Convention on Contracts for the International Sale of Goods does not apply to the transaction contemplated under this Agreement.

### 28. RIGHT TO AUDIT

Upon Customer's request, Supplier will provide adequate justification of any (1) changes to Prices, and (2) cancellation claims on Cross Supply Products or Spare Parts, (3) costs and expenses triggered by a full or partial termination pursuant to Section 14.2, (4) specific investment expenses, and (5) costs and expenses related to start-up and pre-production activities.

Such documents shall be kept available for auditing purposes for a period of five (5) years following the final completion of a Purchase Order.

To the extent that the Supplier employs subcontractors, the Supplier shall ensure that such subcontractors grant to the Customers the same rights granted to them by the Supplier under this Section.

## 29.    INFORMAL DISPUTE RESOLUTION

The Parties, Customers and Suppliers shall attempt to resolve amicably and informally any dispute, controversy or claim arising out of or relating to this Agreement and any Purchasing Order hereunder (the *Dispute*). A Party, Customer or Supplier initiates informal negotiations to resolve the Dispute by giving notice (*Request for Informal Dispute Resolution*) of such intent to the other Party, Customer or Supplier with whom the Dispute arises. (For the purpose of Sections 29 and 30 both disputing sides to be referred to as the *Disputing Parties*). The Request for Informal Dispute Resolution must (i) describe the Dispute and (ii) propose the procedure for its amicable resolution, including, if appropriate, the hiring of consultants. Within thirty days of the date of such Request for Informal Dispute Resolution, the Disputing Parties shall attempt to resolve the Dispute amicably. No Disputing Party may resort to any other means of dispute resolution for at least thirty days after such Request for Informal Dispute Resolution has been delivered.

## 30.    ARBITRATION

30.1    If the matter is not resolved within 30 days of the Request for Informal Dispute Resolution in accordance with Section 29 any Disputing Party may demand arbitration administered by the International Chamber of Commerce (the *ICC*) under its rules presently in force (the *Rules*).

30.2    All Disputes, arising out of or in connection with this Agreement or any Purchase Order hereunder, including the breach, termination or invalidity thereof, must be finally settled under the Rules of the ICC by three arbitrators appointed in accordance with the Rules.

30.3    The Parties, Suppliers and Customers waive irrevocably their right to any form of appeal, review or recourse to any state court or other judicial authority, insofar as such waiver may validly be made.

30.4    If an action or non-action of any Disputing Party which forms part of the disputed issue took place as a result of a Disputing Party being required to comply with any Laws, this requirement must be considered by the arbitrators in determining the rights and obligations of the Parties.

30.5    The seat of the arbitration shall be Geneva, Switzerland.

30.6    The two arbitrators appointed by the Disputing Parties shall appoint the third arbitrator, who will act as chairman of the arbitral tribunal. Should the two arbitrators appointed by the Disputing Parties fail to appoint the third arbitrator within 30 days after the appointment of the second arbitrator, the third arbitrator shall be appointed in accordance with the Rules.

30.7    The language of the arbitration must be English.

30.8    The arbitration award must, if such award is in money, be stated in Euros, to the extent permitted by the applicable Law. Subject to the applicable Law, the arbitral tribunal shall set the rate of interest.

30.9    The Disputing Parties shall use their best endeavours to cause arbitration proceedings arising under this Section to proceed in a prompt and cost-effective manner, avoiding all undue delay and with the intention that the arbitration award is rendered not more than one hundred eighty (180) days from the date of the confirmation by the ICC of all the members of the arbitral tribunal.

The arbitral tribunal shall use its best endeavours to make any award within one hundred eighty (180) days from the date of the confirmation by the ICC of all of the members of the arbitral tribunal. This time limit may be extended by agreement of the Disputing Parties or by the arbitral tribunal if necessary.

30.10  The foregoing provisions of this Section do not preclude the Disputing Parties from applying for any preliminary or interim injunctive remedies available from any court of competent jurisdiction for any purpose including, without limitation, securing the subsequent enforcement of any arbitration award.

30.11   No arbitral tribunal has the power or jurisdiction to alter or modify any of the express terms, provisions, or conditions of this Agreement; to make any award, which by its terms, results in such alteration or modification; or to order the termination of this Agreement for any reason other than as expressly set forth in this Agreement.

### 31. SURVIVAL

The terms of this Agreement that by their sense and context are intended to survive shall survive termination or expiration of the Agreement, in whole or in part, for any reason whatsoever, including, without limitation, the terms of 7, 15, Section 18, Section 26, 30 and this Section 31.

### 32. PARENT COMPANY ASSURANCES

Each Party will ensure that its Subsidiaries adhere to the terms of this Agreement and will be liable for any failure by any of its Subsidiaries to adhere to the terms of this Agreement. To that end, to the extent it is legally able to do so, each Party will cause each member of its Group to perform all obligations under this Agreement. As far as it is legally able, each Party will exercise all voting rights and powers (direct or indirect) available to it in relation to any Subsidiary so that the provisions of this Agreement are completely and punctually fulfilled, observed and performed and that full effect is given to the principles set forth in this Agreement.

IN WITNESS WHEREOF, this Agreement has been executed in the Netherlands by or on behalf of the Parties the day and year first before written.

FIAT S.p.A.

By: _____

Name: Alfredo Altavilla

Title: SVP Bus. Dev.

FIAT AUTO S.p.A.

By: _____

Name: Alfredo Altavilla

Title: SVP Bus. Dev.

FIAT AUTO HOLDINGS B.V.

By: _____

Name: Giorgio Fascetti

Title: Attorney in fact

GENERAL MOTORS CORPORATION

By: _____

Name: Luca Maestri

Title: Executive-in-Charge, Fiat Alliance

**SCHEDULE 1**

**Opt-in Letter to Supply Agreement – Customer**

**Opt-in Letter**

The undersigned hereby declares and undertakes to opt into and to be bound as a Customer by the terms and conditions of the European Powertrain Cross Supply Agreement signed between Fiat Auto Holding BV, Fiat S.p.A., Fiat Auto S.p.A. and General Motors Corporation on May 13, 2005.

This declaration shall be effective as of the date of signature hereof.

[Place] [Date]

**SCHEDULE 2**

**Opt-in Letter to Supply Agreement - Supplier**

To General Motors Corporation
300 Renaissance Center, Jefferson Avenue, Detroit

**Opt-in Letter**

The undersigned hereby declares and undertakes to opt into and to be bound as a Supplier by the terms and conditions of the European Powertrain Cross Supply Agreement signed between Fiat Auto Holding BV, Fiat S.p.A., Fiat Auto S.p.A. and General Motors Corporation on May 13, 2005.

This declaration shall be effective as of the date of signature hereof.

[Place] [Date]

**Schedule 3.1 Business Plan for Cross Supply Products**

# Business Plan Development Process

1 The Business Plan was developed for 2005 through 2010 for each Cross Supply Product with 2005 based on July through December only.

2 The plan was developed for all costs except for Material and Freight.

3 The plan was based on the Committed Volumes for GM, Fiat, and Third Party Sales.

4 Specific improvements were incorporated by plant and product for Manufacturing and SGA for 2005 and 2006, while for 2007 through 2010, the improvements were equal at all plants.

5 The Business Plan is the starting point for development of the prices.
  To the Business Plan data, the following are added:
  a.   Specific Material and freight by part number or representative model.
  b.   Adjustments for depreciation for specific application investment for customer and supplier.
  c.   Adjustments for startup and preproduction.

# Schedule 3.1 Business Plan for Cross Supply Products

| BP 2005 - 2010 - (€URO/000) | M20/32 Transmission | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| PLANT: ASPERN | 2005 BPO5 3-H2 | 2006 | 2007 | 2008 | 2009 | 2010 |
| **Manufacturing Expense** | | | | | | |
| Direct Labour (incl. reworked labour OR overtime premiums) | (9,452.3) | (22,753.8) | (26,362.3) | (28,079.8) | (28,550.4) | (27,983.9) |
| Indirect Labour | (5,567.2) | (12,120.4) | (12,345.5) | (12,278.3) | (12,057.9) | (11,727.8) |
| Redundant labour | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Salaried payroll | (2,910.2) | (5,181.2) | (5,277.6) | (5,448.7) | (5,550.9) | (5,398.9) |
| People Cost (total) | (17,929.8) | (40,055.4) | (43,985.9) | (45,806.8) | (46,159.3) | (45,110.5) |
| Indirect Materials | (5,034.5) | (11,804.0) | (13,676.0) | (14,567.0) | (14,811.1) | (14,517.2) |
| Energy/Utilities | (3,289.1) | (6,048.2) | (6,568.8) | (7,024.8) | (7,398.7) | (7,196.1) |
| Maintenance | (2,454.1) | (5,119.4) | (5,501.3) | (5,626.6) | (5,626.7) | (5,467.1) |
| Scraps | (1,705.4) | (1,583.9) | (1,835.1) | (1,954.6) | (1,987.4) | (1,977.9) |
| Leasing fees | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Service Rebills Intercompany | (223.2) | (417.5) | (425.3) | (423.0) | (415.4) | (404.0) |
| Other sundries (variable OR fix) | (1,860.3) | (4,908.5) | (4,999.8) | (4,972.4) | (4,883.2) | (4,749.5) |
| Total Other sundries | (2,083.5) | (5,326.0) | (5,425.4) | (5,395.4) | (5,298.6) | (5,153.5) |
| Total Regular Manufacturing Expense | (32,496.4) | (69,936.9) | (76,984.1) | (80,375.2) | (81,256.8) | (79,392.4) |
| Depreciation of Fixed Assets | (13,904.0) | (29,794.0) | (37,238.4) | (38,371.4) | (38,735.5) | (38,735.5) |
| Amortization of Special Tools | (2,157.0) | (5,294.0) | | | | |
| Project Operations | (754.0) | (806.0) | (333.5) | (233.6) | (267.1) | (267.1) |
| Total Non Regular Manufacturing Expense | (16,815.0) | (35,894.0) | (37,571.9) | (38,605.1) | (39,002.6) | (39,002.6) |
| TOTAL MANUFACTURING EXPENSE | (49,311.4) | (105,830.9) | (114,556.0) | (118,980.3) | (120,261.4) | (118,395.0) |
| Warranty & Policy Costs | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **S.G.&A.** | | | | | | |
| Salaried Personnel Cost | (102.8) | (353.0) | (403.5) | (434.1) | (443.7) | (430.4) |
| Depreciation of SG&A Equipment | (1.2) | (4.0) | (5.4) | (5.4) | (5.6) | (5.6) |
| Other SG&A Costs | (456.3) | (1,550.0) | (1,769.5) | (1,903.7) | (1,945.8) | (1,887.4) |
| SG&A Rebills Received (Intercompany) | (1,177.9) | (3,546.0) | (3,458.9) | (4,237.1) | (4,894.3) | (4,747.5) |
| S.G.&A. (total) | (1,738.2) | (5,453.0) | (5,636.7) | (6,580.3) | (7,289.4) | (7,070.9) |
| **Other Oper. Costs including Pre-Prod. & Start-up C.** | | | | | | |
| Pre Production OR Start Up expenses | (950.0) | (15,801.0) | (15,801.0) | (14,626.0) | 0.0 | 0.0 |
| Inventory adjustments | (80.0) | (45.0) | (47.2) | (48.3) | (48.9) | (49.1) |
| Royalties - Campaign accrual | (251.9) | (909.0) | (953.2) | (976.6) | (988.3) | (990.9) |
| Amortization of intangible assets | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Other operating Income/Deductions (excl.Separation/Write-off/Cance | 254.0 | (125.0) | (181.1) | (235.5) | (238.4) | (239.0) |
| Production Vs Sales | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Other Operating Income (Expense) (total) | (1,027.9) | (16,880.0) | (16,982.4) | (15,886.4) | (1,275.6) | (1,278.9) |
| Total Structural Costs | (52,077.4) | (128,163.9) | (137,175.2) | (141,447.0) | (128,826.4) | (126,744.9) |
| Country/Wacc (%) | 7.5% | 7.5% | 7.5% | 7.5% | 7.5% | 7.5% |
| Cost of Capital Employed (average) | (13,229.0) | (28,019.0) | (24,817.0) | (21,630.0) | (19,656.0) | (18,197.6) |
| Produced units | 232,196 | 614,060 | 733,448 | 805,394 | 844,218 | 853,057 |
| Sold units | 232,196 | 614,060 | 733,448 | 805,394 | 844,218 | 853,057 |
| Memo: Units Sold to Fiat | 64,312 | 193,139 | 179,686 | 245,494 | 303,195 | 405,458 |
| Percent of Total | 27.7% | 31.5% | 24.5% | 30.5% | 35.9% | 47.5% |

# Schedule 3.1 Business Plan for Cross Supply Products

**F 17 Transmission.**

**BP 2005 - 2010 - (€URO/000)**

| PLANT: ASPERN | 2005 BP05 3-H2 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|
| **Manufacturing Expense** | | | | | | |
| Direct Labour (incl. reworked labour OR overtime premiums) | (9,917.8) | (19,559.4) | (17,369.9) | (15,186.5) | (13,307.2) | (9,613.7) |
| Indirect Labour | (5,702.4) | (11,569.8) | (11,228.3) | (10,761.8) | (10,178.9) | (9,224.1) |
| Redundant labour | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Salaried payroll | (3,654.8) | (7,876.8) | (7,674.1) | (7,554.6) | (7,445.5) | (6,817.1) |
| People Cost (total) | (19,275.0) | (39,005.9) | (36,322.3) | (33,502.9) | (30,931.5) | (25,654.9) |
| Indirect Materials | (3,425.0) | (6,886.5) | (6,115.6) | (5,346.9) | (4,685.2) | (3,304.8) |
| Energy/Utilities | (1,468.5) | (4,232.2) | (3,168.0) | (2,994.8) | (2,832.6) | (2,566.9) |
| Maintenance | (2,171.6) | (4,242.0) | (3,922.0) | (3,896.2) | (3,876.7) | (3,228.1) |
| Scraps | (272.6) | (540.5) | (480.0) | (419.7) | (367.7) | (265.7) |
| Leasing fees | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Service Rebills Intercompany | (99.0) | (182.3) | (173.0) | (163.5) | (154.7) | (140.2) |
| Other sundries (variable OR fix) | (3,060.8) | (5,992.6) | (5,686.3) | (5,375.4) | (5,084.3) | (4,607.4) |
| Total Other sundries | (3,159.8) | (6,174.9) | (5,859.2) | (5,538.9) | (5,238.9) | (4,747.5) |
| Total Regular Manufacturing Expense | (29,774.3) | (60,083.1) | (55,867.1) | (51,699.3) | (47,932.7) | (39,847.9) |
| Depreciation of Fixed Assets | (7,215.0) | (12,787.0) | (14,207.8) | (13,697.7) | (11,650.5) | (11,650.5) |
| Amortization of Special Tools | (741.0) | (2,107.0) | | | | |
| Project Operations | (1,395.0) | (4,351.0) | (189.1) | (583.4) | (680.3) | (680.3) |
| Total Non Regular Manufacturing Expense | (9,351.0) | (19,245.0) | (14,396.9) | (14,281.1) | (12,330.9) | (12,330.9) |
| TOTAL MANUFACTURING EXPENSE | (39,125.3) | (79,328.1) | (70,264.0) | (65,980.4) | (60,263.5) | (52,178.7) |
| **S.G.&A.** | | | | | | |
| Salaried Personnel Cost | (139.2) | (231.0) | (203.9) | (180.1) | (158.6) | (153.8) |
| Depreciation of SG&A Equipment | (1.7) | (3.0) | | (2.2) | (2.0) | (2.0) |
| Other SGAA Costs | (617.9) | (1,012.0) | (884.2) | (789.7) | (695.6) | (674.7) |
| SGAA Rebills Received (Intercompany) | (1,287.0) | (2,055.0) | (1,797.9) | (1,754.6) | (1,742.4) | (1,690.1) |
| S.G. & A. (total) | (2,045.7) | (3,301.0) | (2,898.5) | (2,726.5) | (2,598.6) | (2,520.7) |
| **Other Oper. Costs Including Pre-Prod. & Start-up C.** | | | | | | |
| Pre Production OR Start Up expenses | (373.0) | (254.0) | | (5.0) | 0.0 | 0.0 |
| Inventory adjustments | (4.5) | (680.0) | (665.0) | (649.2) | (633.5) | (593.1) |
| Royalties – Campaign accrual | (512.1) | (1,425.5) | (1,409.5) | (725.1) | (707.6) | (662.5) |
| Amortization of Intangible assets | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Other operating Income/Deductions (excl.Separation/Write-off/Cance | (345.2) | (359.0) | (351.4) | (342.8) | (334.5) | (313.1) |
| Production Vs Sales | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Other Operating Income (Expense) (total) | (1,234.8) | (2,718.5) | (2,431.5) | (1,722.1) | (1,675.6) | (1,568.2) |
| Total Structural Costs | (42,405.9) | (85,347.6) | (75,594.0) | (70,429.1) | (64,537.7) | (56,268.1) |
| Country Wacc (%) | 7.5% | 7.5% | 7.5% | 7.5% | 7.5% | 7.5% |
| Cost of Capital Employed (average) | (4,738.0) | (9,336.0) | (8,932.0) | (7,128.0) | (5,813.0) | (5,374.4) |
| Produced units | 279,200 | 612,514 | 560,771 | 505,446 | 456,595 | 340,068 |
| Sold units | 279,200 | 612,514 | 560,771 | 505,446 | 456,595 | 340,068 |
| Memo: Units Sold to Flat | 208 | 11,216 | 8,686 | 7,690 | 7,150 | 6,727 |
| Percent of Total | 0.1% | 1.8% | 1.5% | 1.5% | 1.6% | 2.0% |

# Schedule 3.1 Business Plan for Cross Supply Products

| BP 2005 - 2010 - (€URO/000) | F 40 Transmission | | | | | |
|---|---|---|---|---|---|---|
| | 2005 BP05 3-H2 | 2006 | 2007 | 2008 | 2009 | 2010 |
| **PLANT: Ruesselsheim** | | | | | | |
| **Manufacturing Expense** | | | | | | |
| Direct Labour (incl. reworked labour OR overtime premiums) | (4,280.7) | (9,654.1) | (9,829.7) | (10,765.0) | (10,923.6) | (11,223.4) |
| Indirect Labour | (1,825.1) | (3,771.1) | (3,651.8) | (3,660.0) | (3,592.4) | (3,537.8) |
| Redundant labour | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Salaried payroll | (1,270.5) | (2,639.7) | (2,593.2) | (2,599.1) | (2,551.1) | (2,512.3) |
| People Cost (total) | (7,376.2) | (16,010.9) | (16,074.7) | (17,024.1) | (17,067.1) | (17,273.5) |
| Indirect Materials | (1,116.3) | (2,838.8) | (2,890.4) | (3,165.5) | (3,212.1) | (3,300.3) |
| Energy/Utilities | (1,191.8) | (2,670.3) | (2,623.4) | (2,629.3) | (2,680.7) | (2,640.0) |
| Maintenance | (1,198.0) | (2,213.2) | (2,206.0) | (2,592.9) | (2,579.5) | (2,584.3) |
| Scraps | (115.7) | (244.4) | (248.8) | (272.5) | (276.5) | (284.1) |
| Leasing fees | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Service Rebiis Intercompany | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Other sundries (variable OR fix) | (2,827.1) | (5,593.7) | (5,495.4) | (5,507.8) | (5,406.0) | (5,323.9) |
| Total Other sundries | (2,827.1) | (5,593.7) | (5,495.4) | (5,507.8) | (5,406.0) | (5,323.9) |
| Total Regular Manufacturing Expense | (13,825.2) | (29,571.4) | (29,538.6) | (31,192.0) | (31,222.0) | (31,406.0) |
| Depreciation of Fixed Assets | (4,310.0) | (10,874.0) | (14,451.7) | (16,412.2) | (16,267.0) | (16,267.0) |
| Amortization of Special Tools | (1,706.0) | (3,772.0) | | | | |
| Project Operations | (1,963.0) | (9,168.0) | (4,635.3) | (2,737.1) | (2,250.0) | (650.0) |
| Total Non Regular Manufacturing Expense | (7,979.0) | (23,814.0) | (19,087.0) | (19,149.2) | (18,517.0) | (16,917.0) |
| TOTAL MANUFACTURING EXPENSE | (21,804.2) | (53,385.4) | (48,625.6) | (50,341.3) | (49,739.0) | (48,323.0) |
| Warranty & Policy Costs | 0.0 | | | | | |
| **S.G.&A.** | | | | | | |
| Salaried Personnel Cost | (71.0) | (143.0) | (175.1) | (173.1) | (168.9) | (163.9) |
| Depreciation of SG&A Equipment | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Other SG&A Costs | (1,657.0) | (3,289.8) | (3,551.6) | (3,394.7) | (3,256.3) | (3,158.6) |
| SG&A Rebiis Received (Intercompany) | (1,038.0) | (1,188.0) | (967.7) | (956.2) | (933.4) | (905.4) |
| S.G.& A. (total) | (2,766.0) | (4,620.7) | (4,694.5) | (4,523.9) | (4,358.7) | (4,227.9) |
| **Other Oper. Costs including Pre-Prod. & Start-up C.** | | | | | | |
| Pre Production OR Start Up expenses | (4,635.0) | (6,595.0) | (201.0) | 0.0 | 0.0 | 0.0 |
| Inventory adjustments | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Royalties - Campaign accrual | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Amortization of intangible assets | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Other operating Income/Deductions (excl.Separation/Write-off/Cance) | 512.3 | 919.0 | 230.4 | (262.2) | (265.2) | (269.1) |
| Production Vs Sales | 0.0 | 0.0 | 29.4 | 0.0 | 0.0 | 0.0 |
| Other Operating Income (Expense) (total) | (4,122.7) | (5,676.0) | 29.4 | (262.2) | (265.2) | (269.1) |
| Total Structural Costs | (28,693.0) | (63,682.1) | (53,290.7) | (55,127.3) | (54,362.8) | (52,820.0) |
| Country Wacc (%) | 7.5% | 7.5% | 7.5% | 7.5% | 7.5% | 7.5% |
| Cost of Capital Employed (average) | (6,633.7) | (11,945.2) | (8,656.0) | (7,518.0) | (6,787.0) | (6,179.4) |
| Produced units | 58,756 | 142,232 | 149,297 | 168,560 | 176,334 | 186,776 |
| Sold units | 58,756 | 142,232 | 149,297 | 168,560 | 176,334 | 186,776 |

# Schedule 3.1 Business Plan for Cross Supply Products

| BP 2005 - 2010 - (€URO/000) | L860 ENGINE | | | | | |
|---|---|---|---|---|---|---|
| PLANT: KAISERSLAUTERN | 2005 BP05 3-H2 | 2006 | 2007 | 2008 | 2009 | 2010 |
| **Manufacturing Expense** | | | | | | |
| Direct Labour (incl. reworked labour OR overtime premiums) | (3,219.8) | (7,153.3) | (6,025.0) | (6,071.8) | (6,479.7) | (5,576.0) |
| Indirect Labour | (1,945.1) | (4,348.5) | (3,824.9) | (3,747.4) | (3,728.8) | (3,511.7) |
| Redundant labour | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Salaried payroll | (856.8) | (1,901.3) | (1,681.7) | (1,647.6) | (1,639.5) | (1,544.0) |
| People Cost (total) | (6,021.7) | (13,403.2) | (11,531.6) | (11,466.8) | (11,847.9) | (10,631.7) |
| Indirect Materials | (1,457.1) | (3,353.2) | (2,824.3) | (2,846.2) | (3,037.4) | (2,613.8) |
| Energy/Utilities | (1,003.1) | (2,553.2) | (2,242.6) | (2,197.1) | (2,186.2) | (2,059.9) |
| Maintenance | (720.3) | (1,337.7) | (1,152.8) | (1,142.4) | (1,169.7) | (1,083.6) |
| Scraps | (306.9) | (643.5) | (542.0) | (546.2) | (582.9) | (501.6) |
| Leasing fees | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Service Rebills Intercompany | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Other sundries (variable OR fix) | (3,927.0) | (6,145.7) | (5,759.0) | (5,642.3) | (5,614.3) | (5,287.5) |
| Total Other sundries | (3,927.0) | (6,145.7) | (5,759.0) | (5,642.3) | (5,614.3) | (5,287.5) |
| Total Regular Manufacturing Expense | (13,436.1) | (27,436.5) | (24,052.3) | (23,841.0) | (24,438.5) | (22,157.1) |
| Depreciation of Fixed Assets | (10,789.5) | (23,117.0) | (27,947.0) | (27,864.5) | (26,843.6) | (24,783.0) |
| Amortization of Special Tools | (3,015.7) | (7,220.0) | | | | |
| Project Operations | (1,926.2) | (2,011.0) | (4,074.5) | (2,088.7) | (2,391.6) | (1,491.6) |
| Total Non Regular Manufacturing Expense | (15,731.4) | (32,348.0) | (32,021.5) | (29,953.1) | (29,235.2) | (26,274.6) |
| TOTAL MANUFACTURING EXPENSE | (29,167.5) | (59,784.5) | (56,073.7) | (53,794.1) | (53,673.7) | (48,431.7) |
| Warranty & Policy Costs | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **S.G.&A.** | | | | | | |
| Salaried Personnel Cost | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Depreciation of SG&A Equipment | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Other SG&A Costs | (2,490.0) | (5,414.0) | (4,285.9) | (4,429.1) | (4,731.8) | (4,589.8) |
| SG&A Rebills Received (Intercompany) | (1,128.0) | (2,095.2) | (1,893.7) | (1,584.5) | (1,093.8) | (1,060.9) |
| S.G.&A. (total) | (3,618.0) | (7,509.2) | (6,179.6) | (6,013.6) | (5,825.5) | (5,650.8) |
| Other Oper. Costs including Pre-Prod. & Start-up C. | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Pre Production OR Start Up expenses | (487.0) | (664.0) | (762.0) | (385.0) | (170.0) | 0.0 |
| Inventory adjustments | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Royalties - Campaign accrual | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Amortization of Intangible assets | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Other operating Income/Deductions (excl.Separation/Write-off/Cance) | 2,035.0 | 2,668.0 | 80.2 | (1,419.1) | (1,954.6) | (1,899.4) |
| Production Vs Sales | (901.0) | 0.0 | 330.7 | 570.3 | | |
| Other Operating Income (Expense) (total) | 647.0 | 2,004.0 | (351.1) | (1,233.8) | (2,124.6) | (1,899.4) |
| Total Structural Costs | (32,138.5) | (65,289.7) | (62,604.5) | (61,041.5) | (61,623.8) | (55,981.9) |
| Country Wacc (%) | 7.5% | 7.5% | 7.5% | 7.5% | 7.5% | 7.5% |
| Cost of Capital Employed (average) | (5,702.0) | (10,449.0) | (10,200.0) | (9,662.0) | (8,465.0) | (7,539.4) |
| Produced units | 37,774 | 82,646 | 71,763 | 74,557 | 82,026 | 72,769 |
| Sold units | 37,774 | 82,646 | 71,763 | 74,557 | 82,026 | 72,769 |

114

# Schedule 3.1 Business Plan for Cross Supply Products

| BP 2005 - 2010 - (€URO/000) | | | FAMILY 1 ENGINE | | | |
|---|---|---|---|---|---|---|
| PLANT: SZENTGOTTHARD | 2005 BP06 3-H2 | 2006 | 2007 | 2008 | 2009 | 2010 |
| **Manufacturing Expense** | | | | | | |
| Direct Labour (incl. reworked labour OR overtime premiums) | (2,611.7) | (5,510.7) | (5,342.8) | (5,046.5) | (4,756.4) | (5,028.5) |
| Indirect Labour | (2,111.0) | (4,449.7) | (4,348.8) | (4,222.5) | (4,097.7) | (4,096.0) |
| Redundant labour | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Salaried payroll | (1,861.0) | (3,833.4) | (3,551.0) | (3,447.8) | (3,345.9) | (3,344.5) |
| People Cost (total) | (6,583.7) | (13,593.8) | (13,242.6) | (12,716.9) | (12,199.9) | (12,467.1) |
| Indirect Materials | (715.6) | (1,478.1) | (1,418.5) | (1,326.1) | (1,237.1) | (1,294.1) |
| Energy/Utilities | (1,446.1) | (2,958.0) | (3,161.3) | (3,037.9) | (2,917.7) | (2,887.3) |
| Maintenance | (2,746.7) | (4,940.5) | (4,763.9) | (4,728.2) | (4,489.0) | (4,543.6) |
| Scraps | (219.3) | (414.6) | (397.9) | (372.0) | (347.0) | (363.0) |
| Leasing fees | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Service Rebills Intercompany | 221.0 | 395.4 | 32.5 | 0.0 | 0.0 | 0.0 |
| Other sundries (variable OR fix) | (3,974.9) | (10,026.0) | (9,655.6) | (9,139.4) | (8,640.1) | (8,813.2) |
| Total Other sundries | (3,753.9) | (9,630.5) | (9,623.1) | (9,139.4) | (8,640.1) | (8,813.3) |
| Total Regular Manufacturing Expense | (15,465.3) | (33,015.4) | (32,607.2) | (31,320.5) | (29,831.0) | (30,368.3) |
| Depreciation of Fixed Assets | (10,305.0) | (21,717.0) | (35,369.0) | (37,280.0) | (38,270.0) | (38,270.9) |
| Amortization of Special Tools | (3,982.0) | (11,851.0) | | | | |
| Project Operations | (2,182.0) | (11,236.0) | (8,629.6) | (8,980.7) | (6,560.6) | (6,560.6) |
| Total Non Regular Manufacturing Expense | (16,469.0) | (44,804.0) | (43,998.6) | (46,260.7) | (44,831.5) | (44,831.5) |
| TOTAL MANUFACTURING EXPENSE | (31,934.3) | (77,819.4) | (76,605.8) | (77,581.2) | (74,662.5) | (75,199.8) |
| Warranty & Policy Costs | 0.0 | 0.0 | 0.0 | | | |
| **S.G.&A.** | | | | | | |
| Salaried Personnel Cost | (469.0) | (981.0) | (937.0) | (899.3) | (863.8) | (837.9) |
| Depreciation of SG&A Equipment | (6.0) | (13.0) | (12.7) | (12.5) | (12.4) | (12.4) |
| Other SG&A Costs | (1,857.0) | (3,648.0) | (3,472.6) | (3,333.2) | (3,201.4) | (3,105.4) |
| SG&A Rebills Received (Intercompany) | (5,982.0) | (12,386.0) | (11,641.9) | (11,835.8) | (12,339.9) | (11,969.7) |
| S.G.&A. (total) | (8,314.0) | (17,028.0) | (16,064.3) | (16,080.9) | (16,417.6) | (15,925.4) |
| Other Oper. Costs Including Pre-Prod. & Start-up C. | | | | | | |
| Pre Production OR Start Up expenses | (42.0) | (649.0) | (824.0) | (863.0) | (245.0) | (66.0) |
| Inventory adjustments | (547.0) | (1,049.0) | (1,046.2) | (1,036.7) | (1,026.8) | (1,046.9) |
| Royalties - Campaign accrual | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Amortization of intangible assets | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Other operating Income/Deductions (excl.Separation/Write-off/Cance | (1,697.0) | (2,754.0) | (2,746.6) | (2,721.8) | (2,695.8) | (2,748.6) |
| Production Vs Sales | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Other Operating Income (Expense) (total) | (2,286.0) | (4,452.0) | (4,616.8) | (4,621.5) | (3,967.6) | (3,861.5) |
| Total Structural Costs | (42,534.3) | (99,299.4) | (97,287.0) | (98,283.7) | (95,047.6) | (94,986.8) |
| Country Wacc (%) | 7.8% | 7.8% | 7.8% | 7.8% | 7.8% | 7.8% |
| Cost of Capital Employed (average) | (8,222.0) | (18,092.0) | (17,205.0) | (16,422.0) | (17,312.0) | (15,819.4) |
| Produced units | 189,156 | 433,443 | 428,814 | 413,300 | 397,486 | 428,636 |
| Sold units | 189,156 | 433,443 | 428,814 | 413,300 | 397,486 | 428,636 |

# Schedule 3.1 Business Plan for Cross Supply Products

**BP 2005 – 2010 – (€URO/000)**
**PLANT: PRATOLA SERRA – FMA**

JTD DIESEL ENGINE – 8 VALVE

| | 2005 BP05 3-H2 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|
| **Manufacturing Expense** | | | | | | |
| Direct Labour (incl. reworked labour OR overtime premiums) | (11,255.1) | (31,308.0) | (28,734.1) | (17,749.0) | (10,227.9) | (5,469.9) |
| Indirect Labour | (3,117.1) | (6,991.9) | (6,465.4) | (4,909.9) | (3,150.4) | (1,873.1) |
| Redundant labour | | | | | | |
| Salaried payroll | | | | | | |
| People Cost (total) | (2,932.6) | (8,052.7) | (7,446.3) | (5,640.2) | (3,619.0) | (2,151.7) |
| Indirect Materials | (17,304.8) | (46,352.5) | (42,645.7) | (28,299.0) | (16,997.3) | (9,494.8) |
| Energy/Utilities | (4,460.4) | (12,140.8) | (11,142.7) | (6,876.2) | (3,962.4) | (2,119.1) |
| Maintenance | (3,399.2) | (9,190.4) | (8,498.3) | (6,380.5) | (4,094.0) | (2,434.2) |
| Scraps | (5,219.3) | (12,867.1) | (11,863.8) | (8,308.5) | (5,114.9) | (2,920.1) |
| Leasing fees | (849.8) | (2,284.0) | (2,096.2) | (1,293.6) | (745.4) | (398.7) |
| Service Rebills Intercompany | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Other sundries (variable OR fix) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Total Other sundries | (5,187.3) | (9,929.5) | (9,181.8) | (6,893.6) | (4,423.3) | (2,629.9) |
| Total Regular Manufacturing Expense | (5,187.3) | (9,929.5) | (9,181.8) | (6,893.6) | (4,423.3) | (2,629.9) |
| Depreciation of Fixed Assets | (36,420.8) | (92,764.4) | (85,428.6) | (58,051.4) | (35,337.3) | (19,996.8) |
| Amortization of Special Tools | (31,857.0) | (73,262.7) | (57,660.8) | (36,530.6) | (23,580.1) | (14,469.4) |
| Project Operations | (1,516.7) | (3,123.8) | 0.0 | 0.0 | 0.0 | 0.0 |
| | (646.9) | (2,770.7) | (3,671.5) | (2,731.7) | (2,509.4) | (1,539.8) |
| Total Non Regular Manufacturing Expense | (34,020.6) | (79,157.2) | (61,332.3) | (39,262.3) | (26,089.5) | (16,009.3) |
| **TOTAL MANUFACTURING EXPENSE** | (70,441.4) | (171,921.6) | (146,760.9) | (97,313.7) | (61,426.8) | (36,006.0) |
| Warranty & Policy Costs | | | | | | |
| **S.G.&A.** | | | | | | |
| Salaried Personnel Cost | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Depreciation of SG&A Equipment | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Other SG&A Costs | 0.0 | 0.0 | (764.5) | (1,040.9) | (944.9) | (580.8) |
| SG&A Rebills Received (Intercompany) | (7,700.2) | (18,640.6) | (17,130.8) | (11,123.2) | (6,177.0) | (3,796.9) |
| **S.G & A. (total)** | (7,700.2) | (18,640.6) | (17,895.3) | (12,164.1) | (7,121.9) | (4,377.8) |
| **Other Oper. Costs Including Pre-Prod. & Start-up C.** | | | | | | |
| Pre Production OR Start Up expenses | (1,215.4) | (2,535.9) | (1,606.6) | (621.0) | (105.9) | (62.0) |
| Inventory adjustments | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Royalties – Campaign accrual | (9.6) | (316.3) | (301.5) | (233.8) | (154.8) | (95.0) |
| Amortization of intangible assets | (47.3) | (100.4) | (95.7) | (74.2) | (49.2) | (30.2) |
| Other operating Income/Deductions (excl.Separation/Write-off/Cance | 2,922.6 | 5,437.0 | 4,550.1 | (217.5) | (148.8) | (94.3) |
| Production Vs Sales | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Other Operating Income (Expense) (total)** | 1,650.4 | 2,484.5 | 2,546.3 | (1,146.6) | (458.7) | (282.0) |
| **Total Structural Costs** | (76,491.2) | (188,077.7) | (162,109.9) | (110,624.4) | (69,007.4) | (40,665.8) |
| Country Ware (%) | | | | | | |
| Cost of Capital Employed (average) | (8,515.4) | (13,743.6) | (14,803.4) | (15,816.8) | (11,990.0) | (6,950.9) |
| Produced units | 192,380 | 476,037 | 454,240 | 289,307 | 172,420 | 95,385 |
| Sold units | 192,380 | 476,037 | 454,240 | 289,307 | 172,420 | 95,385 |

# Schedule 3.1 Business Plan for Cross Supply Products

| BP 2005 - 2010 - (EURO/000) | 2005 BP05 3-H2 | JTD DIESEL ENGINE - 16 VALVE | | | | |
|---|---|---|---|---|---|---|
| PLANT: PRATOLA SERRA - FMA | | 2006 | 2007 | 2008 | 2009 | 2010 |
| **Manufacturing Expense** | | | | | | |
| Direct Labour (incl. reworked labour OR overtime premiums) | (4,944.1) | (10,274.6) | (11,653.3) | (13,539.3) | (17,255.3) | (18,482.9) |
| Indirect Labour | (1,104.2) | (1,850.5) | (2,114.6) | (3,020.4) | (4,286.3) | (5,104.3) |
| Redundant labour | | | | | | |
| Salaried payroll | (1,038.9) | (2,131.2) | (2,435.4) | (3,469.7) | (4,923.8) | (5,863.5) |
| People Cost (total) | (7,087.2) | (14,266.4) | (16,203.3) | (20,029.4) | (26,465.3) | (29,450.6) |
| Indirect Materials | (1,959.3) | (3,984.4) | (4,519.0) | (5,245.3) | (6,864.4) | (7,160.5) |
| Energy/Utilities | (1,204.2) | (2,432.3) | (2,779.5) | (3,925.1) | (5,570.1) | (6,633.1) |
| Maintenance | (2,020.0) | (3,722.8) | (4,239.9) | (5,576.3) | (7,575.9) | (8,648.4) |
| Scraps | (373.3) | (749.6) | (850.1) | (986.8) | (1,257.6) | (1,347.1) |
| Leasing fees | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Service Rebills Intercompany | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Other sundries (variable OR fix) | (1,837.6) | (2,628.0) | (3,003.0) | (4,240.8) | (6,018.1) | (7,166.6) |
| Total Other sundries | (1,837.6) | (2,628.0) | (3,003.0) | (4,240.8) | (6,018.1) | (7,166.6) |
| Total Regular Manufacturing Expense | (14,481.7) | (27,773.4) | (31,594.8) | (40,003.8) | (53,571.9) | (60,406.3) |
| Depreciation of Fixed Assets | (13,994.0) | (24,043.3) | (23,384.7) | (32,913.2) | (44,828.5) | (53,939.2) |
| Amortization of Special Tools | (666.3) | (1,025.2) | 0.0 | (232.0) | (232.0) | (232.0) |
| Project Operations | (284.1) | (909.3) | (1,489.0) | (2,282.8) | (4,233.6) | (5,203.2) |
| Total Non Regular Manufacturing Expense | (14,944.4) | (25,977.8) | (24,873.7) | (35,428.0) | (49,294.1) | (59,374.3) |
| TOTAL MANUFACTURING EXPENSE | (29,426.1) | (53,751.2) | (56,468.6) | (75,431.8) | (102,866.0) | (119,780.7) |
| Warranty & Policy Costs | | | | | | |
| **S.G.&A.** | | | | | | |
| Salaried Personnel Cost | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Depreciation of SG&A Equipment | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Other SG&A Costs | 0.0 | 0.0 | (250.0) | (640.3) | (1,285.6) | (1,582.8) |
| SG&A Rebills Received (Intercompany) | (2,727.8) | (4,933.4) | (5,602.8) | (6,842.8) | (8,404.1) | (10,346.7) |
| S.G.&A. (total) | (2,727.8) | (4,933.4) | (5,852.9) | (7,483.1) | (9,689.7) | (11,929.4) |
| **Other Oper. Costs Including Pre-Prod. & Start-up C.** | | | | | | |
| Pre Production OR Start Up expenses | (430.6) | (671.1) | (525.4) | (382.0) | (144.1) | (170.4) |
| Inventory adjustments | (3.4) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Royalties - Campaign accrual | (16.7) | (83.7) | (98.6) | (143.8) | (210.6) | (258.9) |
| Amortization of intangible assets | 1,035.4 | (26.6) | (31.3) | (45.7) | (66.9) | (82.2) |
| Other operating Income/Deductions (excl.Separation/Write-off/Cance | 0.0 | 1,439.0 | 1,480.2 | (133.8) | (202.5) | (257.0) |
| Production Vs Sales | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Other Operating Income (Expense) (total) | 584.6 | 657.5 | 832.8 | (705.3) | (624.1) | (768.5) |
| Total Structural Costs | (31,569.3) | (58,027.0) | (61,488.6) | (83,620.2) | (113,179.8) | (132,478.6) |
| Country Wacc (%) | | | | | | |
| Cost of Capital Employed (average) | (3,016.6) | (3,637.4) | (4,841.6) | (9,730.2) | (16,313.0) | (18,941.2) |
| Produced units | 68,152 | 125,989 | 148,565 | 177,975 | 234,585 | 259,924 |
| Sold units | 68,152 | 125,989 | 148,565 | 177,975 | 234,585 | 259,924 |

## Schedule 3.1 Business Plan for Cross Supply Products

| BP 2005 - 2010 - (€URO/000) | 2005 BP05 3-H2 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|
| | | | Kit for JTD for Kaiserslautern | | | |
| **PLANT: PRATOLA SERRA - FMA** | | | | | | |
| Manufacturing Expense | | | | | | |
| Direct Labour (incl. reworked labour OR overtime premiums) | (2,100.2) | (3,835.3) | (3,610.8) | | | |
| Indirect Labour | (290.0) | (548.3) | (527.8) | | | |
| Redundant labour | 0.0 | 0.0 | 0.0 | | | |
| Salaried payroll | (291.1) | (631.8) | (608.2) | | | |
| People Cost (total) | (2,681.3) | (5,015.4) | (4,746.8) | | | |
| Indirect Materials | (857.6) | (1,487.2) | (1,400.2) | | | |
| Energy/Utilities | (310.1) | (720.8) | (693.9) | | | |
| Maintenance | (871.3) | (1,217.3) | (1,161.5) | | | |
| Scraps | (144.4) | (280.4) | (264.0) | | | |
| Leasing fees | 0.0 | 0.0 | 0.0 | | | |
| Service Rebills Intercompany | 0.0 | 0.0 | 0.0 | | | |
| Other sundries (variable OR fix) | (459.4) | (779.0) | (749.9) | | | |
| Total Other sundries | (459.4) | (779.0) | (749.9) | | | |
| Total Regular Manufacturing Expense | (5,324.1) | (9,500.2) | (9,016.4) | | | |
| Depreciation of Fixed Assets | (3,666.0) | (5,449.0) | (5,047.0) | | | |
| Amortization of Special Tools | (163.0) | (232.0) | (232.0) | | | |
| Project Operations | (73.0) | (206.0) | (199.0) | | | |
| Total Non Regular Manufacturing Expense | (3,902.0) | (5,887.0) | (5,478.0) | | | |
| TOTAL MANUFACTURING EXPENSE | (9,226.1) | (15,387.2) | (14,494.4) | | | |
| Warranty & Policy Costs | | | | | | |
| S.G.&A. | | | | | | |
| Salaried Personnel Cost | 0.0 | 0.0 | 0.0 | | | |
| Depreciation of SG&A Equipment | 0.0 | 0.0 | 0.0 | | | |
| Other SG&A Costs | 0.0 | 0.0 | (38.6) | | | |
| SG&A Rebills Received (Intercompany) | (676.0) | (635.0) | (864.8) | | | |
| S.G.&A. (total) | (676.0) | (635.0) | (903.4) | | | |
| Other Oper. Costs Including Pre-Prod. & Start-up C. | | | | | | |
| Pre Production OR Start Up expenses | (50.0) | (95.0) | 0.0 | | | |
| Inventory adjustments | 0.0 | 0.0 | 0.0 | | | |
| Royalties - Campaign accrual | 0.0 | 0.0 | 0.0 | | | |
| Amortization of Intangible assets | 0.0 | (3.0) | (3.0) | | | |
| Other operating Income/Deductions (excl.Separation/Write-off/Cancel. | 241.0 | 185.0 | 161.6 | | | |
| Production Vs Sales | 0.0 | 0.0 | 0.0 | | | |
| Other Operating Income (Expense) (total) | 191.0 | 87.0 | 158.7 | | | |
| Total Structural Costs | (9,711.1) | (15,935.2) | (15,239.1) | | | |
| Country Wacc (%) | 7.6% | 7.6% | 7.6% | | | |
| Cost of Capital Employed (average) | (768.0) | (585.0) | (361.0) | | | |
| Produced units | 67,960 | 135,544 | 131,557 | | | |
| Sold units | | | | | | |

# Schedule 3.2 : WACC by Country

| | d/d+e | Kd | e/d+e | Rf | Rm - Rf | beta | tax rate | wacc |
|---|---|---|---|---|---|---|---|---|
| | 0,4 | | 0,6 | | | | 0,35 | |
| Austria | 40% | 4,20 | 60% | 4,25 | 3,77 | 0,55 | 35% | 7,53 |
| Germany | 40% | 4,20 | 60% | 4,19 | 3,77 | 0,55 | 35% | 7,47 |
| Hungary | 40% | 4,20 | 60% | 4,54 | 3,77 | 0,55 | 35% | 7,80 |
| Italy | 40% | 4,20 | 60% | 4,34 | 3,77 | 0,55 | 35% | 7,61 |
| Poland | 40% | 7,88 | 60% | 5,68 | 3,77 | 0,55 | 35% | 10,32 |
| Sweden | 40% | 5,07 | 60% | 4,64 | 3,77 | 0,55 | 35% | 8,23 |
| Turkey | 40% | 6,20 | 60% | 8,25 | 3,77 | 0,55 | 35% | 12,02 |
| UK | 40% | 5,59 | 60% | 4,52 | 3,77 | 0,55 | 35% | 8,34 |

| Countries | Cost of Debt | Cost of Equity | WACC |
|---|---|---|---|
| Italy | 4,20 | 9,88 | 7,61 |
| Germany | 4,20 | 9,65 | 7,47 |
| Austria | 4,20 | 9,74 | 7,53 |
| Hungary | 4,20 | 10,19 | 7,80 |
| UK | 5,59 | 10,17 | 8,34 |
| Sweden | 5,07 | 10,34 | 8,23 |
| Poland | 7,88 | 11,94 | 10,32 |
| Turkey | 6,20 | 15,90 | 12,02 |
| Average | | | 8,66 |

Kd          5 years Euro swap rate Nov. 24 2003 + 40bps (3.80% + 40bps)
Kd Turkey   5 years Euro swap rate Nov. 24 2003 + 240bps (3.80% + 240bps)
Kd Poland   5 years Zloty swap rate Nov. 24 2003 + 75bps (7.13% + 75bps)
Kd UK       5 years £ swap rate Nov. 24 2003 + 40 bps. (5.19% + 40bps)
Kd Sweden   5 years SEK swap rate Nov. 24 2003 + 40 bps. (4.67% + 40bps)

Rf          10 years Euro/£/SEK Treasury Bond yield
Rf Turkey   10 years Euro German Treasury Bond + country risk margin approx 240bps that is
            the difference as at Nov. 2003 between the 10 years USD Turkey TB and 10 years US TB

beta        source E&Y

Rm - Rf     source International Equity Premia Report 2003 by Ibbotson Associates

Schedule 3.3A

**Material, manufacturing and other operating cost improvements by Cross Supply Product family.**

### L850 DIG HO

|  | 2005[A] | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|
| Materials | | 1,0% | 1,0% | 0,5% | 0,5% | 0,5% |
| Regular Manufacturing | 6,8% | 5,0% | 3,0% | 3,0% | 3,0% | 3,0% |
| SG&A (**) | 5,5% | 5,0% | 3,0% | 3,0% | 3,0% | 3,0% |

### L850 MPFI

|  | 2005[A] | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|
| Materials | | 0,3% | 0,0% | 0,0% | 0,0% | 0,0% |
| Regular Manufacturing | 6,8% | 5,0% | 3,0% | 3,0% | 3,0% | 3,0% |
| SG&A (**) | 5,5% | 5,0% | 3,0% | 3,0% | 3,0% | 3,0% |

### Fam I

|  | 2005[A] | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|
| Materials | | 2,0% | 2,0% | 2,0% | 2,0% | 2,0% |
| Regular Manufacturing (*) | 6,8% | 2,0% | 3,0% | 3,0% | 3,0% | 3,0% |
| SG&A (**) | 5,5% | 5,0% | 3,0% | 3,0% | 3,0% | 3,0% |

(A) As per PCs agreement 2005 data considered in the product lines P/L are related to second semester 2005 only.

(**) excludes the unfavorable impact of SAP project from 2007

(*) In case of Hungary (Fam I) the performance applied to Labor cost starting from 2007 is 2% year on year due to the Hungary joining the EU.

## M20/32

| FGP EUROPE | 2005[A] | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|
| Materials * | | 6,5% | 2,5% | 2,0% | 2,0% | 2,0% |
| Regular Manufacturing | 6,9% | 5,0% | 3,0% | 3,0% | 3,0% | 3,0% |
| SG&A ** | 5,5% | 5,0% | 3,0% | 3,0% | 3,0% | 3,0% |

*adjusted for extra-costs on syncro ring 1/2 (all applications) for 13€, forks 1/2, ¾ for 84€ (for some applications only). These extra-cost should end from May 05*

## F40

| FGP EUROPE | 2005[A] | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|
| Materials | | 0,5% | 0,4% | 0,3% | 0,0% | 0,0% |
| Regular Manufacturing | 9,5% | 4,4% | 3,0% | 3,0% | 3,0% | 3,0% |
| SG&A ** | 5,5% | 5,0% | 3,0% | 3,0% | 3,0% | 3,0% |

## F17

| FGP EUROPE | 2005[A] | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|
| Materials | | (0,03)% | 0,0% | 0,0% | 0,0% | 0,0% |
| Regular Manufacturing | 6,9% | 5,0% | 3,0% | 3,0% | 3,0% | 3,0% |
| SG&A ** | 5,5% | 5,0% | 3,0% | 3,0% | 3,0% | 3,0% |

(A) As per PCs agreement 2005 data considered in the product lines P/L are related to second semester 2005 only.

(**) excludes the unfavorable impact of SAP project from 2007

## JTD

| FGP EUROPE | 2005(A) | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|
| Materials | | 2,0% | 2,0% | 2,0% | 2,0% | 2,0% |
| Regular Manufacturing | 6,5% | 5,0% | 3,0% | 3,0% | 3,0% | 3,0% |
| SG&A ** | 5,5% | 5,0% | 3,0% | 3,0% | 3,0% | 3,0% |

(A) As per PCs agreement 2005 data considered in the product lines P/L are related to second semester 2005 only.

(**) excludes the unfavorable impact of SAP project from 2007

## Schedule 3.3B - Specific Investment Depreciation Summary
**Euros in 000's**

| | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|
| **M20/32 Transmission** | | | | | | |
| GM Specific Investment | (31) | (68) | (68) | (68) | (68) | (68) |
| GM Allocated | (11,469) | (23,765) | (27,800) | (26,384) | (24,556) | (20,105) |
| Total GM | (11,500) | (23,833) | (27,868) | (26,452) | (24,624) | (20,173) |
| Fiat Specific Investment | (168) | (350) | (350) | (350) | (350) | (350) |
| Fiat Allocated | (4,393) | (10,905) | (9,021) | (11,569) | (13,761) | (18,212) |
| Total Fiat | (4,561) | (11,255) | (9,371) | (11,919) | (14,111) | (18,562) |
| Grand Total in Business Plan | (16,061) | (35,088) | (37,238) | (38,371) | (38,735) | (38,735) |
| **Family 1 Engine** | | | | | | |
| GM Specific Investment | (268) | (846) | (1,346) | (1,410) | (1,137) | (1,137) |
| GM Allocated | (13,502) | (30,229) | (28,906) | (28,576) | (28,904) | (28,322) |
| Total GM | (13,770) | (31,075) | (30,252) | (29,986) | (30,041) | (29,459) |
| Fiat Specific Investment | (278) | (760) | (1,067) | (1,109) | (956) | (956) |
| Fiat Allocated | (239) | (1,733) | (4,050) | (6,185) | (7,274) | (7,856) |
| Total Fiat | (517) | (2,493) | (5,117) | (7,294) | (8,230) | (8,812) |
| Grand Total in Business Plan | (14,287) | (33,568) | (35,369) | (37,280) | (38,271) | (38,271) |
| **L850 Engine** | | | | | | |
| GM Specific Investment | 0 | 0 | 0 | 0 | 0 | 0 |
| GM Allocated | (9,080) | (15,538) | (13,020) | (9,145) | (8,457) | (8,533) |
| Total GM | (9,080) | (15,538) | (13,020) | (9,145) | (8,457) | (8,533) |
| Fiat Specific Investment | (1,370) | (3,472) | (3,587) | (3,592) | (3,592) | (3,592) |
| Fiat Allocated | (3,356) | (11,327) | (11,340) | (15,128) | (14,795) | (12,658) |
| Total Fiat | (4,726) | (14,799) | (14,927) | (18,720) | (18,387) | (16,250) |
| Grand Total in Business Plan | (13,805) | (30,337) | (27,947) | (27,864) | (26,844) | (24,783) |
| **F40 Transmission** | | | | | | |
| GM Specific Investment | (17) | (41) | (41) | (41) | (41) | (41) |
| GM Allocated | (4,725) | (10,359) | (10,145) | (10,287) | (10,923) | (11,482) |
| Total GM | (4,742) | (10,400) | (10,186) | (10,328) | (10,964) | (11,523) |
| Fiat Specific Investment | (380) | (961) | (961) | (961) | (961) | (961) |
| Fiat Allocated | (894) | (3,285) | (3,304) | (5,123) | (4,342) | (3,783) |
| Total Fiat | (1,274) | (4,246) | (4,265) | (6,084) | (5,303) | (4,744) |
| Grand Total in Business Plan | (6,016) | (14,646) | (14,452) | (16,412) | (16,267) | (16,267) |
| **JTD 8 Valve** | | | | | | |
| GM Specific Investment | (296) | (759) | (759) | (751) | (373) | (107) |
| GM Allocated | (13,389) | (33,298) | (24,046) | (14,995) | (7,213) | (2,534) |
| Total GM | (13,685) | (34,057) | (24,805) | (15,746) | (7,587) | (2,640) |
| Fiat Specific Investment | 0 | 0 | 0 | 0 | 0 | 0 |
| Fiat Allocated | (19,688) | (42,329) | (32,856) | (20,784) | (15,994) | (11,829) |
| Total Fiat | (19,688) | (42,329) | (32,856) | (20,784) | (15,994) | (11,829) |
| Grand Total in Business Plan | (33,374) | (76,387) | (57,661) | (36,531) | (23,580) | (14,469) |
| **JTD16 Valve** | | | | | | |
| GM Specific Investment | (62) | 0 | 0 | (8) | (386) | (652) |
| GM Allocated | (3,490) | 0 | 0 | (243) | (10,550) | (21,187) |
| Total GM | (3,552) | 0 | 0 | (251) | (10,936) | (21,840) |
| Fiat Specific Investment | 0 | 0 | 0 | 0 | 0 | 0 |
| Fiat Allocated | (11,108) | (25,068) | (23,385) | (32,894) | (34,125) | (32,331) |
| Total Fiat | (11,108) | (25,068) | (23,385) | (32,894) | (34,125) | (32,331) |
| Grand Total in Business Plan | (14,660) | (25,068) | (23,385) | (33,145) | (45,060) | (54,171) |
| **Totals** | | | | | | |
| GM Specific Investment | (674) | (1,714) | (2,214) | (2,278) | (2,005) | (2,005) |
| GM Allocated | (55,654) | (113,189) | (103,916) | (89,629) | (90,603) | (92,162) |
| Total GM | (56,328) | (114,903) | (106,130) | (91,907) | (92,608) | (94,167) |
| Fiat Specific Investment | (2,196) | (5,543) | (5,965) | (6,012) | (5,859) | (5,859) |
| Fiat Allocated | (39,679) | (94,648) | (83,956) | (91,684) | (90,290) | (86,670) |
| Total Fiat | (41,875) | (100,191) | (89,921) | (97,696) | (96,149) | (92,529) |
| Grand Total in Business Plan | (98,203) | (215,094) | (196,051) | (189,603) | (188,757) | (186,696) |

## Schedule 3.3C - Startup and Preproduction Summary - Amortization for Cross Supply Products
Euros in 000's

| | | Jul-Dec. 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | After 2010 | Totals | % |
|---|---|---|---|---|---|---|---|---|---|---|
| M20/32 Transmission | GM | (3,068.0) | (8,599.4) | (8,599.4) | (5,505.7) | 0.0 | 0.0 | 0.0 | (25,772.5) | 55.1% |
| | FIAT | (2,871.4) | (7,016.2) | (7,016.2) | (4,131.7) | 0.0 | 0.0 | 0.0 | (21,035.5) | 44.9% |
| | Total | (5,939.4) | (15,615.6) | (15,615.6) | (9,637.4) | 0.0 | 0.0 | 0.0 | (46,808.0) | 100.0% |
| F17 Transmission | GM | (124.2) | (253.2) | (253.2) | (129.1) | 0.0 | 0.0 | 0.0 | (759.7) | 100.0% |
| | FIAT | 0.0 | (0.1) | (0.1) | (0.1) | 0.0 | 0.0 | 0.0 | (0.3) | 0.0% |
| | Total | (124.2) | (253.3) | (253.3) | (129.2) | 0.0 | 0.0 | 0.0 | (760.0) | 100.0% |
| Family 1 | GM | (102.0) | (533.4) | (659.4) | (614.8) | (173.3) | (43.7) | 0.0 | (2,126.6) | 84.7% |
| | FIAT | (22.3) | (99.3) | (120.3) | (107.5) | (28.7) | (7.3) | 0.0 | (385.4) | 15.3% |
| | Total | (124.3) | (632.7) | (779.7) | (722.3) | (202.0) | (51.0) | 0.0 | (2,512.0) | 100.0% |
| L850 | GM | (225.9) | (465.3) | (614.5) | (378.0) | (81.0) | 0.0 | 0.0 | (1,764.7) | 62.7% |
| | FIAT | (100.2) | (215.1) | (378.9) | (267.1) | (89.0) | 0.0 | 0.0 | (1,050.3) | 37.3% |
| | Total | (326.1) | (680.4) | (993.4) | (645.1) | (170.0) | 0.0 | 0.0 | (2,815.0) | 100.0% |
| F40 | GM | (1,948.3) | (3,896.7) | (3,896.7) | (1,948.3) | 0.0 | 0.0 | 0.0 | (11,690.0) | 90.1% |
| | FIAT | (214.3) | (428.7) | (428.7) | (214.3) | 0.0 | 0.0 | 0.0 | (1,286.0) | 9.9% |
| | Total | (2,162.6) | (4,325.4) | (4,325.4) | (2,162.6) | 0.0 | 0.0 | 0.0 | (12,976.0) | 100.0% |
| JTD 16 Valve | GM | (72.8) | 0.0 | 0.0 | (115.3) | (107.1) | (182.0) | (26.0) | (503.2) | 33.1% |
| | FIAT | (2.2) | (138.6) | (182.7) | (310.8) | (119.1) | (140.9) | (124.0) | (1,018.4) | 66.9% |
| | Total | (75.0) | (138.6) | (182.7) | (426.1) | (226.2) | (322.9) | -150.0 | (1,521.6) | 100.0% |
| JTD 8 Valve | GM | (187.5) | (622.0) | (639.1) | (428.6) | (42.3) | (25.0) | (98.7) | (2,043.2) | 36.5% |
| | FIAT | (362.9) | (1,097.4) | (1,122.9) | (725.5) | (63.6) | (37.6) | (148.3) | (3,558.1) | 63.5% |
| | Total | (550.4) | (1,719.4) | (1,762.0) | (1,154.1) | (105.9) | (62.6) | -247.0 | (5,601.3) | 100.0% |
| Totals | GM | (5,728.7) | (14,370.0) | (14,662.3) | (9,119.8) | (403.7) | (250.7) | (124.7) | (44,659.9) | 61.2% |
| | FIAT | (3,573.3) | (8,985.4) | (9,249.8) | (5,757.0) | (300.4) | (185.8) | (272.3) | (28,334.0) | 38.8% |
| | Total | (9,302.0) | (23,365.4) | (23,912.1) | (14,876.8) | (704.1) | (436.5) | -397.0 | (72,993.9) | 100.0% |

List of prices for 2006-2010 will be added to this exhibit according to Section 7.1

**SCHEDULE 3.3 D**    List of Prices for 2005 production Cross Supply Product part numbers at committed volumes including also target prices for non-production Cross Supply Products at committed volume

## FAM. I

*Engines*

| | product by | purchased by |
|---|---|---|
| **FAM.1 1.6 GIIII 16V PDA** | GME | FIAT AUTO |

| Production Cross Supply Product | Supplier Name | year | Part Number | Description | | Material Cost & freight | variable PVA | fixed cost | Cost of Capital employed | Price |
|---|---|---|---|---|---|---|---|---|---|---|
| | SZTHARD | from effective date of ECSA to Dec, 2005 | 13104586 | Fam. I 1.6 GIII 4V PDA I/CE E4 105 hp | STILO | 1006 | 25 | 288 | 43 | 1362 |

| **Fam. I 1.8 GIII 4V MPI I/CE E4 140 hp** | Non-Production Cross Supply Product | Supplier Name | year | Reference to (Bold of xx product. date) | Description | | Target Material Cost & freight | variable PVA | fixed cost | Cost of Capital employed | Target Price |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | SZTHARD | 2005 | | Fam. I 1.8 GIII 4V MPI I/CE E4 140 hp | LARGE | 1,069 | 25 | 288 | 43 | 1,425 |

## F17

*Transmission*

| | product by | purchased by |
|---|---|---|
| **F17 5m** | GME | FIAT AUTO |

| Production Cross Supply Product | Supplier Name | year | Part Number | Description | | Material Cost & freight | variable PVA | fixed cost | Cost of Capital employed | Price |
|---|---|---|---|---|---|---|---|---|---|---|
| | Aspern | from effective date of ECSA to Dec, 2005 | 55558375 | F17 Cable shifted | CROMA | 199 | 52 | 99 | 17 | 367 |

__SCHEDULE 3.3 D__   List of Prices for _2005_ production Cross Supply Product part numbers at committed volumes including also target prices for non-production Cross Supply Products at committed volume

## F40

_Transmission_

| | product by | purchased by |
|---|---|---|
| **F40 6m B/C DS** | GME | FIAT AUTO |

_Production Cross Supply Product_

| Supplier Name | year | Part Number | Description | | Material Cost & freight | variable PVA | fixed cost | Cost of Capital employed | Price |
|---|---|---|---|---|---|---|---|---|---|
| Rüsselsheim | from effective date of ECSA to Dec, 2005 | 55553848 | F40 2.4 JTDE3 | ALFA 156-166 | 328 | 106 | 377 | 117 | 928 |

_Production Cross Supply Product_

| Supplier Name | year | Part Number | Description | | Material Cost & freight | variable PVA | fixed cost | Cost of Capital employed | Price |
|---|---|---|---|---|---|---|---|---|---|
| Rüsselsheim | from effective date of ECSA to Dec, 2005 | 55555708 | F40 2.4 JTD E3 | LANCIA THESIS | 330 | 106 | 377 | 117 | 930 |

_Production Cross Supply Product_

| Supplier Name | year | Part Number | Description | | Material Cost & freight | variable PVA | fixed cost | Cost of Capital employed | Price |
|---|---|---|---|---|---|---|---|---|---|
| Rüsselsheim | from effective date of ECSA to Dec, 2005 | 55556410 | F40 2.4 JTD | ALFA 939 | 318 | 106 | 377 | 117 | 918 |

| | product by | purchased by |
|---|---|---|
| **F40 6m 4x4** | GME | FIAT AUTO |

_Non-Production Cross Supply Product_

| Supplier Name | year | Reference to (BoM of xxproduct, date) | Description | | Target Material Cost & freight | variable PVA | fixed cost | Cost of Capital employed | Target Price |
|---|---|---|---|---|---|---|---|---|---|
| Rüsselsheim | from effective date of ECSA to Dec, 2005 | | F40 6m 4x4 | ALFA 939/BRERA | 555 | 106 | 377 | 117 | 1155 |

**SCHEDULE 3.3 D**   List of Prices for 2005 production Cross Supply Product part numbers at committed volumes including also target prices for non-production Cross Supply Products at committed volume

# L850

| Engines | produced by | purchased by |
|---|---|---|

| L850 2.2 MPI I/CE 16V | GME | FIAT AUTO |
|---|---|---|

Production Cross Supply Product

| Supplier Name | year | Part Number | Description | | Material Cost & freight | variable PVA | fixed cost | Cost of Capital employed | Price |
|---|---|---|---|---|---|---|---|---|---|
| Kaisers'm | from effective date of ECSA to Dec, 2005 | 55560135 | L850 2.2 MPI I/CE 16V 150 hp MT E4 M/T | CROMA | 1154 | 140 | 806 | 151 | 2251 |

Production Cross Supply Product

| Supplier Name | year | Part Number | Description | | Material Cost & freight | variable PVA | fixed cost | Cost of Capital employed | Price |
|---|---|---|---|---|---|---|---|---|---|
| Kaisers'm | from effective date of ECSA to Dec, 2005 | 55560134 | L850 2.2 MPI I/CE 16V 150 hp AT E4 | CROMA | 1069 | 140 | 806 | 151 | 2166 |

| L850 1.9 GDI 16V I/CE | GME | FIAT AUTO |
|---|---|---|

Production Cross Supply Product

| Supplier Name | year | Part Number | Description | | Material Cost & freight | variable PVA | fixed cost | Cost of Capital employed | Price |
|---|---|---|---|---|---|---|---|---|---|
| Kaisers'm | from effective date of ECSA to Dec, 2005 | 55182663 | L850 1.9 DIG HO 160 hp E4 | ALFA 939 | 1332 | 140 | 806 | 151 | 2429 |

| L850 2.2 GDI 16V I/CE | GME | FIAT AUTO |
|---|---|---|

Production Cross Supply Product

| Supplier Name | year | Part Number | Description | | Material Cost & freight | variable PVA | fixed cost | Cost of Capital employed | Price |
|---|---|---|---|---|---|---|---|---|---|
| Kaisers'm | from effective date of ECSA to Dec, 2005 | 55182611 | L850 2.2 DIG HO 165 hp E4 M/T | ALFA 939 | 1.339 | 140 | 806 | 151 | 2.436 |

<u>SCHEDULE 3.3 D</u>     List of Prices for 2005 production Cross Supply Product part numbers at committed volumes including also target prices for non-production Cross Supply Products at committed volume.

# M20-32

*Transmission* | product by | purchased by |

| M20/32 6m | GME | FIAT AUTO |

*Production Cross Supply Product*

| Supplier Name | year | Part Number | Description | | Material Cost & freight | variable PVA | fixed cost | Cost of Capital employed | Price |
|---|---|---|---|---|---|---|---|---|---|
| ASPERN | from effective date of ECSA to Dec, 2005 | 55 355 434 | M20/32 6m 1.9 DS 120/150 hp E4 | CROMA | 312 | 74 | 193 | 57 | 636 |

*Production Cross Supply Product*

| Supplier Name | year | Part Number | Description | | Material Cost & freight | variable PVA | fixed cost | Cost of Capital employed | Price |
|---|---|---|---|---|---|---|---|---|---|
| ASPERN | from effective date of ECSA to Dec, 2005 | 55560195 | M20/32 6m 1.9 DS 120/150 hp E4 | CROMA | 313 | 74 | 193 | 57 | 637 |

*Production Cross Supply Product*

| Supplier Name | year | Part Number | Description | | Material Cost & freight | variable PVA | fixed cost | Cost of Capital employed | Price |
|---|---|---|---|---|---|---|---|---|---|
| ASPERN | from effective date of ECSA to Dec, 2005 | 55560611 | M20/32 6m 1.9 DS 120/150 hp E4 | ALFA 939 | 299 | 74 | 193 | 57 | 623 |

*Production Cross Supply Product*

| Supplier Name | year | Part Number | Description | | Material Cost & freight | variable PVA | fixed cost | Cost of Capital employed | Price |
|---|---|---|---|---|---|---|---|---|---|
| ASPERN | from effective date of ECSA to Dec, 2005 | 55 556 447 | M 20 6m SDE | 199 | 306 | 74 | 193 | 57 | 632 |

*Production Cross Supply Product*

| Supplier Name | year | Part Number | Description | | Material Cost & freight | variable PVA | fixed cost | Cost of Capital employed | Price |
|---|---|---|---|---|---|---|---|---|---|
| ASPERN | from effective date of ECSA to Dec, 2005 | 55 556 448 | M 32 L850 | ALFA | 298 | 74 | 193 | 57 | 622 |

*Production Cross Supply Product*

| Supplier Name | year | Part Number | Description | | Material Cost & freight | variable PVA | fixed cost | Cost of Capital employed | Price |
|---|---|---|---|---|---|---|---|---|---|
| ASPERN | from effective date of ECSA to Dec, 2005 | 55 556 449 | M 32 L850 | ALFA | 297 | 74 | 193 | 57 | 621 |

| M20/32 UP TO 320 | GME | FIAT AUTO |

*Non Production Cross Supply Product*

| Supplier Name | year | Part Number | Description | | Target Material Cost & freight | variable PVA | fixed cost | Cost of Capital employed | Target |
|---|---|---|---|---|---|---|---|---|---|
| ASPERN | from effective date of ECSA to Dec, 2005 | | M20/32 up to 320 | 199/939 | 312 | 74 | 193 | 57 | 636 |

<u>SCHEDULE 3.3 D</u>    List of Prices for 2005 production Cross Supply Product part numbers at committed volumes including also target prices for non-production Cross Supply Products at committed volume

## Fam.B 1.9 JTD 2V

| 1.9 100Hp/260Nm E4 Variable Geometry Turbo (2v) Software detuned 120hp | FIAT AUTO | GM |
|---|---|---|

| Non Production Cross Supply Product | Supplier Name | year | Part Number | Description | | Target Material Cost & freight | Variable PVA | fixed cost | Cost of Capital employed | Target |
|---|---|---|---|---|---|---|---|---|---|---|
| | FMA | from effective date of ECSA to Dec, 2005 | | 1.9 100Hp/260Nm E4 Variable Geometry Turbo (2v) Software detuned 120hp | VECTRA | 1821 | 87 | 299 | 44 | 2061 |

| Non Production Cross Supply Product | Supplier Name | year | Part Number | Description | | Target Material Cost & freight | Variable PVA | fixed cost | Cost of Capital employed | Target |
|---|---|---|---|---|---|---|---|---|---|---|
| | FMA | from effective date of ECSA to Dec, 2005 | | 1.9 100Hp/260Nm E4 Variable Geometry Turbo (2v) Software detuned 120hp | ZAFIRA | 1821 | 87 | 299 | 44 | 2061 |

| 1.9 120Hp/280Nm E4 Variable Geometry Turbo (2v) | FIAT AUTO | GM |
|---|---|---|

| Non Production Cross Supply Product | Supplier Name | year | Part Number | Description | | Target Material Cost & freight | Variable PVA | fixed cost | Cost of Capital employed | Target |
|---|---|---|---|---|---|---|---|---|---|---|
| | FMA | from effective date of ECSA to Dec, 2005 | | 1.9 120Hp/280Nm E4 Variable Geometry Turbo (2v) | ASTRA | 1831 | 87 | 299 | 44 | 2061 |

| Production Cross Supply Product | Supplier Name | year | Part Number | Description | | Material Cost & freight | Variable PVA | fixed cost | Cost of Capital employed | Price |
|---|---|---|---|---|---|---|---|---|---|---|
| | FMA | from effective date of ECSA to Dec, 2005 | 551881770 | 1.9 120Hp/280Nm E4 Variable Geometry Turbo (2v) MT | ZAFIRA | 1821 | 87 | 299 | 44 | 2061 |

| Production Cross Supply Product | Supplier Name | year | Part Number | Description | | Material Cost & freight | Variable PVA | fixed cost | Cost of Capital employed | Price |
|---|---|---|---|---|---|---|---|---|---|---|
| | FMA | from effective date of ECSA to Dec, 2005 | 551821060 | 1.9 120Hp/280Nm E4 Variable Geometry Turbo (2v) AT | ZAFIRA | 1835 | 97 | 299 | 44 | 1975 |

| Production Cross Supply Product | Supplier Name | year | Part Number | Description | | Material Cost & freight | Variable PVA | fixed cost | Cost of Capital employed | Price |
|---|---|---|---|---|---|---|---|---|---|---|
| | FMA | from effective date of ECSA to Dec, 2005 | 551942290 | 1.9 120Hp/280Nm E4 Variable Geometry Turbo (2v) MT | VECTRA | 1809 | 87 | 299 | 44 | 2048 |

| Production Cross Supply Product | Supplier Name | year | Part Number | Description | | Material Cost & freight | Variable PVA | fixed cost | Cost of Capital employed | Price |
|---|---|---|---|---|---|---|---|---|---|---|
| | FMA | from effective date of ECSA to Dec, 2005 | 551906600 | 1.9 120Hp/280Nm E4 Variable Geometry Turbo (2v) MT R.OR | VECTRA | 1824 | 97 | 299 | 44 | 2064 |

| Production Cross Supply Product | Supplier Name | year | Part Number | Description | | Material Cost & freight | Variable PVA | fixed cost | Cost of Capital employed | Price |
|---|---|---|---|---|---|---|---|---|---|---|
| | FMA | from effective date of ECSA to Dec, 2005 | 551962470 | 1.9 120Hp/280Nm E4 Variable Geometry Turbo (2v) MT | EPSILON | 1815 | 97 | 299 | 44 | 2055 |

| Production Cross Supply Product | Supplier Name | year | Reference to (Bold of maroduct, date) | Description | | Material Cost & freight | Variable PVA | fixed cost | Cost of Capital employed | Price |
|---|---|---|---|---|---|---|---|---|---|---|
| | FMA | from effective date of ECSA to Dec, 2005 | 551942290 | 1.9 120Hp/280Nm E4 Variable Geometry Turbo (2v) MT | G-3 | 1509 | 67 | 299 | 44 | 2049 |

| Production Cross Supply Product | Supplier Name | year | Reference to (Bold of maroduct, date) | Description | | Material Cost & freight | Variable PVA | fixed cost | Cost of Capital employed | Price |
|---|---|---|---|---|---|---|---|---|---|---|
| | FMA | from effective date of ECSA to Dec, 2005 | 551906840 | 1.9 120Hp/280Nm E4 Variable Geometry Turbo (2v) MT R.OR | DELTA | 1825 | 97 | 299 | 44 | 2065 |

| Production Cross Supply Product | Supplier Name | year | Reference to (Bold of maroduct, date) | Description | | Material Cost & freight | Variable PVA | fixed cost | Cost of Capital employed | Price |
|---|---|---|---|---|---|---|---|---|---|---|
| | FMA | from effective date of ECSA to Dec, 2005 | 551906800 | 1.9 120Hp/280Nm E4 Variable Geometry Turbo (2v) AT R.OR | DELTA | 1537 | 97 | 299 | 44 | 1977 |

**SCHEDULE 3.3 D**  List of Prices for 2005 production Cross Supply Product part numbers at committed volumes including also target prices for non-production Cross Supply Products at committed volume

## Fam.B 1.9 JTD 4V

*Engines*

| | product by | purchased by |
|---|---|---|
| 1.9 150Hp/320Nm E4 VarGeomTurbo (4v) | FIAT AUTO | GM |

| | Supplier Name | year | Part Number | Description | | Material Cost & freight | variable PVA | fixed cost | Cost of Capital employed | Price |
|---|---|---|---|---|---|---|---|---|---|---|
| Production Cross Supply Product | | | | | | | | | | |
| | FMA | from effective date of ECSA to Dec, 2005 | 551862590 | 1.9 150Hp/320Nm E4 VarGeomTurbo (4v) MT | ASTRA | 1451 | 119 | 346 | 44 | 2350 |

| | Supplier Name | year | Part Number | Description | | Material Cost & freight | variable PVA | fixed cost | Cost of Capital employed | Price |
|---|---|---|---|---|---|---|---|---|---|---|
| Production Cross Supply Product | | | | | | | | | | |
| | FMA | from effective date of ECSA to Dec, 2005 | 551999470 | 1.9 150Hp/320Nm E4 VarGeomTurbo (4v) AT | EPSILON | 1753 | 119 | 346 | 44 | 2262 |

| | Supplier Name | year | Reference to (Bokì el expoduct, date) | Description | | Material Cost & freight | variable PVA | fixed cost | Cost of Capital employed | Price |
|---|---|---|---|---|---|---|---|---|---|---|
| Production Cross Supply Product | | | | | | | | | | |
| | FMA | from effective date of ECSA to Dec, 2005 | 551999460 | 1.9 150Hp/320Nm E4 VarGeomTurbo (4v) MT | EPSILON | 1844 | 119 | 346 | 44 | 2353 |

| | Supplier Name | year | Part Number | Description | | Material Cost & freight | variable PVA | fixed cost | Cost of Capital employed | Price |
|---|---|---|---|---|---|---|---|---|---|---|
| Production Cross Supply Product | | | | | | | | | | |
| | FMA | from effective date of ECSA to Dec, 2005 | 551988970 | 1.9 150Hp/320Nm E4 VarGeomTurbo (4v) MT FLDR | DELTA | 1854 | 119 | 346 | 44 | 2353 |

| | Supplier Name | year | Part Number | Description | | Material Cost & freight | variable PVA | fixed cost | Cost of Capital employed | Price |
|---|---|---|---|---|---|---|---|---|---|---|
| Production Cross Supply Product | | | | | | | | | | |
| | FMA | from effective date of ECSA to Dec, 2005 | 551986220 | 1.9 150Hp/320Nm E4 VarGeomTurbo (4v) AT FLDR | EPSILON | 1754 | 119 | 346 | 44 | 2263 |

| | Supplier Name | year | Part Number | Description | | Material Cost & freigM | variable PVA | fixed cost | Cost of Capital employed | Price |
|---|---|---|---|---|---|---|---|---|---|---|
| Production Cross Supply Product | | | | | | | | | | |
| | FMA | from effective date of ECSA to Dec, 2005 | 551585560 | 1.9 150Hp/320Nm E4 VarGeomTurbo (4v) MT FLDR | VECTRA | 1846 | 119 | 346 | 44 | 2355 |

<u>SCHEDULE 3.3 D</u>    List of Prices for <u>2005</u> production Cross Supply Product part numbers at committed volumes including also target prices for non-production Cross Supply Products at committed volume

# Component

| product by | puchased by |
|---|---|

| Cylinder Head for JTD 1.9 16V | FMA | KL |
|---|---|---|

*Production Cross Supply Product*

| Supplier Name | year | Part Number | Description | Material Cost & freight | variable PVA | fixed cost | Cost of Capital employed | Price |
|---|---|---|---|---|---|---|---|---|
| FMA | from effective date of ECSA to Dec, 2005 | 46816263 | Cylinder Head for JTD 1.9 16V | 191 | 51 | 92 | 11 | 345 |

| JTD 1.9 machined cylinder blocks ( support to FMA, if need be) | KL | FMA |
|---|---|---|

*Production Cross Supply Product*

| Supplier Name | year | Part Number | Description | Material Cost & freight | variable PVA | fixed cost | Cost of Capital employed | Price |
|---|---|---|---|---|---|---|---|---|
| KL | from effective date of ECSA to Dec, 2005 | 55194251 | JTD 1.9 machined cylinder blocks ( support to FMA, if need be) | 48 | 25 | 47 | 4 | 123 |

## Schedule 3.4 Band Pricing Summary of All Cross Supply Product Families

### M20/32 Transmission - Aspern, Austria

Band Pricing Summary

| Euros | | | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|---|
| **Volumes** | | | | | | | | |
| Flat Volume Commitment | | | 64,312 | 193,139 | 179,686 | 245,494 | 303,195 | 405,458 |
| Total Volume Commitment-GM/FIAT/Existing Third Party | | | 232,196 | 614,060 | 733,448 | 805,394 | 844,218 | 853,057 |
| **Material Cost per Unit--Representative Model(1)** | | | (298) | (279) | (272) | (267) | (262) | (257) |
| L850 Alfa | | | | | | | | |
| **Variable Mfg. Cost per Unit** | | | (74) | (62) | (60) | (58) | (56) | (55) |
| | | | | | | | | |
| **Fixed Cost Per Unit: [2]** | | | | | | | | |
| +20% to +30% Volume vs. Commitment | 1.25 | | (154) | (127) | (117) | (94) | (78) | (75) |
| +10% to +20% Volume vs. Commitment | 1.15 | | (166) | (138) | (127) | (102) | (84) | (82) |
| +10% to -10% Volume vs. Commitment | 1.00 | | (193) | (158) | (146) | (117) | (97) | (94) |
| -10% to -20% Volume vs. Commitment | 0.85 | | (227) | (186) | (172) | (138) | (114) | (111) |
| -20% to -30% Volume vs. Commitment | 0.75 | | (257) | (211) | (194) | (156) | (129) | (126) |
| -30% to -40% Volume vs. Commitment | 0.65 | | (296) | (243) | (224) | (180) | (149) | (145) |
| -40% to -50% Volume vs. Commitment | 0.55 | | (350) | (288) | (265) | (213) | (176) | (171) |
| 0% to -50% Volume vs. Commitment | | | SEE "NON-UTILIZATION FEE" NOTE BELOW (4) | | | | | |
| **Total Cost per Unit:** | | | | | | | | |
| +20% to +30% Volume vs. Commitment | | | (526) | (468) | (449) | (419) | (396) | (387) |
| +10% to +20% Volume vs. Commitment | | | (540) | (479) | (459) | (427) | (402) | (394) |
| +10% to -10% Volume vs. Commitment | | | (565) | (499) | (478) | (442) | (415) | (406) |
| -10% to -20% Volume vs. Commitment | | | (599) | (527) | (504) | (463) | (432) | (423) |
| -20% to -30% Volume vs. Commitment | | | (629) | (552) | (526) | (481) | (447) | (438) |
| -30% to -40% Volume vs. Commitment | | | (668) | (584) | (556) | (505) | (467) | (457) |
| -40% to -50% Volume vs. Commitment | | | (722) | (629) | (597) | (536) | (494) | (483) |
| 0% to -50% Volume vs. Commitment | | | SEE "NON-UTILIZATION FEE" NOTE BELOW (4) | | | | | |
| **Cost of Capital per Unit (3)** | | | | | | | | |
| +20% to +30% Volume vs. Commitment | 1.25 | | (46) | (37) | (27) | (21) | (19) | (17) |
| +10% to +20% Volume vs. Commitment | 1.15 | | (50) | (40) | (29) | (23) | (20) | (19) |
| +10% to -10% Volume vs. Commitment | 1.00 | | (57) | (46) | (34) | (27) | (23) | (21) |
| -10% to -20% Volume vs. Commitment | 0.85 | | (67) | (54) | (40) | (32) | (27) | (25) |
| -20% to -30% Volume vs. Commitment | 0.75 | | (76) | (61) | (45) | (36) | (31) | (28) |
| -30% to -40% Volume vs. Commitment | 0.65 | | (88) | (70) | (52) | (41) | (36) | (33) |
| -40% to -50% Volume vs. Commitment | 0.55 | | (104) | (83) | (62) | (49) | (42) | (39) |
| 0% to -50% Volume vs. Commitment | | | SEE "NON-UTILIZATION FEE" NOTE BELOW (4) | | | | | |
| **Selling Price** | | | | | | | | |
| +20% to +30% Volume vs. Commitment | | | 572 | 505 | 476 | 440 | 415 | 404 |
| +10% to +20% Volume vs. Commitment | | | 590 | 519 | 488 | 450 | 422 | 413 |
| +10% to -10% Volume vs. Commitment | | | 622 | 545 | 512 | 469 | 438 | 427 |
| -10% to -20% Volume vs. Commitment | | | 686 | 581 | 544 | 495 | 459 | 448 |
| -20% to -30% Volume vs. Commitment | | | 705 | 613 | 571 | 517 | 478 | 466 |
| -30% to -40% Volume vs. Commitment | | | 756 | 654 | 608 | 546 | 503 | 490 |
| -40% to -50% Volume vs. Commitment | | | 826 | 712 | 659 | 587 | 536 | 522 |
| 0% to -50% Volume vs. Commitment | | | SEE "NON-UTILIZATION FEE" NOTE BELOW (4) | | | | | |
| **Volume Ranges:** | | | | | | | | |
| +20% to +30% Volume vs. Commitment | From | | 77,175 | 231,768 | 215,624 | 294,594 | 363,835 | 486,551 |
| | To | | 83,606 | 251,081 | 233,592 | 319,142 | 394,154 | 527,095 |
| +10% to +20% Volume vs. Commitment | From | | 70,744 | 212,454 | 197,656 | 270,044 | 333,516 | 446,005 |
| | To | | 77,174 | 231,767 | 215,623 | 294,593 | 363,834 | 486,550 |
| +10% to -10% Volume vs. Commitment | From | | 57,881 | 173,825 | 161,717 | 220,945 | 272,875 | 364,912 |
| | To | | 70,743 | 212,453 | 197,655 | 270,043 | 333,515 | 446,004 |
| -10% to -20% Volume vs. Commitment | From | | 51,450 | 154,511 | 143,749 | 196,395 | 242,556 | 324,366 |
| | To | | 57,880 | 173,824 | 161,716 | 220,944 | 272,874 | 364,911 |
| -20% to -30% Volume vs. Commitment | From | | 45,018 | 135,197 | 125,780 | 171,846 | 212,236 | 283,821 |
| | To | | 51,449 | 154,510 | 143,748 | 196,394 | 242,555 | 324,365 |
| -30% to -40% Volume vs. Commitment | From | | 38,587 | 115,883 | 107,812 | 147,296 | 181,917 | 243,275 |
| | To | | 45,017 | 135,196 | 125,779 | 171,845 | 212,235 | 283,820 |
| -40% to -50% Volume vs. Commitment | From | | 32,156 | 96,569 | 89,843 | 122,747 | 151,597 | 202,729 |
| | To | | 38,586 | 115,882 | 107,811 | 147,295 | 181,916 | 243,274 |
| 0% to -50% Volume vs. Commitment | From | | 0 | 0 | 0 | 0 | 0 | 0 |
| | To | | 32,155 | 96,568 | 89,842 | 122,746 | 151,596 | 202,728 |

| | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|
| 1) The Material & Freight is for one sample/representative model. For each part number, the specific bill of material will be used. | | | | | | |
| 2) Fixed Costs Allocated to Customer From Business Plan | (9,667.3) | (28,299.5) | (22,808.7) | (28,833.7) | (29,175.3) | (38,075.8) |
|    Adjustment for Specific Investment | (112.8) | (218.5) | (247.5) | (222.6) | (199.8) | (151.3) |
|    Adjustment for Startup & Preproduction | (2,608.3) | (2,046.3) | (3,145.1) | 326.5 | 0.0 | 0.0 |
|    Total Fixed to Customer | (12,388.4) | (30,564.3) | (26,201.3) | (28,729.8) | (29,375.1) | (38,227.1) |
| 3) Cost of Capital Employed for Customer | (3,664.1) | (8,812.8) | (6,079.9) | (6,593.1) | (7,059.3) | (8,649.3) |

4) Non-Utilization Fee: If a customer's Volume goes below 50% of the demand volumes committed to above, the customer will pay the -40% to -50% price and will quarterly pay an amount to cover its specific investment depreciation and specific startup & preproduction and at least 75% of the other fixed costs and cost of capital not paid for in the price.

## Schedule 3.4 Band Pricing Summary of All Cross Supply Product Families

### F17 Transmission - Aspern, Austria

**Band Pricing Summary**

| Euros | | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| **Volumes** | | | | | | | |
| Fiat Volume Commitment | | 208 | 11,216 | 8,586 | 7,590 | 7,150 | 6,727 |
| Total Volume Commitment-GM/FIAT/Existing Third Party | | 279,200 | 612,514 | 560,771 | 505,446 | 456,595 | 340,068 |
| Material Cost per Unit--Representative Model(1) | | (199) | (199) | (199) | (199) | (199) | (199) |
| FIAT (Cable shifted) | | | | | | | |
| Variable Mfg. Cost per Unit | | (52) | (47) | (46) | (45) | (44) | (43) |
| **Fixed Cost Per Unit: (2)** | | | | | | | |
| +20% to +30% Volume vs. Commitment | 1.25 | (79) | (74) | (71) | (76) | (78) | (98) |
| +10% to +20% Volume vs. Commitment | 1.15 | (86) | (80) | (78) | (82) | (85) | (107) |
| +10% to -10% Volume vs. Commitment | 1.00 | (99) | (92) | (89) | (95) | (98) | (123) |
| -10% to -20% Volume vs. Commitment | 0.85 | (116) | (108) | (105) | (112) | (115) | (144) |
| -20% to -30% Volume vs. Commitment | 0.75 | (131) | (123) | (119) | (126) | (130) | (164) |
| -30% to -40% Volume vs. Commitment | 0.65 | (152) | (142) | (137) | (146) | (150) | (189) |
| -40% to -50% Volume vs. Commitment | 0.55 | (179) | (167) | (162) | (172) | (178) | (223) |
| 0% to -50% Volume vs. Commitment | | SEE "NON-UTILIZATION FEE" NOTE BELOW (4) | | | | | |
| **Total Cost per Unit:** | | | | | | | |
| +20% to +30% Volume vs. Commitment | | (330) | (320) | (316) | (320) | (321) | (340) |
| +10% to +20% Volume vs. Commitment | | (337) | (326) | (323) | (326) | (328) | (349) |
| +10% to -10% Volume vs. Commitment | | (350) | (338) | (334) | (339) | (341) | (365) |
| -10% to -20% Volume vs. Commitment | | (367) | (354) | (350) | (356) | (358) | (386) |
| -20% to -30% Volume vs. Commitment | | (382) | (369) | (364) | (370) | (373) | (406) |
| -30% to -40% Volume vs. Commitment | | (403) | (388) | (382) | (390) | (393) | (431) |
| -40% to -50% Volume vs. Commitment | | (430) | (413) | (407) | (416) | (421) | (465) |
| 0% to -50% Volume vs. Commitment | | SEE "NON-UTILIZATION FEE" NOTE BELOW (4) | | | | | |
| **Cost of Capital per Unit (3)** | | | | | | | |
| +20% to +30% Volume vs. Commitment | 1.25 | (13) | (12) | (13) | (11) | (10) | (13) |
| +10% to +20% Volume vs. Commitment | 1.15 | (15) | (13) | (14) | (12) | (11) | (14) |
| +10% to -10% Volume vs. Commitment | 1.00 | (17) | (15) | (16) | (14) | (13) | (16) |
| -10% to -20% Volume vs. Commitment | 0.85 | (20) | (18) | (19) | (17) | (15) | (19) |
| -20% to -30% Volume vs. Commitment | 0.75 | (22) | (20) | (21) | (19) | (17) | (21) |
| -30% to -40% Volume vs. Commitment | 0.65 | (26) | (23) | (25) | (22) | (20) | (24) |
| -40% to -50% Volume vs. Commitment | 0.55 | (31) | (28) | (29) | (26) | (23) | (29) |
| 0% to -50% Volume vs. Commitment | | SEE "NON-UTILIZATION FEE" NOTE BELOW (4) | | | | | |
| **Selling Price** | | | | | | | |
| +20% to +30% Volume vs. Commitment | | 343 | 332 | 329 | 331 | 331 | 353 |
| +10% to +20% Volume vs. Commitment | | 352 | 339 | 337 | 338 | 339 | 363 |
| +10% to -10% Volume vs. Commitment | | 367 | 353 | 350 | 353 | 354 | 381 |
| -10% to -20% Volume vs. Commitment | | 387 | 372 | 369 | 373 | 373 | 405 |
| -20% to -30% Volume vs. Commitment | | 404 | 389 | 385 | 389 | 390 | 427 |
| -30% to -40% Volume vs. Commitment | | 429 | 411 | 407 | 412 | 413 | 455 |
| -40% to -50% Volume vs. Commitment | | 461 | 441 | 436 | 442 | 444 | 494 |
| 0% to -50% Volume vs. Commitment | | SEE "NON-UTILIZATION FEE" NOTE BELOW (4) | | | | | |
| **Volume Ranges:** | | | | | | | |
| +20% to +30% Volume vs. Commitment | From | 251 | 13,460 | 10,304 | 9,109 | 8,581 | 8,073 |
| | To | 270 | 14,581 | 11,162 | 9,867 | 9,295 | 8,745 |
| +10% to +20% Volume vs. Commitment | From | 230 | 12,339 | 9,446 | 8,350 | 7,866 | 7,401 |
| | To | 250 | 13,459 | 10,303 | 9,108 | 8,580 | 8,072 |
| +10% to -10% Volume vs. Commitment | From | 187 | 10,094 | 7,727 | 6,831 | 6,435 | 6,054 |
| | To | 229 | 12,338 | 9,445 | 8,349 | 7,865 | 7,400 |
| -10% to -20% Volume vs. Commitment | From | 166 | 8,973 | 6,869 | 6,072 | 5,720 | 5,382 |
| | To | 186 | 10,093 | 7,726 | 6,830 | 6,434 | 6,053 |
| -20% to -30% Volume vs. Commitment | From | 146 | 7,851 | 6,010 | 5,313 | 5,005 | 4,709 |
| | To | 165 | 8,972 | 6,868 | 6,071 | 5,719 | 5,381 |
| -30% to -40% Volume vs. Commitment | From | 125 | 6,730 | 5,152 | 4,554 | 4,290 | 4,036 |
| | To | 145 | 7,850 | 6,009 | 5,312 | 5,004 | 4,708 |
| -40% to -50% Volume vs. Commitment | From | 104 | 5,608 | 4,293 | 3,795 | 3,575 | 3,363 |
| | To | 124 | 6,729 | 5,151 | 4,553 | 4,289 | 4,035 |
| 0% to -50% Volume vs. Commitment | From | 0 | 0 | 0 | 0 | 0 | 0 |
| | To | 103 | 5,607 | 4,292 | 3,794 | 3,574 | 3,382 |

1) The Material & Freight is for one sample/representative model.  For each part number, the specific bill of material will be used.

| 2) Fixed Costs Allocated to Customer From Business Plan | (20.8) | (1,037.6) | (766.5) | (719.6) | (698.8) | (825.1) |
|---|---|---|---|---|---|---|
| Adjustment for Specific Investment | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Adjustment for Startup & Preproduction | 0.3 | 4.6 | 0.0 | 0.0 | 0.0 | 0.0 |
| Total Fixed to Customer | (20.5) | (1,033.0) | (766.5) | (719.6) | (698.8) | (825.1) |
| 3) Cost of Capital Employed for Customer | (3.5) | (171.0) | (136.8) | (107.0) | (91.0) | (106.3) |

4) Non-Utilization Fee:  If a customer's Volume goes below 50% of the demand volumes committed to above, the customer will pay the -40% to -50% price and will quarterly pay an amount to cover its specific investment depreciation and specific startup & preproduction and at least 75% of the other fixed costs and cost of capital not paid for in the price.

## Schedule 3.4 Band Pricing Summary of All Cross Supply Product Families

### F40 Transmission - Ruesselsheim, Germany

Band Pricing Summary

| Euros | | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| **Volumes** | | | | | | | |
| Fiat Volume Commitment | | 9,034 | 34,248 | 36,680 | 56,041 | 50,157 | 46,290 |
| Total Volume Commitment-GM/FIAT/Existing Third Party | | 56,756 | 142,232 | 149,297 | 168,560 | 176,334 | 188,776 |
| **Material Cost per Unit--Representative Model(1)** | | (328) | (326) | (325) | (324) | (324) | (324) |
| ALFA 156 2.5 JTD | | | | | | | |
| **Variable Mfg. Cost per Unit** | | (106) | (96) | (93) | (90) | (88) | (85) |
| | | | | | | | |
| **Fixed Cost Per Unit: (2)** | | | | | | | |
| +20% to +30% Volume vs. Commitment | 1.25 | (302) | (271) | (235) | (201) | (187) | (171) |
| +10% to +20% Volume vs. Commitment | 1.15 | (328) | (295) | (256) | (219) | (204) | (186) |
| +10% to -10% Volume vs. Commitment | 1.00 | (377) | (339) | (294) | (252) | (234) | (213) |
| -10% to -20% Volume vs. Commitment | 0.85 | (444) | (399) | (346) | (296) | (276) | (251) |
| -20% to -30% Volume vs. Commitment | 0.75 | (503) | (452) | (392) | (336) | (312) | (285) |
| -30% to -40% Volume vs. Commitment | 0.65 | (580) | (522) | (452) | (387) | (360) | (328) |
| -40% to -50% Volume vs. Commitment | 0.55 | (686) | (617) | (535) | (458) | (426) | (388) |
| 0% to -50% Volume vs. Commitment | | SEE "NON-UTILIZATION FEE" NOTE BELOW (4) | | | | | |
| **Total Cost per Unit:** | | | | | | | |
| +20% to +30% Volume vs. Commitment | | (736) | (693) | (653) | (615) | (599) | (580) |
| +10% to +20% Volume vs. Commitment | | (762) | (717) | (674) | (633) | (616) | (595) |
| +10% to -10% Volume vs. Commitment | | (811) | (761) | (712) | (666) | (646) | (622) |
| -10% to -20% Volume vs. Commitment | | (878) | (821) | (764) | (710) | (688) | (660) |
| -20% to -30% Volume vs. Commitment | | (937) | (874) | (810) | (750) | (724) | (694) |
| -30% to -40% Volume vs. Commitment | | (1,014) | (944) | 306 | (801) | (772) | (737) |
| -40% to -50% Volume vs. Commitment | | (1,120) | (1,039) | (953) | (872) | (838) | (797) |
| 0% to -50% Volume vs. Commitment | | SEE "NON-UTILIZATION FEE" NOTE BELOW (4) | | | | | |
| **Cost of Capital per Unit (3)** | | | | | | | |
| +20% to +30% Volume vs. Commitment | 1.25 | (94) | (67) | (46) | (36) | (31) | (26) |
| +10% to +20% Volume vs. Commitment | 1.15 | (102) | (73) | (50) | (39) | (33) | (29) |
| +10% to -10% Volume vs. Commitment | 1.00 | (117) | (84) | (58) | (45) | (38) | (33) |
| -10% to -20% Volume vs. Commitment | 0.85 | (138) | (99) | (68) | (52) | (45) | (39) |
| -20% to -30% Volume vs. Commitment | 0.75 | (156) | (112) | (77) | (59) | (51) | (44) |
| -30% to -40% Volume vs. Commitment | 0.65 | (180) | (129) | (89) | (69) | (59) | (51) |
| -40% to -50% Volume vs. Commitment | 0.55 | (213) | (153) | (105) | (81) | (70) | (60) |
| 0% to -50% Volume vs. Commitment | | SEE "NON-UTILIZATION FEE" NOTE BELOW (4) | | | | | |
| **Selling Price** | | | | | | | |
| +20% to +30% Volume vs. Commitment | | 830 | 760 | 699 | 651 | 630 | 606 |
| +10% to +20% Volume vs. Commitment | | 864 | 790 | 724 | 672 | 649 | 624 |
| +10% to -10% Volume vs. Commitment | | 928 | 845 | 770 | 711 | 684 | 655 |
| -10% to -20% Volume vs. Commitment | | 1,016 | 920 | 832 | 762 | 733 | 699 |
| -20% to -30% Volume vs. Commitment | | 1,093 | 986 | 887 | 809 | 775 | 738 |
| -30% to -40% Volume vs. Commitment | | 1,194 | 1,073 | (217) | 870 | 831 | 788 |
| -40% to -50% Volume vs. Commitment | | 1,333 | 1,192 | 1,058 | 953 | 908 | 857 |
| 0% to -50% Volume vs. Commitment | | SEE "NON-UTILIZATION FEE" NOTE BELOW (4) | | | | | |
| **Volume Ranges:** | | | | | | | |
| +20% to +30% Volume vs. Commitment | From | 10,842 | 41,099 | 44,017 | 67,250 | 60,189 | 55,549 |
| | To | 11,744 | 44,522 | 47,684 | 72,853 | 65,204 | 60,177 |
| +10% to +20% Volume vs. Commitment | From | 9,938 | 37,674 | 40,349 | 61,645 | 55,174 | 50,920 |
| | To | 10,841 | 41,098 | 44,016 | 67,249 | 60,188 | 55,548 |
| +10% to -10% Volume vs. Commitment | From | 8,131 | 30,823 | 33,012 | 50,437 | 45,141 | 41,661 |
| | To | 9,937 | 37,673 | 40,348 | 61,645 | 55,173 | 50,919 |
| -10% to -20% Volume vs. Commitment | From | 7,227 | 27,398 | 29,344 | 44,833 | 40,126 | 37,032 |
| | To | 8,130 | 30,822 | 33,011 | 50,436 | 45,140 | 41,660 |
| -20% to -30% Volume vs. Commitment | From | 6,324 | 23,974 | 25,676 | 39,229 | 35,110 | 32,403 |
| | To | 7,226 | 27,397 | 29,343 | 44,832 | 40,125 | 37,031 |
| -30% to -40% Volume vs. Commitment | From | 5,420 | 20,549 | 22,008 | 33,625 | 30,094 | 27,774 |
| | To | 6,323 | 23,973 | 25,675 | 39,228 | 35,109 | 32,402 |
| -40% to -50% Volume vs. Commitment | From | 4,517 | 17,124 | 18,340 | 28,020 | 25,078 | 23,145 |
| | To | 5,419 | 20,548 | 22,007 | 33,624 | 30,093 | 27,773 |
| 0% to -50% Volume vs. Commitment | From | 0 | 0 | 0 | 0 | 0 | 0 |
| | To | 4,516 | 17,123 | 18,339 | 28,019 | 25,077 | 23,144 |

| | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|
| 1) The Material & Freight is for one sample/representative model. For each part number, the specific bill of material will be used. | | | | | | |
| 2) Fixed Costs Allocated to Customer From Business Plan | (3,613.4) | (12,053.8) | (9,689.7) | (13,261.3) | (11,070.2) | (9,164.7) |
| Adjustment for Specific Investment | (316.8) | (719.7) | (714.6) | (627.9) | (676.0) | (712.6) |
| Adjustment for Startup & Preproduction | 523.5 | 1,159.3 | (379.3) | (214.3) | 0.0 | 0.0 |
| Total Fixed to Customer | (3,406.7) | (11,614.2) | (10,783.8) | (14,103.5) | (11,746.2) | (9,877.3) |
| 3) Cost of Capital Employed for Customer | (1,055.9) | (2,876.3) | (2,126.6) | (2,499.5) | (1,930.5) | (1,531.5) |
| 4) Non-Utilization Fee: If a customer's Volume goes below 60% of the demand volumes committed to above, the customer will pay the -40% to -50% price and will quarterly pay an amount to cover its specific investment depreciation and specific startup & preproduction and at least 75% of the other fixed costs and cost of capital not paid for in the price. | | | | | | |

3

## Schedule 3.4 Band Pricing Summary of All Cross Supply Product Families

### L850 Engine - Kaiserslautern, Germany

Band Pricing Summary

| Euros | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|
| **Volumes** | | | | | | |
| Fiat Volume Commitment | 10,193 | 34,846 | 33,408 | 46,468 | 52,192 | 43,468 |
| Total Volume Commitment-GM/FIAT/Existing Third Party | 37,774 | 82,646 | 71,763 | 74,557 | 82,026 | 72,769 |
| **Material Cost per Unit--Representative Model(1)** | (1,332) | (1,318) | (1,305) | (1,299) | (1,292) | (1,286) |
| 1.9 N4 S GE4 - L850 DIG HO Alfa | | | | | | |
| **Variable Mfg. Cost per Unit** | (140) | (141) | (137) | (133) | (129) | (125) |
| **Fixed Cost Per Unit: (2)** | | | | | | |
| +20% to +30% Volume vs. Commitment 1.25 | (645) | (563) | (635) | (572) | (518) | (542) |
| +10% to +20% Volume vs. Commitment 1.15 | (701) | (612) | (690) | (622) | (583) | (589) |
| +10% to -10% Volume vs. Commitment 1.00 | (806) | (704) | (793) | (715) | (647) | (677) |
| -10% to -20% Volume vs. Commitment 0.85 | (949) | (829) | (933) | (842) | (761) | (797) |
| -20% to -30% Volume vs. Commitment 0.75 | (1,075) | (939) | (1,058) | (954) | (863) | (903) |
| -30% to -40% Volume vs. Commitment 0.65 | (1,240) | (1,084) | (1,220) | (1,101) | (996) | (1,042) |
| -40% to -50% Volume vs. Commitment 0.55 | (1,466) | (1,281) | (1,442) | (1,301) | (1,177) | (1,231) |
| 0% to -50% Volume vs. Commitment | SEE "NON-UTILIZATION FEE" NOTE BELOW (4) | | | | | |
| **Total Cost per Unit:** | | | | | | |
| +20% to +30% Volume vs. Commitment | (2,117) | (2,022) | (2,077) | (2,004) | (1,939) | (1,953) |
| +10% to +20% Volume vs. Commitment | (2,173) | (2,071) | (2,132) | (2,054) | (1,984) | (2,000) |
| +10% to -10% Volume vs. Commitment | (2,278) | (2,163) | (2,235) | (2,147) | (2,068) | (2,088) |
| -10% to -20% Volume vs. Commitment | (2,421) | (2,288) | (2,375) | (2,274) | (2,182) | (2,208) |
| -20% to -30% Volume vs. Commitment | (2,547) | (2,398) | (2,500) | (2,386) | (2,284) | (2,314) |
| -30% to -40% Volume vs. Commitment | (2,712) | (2,543) | (1,442) | (2,533) | (2,417) | (2,453) |
| -40% to -50% Volume vs. Commitment | (2,938) | (2,740) | (2,884) | (2,733) | (2,598) | (2,642) |
| 0% to -50% Volume vs. Commitment | SEE "NON-UTILIZATION FEE" NOTE BELOW (4) | | | | | |
| **Cost of Capital per Unit (3)** | | | | | | |
| +20% to +30% Volume vs. Commitment 1.25 | (121) | (101) | (114) | (104) | (83) | (83) |
| +10% to +20% Volume vs. Commitment 1.15 | (131) | (110) | (124) | (113) | (90) | (90) |
| +10% to -10% Volume vs. Commitment 1.00 | (151) | (126) | (142) | (130) | (103) | (104) |
| -10% to -20% Volume vs. Commitment 0.65 | (178) | (149) | (167) | (152) | (121) | (122) |
| -20% to -30% Volume vs. Commitment 0.75 | (201) | (169) | (190) | (173) | (138) | (138) |
| -30% to -40% Volume vs. Commitment 0.65 | (232) | (195) | (219) | (199) | (159) | (159) |
| -40% to -50% Volume vs. Commitment 0.55 | (274) | (230) | (258) | (234) | (188) | (188) |
| 0% to -50% Volume vs. Commitment | SEE "NON-UTILIZATION FEE" NOTE BELOW (4) | | | | | |
| **Selling Price** | | | | | | |
| +20% to +30% Volume vs. Commitment | 2,238 | 2,123 | 2,191 | 2,108 | 2,022 | 2,036 |
| +10% to +20% Volume vs. Commitment | 2,304 | 2,181 | 2,256 | 2,167 | 2,074 | 2,090 |
| +10% to -10% Volume vs. Commitment | 2,429 | 2,289 | 2,377 | 2,277 | 2,171 | 2,192 |
| -10% to -20% Volume vs. Commitment | 2,599 | 2,437 | 2,542 | 2,426 | 2,303 | 2,330 |
| -20% to -30% Volume vs. Commitment | 2,748 | 2,567 | 2,690 | 2,559 | 2,422 | 2,452 |
| -30% to -40% Volume vs. Commitment | 2,944 | 2,738 | 1,661 | 2,732 | 2,576 | 2,612 |
| -40% to -50% Volume vs. Commitment | 3,212 | 2,970 | 3,142 | 2,969 | 2,786 | 2,830 |
| 0% to -50% Volume vs. Commitment | SEE "NON-UTILIZATION FEE" NOTE BELOW (4) | | | | | |
| **Volume Ranges:** | | | | | | |
| +20% to +30% Volume vs. Commitment From | 12,233 | 41,816 | 40,091 | 55,763 | 62,631 | 52,163 |
| To | 13,261 | 45,300 | 43,430 | 60,408 | 67,850 | 56,508 |
| +10% to +20% Volume vs. Commitment From | 11,213 | 38,332 | 36,750 | 51,116 | 57,412 | 47,816 |
| To | 12,232 | 41,815 | 40,090 | 55,762 | 62,630 | 52,162 |
| +10% to -10% Volume vs. Commitment From | 9,174 | 31,361 | 30,067 | 41,821 | 46,973 | 39,121 |
| To | 11,212 | 38,331 | 36,749 | 51,115 | 57,411 | 47,815 |
| -10% to -20% Volume vs. Commitment From | 8,154 | 27,877 | 26,726 | 37,174 | 41,754 | 34,774 |
| To | 9,173 | 31,360 | 30,066 | 41,820 | 46,972 | 39,120 |
| -20% to -30% Volume vs. Commitment From | 7,135 | 24,392 | 23,386 | 32,528 | 36,534 | 30,428 |
| To | 8,153 | 27,876 | 26,725 | 37,173 | 41,753 | 34,773 |
| -30% to -40% Volume vs. Commitment From | 6,116 | 20,908 | 20,045 | 27,881 | 31,315 | 26,081 |
| To | 7,134 | 24,391 | 23,385 | 32,527 | 36,533 | 30,427 |
| -40% to -50% Volume vs. Commitment From | 5,096 | 17,423 | 16,704 | 23,234 | 26,096 | 21,734 |
| To | 6,115 | 20,907 | 20,044 | 27,880 | 31,314 | 26,080 |
| 0% to -50% Volume vs. Commitment From | 0 | 0 | 0 | | 0 | 0 |
| To | 5,095 | 17,422 | 16,703 | 23,233 | | 26,095 | 21,733 |

1) The Material & Freight is for one sample/representative model. For each part number, the specific bill of material will be used.

2) Fixed Costs Allocated to Customer From Business Plan | (7,249.7) | (22,601.3) | (24,557.8) | (31,861.0) | (32,488.1) | (27,994.5)
Adjustment for Specific Investment | (1,000.3) | (2,008.1) | (1,917.2) | (1,353.2) | (1,306.5) | (1,446.4)
Adjustment for Startup & Preproduction | 31.2 | 64.9 | (24.2) | (27.1) | 19.2 | 0.0
Total Fixed to Customer | (8,218.8) | (24,544.5) | (26,499.2) | (33,241.3) | (33,773.4) | (29,440.9)

3) Cost of Capital Employed for Customer | (1,536.6) | (4,405.6) | (4,748.4) | (6,021.9) | (5,386.2) | (4,503.6)

4) Non-Utilization Fee: If a customer's Volume goes below 50% of the demand volumes committed to above, the customer will pay the -40% to -50% price and will quarterly pay an amount to cover its specific investment depreciation and specific startup & preproduction and at least 75% of the other fixed costs and cost of capital not paid for in the price.

## Schedule 3.4 Band Pricing Summary of All Cross Supply Product Families

### Family 1 Engine - Szentgotthard, Hungary

**Band Pricing Summary**

| Euros | | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| **Volumes** | | | | | | | |
| Fiat Volume Commitment | | 3,293 | 23,507 | 52,701 | 73,543 | 79,916 | 93,072 |
| Total Volume Commitment-GM/FIAT/Existing Third Party | | 189,156 | 433,443 | 428,814 | 413,300 | 397,486 | 428,636 |
| **Material Cost per Unit--Representative Model(1)** | | (1,006) | (986) | (967) | (948) | (929) | (911) |
| Fam I 1,6 PDA | | | | | | | |
| **Variable Mfg. Cost per Unit** | | (25) | (22) | (21) | (21) | (20) | (20) |
| | | | | | | | |
| **Fixed Cost Per Unit: (2)** | | | | | | | |
| +20% to +30% Volume vs. Commitment | 1.25 | (231) | (191) | (177) | (180) | (180) | (166) |
| +10% to +20% Volume vs. Commitment | 1.15 | (251) | (208) | (192) | (196) | (196) | (180) |
| +10% to -10% Volume vs. Commitment | 1.00 | (288) | (239) | (221) | (225) | (225) | (207) |
| -10% to -20% Volume vs. Commitment | 0.85 | (339) | (281) | (260) | (265) | (265) | (244) |
| -20% to -30% Volume vs. Commitment | 0.75 | (385) | (318) | (294) | (300) | (300) | (276) |
| -30% to -40% Volume vs. Commitment | 0.65 | (444) | (367) | (340) | (347) | (346) | (319) |
| -40% to -50% Volume vs. Commitment | 0.55 | (524) | (434) | (401) | (410) | (409) | (377) |
| 0% to -50% Volume vs. Commitment | | SEE "NON-UTILIZATION FEE" NOTE BELOW (4) | | | | | |
| **Total Cost per Unit:** | | | | | | | |
| +20% to +30% Volume vs. Commitment | | (1,262) | (1,199) | (1,165) | (1,149) | (1,129) | (1,097) |
| +10% to +20% Volume vs. Commitment | | (1,282) | (1,216) | (1,180) | (1,165) | (1,145) | (1,111) |
| +10% to -10% Volume vs. Commitment | | (1,319) | (1,247) | (1,209) | (1,194) | (1,174) | (1,138) |
| -10% to -20% Volume vs. Commitment | | (1,370) | (1,289) | (1,248) | (1,234) | (1,214) | (1,175) |
| -20% to -30% Volume vs. Commitment | | (1,416) | (1,326) | (1,282) | (1,269) | (1,249) | (1,207) |
| -30% to -40% Volume vs. Commitment | | (1,475) | (1,375) | (1,328) | (1,316) | (1,295) | (1,250) |
| -40% to -50% Volume vs. Commitment | | (1,555) | (1,442) | (1,389) | (1,379) | (1,358) | (1,308) |
| 0% to -50% Volume vs. Commitment | | SEE "NON-UTILIZATION FEE" NOTE BELOW (4) | | | | | |
| **Cost of Capital per Unit (3)** | | | | | | | |
| +20% to +30% Volume vs. Commitment | 1.25 | (35) | (33) | (32) | (32) | (35) | (30) |
| +10% to +20% Volume vs. Commitment | 1.15 | (38) | (36) | (35) | (35) | (38) | (32) |
| +10% to -10% Volume vs. Commitment | 1.00 | (43) | (42) | (40) | (40) | (44) | (37) |
| -10% to -20% Volume vs. Commitment | 0.85 | (51) | (49) | (47) | (47) | (51) | (43) |
| -20% to -30% Volume vs. Commitment | 0.75 | (58) | (56) | (53) | (53) | (58) | (49) |
| -30% to -40% Volume vs. Commitment | 0.65 | (67) | (64) | (62) | (61) | (67) | (57) |
| -40% to -50% Volume vs. Commitment | 0.55 | (79) | (76) | (72) | (72) | (79) | (67) |
| 0% to -50% Volume vs. Commitment | | SEE "NON-UTILIZATION FEE" NOTE BELOW (4) | | | | | |
| **Selling Price** | | | | | | | |
| +20% to +30% Volume vs. Commitment | | 1,297 | 1,232 | 1,197 | 1,181 | 1,164 | 1,127 |
| +10% to +20% Volume vs. Commitment | | 1,320 | 1,252 | 1,215 | 1,200 | 1,183 | 1,143 |
| +10% to -10% Volume vs. Commitment | | 1,362 | 1,289 | 1,249 | 1,234 | 1,218 | 1,175 |
| -10% to -20% Volume vs. Commitment | | 1,421 | 1,338 | 1,295 | 1,281 | 1,265 | 1,218 |
| -20% to -30% Volume vs. Commitment | | 1,474 | 1,382 | 1,335 | 1,322 | 1,307 | 1,256 |
| -30% to -40% Volume vs. Commitment | | 1,542 | 1,439 | 1,390 | 1,377 | 1,362 | 1,307 |
| -40% to -50% Volume vs. Commitment | | 1,634 | 1,518 | 1,462 | 1,451 | 1,437 | 1,375 |
| 0% to -50% Volume vs. Commitment | | SEE "NON-UTILIZATION FEE" NOTE BELOW (4) | | | | | |
| **Volume Ranges:** | | | | | | | |
| +20% to +30% Volume vs. Commitment | From | 3,953 | 28,209 | 63,242 | 88,253 | 95,900 | 111,687 |
| | To | 4,281 | 30,559 | 68,511 | 95,608 | 103,891 | 120,994 |
| +10% to +20% Volume vs. Commitment | From | 3,623 | 25,859 | 57,972 | 80,898 | 87,909 | 102,380 |
| | To | 3,952 | 28,208 | 63,241 | 88,252 | 95,899 | 111,686 |
| +10% to -10% Volume vs. Commitment | From | 2,964 | 21,156 | 47,431 | 66,189 | 71,924 | 83,765 |
| | To | 3,622 | 25,858 | 57,971 | 80,897 | 87,908 | 102,379 |
| -10% to -20% Volume vs. Commitment | From | 2,634 | 18,806 | 42,161 | 58,834 | 63,933 | 74,458 |
| | To | 2,963 | 21,155 | 47,430 | 66,188 | 71,923 | 83,764 |
| -20% to -30% Volume vs. Commitment | From | 2,305 | 16,455 | 36,891 | 51,480 | 55,941 | 65,150 |
| | To | 2,633 | 18,805 | 42,160 | 58,833 | 63,932 | 74,457 |
| -30% to -40% Volume vs. Commitment | From | 1,976 | 14,104 | 31,621 | 44,126 | 47,950 | 55,843 |
| | To | 2,304 | 16,454 | 36,890 | 51,479 | 55,940 | 65,149 |
| -40% to -50% Volume vs. Commitment | From | 1,646 | 11,753 | 26,350 | 36,771 | 39,958 | 46,536 |
| | To | 1,975 | 14,103 | 31,620 | 44,125 | 47,949 | 55,842 |
| 0% to -50% Volume vs. Commitment | From | 0 | 0 | 0 | 0 | 0 | 0 |
| | To | 1,645 | 11,752 | 26,349 | 36,770 | 39,957 | 46,535 |

| | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|
| 1) The Material & Freight is for one sample/representative model. For each part number, the specific bill of material will be used. | | | | | | |
| 2) Fixed Costs Allocated to Customer From Business Plan | (859.6) | (4,876.6) | (10,842.5) | (15,952.0) | (17,473.9) | (18,779.1) |
| Adjustment for Specific Investment | (268.5) | (672.9) | (770.5) | (660.8) | (535.2) | (501.6) |
| Adjustment for Startup & Preproduction | (21.6) | (64.1) | (19.0) | 46.1 | 20.6 | 7.0 |
| Total Fixed to Customer | (949.7) | (5,613.6) | (11,632.0) | (16,566.7) | (17,988.5) | (19,273.7) |
| 3) Cost of Capital Employed for Customer | (143.1) | (981.2) | (2,114.5) | (2,922.1) | (3,480.6) | (3,435.0) |
| 4) Non-Utilization Fee: If a customer's Volume goes below 50% of the demand volumes committed to above, the customer will pay the -40% to -50% price and will quarterly pay an amount to cover its specific investment depreciation and specific startup & preproduction and at least 75% of the other fixed costs and cost of capital not paid for in the price. | | | | | | |

5

## Schedule 3.4 Band Pricing Summary of All Cross Supply Product Families

### JTD 8 Valve Engine - Pratola Serra, Italy

**Band Pricing Summary**

| Euros | | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| **Volumes** | | | | | | | |
| GM Volume Commitment | | 77,873 | 209,596 | 191,956 | 121,249 | 53,595 | 16,823 |
| Total Volume Commitment-GM/FIAT/Existing Third Party | | 192,380 | 476,037 | 454,240 | 289,307 | 172,420 | 95,385 |
| Material Cost per Unit--Representative Model(1) | | (1,624) | (1,592) | (1,560) | (1,529) | (1,499) | (1,469) |
|   M737'EPSILON' GDX 8V | | | | | | | |
| Variable Mfg. Cost per Unit | | (97) | (107) | (103) | (101) | (98) | (96) |
| | | | | | | | |
| **Fixed Cost Per Unit: (2)** | | | | | | | |
| +20% to +30% Volume vs. Commitment | 1.25 | (239) | (230) | (205) | (229) | (245) | (269) |
| +10% to +20% Volume vs. Commitment | 1.15 | (260) | (250) | (223) | (249) | (267) | (293) |
| +10% to -10% Volume vs. Commitment | 1.00 | (299) | (288) | (256) | (286) | (307) | (336) |
| -10% to -20% Volume vs. Commitment | 0.85 | (352) | (339) | (301) | (337) | (361) | (396) |
| -20% to -30% Volume vs. Commitment | 0.75 | (399) | (384) | (341) | (382) | (409) | (449) |
| -30% to -40% Volume vs. Commitment | 0.65 | (460) | (443) | (394) | (440) | (472) | (518) |
| -40% to -50% Volume vs. Commitment | 0.55 | (544) | (521) | (466) | (521) | (558) | (612) |
| 0% to -50% Volume vs. Commitment | | SEE "NON-UTILIZATION FEE" NOTE BELOW (4) | | | | | |
| **Total Cost per Unit:** | | | | | | | |
| +20% to +30% Volume vs. Commitment | | (1,960) | (1,929) | (1,868) | (1,859) | (1,842) | (1,834) |
| +10% to +20% Volume vs. Commitment | | (1,981) | (1,949) | (1,886) | (1,879) | (1,864) | (1,858) |
| +10% to -10% Volume vs. Commitment | | (2,020) | (1,987) | (1,919) | (1,916) | (1,904) | (1,901) |
| -10% to -20% Volume vs. Commitment | | (2,073) | (2,038) | (1,964) | (1,967) | (1,958) | (1,961) |
| -20% to -30% Volume vs. Commitment | | (2,120) | (2,083) | (2,004) | (2,012) | (2,006) | (2,014) |
| -30% to -40% Volume vs. Commitment | | (2,181) | (2,142) | (2,057) | (2,070) | (2,069) | (2,083) |
| -40% to -50% Volume vs. Commitment | | (2,265) | (2,222) | (2,129) | (2,151) | (2,155) | (2,177) |
| 0% to -50% Volume vs. Commitment | | SEE "NON-UTILIZATION FEE" NOTE BELOW (4) | | | | | |
| **Cost of Capital per Unit (3)** | | | | | | | |
| +20% to +30% Volume vs. Commitment | 1.25 | (35) | (23) | (26) | (44) | (56) | (58) |
| +10% to +20% Volume vs. Commitment | 1.15 | (38) | (25) | (28) | (48) | (60) | (63) |
| +10% to -10% Volume vs. Commitment | 1.00 | (44) | (29) | (33) | (55) | (70) | (73) |
| -10% to -20% Volume vs. Commitment | 0.85 | (52) | (34) | (38) | (64) | (82) | (86) |
| -20% to -30% Volume vs. Commitment | 0.75 | (59) | (38) | (43) | (73) | (93) | (97) |
| -30% to -40% Volume vs. Commitment | 0.65 | (68) | (44) | (50) | (84) | (107) | (112) |
| -40% to -50% Volume vs. Commitment | 0.55 | (80) | (52) | (59) | (99) | (126) | (132) |
| 0% to -50% Volume vs. Commitment | | SEE "NON-UTILIZATION FEE" NOTE BELOW (4) | | | | | |
| **Selling Price** | | | | | | | |
| +20% to +30% Volume vs. Commitment | | 1,995 | 1,952 | 1,894 | 1,903 | 1,898 | 1,892 |
| +10% to +20% Volume vs. Commitment | | 2,019 | 1,974 | 1,914 | 1,927 | 1,924 | 1,921 |
| +10% to -10% Volume vs. Commitment | | 2,064 | 2,016 | 1,952 | 1,971 | 1,974 | 1,974 |
| -10% to -20% Volume vs. Commitment | | 2,125 | 2,072 | 2,002 | 2,031 | 2,040 | 2,047 |
| -20% to -30% Volume vs. Commitment | | 2,179 | 2,121 | 2,047 | 2,085 | 2,099 | 2,111 |
| -30% to -40% Volume vs. Commitment | | 2,249 | 2,186 | 2,107 | 2,154 | 2,176 | 2,195 |
| -40% to -50% Volume vs. Commitment | | 2,345 | 2,274 | 2,188 | 2,250 | 2,281 | 2,309 |
| 0% to -50% Volume vs. Commitment | | SEE "NON-UTILIZATION FEE" NOTE BELOW (4) | | | | | |
| **Volume Ranges:** | | | | | | | |
| +20% to +30% Volume vs. Commitment | From | 93,449 | 251,516 | 230,348 | 145,500 | 64,315 | 20,189 |
| | To | 101,235 | 272,475 | 249,543 | 157,624 | 69,674 | 21,870 |
| +10% to +20% Volume vs. Commitment | From | 85,661 | 230,557 | 211,153 | 133,375 | 58,956 | 18,508 |
| | To | 93,448 | 251,515 | 230,347 | 145,499 | 64,314 | 20,188 |
| +10% to -10% Volume vs. Commitment | From | 70,686 | 188,636 | 172,760 | 109,124 | 48,235 | 15,141 |
| | To | 85,660 | 230,556 | 211,152 | 133,374 | 58,955 | 18,505 |
| -10% to -20% Volume vs. Commitment | From | 62,298 | 167,677 | 153,565 | 96,999 | 42,876 | 13,458 |
| | To | 70,685 | 188,635 | 172,759 | 109,123 | 48,234 | 15,140 |
| -20% to -30% Volume vs. Commitment | From | 54,511 | 146,717 | 134,369 | 84,874 | 37,516 | 11,776 |
| | To | 62,297 | 167,676 | 153,564 | 96,998 | 42,875 | 13,457 |
| -30% to -40% Volume vs. Commitment | From | 46,724 | 125,758 | 115,174 | 72,749 | 32,157 | 10,094 |
| | To | 54,510 | 146,716 | 134,368 | 84,873 | 37,515 | 11,775 |
| -40% to -50% Volume vs. Commitment | From | 38,936 | 104,798 | 95,976 | 60,624 | 26,797 | 8,411 |
| | To | 46,723 | 125,757 | 115,173 | 72,748 | 32,156 | 10,093 |
| 0% to -50% Volume vs. Commitment | From | 0 | 0 | 0 | 0 | 0 | 0 |
| | To | 38,935 | 104,797 | 95,977 | 60,623 | 26,796 | 8,410 |

| | | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| 1) The Material & Freight is for one sample/representative model. For each part number, the specific bill of material will be used. | | | | | | | |
| 2) Fixed Costs Allocated to Customer From Business Plan | | (23,412.1) | (60,407.4) | (48,762.9) | (34,107.4) | (16,171.7) | (5,557.4) |
|     Adjustment for Specific Investment | | (176.2) | (424.9) | (438.2) | (436.3) | (257.0) | (88.2) |
|     Adjustment for Startup & Preproduction | | 304.5 | 494.5 | 39.8 | (168.3) | (9.4) | (14.0) |
|     Total Fixed to Customer | | (23,283.8) | (60,337.8) | (49,161.3) | (34,712.0) | (16,438.1) | (5,659.6) |
| 3) Cost of Capital Employed for Customer | | (3,446.9) | (6,051.2) | (6,255.7) | (6,628.9) | (3,727.0) | (1,225.9) |
| 4) Non-Utilization Fee:  If a customer's Volume goes below 50% of the demand volumes committed to above, the customer will pay the -40% to -50% price and will quarterly pay an amount to cover its specific investment depreciation and specific startup & preproduction and at least 75% of the other fixed costs and cost of capital not paid for in the price. | | | | | | | |

## Schedule 3.4 Band Pricing Summary of All Cross Supply Product Families

### JTD 16 Valve Engine - Pratola Serra, Italy

**Band Pricing Summary**

| Euros | | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| **Volumes** | | | | | | | |
| GM Volume Commitment | | 16,293 | 0 | 0 | 1,304 | 55,397 | 102,902 |
| Total Volume Commitment-GM/FIAT/Existing Third Party | | 68,152 | 125,989 | 148,565 | 177,975 | 234,585 | 259,924 |
| **Material Cost per Unit--Representative Model[1]** | | (1,851) | 0 | 0 | (1,743) | (1,708) | (1,674) |
| M741 ASTRA 16V BA | | | | | | | |
| **Variable Mfg. Cost per Unit** | | (119) | 0 | 0 | (124) | (120) | (117) |
| | | | | | | | |
| **Fixed Cost Per Unit: (2)** | | | | | | | |
| +20% to +30% Volume vs. Commitment | 1.25 | (277) | 0 | 0 | (351) | (295) | (318) |
| +10% to +20% Volume vs. Commitment | 1.15 | (301) | 0 | 0 | (381) | (321) | (346) |
| +10% to -10% Volume vs. Commitment | 1.00 | (346) | 0 | 0 | (439) | (369) | (397) |
| -10% to -20% Volume vs. Commitment | 0.85 | (407) | 0 | 0 | (516) | (434) | (468) |
| -20% to -30% Volume vs. Commitment | 0.75 | (461) | 0 | 0 | (585) | (492) | (530) |
| -30% to -40% Volume vs. Commitment | 0.65 | (532) | 0 | 0 | (675) | (567) | (611) |
| -40% to -50% Volume vs. Commitment | 0.55 | (628) | 0 | 0 | (797) | (671) | (723) |
| 0% to -50% Volume vs. Commitment | | SEE "NON-UTILIZATION FEE" NOTE BELOW (4) | | | | | |
| **Total Cost per Unit:** | | | | | | | |
| +20% to +30% Volume vs. Commitment | | (2,247) | 0 | 0 | (2,218) | (2,123) | (2,109) |
| +10% to +20% Volume vs. Commitment | | (2,271) | 0 | 0 | (2,248) | (2,149) | (2,137) |
| +10% to -10% Volume vs. Commitment | | (2,316) | 0 | 0 | (2,306) | (2,197) | (2,188) |
| -10% to -20% Volume vs. Commitment | | (2,377) | 0 | 0 | (2,383) | (2,262) | (2,259) |
| -20% to -30% Volume vs. Commitment | | (2,431) | 0 | 0 | (2,452) | (2,320) | (2,321) |
| -30% to -40% Volume vs. Commitment | | (2,502) | 0 | 0 | (2,542) | (2,395) | (2,402) |
| -40% to -50% Volume vs. Commitment | | (2,598) | 0 | 0 | (2,664) | (2,499) | (2,514) |
| 0% to -50% Volume vs. Commitment | | SEE "NON-UTILIZATION FEE" NOTE BELOW (4) | | | | | |
| **Cost of Capital per Unit (3)** | | | | | | | |
| +20% to +30% Volume vs. Commitment | 1.25 | (35) | 0 | 0 | (44) | (56) | (58) |
| +10% to +20% Volume vs. Commitment | 1.15 | (36) | 0 | 0 | (46) | (60) | (63) |
| +10% to -10% Volume vs. Commitment | 1.00 | (44) | 0 | 0 | (55) | (70) | (73) |
| -10% to -20% Volume vs. Commitment | 0.85 | (52) | 0 | 0 | (64) | (82) | (86) |
| -20% to -30% Volume vs. Commitment | 0.75 | (59) | 0 | 0 | (73) | (93) | (97) |
| -30% to -40% Volume vs. Commitment | 0.65 | (68) | 0 | 0 | (84) | (107) | (112) |
| -40% to -50% Volume vs. Commitment | 0.55 | (80) | 0 | 0 | (99) | (126) | (132) |
| 0% to -50% Volume vs. Commitment | | SEE "NON-UTILIZATION FEE" NOTE BELOW (4) | | | | | |
| **Selling Price** | | | | | | | |
| +20% to +30% Volume vs. Commitment | | 2,282 | 0 | 0 | 2,262 | 2,179 | 2,167 |
| +10% to +20% Volume vs. Commitment | | 2,309 | 0 | 0 | 2,296 | 2,209 | 2,200 |
| +10% to -10% Volume vs. Commitment | | 2,360 | 0 | 0 | 2,361 | 2,267 | 2,261 |
| -10% to -20% Volume vs. Commitment | | 2,429 | 0 | 0 | 2,447 | 2,344 | 2,345 |
| -20% to -30% Volume vs. Commitment | | 2,490 | 0 | 0 | 2,525 | 2,413 | 2,418 |
| -30% to -40% Volume vs. Commitment | | 2,570 | 0 | 0 | 2,626 | 2,502 | 2,514 |
| -40% to -50% Volume vs. Commitment | | 2,678 | 0 | 0 | 2,763 | 2,625 | 2,646 |
| 0% to -50% Volume vs. Commitment | | SEE "NON-UTILIZATION FEE" NOTE BELOW (4) | | | | | |
| **Volume Ranges:** | | | | | | | |
| +20% to +30% Volume vs. Commitment | From | 19,553 | 0 | 0 | 1,566 | 66,477 | 123,483 |
| | To | 21,181 | 0 | 0 | 1,695 | 72,016 | 133,773 |
| +10% to +20% Volume vs. Commitment | From | 17,923 | 0 | 0 | 1,435 | 60,938 | 113,193 |
| | To | 19,552 | 0 | 0 | 1,565 | 66,476 | 123,482 |
| +10% to -10% Volume vs. Commitment | From | 14,664 | 0 | 0 | 1,174 | 49,857 | 92,612 |
| | To | 17,922 | 0 | 0 | 1,434 | 60,937 | 113,192 |
| -10% to -20% Volume vs. Commitment | From | 13,034 | 0 | 0 | 1,043 | 44,318 | 82,322 |
| | To | 14,663 | 0 | 0 | 1,173 | 49,856 | 92,611 |
| -20% to -30% Volume vs. Commitment | From | 11,405 | 0 | 0 | 913 | 38,778 | 72,031 |
| | To | 13,033 | 0 | 0 | 1,042 | 44,317 | 82,321 |
| -30% to -40% Volume vs. Commitment | From | 9,776 | 0 | 0 | 782 | 33,238 | 61,741 |
| | To | 11,404 | 0 | 0 | 912 | 38,777 | 72,030 |
| -40% to -50% Volume vs. Commitment | From | 8,146 | 0 | 0 | 652 | 27,698 | 51,451 |
| | To | 9,775 | 0 | 0 | 781 | 33,237 | 61,740 |
| 0% to -50% Volume vs. Commitment | From | 0 | 0 | 0 | 0 | 0 | 0 |
| | To | 8,145 | 0 | 0 | 651 | 27,697 | 51,450 |

| 1) The Material & Freight is for one sample/representative model.  For each part number, the specific bill of material will be used. | | | | | | | |
|---|---|---|---|---|---|---|---|
| 2) Fixed Costs Allocated to Customer From Business Plan | | (5,614.4) | 0.0 | 0.0 | (451.5) | (20,061.2) | (40,392.5) |
| Adjustment for Specific Investment | | (47.2) | 0.0 | 0.0 | (7.9) | (294.9) | (393.7) |
| Adjustment for Startup & Preproduction | | 30.1 | 0.0 | 0.0 | (112.5) | (73.1) | (114.5) |
| Total Fixed to Customer | | (5,631.5) | 0.0 | 0.0 | (571.9) | (20,429.2) | (40,900.7) |
| 3) Cost of Capital Employed for Customer | | (721.2) | 0.0 | 0.0 | (71.3) | (3,852.5) | (7,498.7) |
| 4) Non-Utilization Fee:  If a customer's Volume goes below 50% of the demand volumes committed to above, the customer | | | | | | | |
| will pay the -40% to -50% price and will quarterly pay an amount to cover its specific investment depreciation and | | | | | | | |
| specific startup & preproduction and at least 75% of the other fixed costs and cost of capital not paid for in the price. | | | | | | | |

7

## Schedule 3.4 Band Pricing Summary of All Cross Supply Product Families

### JTD Kit Sold to Germany - Pratola Serra, Italy

**Band Pricing Summary**

Euros

| | | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| **Volumes** | | | | | | | |
| GM Volume Commitment | | 67,960 | 135,544 | 131,557 | 0 | 0 | 0 |
| Total Volume Commitment–GM/FIAT/Existing Third Party | | 67,960 | 135,544 | 131,557 | - | - | - |
| Material Cost per Unit–Representative Model(1) | | (191) | (191) | (191) | 0 | 0 | 0 |
| Variable Mfg. Cost per Unit | | (51) | (45) | (44) | 0 | 0 | 0 |
| **Fixed Cost Per Unit: (2)** | | | | | | | |
| +20% to +30% Volume vs. Commitment | 1.25 | (74) | (58) | (58) | 0 | 0 | 0 |
| +10% to +20% Volume vs. Commitment | 1.15 | (80) | (63) | (63) | 0 | 0 | 0 |
| +10% to -10% Volume vs. Commitment | 1.00 | (92) | (73) | (72) | 0 | 0 | 0 |
| -10% to -20% Volume vs. Commitment | 0.85 | (108) | (85) | (85) | 0 | 0 | 0 |
| -20% to -30% Volume vs. Commitment | 0.75 | (123) | (97) | (96) | 0 | 0 | 0 |
| -30% to -40% Volume vs. Commitment | 0.65 | (142) | (112) | (111) | 0 | 0 | 0 |
| -40% to -50% Volume vs. Commitment | 0.55 | (167) | (132) | (131) | 0 | 0 | 0 |
| 0% to -50% Volume vs. Commitment | | SEE "NON-UTILIZATION FEE" NOTE BELOW (4) | | | | | |
| **Total Cost per Unit:** | | | | | | | |
| +20% to +30% Volume vs. Commitment | | (316) | (294) | (293) | 0 | 0 | 0 |
| +10% to +20% Volume vs. Commitment | | (322) | (299) | (298) | 0 | 0 | 0 |
| +10% to -10% Volume vs. Commitment | | (334) | (309) | (307) | 0 | 0 | 0 |
| -10% to -20% Volume vs. Commitment | | (350) | (321) | (320) | 0 | 0 | 0 |
| -20% to -30% Volume vs. Commitment | | (365) | (333) | (331) | 0 | 0 | 0 |
| -30% to -40% Volume vs. Commitment | | (384) | (348) | (346) | 0 | 0 | 0 |
| -40% to -50% Volume vs. Commitment | | (409) | (368) | (366) | 0 | 0 | 0 |
| 0% to -50% Volume vs. Commitment | | SEE "NON-UTILIZATION FEE" NOTE BELOW (4) | | | | | |
| **Cost of Capital per Unit (3)** | | | | | | | |
| +20% to +30% Volume vs. Commitment | 1.25 | (9) | (3) | (2) | 0 | 0 | 0 |
| +10% to +20% Volume vs. Commitment | 1.15 | (10) | (4) | (2) | 0 | 0 | 0 |
| +10% to -10% Volume vs. Commitment | 1.00 | (11) | (4) | (3) | 0 | 0 | 0 |
| -10% to -20% Volume vs. Commitment | 0.85 | (13) | (5) | (3) | 0 | 0 | 0 |
| -20% to -30% Volume vs. Commitment | 0.75 | (15) | (6) | (4) | 0 | 0 | 0 |
| -30% to -40% Volume vs. Commitment | 0.65 | (17) | (7) | (4) | 0 | 0 | 0 |
| -40% to -50% Volume vs. Commitment | 0.55 | (21) | (8) | (5) | 0 | 0 | 0 |
| 0% to -50% Volume vs. Commitment | | SEE "NON-UTILIZATION FEE" NOTE BELOW (4) | | | | | |
| **Selling Price** | | | | | | | |
| +20% to +30% Volume vs. Commitment | | 325 | 297 | 295 | 0 | 0 | 0 |
| +10% to +20% Volume vs. Commitment | | 332 | 303 | 300 | 0 | 0 | 0 |
| +10% to -10% Volume vs. Commitment | | 345 | 313 | 310 | 0 | 0 | 0 |
| -10% to -20% Volume vs. Commitment | | 363 | 326 | 323 | 0 | 0 | 0 |
| -20% to -30% Volume vs. Commitment | | 380 | 339 | 335 | 0 | 0 | 0 |
| -30% to -40% Volume vs. Commitment | | 401 | 355 | 350 | 0 | 0 | 0 |
| -40% to -50% Volume vs. Commitment | | 430 | 376 | 371 | 0 | 0 | 0 |
| 0% to -50% Volume vs. Commitment | | SEE "NON-UTILIZATION FEE" NOTE BELOW (4) | | | | | |
| **Volume Ranges:** | | | | | | | |
| +20% to +30% Volume vs. Commitment | From | 81,553 | 162,654 | 157,869 | 0 | 0 | 0 |
| | To | 88,348 | 176,207 | 171,024 | 0 | 0 | 0 |
| +10% to +20% Volume vs. Commitment | From | 74,757 | 149,099 | 144,714 | 0 | 0 | 0 |
| | To | 81,552 | 162,653 | 157,868 | 0 | 0 | 0 |
| +10% to -10% Volume vs. Commitment | From | 61,184 | 121,990 | 118,401 | 0 | 0 | 0 |
| | To | 74,756 | 149,098 | 144,713 | 0 | 0 | 0 |
| -10% to -20% Volume vs. Commitment | From | 54,368 | 108,435 | 105,246 | 0 | 0 | 0 |
| | To | 61,163 | 121,989 | 118,400 | 0 | 0 | 0 |
| -20% to -30% Volume vs. Commitment | From | 47,572 | 94,881 | 92,090 | 0 | 0 | 0 |
| | To | 54,367 | 108,434 | 105,245 | 0 | 0 | 0 |
| -30% to -40% Volume vs. Commitment | From | 40,776 | 81,326 | 78,934 | 0 | 0 | 0 |
| | To | 47,571 | 94,880 | 92,089 | 0 | 0 | 0 |
| -40% to -50% Volume vs. Commitment | From | 33,980 | 67,772 | 65,778 | 0 | 0 | 0 |
| | To | 40,775 | 81,325 | 78,933 | 0 | 0 | 0 |
| 0% to -50% Volume vs. Commitment | From | 0 | 0 | 0 | 0 | 0 | 0 |
| | To | 33,979 | 67,771 | 65,777 | 0 | 0 | 0 |

| | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|
| 1) The Material & Freight is for one sample/representative model. For each part number, the specific bill of material will be used. | | | | | | |
| 2) Fixed Costs Allocated to Customer From Business Plan | (6,260.5) | (9,845.4) | (9,499.5) | 0.0 | 0.0 | 0.0 |
| Adjustment for Specific Investment | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Adjustment for Startup & Preproduction | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Total Fixed to Customer | (6,260.5) | (9,845.4) | (9,499.5) | 0.0 | 0.0 | 0.0 |
| 3) Cost of Capital Employed for Customer | (768.0) | (585.0) | (361.0) | 0.0 | 0.0 | 0.0 |
| 4) Non-Utilization Fee: If a customer's Volume goes below 50% of the demand volumes committed to above, the customer will pay the -40% to -50% price and will quarterly pay an amount to cover its specific investment depreciation and specific startup & preproduction and at least 75% of the other fixed costs and cost of capital not paid for in the price. | | | | | | |

8

## Schedule 3.5

## Volumes used for Price calculation

**BP05-3 - Fiat Auto Engine Volume**

| BP05-3 | | | | | | |
| FIAT | Volume Demand | | | | | |
| Engine Family | Jul05-Dec05 | CY06 | CY07 | CY08 | CY09 | CY10 |
| --- | --- | --- | --- | --- | --- | --- |
| FAM 1 | 3,293 | 23,507 | 52,701 | 73,543 | 79,916 | 93,072 |
| L850/L850T | 10,193 | 34,846 | 33,408 | 46,468 | 52,192 | 43,468 |
| Total | 13,486 | 58,353 | 86,109 | 120,011 | 132,108 | 136,540 |

**BP05-3 - GME Engine Volume**

| BP 05-3 | | | | | | |
| GME | Volume Demand | | | | | |
| Engine Family | Jul05-Dec05 | CY06 | CY07 | CY08 | CY09 | CY10 |
| --- | --- | --- | --- | --- | --- | --- |
| Fam B/C DS P&A from FMA | 350 | 770 | 770 | 770 | 770 | 770 |
| Fam B/C DS from FMA - 2V | 93,816 | 208,826 | 184,453 | 107,183 | 40,393 | 5,929 |
| Fam B/C DS from FMA - 4V | 0 | 0 | 6,733 | 14,600 | 67,828 | 113,025 |
| Fam B/C DS from K/L - 4V | 67,960 | 135,544 | 131,557 | 133,646 | 150,000 | 150,000 |
| Total | 162,126 | 345,140 | 323,513 | 258,198 | 258,991 | 269,725 |

**BP05-3 - Fiat Auto Transmission Volume**

| BP05-3 | | | | | | |
| FIAT | Volume Demand | | | | | |
| Transmission Family | Jul05-Dec05 | CY06 | CY07 | CY08 | CY09 | CY10 |
| --- | --- | --- | --- | --- | --- | --- |
| M20-32 | 64,312 | 193,139 | 179,686 | 245,494 | 303,195 | 405,458 |
| F17 | 208 | 11,216 | 8,586 | 7,590 | 7,150 | 6,727 |
| F40 | 9,034 | 34,248 | 36,680 | 56,041 | 50,157 | 46,290 |
| Total | 73,554 | 238,603 | 224,951 | 309,125 | 360,502 | 458,475 |

**BP05-3 - OSS Volumes**

| BP05-3 | | | | | | |
| OSS | Volume Demand | | | | | |
| Family | Jul05-Dec05 | CY06 | CY07 | CY08 | CY09 | CY10 |
| --- | --- | --- | --- | --- | --- | --- |
| Engine FAM B/C DS - 2V | 550 | 16,200 | 16,200 | 16,200 | 16,000 | 16,000 |
| Engine FAM B/C DS - 4V | 110 | 550 | 600 | 700 | 0 | 0 |
| Engine FAM 1 | 3,000 | 7,800 | 8,400 | 0 | 0 | 0 |
| Transmission F17 | 12,340 | 20,000 | 20,000 | 0 | 0 | 0 |
| Total | 18,000 | 44,550 | 45,200 | 16,900 | 16,000 | 16,000 |

## COMPONENTS FLOW

| BP05-3 | Volume Demand | | | | | |
| FAM B-C COMPONENTS | Jul05-Dec05 | CY06 | CY07 | CY08 | CY09 | CY10 |
| --- | --- | --- | --- | --- | --- | --- |
| Cylinder Block from KL to FMA | 20,000 | 0 | 0 | 0 | 0 | 0 |

| BP 05-3 | Volume Demand | | | | | |
| FAM B-C COMPONENTS | Jul05-Dec05 | CY06 | CY07 | CY08 | CY09 | CY10 |
| --- | --- | --- | --- | --- | --- | --- |
| Upper Cylinder Head and Cylinder Head from FMA to KL | 67,960 | 135,544 | 131,557 | 0 | 0 | 0 |

| BP05-3 | Volume Demand | | | | | |
| M40 CV COMPONENTS | Jul05-Dec05 | CY06 | CY07 | CY08 | CY09 | CY10 |
| --- | --- | --- | --- | --- | --- | --- |
| Blank* gears for M40 from RUESSELSHEIM to TERMOLI | 0 | 45,000 | 83,419 | 81,080 | 81,239 | 79,921 |

*Blank* gears for M40 Transmission:
3rd Wheel Gear Driving
5th Wheel Gear Driving
4th&6th Wheel Gear Driving
Reverse Wheel Gear Driving
3rd Wheel Gear Driven
4th Wheel Gear Driven
2nd Wheel Gear Driven
5th Wheel Gear Driven
6th Wheel Gear Driven

## Schedule 3.6 Non Utilization Fee Example
## Based on M20/32 Transmission for 2006

| | At 100% Committed Volume | At 55% Volume Price | At 40% Volume | At 30% Volume | At 25% Volume | At 10% Volume | At 0 Volume |
|---|---|---|---|---|---|---|---|
| Volume | 193,139 | 106,226 | 77,256 | 57,942 | 48,285 | 19,314 | 0 |
| Fixed Cost Exc. Specifics | (23,198) | (23,198) | (23,198) | (23,198) | (23,198) | (23,198) | (23,198) |
| Total Cost of Capital | (8,813) | (8,813) | (8,813) | (8,813) | (8,813) | (8,813) | (8,813) |
| Total | (32,011) | (32,011) | (32,011) | (32,011) | (32,011) | (32,011) | (32,011) |
| Per Unit in Price | (166) | (302) | (302) | (302) | (302) | (302) | (302) |
| Amount in Price | (32,011) | (32,080) | (23,331) | (17,498) | (14,582) | (5,833) | 0 |
| Non-Utilization Fee | 0 | 0 | (677) | (6,510) | (9,426) | (18,176) | (24,008) |
| Total | (32,011) | (32,080) | (24,008) | (24,008) | (24,008) | (24,009) | (24,008) |
| Percent of Total | 100% | 100% | 75% | 75% | 75% | 75% | 75% |
| Specific Fixed Costs | (7,366) | (7,366) | (7,366) | (7,366) | (7,366) | (7,366) | (7,366) |
| Total Fixed +WACC | (39,377) | (39,446) | (31,374) | (31,374) | (31,374) | (31,375) | (31,374) |
| Total Paid | (39,377) | (39,446) | (31,374) | (31,374) | (31,374) | (31,375) | (31,374) |
| Percent of Total | 100% | 100% | 80% | 80% | 80% | 80% | 80% |

## Schedule 3.7 - Supplier Cancellation - Specific Variants Causing Cancellation

### Sourcing Volumes for Supplier XYZ

|  | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | Total | % |
|---|---|---|---|---|---|---|---|---|
| GM Engine | 20 | 30 | 30 | 30 | 30 | 30 | 170 | 25% |
| Fiat Engine | 25 | 75 | 100 | 100 | 100 | 100 | 500 | 75% |
| Total | 45 | 105 | 130 | 130 | 130 | 130 | 670 |  |

### Actual Volumes

|  | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | Total | % |
|---|---|---|---|---|---|---|---|---|
| GM Engine | 15 | 15 | 10 | 10 | - | - | 50 | 15% |
| Fiat Engine | 25 | 50 | 50 | 50 | 50 | 50 | 275 | 85% |
| Total | 40 | 65 | 60 | 60 | 50 | 50 | 325 |  |

### Variance

|  | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | Total | % |
|---|---|---|---|---|---|---|---|---|
| GM Engine | ( 5 ) | ( 15 ) | ( 20 ) | ( 20 ) | ( 30 ) | ( 30 ) | ( 120 ) | 35% |
| Fiat Engine | - | ( 25 ) | ( 50 ) | ( 50 ) | ( 50 ) | ( 50 ) | ( 225 ) | 65% |
| Total | ( 5 ) | ( 40 ) | ( 70 ) | ( 70 ) | ( 80 ) | ( 80 ) | ( 345 ) |  |

**Supplier Cancellation/Volume Cost =**    10.0  M Euro

| | | | |
|---|---|---|---|
| **GM Allcoation** | 35% | 3.5 | M Euro |
| **Fiat Allocation** | 65% | 6.5 | M Euro |

# Fiat Auto

Fiat Auto S.p.A. a socio unico
BUSINESS DEVELOPMENT
Corso G. Agnelli , 200 - 10135 Torino
Tel.: (+ 39)  011 00 31111
Capitale Sociale deliberato Euro 2.500.000.000
Capitale Sociale sottoscritto e versato Euro 645.031.979
R.I. - Ufficio di Torino n. 07973780013 - REA Torino 934697
Comm. Estero - Posiz. TO 084920
Cod.Fiscale/P.IVA 07973780013
Direzione e coordinamento ex art. 2497 c.c.: Fiat S.p.A

Turin, December 22, 2006

**General Motors Corp.**
Renaissance Centre
Jefferson Street
Detroit, MICHIGAN
48265-3000
Attention: General Counsel

Dear Sirs,

<u>Subject: European Powertrain Cross Supply Agreement ("**ECSA**") dated as of May
13, 2005 by and among Fiat S.p.A., Fiat Auto Holding B.V., Fiat Auto S.p.A.
and General Motors Corp and subsequent amendments thereto.</u>

this letter is sent on behalf of all the Fiat Customers (term which, as any other
capitalized terms used in this letter, has, unless otherwise specified,  the meaning
ascribed thereto in the ECSA).

Reference is made to Section 14.2 of the ECSA and the provisions contained
therein.

This letter is the written notice required for the Fiat Customers to discontinue
purchasing the Cross Supply Products as far as the product family Fam.1 is
concerned ("**Discontinued Products**").
Only for ease of reference, the Discontinued Products are represented - as of today -
by the part number lists attached hereto.

In compliance with the present notice, no Discontinued Products will be purchased
by the Fiat Customers after December 31, 2007 with the exception of those of such
Discontinued Products which have been scheduled by the concerned Fiat Customer
for delivery on or before such a date and for which the relevant GM Supplier is
unable to timely perform actual delivery.

Any other terms and conditions of the ECSA as well as the supply of any Cross
Supply Products other  than the Discontinued Products do remain in full force and
effect.

Sincerely Yours,

**Fiat Auto S.p.A.**

Encl.: a.a.

## SALES TO FIAT - CY 2006

| Product Family | Description | | Part number |
|---|---|---|---|
| FAM 1 | Fam. I 1.6 GIII 4V PDA I/CE E4 105 hp | STILO | 55560310 |
| | Fam. I 1.6 GIII 4V PDA I/CE E4 105 hp | STILO | 55557871 |
| | Fam. I 1.6 GIII 4V PDA I/CE E4 105 hp | STILO | 55559152 |
| | Fam. I 1.6 GIII 4V PDA I/CE E4 105 hp | STILO | 55560309 |
| 2006new | Fam. I 1.8 GIII 4V MPI I/CE E4 140 hp | CROMA | 55354936 |
| | Fam. I 1.8 GIII 4V MPI I/CE E4 140 hp | 939 ALFA | 55354935 |

Confidential
Execution Copy

# AGREEMENT TO LIQUIDATE JOINT VENTURES
## AND
## TERMINATE MASTER AGREEMENT

This Agreement is made and entered into as of the 13th day of February, 2005 (**"Effective Date"**), by and among Fiat S.p.A., a corporation organized under the laws of the Republic of Italy (**"Fiat"**); Fiat Auto Holdings B.V., a corporation organized under the laws of the Netherlands (**"FAH"**); Fiat Auto S.p.A., a corporation organized under the laws of the Republic of Italy (**"Fiat Auto"**) and General Motors Corporation, a Delaware corporation (**"GM"**).

## RECITALS

**WHEREAS**, Fiat and GM are Parties to the Master Agreement;

**WHEREAS**, pursuant to the Master Agreement, Fiat and GM, directly or through their Subsidiaries, entered into a series of separate cooperative agreements which combined various aspects of their operations in Europe and South America and created the Powertrain JV, the Purchasing JV and the Brazil JV;

**WHEREAS**, in connection with the establishment of the Joint Ventures, GM and Fiat, directly or through their respective Subsidiaries, entered into Project Agreements;

**WHEREAS**, pursuant to Section 8.03 of the Master Agreement, GM and Fiat agreed that Fiat would have an option, exercisable on the terms and in the manner set forth in the Master Agreement, to sell FAH's auto business to General Motors at a future date (the **"Put Option"**);

**WHEREAS**, disagreements have arisen between Fiat and GM which include, but are not limited to, disagreements as to whether or not Fiat has breached obligations under the Master Agreement and thereby forfeited its legal right to exercise the Put Option;

**WHEREAS**, the Parties wish to settle and resolve their disagreements; and

**WHEREAS**, Fiat and GM have agreed to terminate and liquidate the Joint Ventures and to terminate the Master Agreement on the terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the foregoing and the mutual covenants and agreements herein contained, and intending to be legally bound hereby, Fiat, FAH, Fiat Auto and GM hereby each agree, on its own behalf and on behalf of its Subsidiaries and Affiliates, as follows:

**1.    Definitions; Interpretation.**

1.1    Definitions. As used in this Agreement, capitalized terms shall have the meanings given in Schedule 1.0

Confidential
Execution Copy

1.2    <u>Interpretation and Rules of Construction</u>. In this Agreement, except to the extent the context otherwise requires:

(a) when a reference is made to a Section or a Schedule, such reference is to a Section of or a Schedule to this Agreement, unless otherwise indicated;

(b) the headings for this Agreement are for reference purposes only and do not affect in any way the meaning or interpretation of this Agreement;

(c) whenever the words "include", "includes" or "including" are used in this Agreement, they are deemed to be followed by the words "without limitation";

(d) the words "hereof", "herein" and "hereunder", and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to a specific provision of this Agreement;

(e) the defined terms used in this Agreement are applicable to the singular as well as the plural form of such terms;

(f) any Law referred to herein or in any attachment or instrument referred to herein shall mean such Law or statute as from time to time amended, modified or supplemented, including by succession of comparable successor laws;

(g) references to a Person are also to its permitted successors and assigns;

(h) the use of the term "or" is not intended to be exclusive, unless expressly stated otherwise.

**2.    GM Payment Obligations.** In settlement of the disagreements referenced in the Recitals hereto and in recognition of the benefits GM is receiving pursuant to this Agreement, GM (directly or through one or more Subsidiaries) shall pay to Fiat for its own account and the account of certain of its Affiliates in cash a total amount of One Billion Five Hundred Fifty Million Euros (€1.550 billion), which amount shall be payable in two installments, as follows:

2.1    <u>Initial Payment</u>. On the first business day following the Effective Date of this Agreement (the "Initial Payment Date"), GM shall pay (or cause one or more of its Subsidiaries to pay) to Fiat or a designated Fiat Affiliate (as mutually agreed by the Parties) for its own account and the account of its Affiliates an amount in cash in the sum of One Billion Euros (€1.0 billion), which payment shall be made by wire transfer.

2.2    <u>Second Payment</u>. On the Liquidation Date, GM shall pay (or cause one or more of its Subsidiaries to pay) to Fiat or a designated Fiat Affiliate (as mutually agreed by the Parties) for its own account and the account of certain of its Affiliates an amount in cash in the sum of Five Hundred Fifty Million Euros (€550 million) (the **"Second Payment"**), which Second Payment shall be made by wire transfer.

Confidential
Execution Copy

## 3.    Termination of Master Agreement

3.1    . Surrender of GM's FAH Shares. GM shall cause the appropriate GM
Subsidiary(ies) to transfer GM's FAH Shares to Fiat or to a Subsidiary designated by Fiat or
alternatively, at Fiat's option, cause such Subsidiary(ies) to surrender GM's FAH Shares to FAH
for cancellation. Such transfer or surrender shall be completed as soon as reasonably practicable
following the Effective Date and shall be documented in accordance with the requirements of
applicable Dutch Law which, if handled as a transfer, shall be accomplished with a Deed of
Transfer covering all of GM's FAH Shares which Deed of Transfer is to be executed by FAH,
the transferor(s) and the transferee and, if handled as a surrender, shall be done in accordance
with applicable Dutch Law.

3.2    Termination of Master Agreement. Effective on the Initial Payment Date, GM
and Fiat hereby irrevocably agree that the Master Agreement shall terminate in its entirety.
Upon such termination, neither GM nor Fiat, nor any of their respective Subsidiaries or
Affiliates, shall have any remaining rights or obligations under the Master Agreement (including
the Put Option set forth in Section 8.03 of the Master Agreement). Notwithstanding the
provisions of Section 9.02 of the Master Agreement, Section 6.09 of the Master Agreement shall
not survive termination of the Master Agreement, and hereafter the confidentiality obligations of
the Parties to this Agreement shall be governed by Section 19 of this Agreement.

## 4.    Other Arrangements Effective on Initial Payment Date.

4.1    Termination of Exclusivity and Noncompetition Obligations. Effective on the
Initial Payment Date, all members of the Fiat Auto Group and all members of the GM Group are
relieved from all restrictions imposed under Section 8 of the Powertrain JV Agreement, Section
8 of the Brazil JV Agreement, Section 3.2 of the Purchasing JV Agreement and any provisions in
the Project Agreements that implement the restrictions included in the referenced sections of the
Joint Venture Agreements.

4.2    Release of Claims. Effective on the Initial Payment Date, GM and Fiat, FAH and
Fiat Auto shall each execute and deliver to the other a Release of Claims in the form attached as
Schedule 4.2.

## 5.    Liquidation Of Joint Ventures

5.1    Agreement to Liquidate Joint Ventures. The Parties agree that all of the Joint
Ventures shall be terminated and liquidated as soon as reasonably practicable. Promptly
following the execution of this Agreement, the Parties shall establish a Liquidation Committee as
described in Section 14.1 of the Powertrain Joint Venture Agreement to prepare a definitive
written Liquidation Plan for the Joint Ventures consistent with the terms of this Agreement and
the relevant terms of the Joint Venture Agreements. To the extent the terms of this Agreement
conflict with any such terms of the Joint Venture Agreements, the terms of this Agreement shall
control. A single Liquidation Committee shall function as the Liquidation Committee for the
Powertrain JV, the Purchasing JV and the Brazil JV. There shall be six members on the
Liquidation Committee. The initial members of the Liquidation Committee are as follows:

- 3 -

Confidential
Execution Copy

Fiat appointments:

Alfredo Altavilla
Giorgio Fossati
Paolo Arpellino

GM appointments:

Frederick A. Henderson
Luca Maestri
Teresa Holderer

The Parties shall direct their representatives on the Liquidation Committee to prepare the Liquidation Plan as soon as reasonably practicable, in order to complete the Liquidation Plan within ninety (90) days following the Effective Date of this Agreement. All Liquidation Committee actions will be made in writing. If Disputes arise among the members of the Liquidation Committee while the Liquidation Plan is being prepared or implemented, any member of the Liquidation Committee may request that the Dispute be addressed and resolved in accordance with the Dispute Resolution Procedures set forth in Section 16 of this Agreement. The Dispute Resolution Procedures in this Agreement supersede and replace the procedures contemplated in the Joint Venture Agreements for resolution of disputes relating to the Liquidation Committee, including (without limitation) the mediation and Expert Determination process described in the Joint Venture Agreements. When the Liquidation Committee has completed the preparation of a Liquidation Plan implementing the provisions of this Agreement, each Party shall also ensure that each of its Subsidiaries who are shareholders in any of the Joint Ventures (**"JV Shareholders"**) will promptly provide any written approvals of such JV Shareholders to the Liquidation Plan as may reasonably be required to allow the Liquidation Plan to be implemented.

       5.1.1  <u>Committee's Role; Liquidation Principles</u>. Except as otherwise expressly set forth in this Agreement, as hereafter agreed in writing by the Parties or as hereafter approved by the Liquidation Committee, the Parties agree that (i) in applying the Liquidation Principles noted in clause (iii) below, the liquidations will be deemed to be occurring within five years of Completion (as defined in the Joint Venture Agreements), (ii) the Liquidation Committee shall function in the manner and have the responsibilities and authority as set forth for a Liquidation Committee in the Joint Venture Agreements and (iii) the Liquidation Plan for the Powertrain Joint Ventures shall be based on the Liquidation Principles set out in Schedule 14.1 of the Powertrain JV Agreement, the Liquidation Plan for the Purchasing Joint Venture shall be based on the Liquidation Principles set out in Schedule 12.1 of the Purchasing JV, and the Liquidation Plan for the Brazil JV shall be based on the Liquidation Principles set out in Schedule 14.1 of the Brazil JV Agreement. The Liquidation Committee will endeavor to effect the liquidation of the Joint Ventures in a tax effective manner for the Parties. Subject to the goal of achieving tax efficiencies and except as otherwise provided herein to the contrary, the Liquidation Committee will effect the liquidation of the Powertrain JV in part through the distribution from the Powertrain JV (a) to the Fiat Group of shares in the entities holding production facilities

- 4 -

Confidential
Execution Copy

formerly owned by the Fiat Group and (b) to the GM Group of shares in the entities holding production facilities formerly owned by the GM Group.

    5.1.2   Project Agreements. Except as otherwise expressly set forth in this Agreement, as hereafter agreed in writing by the Parties, or as hereafter approved by the Liquidation Committee, the Parties agree that following the termination of the Joint Ventures, the Parties to the Project Agreements shall have all rights and obligations as set forth in each of the Project Agreements as becoming applicable on or following the termination of the Joint Venture(s) to which each Project Agreement relates.

    5.1.3   Joint Venture Liabilities.

      (a)   Powertrain Syndicated Credit Facility. The Liquidation Plan for the Powertrain JV shall make provision for the payment in full of the Powertrain Syndicated Credit Facility immediately prior to the liquidation of the Powertrain JV. To the extent that the Powertrain JV does not have sufficient cash to pay the Powertrain Syndicated Credit Facility, GM and Fiat (directly or through their respective Subsidiaries) shall each contribute one-half of the funds necessary to allow the Powertrain JV to pay the Powertrain Syndicated Credit Facility in full.

      (b)   Liabilities Associated with Distributed Assets. The Liquidation Plan shall provide that if assets of the Joint Venture are encumbered by liabilities (for example, credit lines of a legal entity owned by the Powertrain JV or debt secured by specific assets), the assets are to be distributed subject to the associated liabilities. If a Joint Venture has guaranteed such a liability or otherwise is legally responsible for the payment of such a liability, the Party to whom the assets are to be distributed under the Liquidation Plan shall (i) use commercially reasonable efforts to have the creditor release the Joint Venture from such obligation and (ii) indemnify, defend and hold harmless the Joint Venture and all members of the other Party's Group from any claims that the indemnitees are obligated to satisfy the liability. The parties acknowledge and agree that if as of the Effective Date there are unknown or contingent liabilities associated with assets, the assets are nonetheless to be distributed subject to the associated unknown or contingent liabilities and there shall be no adjustments to the Balancing Payment under Section 5.3 as a result of the existence of such unknown or contingent liabilities.

      (c)   Reimbursement Agreement. Effective on the Liquidation Date, unless the Liquidation Committee otherwise determines, Fiat will be relieved from its payment obligation under the Reimbursement Agreement but shall reassume the "pension" liabilities that were the basis for the Reimbursement Agreement with respect to employees that will revert to the Fiat Group.

    5.1.4   Implementation of Liquidation. Promptly following the preparation of the Liquidation Plan, the Parties shall take, and shall cause each of the Joint Ventures to take, such action as may be required by the Liquidation Plan and under applicable law to dissolve and liquidate each of the Joint Ventures as soon as reasonably practicable. After all liabilities of a Joint Venture have been discharged or otherwise addressed in accordance with the Liquidation Plan, the remaining Joint Venture assets shall be distributed to the shareholders in the Joint Venture in accordance with the Liquidation Plan.

Confidential
Execution Copy

     5.1.5   Conduct of Business Pending Liquidation. Except as otherwise expressly set forth in this Agreement, as hereafter agreed in writing by the Parties, or as hereafter approved by the Liquidation Committee, until the Liquidation Plan has been completed and the liquidation occurs, the Joint Ventures shall continue to operate their respective businesses in accordance with past practice; provided that no actions or decisions may be taken by management of a Joint Venture which is outside the ordinary course of past business practices of the Joint Venture and would be binding on either Party subsequent to the Liquidation Date or otherwise result in a material adverse effect on the operations of either Party subsequent to the Liquidation Date, except with the approval of the Liquidation Committee.

     5.2   Ownership of Bielsko-Biala Plant. Notwithstanding any contrary provisions in the Liquidation Principles for the Powertrain Joint Venture, the Parties agree that the Liquidation Plan shall provide for the following treatment of the Bielsko-Biala Plant. The Liquidation Plan shall provide that as part of the liquidation of the Powertrain JV, the legal entity (the **"BB Entity"**) holding the Bielsko-Biala Plant shall be distributed to Fiat or a Fiat Subsidiary. As promptly as reasonably practicable thereafter, a fifty percent (50%) interest in the BB Entity shall be transferred to GM (or a GM Subsidiary). The purchase price is being paid as a portion of the Second Payment, subject to adjusting payments in accordance with Section 5.3. The Liquidation Committee shall determine a tax efficient method for the distribution of the BB Entity to Fiat and GM's acquisition of its ownership interest in the BB Entity to occur and shall oversee the preparation and execution of the forms of legal documents to implement such transactions. In connection with the preparation of the Liquidation Plan, the Liquidation Committee shall also be responsible for overseeing the preparation of the forms of the organizational and governance documents for the BB Entity. Unless otherwise determined by the Liquidation Committee, the Liquidation Plan shall provide for the organizational and/or governance documents for the BB Entity to be amended as necessary to implement the following principles:

     5.2.1   The BB Entity shall be operated under the direction of a six member Board of Directors ("BB Board") comprised of three members appointed by the Fiat Auto Group and three members appointed by the GM Group. Unless otherwise determined by the Liquidation Committee, any issues on which the BB Board deadlocks shall be addressed by GM's Chief Financial Officer and the Chief Executive Officer of Fiat.

     5.2.2   Except as provided in Section 5.2.3, the Fiat Auto Group shall appoint management personnel for the Bielsko-Biala Plant.

     5.2.3   The GM Group shall be entitled to set up a project office at the Bielsko-Biala Plant, which will be staffed by GM at GM's expense. Any GM personnel staffing the project office will not be within the management structure of the Plant, but will be responsible for the affairs of GM at the Plant. Fiat agrees to reasonably cooperate with such GM personnel.

     5.2.4   The GM Group and the Fiat Group shall have identical rights of access to the Bielsko-Biala Plant and the same inspection and audit rights for the BB Entity operations and the Bielsko-Biala Plant.

Confidential
Execution Copy

5.2.5    The BB Board shall approve an annual budget and annual business plan of the BB Entity, any changes to the budget or business plans, any material capital expenditures (unless included in the approved budget), allocations of products produced by the BB Entity, any financing, funding or refinancing and refunding of the BB Entity and such other matters which the Liquidation Committee determines should be presented for BB Board consideration and approval.

5.2.6    The BB Entity shall offer employment to all Powertrain JV employees whose principal work location is currently the Bielsko-Biala Plant, and members of the GM Group and the Fiat Group shall use good faith reasonable efforts to encourage such employees to accept the offer of employment.

5.2.7    If either the GM Group or the Fiat Group desires to sell or transfer all or any portion of their ownership interest in the BB Entity to anyone other than a Subsidiary or Affiliate, the other Group shall have a right of first refusal to acquire such ownership interest.

5.2.8    Capital improvements at the Bielsko-Biala Plant will be subject to approval of the BB Board; provided that either Party may, in the event a capital improvement for increased capacity is not approved by the BB Board, fund a separate capital improvement, provided that the Party funding such capital improvements shall hold the other Party and the BB Entity harmless for any adverse impact from the capital improvements and the additional capacity, and provided further that such funding does not result in a change to the BB Entity ownership structure.

5.3    Balancing Payment.    To implement the Liquidation Principles which contemplate that the liquidation will return value to each JV Shareholder on an equal basis, a balancing payment shall be calculated based on the liquidating distributions that are made to each JV Shareholder, which calculations shall be made in accordance with the approach shown in Schedule 5.3, which includes the BB Entity. The Payment in Section 2 above assumes (i) the Aggregate Net Book Value for the BB Entity is € 330 million, and therefore the consideration for GM's acquisition of the 50% interest in the BB Entity pursuant to Section 4.2 is one-half of the Aggregate Net Book Value, or € 165 million and (ii) the balancing payment necessary pursuant to Schedule 5.3 is € 200 million (the sum of these assumed amounts (the "Base Amount") being € 365 million). If on the Liquidation Date the actual sum of GM's share of the Aggregate Net Book Value for the BB Entity and the balancing payment (the "Actual Amount") varies from the Base Amount, there will be a balancing payment made on the Liquidation Date. If the Actual Amount exceeds the Base Amount, the GM Group shall be required to pay the Fiat Group (in addition to the Second Payment) the amount by which the Actual Amount exceeds the Base Amount. If the Actual Amount is less than the Base Amount, then Fiat shall be required to pay the GM Group the amount by which the Base Amount exceeds the Actual Amount; provided, however, that at GM's option, such payment by Fiat may instead be offset against the Second Payment.

5.4    Capacity Restriction on Use of Kaiserslautern Module to Produce JTD Diesel Engine.    GM agrees to limit the number of JTD Diesel Engines produced annually at the Kaiserslautern Module to 150,000 units, provided that such annual capacity limit shall remain in effect only so long as the Fiat Auto Group provides supply of JTD Diesel Engines sufficient to

Confidential
Execution Copy

satisfy the requirements of the GM Group for units of the JTD Diesel Engine that exceed the annual capacity limit for the Kaiserslautern Module.

**6.    Ownership of Intellectual Property.**

6.1    Rights for Intellectual Property.    Notwithstanding any contrary provisions of the Joint Venture Agreements or any Project Agreements, the Liquidation Plan shall provide for the following Intellectual Property to be jointly owned by the GM Group and the Fiat Group: Intellectual Property for the (a) SDE Diesel Engine, (b) M20/32 6 speed manual transmission and (c) JTD diesel engine. Neither party shall have any obligation whatsoever to account to the other for any use of the jointly owned Intellectual Property; provided, however, that notwithstanding the GM Group's joint ownership of the Intellectual Property for the JTD diesel engine, the GM Group shall not be permitted to manufacture, or to authorize other Persons to manufacture, any units of the JTD diesel engine outside Europe that are to be sold in Europe whether as part of a vehicle or otherwise. Unless otherwise agreed, each Party will own exclusively any improvements in the Intellectual Property made by such Party subsequent to the Liquidation Date.

6.2    Confirmation of No Royalties for Use of Initial Powertrain Technology.    The Parties acknowledge and agree that neither the Fiat Auto Group nor the GM Group has any obligation to pay royalties to the other Group with respect to (a) any past use of Initial Powertrain Technology (as defined in the Master IP Agreement, (b) any use of such Initial Technology from the Effective Date of this Agreement until the Liquidation Date, or (c) any future such of such Initial Technology that has been incorporated into Powertrain products as of the date of the Liquidation Date.

6.3    Royalties for Future Use of Powertrain Technology.    The Parties agree that for those products identified on Schedule 6.3, a royalty of 1 ½% of royalty base cost (material cost plus variable plant value added cost plus fixed costs) will be applied beginning on the Liquidation Date for the use of the other Party's Initial Powertrain Technology.

**7.    Supply Agreements**

7.1    Amendment of Master Supply Agreement to Eliminate Fiat's Take or Pay Obligations.    Effective as of January 1, 2005, GM agrees that Fiat shall no longer be obligated thereafter to pay Suppliers (as defined in the European Supply Agreement and the Brazil Supply Agreement) for products not purchased pursuant to the Take or Pay Volume Commitments set out in the European Supply Agreement and the Brazil Supply Agreement.

7.2    Post Liquidation Supply.    Unless otherwise provided in the Liquidation Plan, the Supply Agreements that the Parties have entered into pursuant to the Master Supply Agreement shall continue during the liquidation process. After liquidation of the Joint Ventures, each JV Shareholder has an option, but not the obligation, to maintain its Group's then current purchase arrangements to the extent it is supplied from assets it did not receive in the liquidation, on the same terms and conditions as contained in the Supply Agreement, except as contemplated by Section 7.1, for a period of up to five (5) years from the date of completion of the liquidation of the Powertrain JV. Each JV Shareholder may elect to terminate any such Supply Agreement that

- 8 -

Confidential
Execution Copy

is maintained following liquidation by giving at least one year's prior written notice to the Supplier.

7.2.1    Supply of components from Fiat, including (without limitation) Magneti Marelli, will continue on no worse than the same economic terms as exist on the Effective Date.

7.3    <u>Supply Agreements with BB Entity</u>. The Fiat Auto Group and the GM Group shall enter into Supply Agreements with the BB Entity with terms (including pricing mechanics) to be determined by the Liquidation Committee.

**8.    Cancellation of Mexican Distribution Contracts.** The Liquidation Committee shall provide for the cancellation as soon as reasonably practicable for the cancellation of the Distribution Agreements currently in place between members of the Fiat Group and GM de Mexico. The GM Group will be responsible for any costs associated with such cancellation; provided, however, that any costs of addressing claims GM de Mexico may have based on distribution activities prior to the cancellation date shall remain the responsibility of the Fiat Group.

**9.    GM's R&D Support to Fiat for USA Compliance of Premium Platform.** In connection with the preparation of the Liquidation Plan, the Liquidation Committee shall oversee the preparation and execution of an appropriate engineering support agreement for the GM Group to provide engineering support to the Fiat Group on reasonable terms to assist the Fiat Group in addressing USA compliance issues for the Fiat Group's premium platform architecture. Such services will be provided for a charge of full cost plus 5% based on "Value Added" which Value Added shall be determined consistent with past practice of the Powertrain JV in pricing services charged on a "Value Added" basis.

**10.    Supply Agreement for GM's V8 Northstar Engine.** In connection with the preparation of the Liquidation Plan, the Liquidation Committee shall oversee the preparation of an appropriate supply agreement for the GM Group to supply to the Fiat Group on commercially reasonable terms a GM V8 Northstar Engine to be mutually agreed by GM and Fiat at a charge of full cost plus 8%. For purposes of this provision "full cost" will be calculated on a basis consistent with the cost determination and allocation by the Powertrain JV without any additional cost allocation by either Party (whether by virtue of the liquidation or otherwise). Costs will be subject to audit procedures to be established by the Liquidating Committee.

**11.    Supply Agreement for GM's Fam 1 Gen III Engine.** In connection with the preparation of the Liquidation Plan, the Liquidation Committee shall oversee the preparation and execution of an appropriate supply agreement for the GM Group to supply to the Fiat Group on commercially reasonable terms GM's Fam 1 Gen III Engine at a charge of full cost plus 8%. It is envisioned that such supply agreement shall initially be with GM's Affiliate in Korea, but at a subsequent date will be sourced out of GM's Affiliate in China. For purposes of this provision "full cost" will be calculated on a basis consistent with the cost determination and allocation by the Powertrain JV without any additional cost allocation by either Party (whether by virtue of the liquidation or otherwise). Costs will be subject to reasonable audit procedures to be established by the Liquidating Committee.

Confidential
Execution Copy

## 12.    Engineering Services Agreement.

12.1    <u>Elasis and CRF Support Agreements.</u>    In connection with the preparation of the Liquidation Plan, the Liquidation Committee shall oversee the preparation and execution of appropriate engineering support services agreements pursuant to which the Fiat Group will arrange on a "best efforts" basis for the GM Group to have access to engineering support from Fiat's Affiliates Elasis and CRF for Powertrain technology, which engineering services shall be provided to the GM Group on substantially the same commercial terms as such services have in the past been provided by Elasis and CRF to the Powertrain JV Group, including pricing at cost, plus 5% based on Value Added.

12.2    <u>Other Engineering Support Services.</u>    In connection with the preparation of the Liquidation Plan, the Liquidation Committee shall oversee the preparation and execution of appropriate engineering support services agreements pursuant to which the GM Group will have access to engineering support from the Fiat Group and the Fiat Group will have access to engineering support from the GM Group for Powertrain technology. Such engineering services shall be provided on substantially the same commercial terms as have applied to engineering services provided in connection with the Powertrain JV, including pricing at cost, plus 5% based on Value Added.

12.3    <u>Engineering Resources.</u>    In connection with the separation of engineering resources within the Powertrain JV, personnel will be allocated between the Parties in accordance with the following principles:

(i)    employees whose primary responsibility is within a platform or technology the sole contributor (e.g., D1 and application specific engineering) of which to the JV was one Party may only be offered employment by that Party;

(ii)    except as specified in (iv) below, employees who were employed by a Party prior to the commencement of the Powertrain JV may only be offered employment by that Party;

(iii)    any new employees hired by the JV since its inception may be offered employment by either Party;

(iv)    the Parties agree that between the time of this Agreement and the JV Liquidation, any pre-existing employees of a Party that choose to work for the other Party may do so, subject to the provision below;

(v)    both Parties undertake for a period of one year from the date hereof not to offer any of the engineers compensation packages that constitute a significant increase in compensation or benefits over such employees current terms of employment.

The above provisions shall be applicable only to the extent they do not conflict with any antitrust or other legal prohibitions or restrictions.

## 13.    Purchasing.    GM shall, following liquidation and termination of the Purchasing JV, provide joint purchasing opportunities to Fiat and its Affiliates for commodities (e.g., steel,

Confidential
Execution Copy

aluminum, glass) and common components in accordance with the GM alliance purchasing team model.

**14.    Common Architecture Agreement and Project Agreements for Common Platforms.**

14.1    Completion of Project Agreements.  Unless the Liquidation Committee otherwise determines, the Liquidation Plan shall provide for completion of the Project Agreements for the Large and Small vehicle platforms.

14.2    Post Liquidation Rights to Small and Premium Platforms.  Unless the Liquidation Committee otherwise determines, the Liquidation Plan shall provide for both the Fiat Auto Group and the GM Group to have unrestricted use of the Small and Premium vehicle platforms without accounting to the other Group with respect to such use.

14.3    Post Liquidation Rights to Large Platform.  Unless the Liquidation Committee otherwise determines, the Liquidation Plan shall provide that Fiat Auto and its Subsidiaries shall have the right to use the Large vehicle platform for vehicles manufactured and sold by the Fiat Auto Group without the right to license or authorize other Persons to utilize such technology, except that Fiat Auto may authorize Fiat Auto Affiliates in China, Turkey and India to utilize the Large vehicle platform only in vehicles manufactured by such Affiliate in China,Turkey or India. Fiat Auto Affiliates in China, Turkey and India will be permitted to export vehicles for sale elsewhere provided that no exports based on the Large vehicle platform shall be permitted to be made to countries where applicable Law would prohibits the GM Group from selling such vehicles.

**15.    Third Party Contracts.**  The Liquidation Plan shall provide that the Powertrain JV's contracts with third parties shall be assigned to and assumed by members of the Fiat Auto Group or by members of the GM Group as reasonably determined by the Liquidation Committee on a basis that takes into account the manner in which the Powertrain JV's assets are to be distributed.

**16.    Dispute Resolution Procedures**

16.1    Informal Dispute Resolution.  The Parties shall attempt to resolve amicably and informally any dispute, controversy or claim among the Parties arising out of or relating to this Agreement, including (without limitation) any disputes arising among the members of the Liquidation Committee during the preparation or implementation of the Liquidation Plan (a "Dispute").  A Party, or a member of the Liquidation Committee, may initiate informal negotiations to resolve a Dispute by giving the Parties to this Agreement a written Request for Informal Dispute Resolution.  If a Request for Informal Dispute Resolution is issued, GM's Chief Financial Officer or such other person as GM may designate shall meet in person or telephonically with the Chief Executive Officer of Fiat or such other person as Fiat may designate within fifteen days in a neutral setting to attempt in good faith to resolve such Dispute. If such Persons have not resolved the Dispute within fifteen days following delivery of the Request for Informal Dispute Resolution, any Party may initiate the Binding Dispute Resolution procedures described in Section 16.2 by delivering a written Request for Binding Dispute Resolution to the Parties to this Agreement.

- 11 -

Confidential
Execution Copy

16.2    Binding Dispute Resolution Process.  If a Request for Binding Dispute Resolution is delivered, the Parties shall jointly select a mediator (the "Mediator") to facilitate a resolution to the Dispute.  The Mediator shall give the Parties a reasonable opportunity to make written or oral presentations to the Mediator regarding the Dispute and suggested ways of resolving the Dispute.  Subject to the Mediator agreeing to commercially reasonable confidentiality obligations, the Parties agree that the Mediator shall be given access to such personnel, records, books and information as the Mediator may reasonably request.  At the written request of any Party or at the request of the Mediator, the Parties shall also select a Qualified Expert to advise the Mediator on issues relating to the Powertrain Business or automotive business.  If the Parties fail to agree on a Qualified Expert within fifteen days of the written request for the appointment of a Qualified Expert, Fiat and GM shall each submit a list of the names and qualifications of up to three persons it believes are suitable to serve as the Qualified Expert, and the Mediator shall promptly select from among the suggested individuals one such Person to serve as Qualified Expert.  The Mediator, in consultation with the Qualified Expert (if one is appointed) shall endeavor for a period of fifteen days to mediate a resolution of the Dispute that is satisfactory to each of GM and Fiat.  If the Dispute is not resolved by the end of such period, the Mediator shall decide upon the resolution of the Dispute consistent with the Dispute Resolution Principles set forth in Section 16.4.  The decision of the Mediator is final and binding upon the Parties, the JV Shareholders and the Joint Ventures and enforceable in accordance with Sections 16.5 and 20.9.

16.3    Mediation and Qualified Expert Costs.  Fiat and GM shall each pay one-half of the fees and expenses paid or reimbursed to the Mediator and to any Qualified Expert.

16.4    Dispute Resolution Principles.  In resolving a Dispute, the Mediator shall follow the following Dispute Resolution Principles:

Dispute Resolution Principle #1:  Disputes should be resolved in a manner that will (a) implement all express terms of this Agreement and (b) except to the extent inconsistent with express terms of this Agreement, allow each of Fiat and GM to continue doing the same business they were doing as of the Effective Date.

Dispute Resolution Principle #2:  Unless it would violate Principle #1, Disputes should be resolved in a manner that will give each of Fiat and GM an outcome comparable to that which would have occurred had the Joint Ventures been liquidated under the "Deadlock" provisions of the Joint Venture Agreements.

16.5    Interim Injunctive Relief.  The foregoing provisions of Section 16 do not preclude the disputing Parties from applying to the United States District Court for the Southern District of New York for preliminary or injunctive remedies to enforce this Section 16, to preserve the status quo during the pendency of the Dispute resolution proceedings under this Section 16 or to enforce the decision of the Mediator.

## 17.    Representations and Warranties of Fiat, FAH and Fiat Auto

Fiat, FAH and Fiat Auto (each, on its own behalf) hereby represents and warrants to GM that:

- 12 -

Confidential
Execution Copy

17.1    Organization and Qualification; Valid Execution and Delivery; Enforceability of Agreement. It has been duly organized and is validly existing and in good standing under the laws of the jurisdiction of its incorporation. It has all necessary corporate power and authority to execute and deliver this Agreement and to perform its obligations hereunder. The execution and delivery of this Agreement by it and the consummation of its obligations hereunder have been duly and validly authorized by all necessary corporate action, including Board of Directors approval, and no other corporate proceedings on its part are necessary to duly authorize this Agreement. This Agreement has been duly authorized and validly executed and delivered by it and constitutes (assuming due authorization, execution and delivery by GM) a legal, valid and binding obligation of it, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, moratorium, reorganization or similar Laws affecting the rights of creditors generally and the availability of equitable remedies.

17.2    No Conflicts; Required Filings and Consents. (a) The execution and delivery of this Agreement by it does not, and the performance of its obligations hereunder will not, (i) conflict with or violate any provision of its constituent documents; (ii) assuming that all necessary consents, approvals, authorizations, and other actions described in Section 17.2(b) have been obtained and all filings and obligations described in Section 17.2(b) have been made, conflict with or violate any Law applicable to it or by which any of its properties or assets is bound or affected, or (iii) result in any breach of or constitute a default (or an event which upon notice or lapse of time or both would become a default) under any note, bond, mortgage, indenture, contract, agreement, license, permit, franchise, or other instrument or obligation, except with respect to (ii) and (iii), any such conflicts, violations, breaches, defaults or other occurrences which would not reasonably be expected to, individually or in the aggregate, prevent or materially delay performance of its obligations under this Agreement.

(b)  Its execution and delivery of this Agreement does not, and the performance of its obligations hereunder will not, require any consent, approval, authorization or permit of, or filing with or notification to, any Governmental Authority; except (i) for applicable requirements of the Exchange Act, the Securities Act of 1933, as amended, state securities or "blue sky" laws, the New York Stock Exchange, Inc., and (ii) where failure to obtain such consents, approvals, authorizations or permits, or to make such filings or notifications, would not reasonably be expected to prevent or materially delay its consummation of its obligations under this Agreement.

17.3    Absence of Litigation to Prevent Consummation. As of the Effective Date hereof, there is no litigation, suit, claim, action, proceeding or investigation pending, or, to its knowledge, threatened against it or any of its Subsidiaries, properties or assets before any Governmental Authority which seeks to delay or prevent or would result in the material delay of or would prevent the consummation of its obligations under this Agreement. Neither it nor any Subsidiary, property or assets of it is subject to a continuing order of, consent decree, settlement agreement or similar written agreement with, or, to its knowledge, continuing investigation by, any Governmental Authority, or Order of any Governmental Authority or any arbitrator that would prevent or materially delay it from performing its obligations under this Agreement.

18.    **Representations and Warranties of GM**

Confidential
Execution Copy

GM hereby represents and warrants to Fiat, FAH and Fiat Auto that:

18.1    Organization and Qualification; Valid Execution and Delivery; Enforceability of Agreement. It has been duly organized and is validly existing and in good standing under the laws of the jurisdiction of its incorporation. It has all necessary corporate power and authority to execute and deliver this Agreement and to perform its obligations hereunder. The execution and delivery of this Agreement by it and the consummation of its obligations hereunder have been duly and validly authorized by all necessary corporate action, including Board of Directors approval, and no other corporate proceedings on its part are necessary to duly authorize this Agreement. This Agreement has been duly authorized and validly executed and delivered by it and constitutes (assuming due authorization, execution and delivery by Fiat) a legal, valid and binding obligation of it, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, moratorium, reorganization or similar Laws affecting the rights of creditors generally and the availability of equitable remedies.

18.2    No Conflicts; Required Filings and Consents. (a) The execution and delivery of this Agreement by it does not, and the performance of its obligations hereunder will not, (i) conflict with or violate any provision of its constituent documents; (ii) assuming that all necessary consents, approvals, authorizations, and other actions described in Section 18.2(b) have been obtained and all filings and obligations described in Section 18.2(b) have been made, conflict with or violate any Law applicable to it or by which any of its properties or assets is bound or affected, or (iii) result in any breach of or constitute a default (or an event which upon notice or lapse of time or both would become a default) under any note, bond, mortgage, indenture, contract, agreement, license, permit, franchise, or other instrument or obligation, except with respect to (ii) and (iii), any such conflicts, violations, breaches, defaults or other occurrences which would not reasonably be expected to, individually or in the aggregate, prevent or materially delay performance of its obligations under this Agreement.

(b) Its execution and delivery of this Agreement does not, and the performance of its obligations hereunder will not, require any consent, approval, authorization or permit of, or filing with or notification to, any Governmental Authority, except (i) for applicable requirements of the Exchange Act, the Securities Act of 1933, as amended, state securities or "blue sky" laws, the New York Stock Exchange, Inc., and (ii) where failure to obtain such consents, approvals, authorizations or permits, or to make such filings or notifications, would not reasonably be expected to prevent or materially delay its consummation of its obligations under this Agreement.

18.3    Absence of Litigation to Prevent Consummation. As of the Effective Date hereof, there is no litigation, suit, claim, action, proceeding or investigation pending, or, to its knowledge, threatened against it or any of its Subsidiaries, properties or assets before any Governmental Authority which seeks to delay or prevent or would result in the material delay of or would prevent the consummation of its obligations under this Agreement. Neither it nor any Subsidiary, property or assets of it is subject to a continuing order of, consent decree, settlement agreement or similar written agreement with, or, to its knowledge, continuing investigation by, any Governmental Authority, or Order of any Governmental Authority or any arbitrator that would prevent or materially delay it from performing its obligations under this Agreement.

- 14 -

Confidential
Execution Copy

## 19. Confidentiality

19.1 <u>Liquidation Committee Proceedings</u>. The Parties intend that the proceedings of the Liquidation Committee remain confidential to the extent practical, except where otherwise required by Law. The Liquidation Committee shall adopt reasonable protocols for the purpose of maintaining confidentiality.

19.2 <u>Confidential Group Information</u>. The GM Group and the Fiat Group may have previously received, or may subsequently receive from the other Group, or its Representatives, information about the assets, properties, employees, financial condition, business or operations of the other Group. (The Group disclosing such information about it being the "Disclosing Group" and the Group receiving such information of the other Group being the "Receiving Group"). All such information relating to the Disclosing Group, whether furnished before or after the date hereof, whether oral or written, regardless of the manner in which it is furnished, is referred to in this Agreement as "Confidential Group Information". Confidential Group Information does not include, however, information which (i) is or becomes generally available to the public other than as a result of disclosure by the Receiving Group or its Representatives, (ii) was available to the Receiving Group on a non-confidential basis prior to its disclosure by the Disclosing Group or its Representatives or (iii) becomes available to the Receiving Group on a non-confidential basis from a Person other than the Disclosing Group or its Representatives who is not otherwise bound by a confidentiality agreement with the Disclosing Group or any of its Representatives, or is otherwise not under an obligation to the Disclosing Group or any of its Representatives not to transmit the information to the Receiving Group.

19.3 <u>Restrictions on Disclosure</u>. Unless otherwise agreed to in writing by the Disclosing Group, the Receiving Group agrees to keep all Confidential Group Information of the other Group confidential in the same manner it treats its own information of a similar nature and not to disclose or reveal any such Confidential Group Information to any Person or entity. The Receiving Group will be responsible for any breach of the terms of this Section 19.3 by the Receiving Group or its Representatives. Notwithstanding the foregoing, however, in the event that the Receiving Group is requested pursuant to, or required by, applicable Law or regulation or stock exchange rule or by legal process to disclose any Confidential Group Information of the Disclosing Group, the Receiving Group agrees that it will provide the Disclosing Group with prompt notice of such request or requirement in order to enable the Disclosing Group to seek an appropriate protective order or remedy. If no such protective order or other remedy is obtained by the Disclosing Group, or the Disclosing Group waives compliance with the terms of this Section, the Receiving Group will furnish only that portion of any Confidential Group Information which the Receiving Group is advised by counsel is legally required.

## 20. Miscellaneous

20.1 <u>Binding Nature of Agreement; Specific Performance</u>. This Agreement constitutes a binding, fully enforceable agreement of the Parties. The Parties acknowledge and agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Parties are entitled to specific performance of the terms hereof, in addition to any other remedy at law or equity.

Confidential
Execution Copy

    20.2   Entire Agreement; Assignment.  This Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, among the Parties, or any of them, with respect to the subject matter hereof.  This Agreement shall not be assigned (except by operation of law or to a successor in interest in connection with the transfer of all or substantially all of a Party's business to a Person which assumes all of its obligations hereunder.)

    20.3   Compliance with Laws.  Neither Party shall take, or be required by the terms of this Agreement to take, any action pursuant to this Agreement that is not in compliance with the Laws of any applicable Governmental Authority.

    20.4   Parent Company Assurances.  Each Party shall, to the extent it is legally able to do so, cause each member of its Group to perform all obligations under this Agreement or under any agreement entered into by any other member of its Group pursuant to this Agreement.  As far as it is legally able, each Party shall exercise all voting rights and powers (direct or indirect) available to it in relation to any Person or entity so that the provisions of this Agreement (and the other agreements referred to or contemplated by this Agreement) are completely and punctually fulfilled, observed and performed and, generally, that full effect is given to the principles set out in this Agreement.

    20.5   Survival of Representations and Warranties.  The representations and warranties in this Agreement shall survive the Interim Payment Date indefinitely or until the expiration of the applicable statute of limitations.

    20.6   Notices.  All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given or made (and shall be deemed to have been duly given or made upon receipt) by delivery in Person, by facsimile, by e-mail, and confirmed by overnight courier service to the respective Parties at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this Section.):

If to Fiat, Fiat Auto or FAH:    To the same notice addressees as are in effect as of the Effective Date for notices given pursuant to the Master Agreement

If to GM:  To the same notice addressees as are in effect as of the Effective Date for notices given pursuant to the Master Agreement

    20.7   Severability.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law, or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as any economic or legal substance of the Agreement is not affected in any matter materially adverse to any Party.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the obligations of the Parties be consummated as originally contemplated to the fullest extent possible.

Confidential
Execution Copy

20.8    Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York, excluding (to the extent permissible by law) any rule of law that would cause the application of the laws of a jurisdiction other than the State of New York.

20.9    Consent to Jurisdiction.  (a)  All Disputes, controversies or claims arising out of or in connection with this Agreement are to be resolved pursuant to Section 16.  Subject to the foregoing, each of Fiat and General Motors hereby irrevocably submits to the exclusive jurisdiction of the United States District Court for the Southern District of New York, located in New York City, for the purpose of any action or proceeding arising out of or relating to this Agreement, and each of Fiat and General Motors hereby irrevocably agrees that all claims in respect to such action or proceeding may be heard and determined in such federal court.  Each of Fiat and General Motors agrees that any final judgment in any action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any manner provided by law.

(b)  Each of Fiat and General Motors irrevocably consents to the service of the summons and complaint and any other process in any action or proceeding relating to this Agreement, on behalf of itself or its property, by Personal delivery of copies of such process to such Party.  Nothing in this section shall affect the right of any Party to serve legal process in any other manner permitted by law.

20.10    Parties in Interest.  This Agreement is binding upon and inures solely to the benefit of each Party hereto and their respective successors and assigns, and nothing in this Agreement, express or implied, is intended to or confers upon any other Person any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

20.11    Counterparts.  This Agreement may be executed and delivered (including by facsimile transmission) in one or more counterparts, and by the different Parties hereto in separate counterparts, each of which when executed and delivered shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

20.12    WAIVER OF JURY TRIAL.  EACH OF FIAT, FAH, FIAT AUTO AND GM HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF FIAT, FAH, FIAT AUTO AND GM IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE AND ENFORCEMENT THEREOF.

Confidential
Execution Copy

IN WITNESS WHEREOF, Fiat, FAH, Fiat Auto and GM have caused this Agreement to be executed as of the Effective Date by their respective officers thereunto duly authorized.

Fiat S.p.A.

By: _____
　　　Sergio Marchionne
　　　Chief Executive Officer.

Fiat Auto Holdings B.V.

By: _____
　　　Sergio Marchionne
　　　Chairman

Fiat Auto S.p.A.

By: _____
　　　Sergio Marchionne
　　　Chairman

General Motors Corporation

By: _____
　　　G. Richard Wagoner, Jr.
　　　Chairman and Chief Executive Officer

Confidential
Execution Copy

## SCHEDULE 1.0

## DEFINITIONS

1)    "Affiliate" of a Party means any entity that directly or indirectly through one or more intermediaries controls, is controlled by, or is under common control with such specified Party.

2)    "Aggregate Net Book Value" means the aggregate net book value of the BB Entity based on the balance sheets of the BB Entity as of the Liquidation Date prepared in accordance with the accounting principles set forth in Schedule 3 to the Contribution Agreement.

3)    "Brazil JV" means the joint venture formed pursuant to the Joint Venture Agreement, dated as of August 9, 2000, between Affiliates of Fiat and GM, including any amendments thereto as of the Effective Date.

4)    "Brazil Supply Agreement" means the Brazilian Master Supply Agreement, dated April 2, 2001 between Fiat-GM Powertrain Ltd, Fiat Automoveis S.A. and General Motors do Brasil Ltda., as amended.

5)    "Confidential Group Information" has the meaning given in Section 19.2.

6)    "Disclosing Group" has the meaning given in Section 19.2.

7)    "Dispute" has the meaning given in Section 16.1.

8)    "Effective Date" has the meaning given in the first paragraph of this Agreement.

9)    "Europe" has the meaning given in the Powertrain JV Agreement.

10)   "European Supply Agreement" means the European Supply Agreement dated June 29, 2001 among Fiat-GM Powertrain B.V., Fiat Auto Holdings B.V., and General Motors Corporation, as amended.

11)   "FGP" means FIAT-GM Powertrain B.V., a company organized under the laws of the Netherlands (formerly known as PTC Holdings B.V.).

12)   "Fiat Group" and "Fiat Auto Group" have the same meanings as in the Powertrain JV Agreement.

13)   "GM Group" has the same meaning as in the Powertrain JV Agreement.

14)   "GM's FAH Shares" means the shares of FAH's common stock owned by a GM Subsidiary, which shares currently represent ten percent of FAH's total outstanding capital stock.

Confidential
Execution Copy

15) "Governmental Authority" means any government, governmental entity, regulatory authority, department, commission, board, agency or instrumentality, or any court, arbitrator, tribunal or judicial body, whether supranational, regional, national, state or local.

16) "Intellectual Property" shall have the meaning given in the Master IP Agreement.

17) "Initial Payment Date" means the date on which the payment required by Section 2.1 is made.

18) "JV Shareholders" has the meaning given in Section 5.1.

19) "Joint Ventures" means the Powertrain JV, the Purchasing JV and the Brazil JV.

20) "Law" means any domestic or foreign or supranational government, governmental, regulatory or administrative law, rule, regulation, order, judgment or decree.

21) "Liquidation Date" means the date which the Liquidation Plan establishes as the date when liquidation of the Powertrain JV is to occur.

22) "Master Agreement" means the Master Agreement dated as of March 13, 2000, between GM and Fiat, as amended by Amendment dated July 24, 2000, and Amendment No. 2 dated October 26, 2003.

23) "Master Intellectual Property Agreement" means that Master Intellectual Property Agreement dated June 29, 2001 among, Fiat, GM and Fiat-GM Powertrain B.V., as amended.

24) "Mediator" has the meaning given in Section 16.2.

25) "Party" means any party to this Agreement.

26) "Person" means an individual, corporation, limited liability company, partnership, limited partnership, syndicate, person, trust, association or entity or government, political subdivision, agency or instrumentality of a government.

27) "Powertrain" and "Powertrain Business" and "Powertrain Group" have the same meanings as in the Powertrain JV Agreement.

28) "Powertrain Syndicated Credit Facility" means the syndicated loan facility entered into in 2001 between FGP and its Subsidiaries, on the one part, and a group of banks, on the other part, in the original amount of € one billion.

29) "Qualified Expert" means a Person who is familiar with the Powertrain Business and the automotive business and who shall not have, or have had, any connection or affiliation, including as a director, employee, advisor, agent or attorney, with the Fiat Group, the Fiat Auto Group, the GM Group, or the Powertrain Group.

Confidential
Execution Copy

30) "Powertrain JV" means the joint venture formed pursuant to the Joint Venture Agreement, dated as of July 24, 2000, among Fiat, FAH, GM and FGP, as amended through Amendment No. 6 dated December 19, 2003.

31) "Project Agreements" means those agreements listed in the definition of "Project Agreement" in each of the Powertrain Joint Venture Agreement, the Purchasing Joint Venture Agreement and the Brazilian Joint Venture Agreement. In addition, the Project Agreements include (i) the Common Architecture Agreement dated March 2002, among Fiat, GM, Adam Opel AG and Saab Automobile AB, (ii) the Project Agreement – Fiat Large off GM Epsilon dated February 23, 2004 among Fiat, GM and Adam Opel AG, (iii) the Project Agreement – Small Architecture dated May 28, 2003 among Fiat, General Motors and Adam Opel AG, (iv) the Credit Cooperative Agreement between Fiat and GM dated July 11, 2000, (v) the Reimbursement Agreement dated March 29, 2002, between FAH and FGP and (vi) the Cost Sharing Agreement dated December 23, 2003, among Adam Opel AG; Opel Espana De Automoviles S.L.; Saab Automobile AB; Opel Polska Sp. Z. o. o.; Vauxhall Motors Ltd.; Opel Eisenach GMBH; BC Vehicles Ltd; GM, Fiat Auto; Fiat Auto Poland S.A. and Powertrain Industrial Services S.C.R.L., and (vii) the Engineering and Development Cooperation Agreement ("Teaming Agreement") dated July 26, 2001.

32) "Purchasing JV" means the joint venture formed pursuant to the Joint Venture Agreement, dated as of July 24, 2000, among Fiat, FAH, GM and GM-Fiat Worldwide Purchasing B.V. (formerly known as JVP Holdings BV), as amended through Amendment No.2, dated March 15, 2002.

33) "Put Option" has the meaning given in the Recitals.

34) "Receiving Group" has the meaning given in Section 19.2.

35) "Representatives" means, as to any Person, such Person's affiliates and its and their directors, officers, employees, agents, advisors (including, without limitation, financial advisors, counsel and accountants).

36) "Second Payment" has the meaning given in Section 2.2.

37) "Subsidiary" of any Person means any corporation, partnership, joint venture or other legal entity of which such Person (either alone or through or together with any other Subsidiary) owns more than fifty percent (50%) of the stock or other equity interests and the holders of which are generally entitled to vote for the election of the board of directors or other governing body of such corporation or other legal entity.

38) "Value Added" shall have the meaning given in Section 9.

## RELEASE OF CLAIMS

This Release of Claims ("Release") is entered into by and between General Motors Corporation, a Delaware corporation ("GM"), on the one hand, and Fiat S.p.A., a corporation organized under the laws of the Republic of Italy ("Fiat"), Fiat Auto Holdings B.V., a corporation organized under the laws of the Netherlands ("FAH") and Fiat Auto S.p.A., a corporation organized under the laws of the Republic of Italy ("Fiat Auto"), on the other hand. GM, Fiat, FAH and Fiat Auto are sometimes individually referred to herein as a Party and collectively referred to as "the Parties."

### RECITALS

WHEREAS, on February 13, 2005, the Parties entered into an Agreement to Liquidate Joint Ventures and Terminate Master Agreement (the "Termination Agreement");

WHEREAS, in conjunction with the execution of the Termination Agreement, the Parties wish to enter into a release of certain claims that they may have against each other;

NOW THEREFORE, for good and valuable consideration, including that contained in the Termination Agreement, and intending to be legally bound hereby, the Parties agree as follows:

1.  Definitions. Capitalized terms not defined in this Release shall have the meanings given in the Termination Agreement.

2.  Release of GM. On the Effective Date, Fiat, FAH and Fiat Auto, each acting on behalf of itself and its respective Subsidiaries, predecessors, successors, Affiliates, parents, transferees, assigns, officers, directors, general partners, limited partners, employees, managers, attorneys, accountants, agents, and servants, and each of them, in all capacities, releases and forever discharges GM, and each of its present or former Subsidiaries, predecessors, successors, Affiliates, parents, transferees, assigns, officers, directors, general partners, limited partners, employees, managers, attorneys, accountants, agents, bonding companies, and servants, in all capacities, from any and all claims, demands, causes of action, liens, obligations, debts, damages, suits, costs, fees, judgments, and liabilities of every kind, nature and description, whether known or unknown (collectively, "Claims"), that each of Fiat, FAH or Fiat Auto has or may have as of the Effective Date under the Master Agreement, any Joint Venture Agreement or Project Agreement, or the formation or operation of any of their Joint Ventures, or in their past conduct toward each other in connection with these activities. Without limiting the generality of the foregoing, Fiat, FAH and Fiat Auto are each releasing any and all Claims each of them may have directly or as a shareholder of FGP against GM's Affiliates alleging misuse of confidential information.

3.  Release of Fiat. On the Effective Date, GM, acting on behalf of itself and its respective Subsidiaries, predecessors, successors, Affiliates, parents, transferees, assigns, officers, directors, general partners, limited partners, employees, managers, attorneys, accountants, agents, and servants, and each of them, in all capacities, releases and forever discharges Fiat, FAH, Fiat Auto, and each of their present or former Subsidiaries, predecessors, successors, Affiliates, parents,

*Schedule 4.2*

- 1 -

transferees, assigns, officers, directors, general partners, limited partners, employees, managers, attorneys, accountants, agents, bonding companies, and servants in all capacities, from any and all Claims that GM has or may have as of the Effective Date under the Master Agreement, any Joint Venture Agreement or Project Agreement, or the formation or operation of any of their Joint Ventures, or in their past conduct toward each other in connection with these activities.

4.  Effective Date. The Release shall become effective upon the payment by GM pursuant to Section 2.1 of the Termination Agreement (the "Effective Date").

5.  Covenant Not to Sue. The Parties covenant and agree that they will never, individually or with any other person or entity, or through any agent, commence or prosecute against each other, any action or proceeding for any claim which is barred by the releases set forth in paragraphs 2 and 3 herein. This Release may be pled by any Party hereto as a full and complete defense to, and may be used as the basis for an injunction against, any action, suit, or other proceeding that may be instituted, prosecuted, or attempted by any other Party bound by this Release in contravention or breach of this Release.

6.  No Admission of Liability. Nothing herein constitutes any admission or concession of liability whatsoever by either Party on account of any matter.

7.  Breach of Settlement or Warranty. Notwithstanding any other language herein, the Parties expressly understand that any act, including assertion of claims, in breach of this Release is proscribed, and they agree that the breaching Party shall defend, indemnify and hold harmless the other Party from all claims, liens, demands, causes of action, obligations, damages, liabilities, judgments, litigation costs and attorney fees arising out of the conduct or claims of the Party that is in breach of this Release, including attorneys' fees, expenses and costs reasonably incurred in litigation or proceeding to enforce the terms of this Release.

8.  Entire Agreement and Modification. The Parties each warrant and represent that no promise, inducement or agreement not expressed herein or in the Termination Agreement has been made in connection with this Release, and that this Release constitutes the entire agreement between the Parties with respect to its subject matter and supercedes any and all other agreements and negotiations, whether oral or in writing. It is expressly understood and agreed that this Release may not be altered, amended, modified or otherwise changed in any respect whatsoever except by a writing duly executed by the authorized representatives of each of the Parties. The Parties hereby agree and acknowledge that they will not claim at any time or place that this Release has been orally altered or modified or otherwise changed by oral communication of any kind or character.

9.  Attorneys' Fees. In the event of any dispute in connection with the enforcement of this Release or any instrument or agreement required under this Release, the prevailing Party shall be entitled to reasonable attorneys' fees, costs and necessary disbursements incurred in connection with such action or proceeding, as determined by the court.

10.   <u>Successors and Assigns</u>.  This Release shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns.

11.   <u>Illegality</u>.  Should any provision of this Release be held invalid or illegal, such invalidity or illegality shall not invalidate the whole of this Release but, rather, the Release shall be construed as if it did not contain the invalid or illegal part, and the rights and obligations of the Parties shall be construed and enforced to carry out the remaining terms of the Release.

12.   <u>Counterparts and Duplicate Originals</u>.  This Release may be executed in counterparts and in duplicate originals, each of which is equally admissible in evidence.  Copies of a duly executed Release may be used in lieu of the original, and such copies shall be admissible in evidence to the same extent that the original would be admissible in evidence.

13.   <u>New York Law; Forum</u>.  This Release shall be construed and enforced pursuant to the laws of the State of New York.  The dispute resolution process set forth in the Termination Agreement shall not apply to disputes arising out of or in connection with this Release; such disputes shall be subject to the exclusive jurisdiction of the United States District Court for the Southern District of New York, located in the City and County of New York.

14.   <u>Interpretation</u>.  The Parties expressly acknowledge that this Release is a result of mutual negotiation and the language is not to be construed against any Party as the drafter of this Release.  The Parties further acknowledge that the headings and captions herein are for ease and convenience only and should not be used or considered in interpreting this Release.

15.   <u>Execution</u>.  Each signatory represents that he or she is authorized to sign this Release on behalf of the Party for whom he or she signs and to bind that Party to the terms of this Release.

IN WITNESS WHEREOF, the Parties have executed this Release to be effective as provided herein.

Fiat S.p.A.

By: _____
    Sergio Marchionne
    Chief Executive Officer

Fiat Auto Holdings B.V.

By: _____
Name:
Title:

General Motors Corporation

By: _____
    G. Richard Wagoner, Jr.
    Chairman and Chief Executive Officer

Fiat Auto S.p.A.

By: _____
Name:
Title:

23040\3014\421271.3

- 3 -

DRAFT

# FGP Asset Valuation for Determination of Distributed Value
Based on Principles Utilized in Contribution Agreement
(€ million)

## FGP Balance Sheet (11-30-04 UNAUDITED)

| Entity | Fixed Assets | Working Cap | Other Assets | Debt | Long Term Liabilities | NBV | Adjust: DTI** | Adjust: Syndicated Loan | Adjusted NBV | Post-Dissolution Ownership |
|---|---|---|---|---|---|---|---|---|---|---|
| Germany | 505 | 300 | 198 | (115) | (384) | 505 | 64 | 70 | 639 | GM |
| Sweden | 131 | 31 | 0 | (84) | (25) | 54 | 12 | 83 | 150 | GM |
| UK | 0 | 93 | 0 | (9) | 0 | 85 | 0 | 9 | 93 | GM |
| Austria | 522 | 105 | 3 | (168) | (143) | 320 | 71 | 0 | 390 | GM |
| Hungary | 207 | 127 | 8 | (15) | (20) | 306 | (0) | 0 | 306 | GM |
| Brazil - Sao Jose | 117 | 9 | 2 | (10) | (18) | 100 | 16 | 0 | 115 | GM |
| Italy | 994 | 205 | 165 | (643) | (196) | 524 | (36) | 280 | 768 | FA |
| Industrial Services | 1 | 3 | 8 | (5) | (6) | 1 | 0 | 0 | 1 | FA |
| Brazil-Betim | 143 | 22 | 2 | (18) | (43) | 106 | 8 | 0 | 114 | FA |
| Turkey | 47 | 39 | 1 | 0 | (3) | 84 | 1 | 0 | 85 | FA |
| Poland | 293 | 52 | 10 | (112) | (12) | 231 | 0 | 100 | 331 | FA |
| Consolidation | | | | | | (1) | | | (1) | |
| FGP Consolidated | 2,962 | 987 | 396 | (1,179) | (849) | 2,314 | 135 | 541 | 2,991 | |

* Other Net Cash includes adjustments for cash pool lending / withdrawals, intercompany loans, etc. Holding BV cash/debt attributed to Poland.
** DTI balances include net current and long-term deferred tax assets and liabilities



## Potential FGP Distributed Value and Cash True-Up

| | GM | FA |
|---|---|---|
| Current NBV Interest in FGP | 1,495 | 1,495 |
| Distributed Value | 1,693 | 1,298 |
| GM Cash Payment to FA for Distributed Value | | 197 |

*memo: GM and FA Cash Contribution to FGP to*    271    271
*Repay Syndicated Loan*

≈ € 200 MILLION

Paul

Payment based on November 2004 balance sheet

Confidential
Execution Copy

## SCHEDULE 6.3

## ROYALTIES FOR FUTURE USE OF INITIAL TECHNOLOGY

Family I in Europe and Brazil (GM Group to Fiat Group)

Fire in Brazil (Fiat Group to GM Group)

Family II in Brazil (GM Group to Fiat Group)

F17 in Europe (GM Group to Fiat Group)

L850 in Europe (GM Group to Fiat Group)

F40 in Europe (GM Group to Fiat Group

M40 CV in Europe (GM Group to Fiat Group)

<u>RELEASE OF CLAIMS</u>

This Release of Claims ("Release") is entered into by and between General Motors Corporation, a Delaware corporation ("GM"), on the one hand, and Fiat S.p.A., a corporation organized under the laws of the Republic of Italy ("Fiat"), Fiat Auto Holdings B.V., a corporation organized under the laws of the Netherlands ("FAH") and Fiat Auto S.p.A., a corporation organized under the laws of the Republic of Italy ("Fiat Auto"), on the other hand. GM, Fiat, FAH and Fiat Auto are sometimes individually referred to herein as a Party and collectively referred to as "the Parties."

## RECITALS

WHEREAS, on February 13, 2005, the Parties entered into an Agreement to Liquidate Joint Ventures and Terminate Master Agreement (the "Termination Agreement");

WHEREAS, in conjunction with the execution of the Termination Agreement, the Parties wish to enter into a release of certain claims that they may have against each other;

NOW THEREFORE, for good and valuable consideration, including that contained in the Termination Agreement, and intending to be legally bound hereby, the Parties agree as follows:

1.   <u>Definitions</u>. Capitalized terms not defined in this Release shall have the meanings given in the Termination Agreement.

2.   <u>Release of GM</u>. On the Effective Date, Fiat, FAH and Fiat Auto, each acting on behalf of itself and its respective Subsidiaries, predecessors, successors, Affiliates, parents, transferees, assigns, officers, directors, general partners, limited partners, employees, managers, attorneys, accountants, agents, and servants, and each of them, in all capacities, releases and forever discharges GM, and each of its present or former Subsidiaries, predecessors, successors, Affiliates, parents, transferees, assigns, officers, directors, general partners, limited partners, employees, managers, attorneys, accountants, agents, bonding companies, and servants, in all capacities, from any and all claims, demands, causes of action, liens, obligations, debts, damages, suits, costs, fees, judgments, and liabilities of every kind, nature and description, whether known or unknown (collectively, "Claims"), that each of Fiat, FAH or Fiat Auto has or may have as of the Effective Date under the Master Agreement, any Joint Venture Agreement or Project Agreement, or the formation or operation of any of their Joint Ventures, or in their past conduct toward each other in connection with these activities. Without limiting the generality of the foregoing, Fiat, FAH and Fiat Auto are each releasing any and all Claims each of them may have directly or as a shareholder of FGP against GM's Affiliates alleging misuse of confidential information.

3.   <u>Release of Fiat</u>. On the Effective Date, GM, acting on behalf of itself and its respective Subsidiaries, predecessors, successors, Affiliates, parents, transferees, assigns, officers, directors, general partners, limited partners, employees, managers, attorneys, accountants, agents, and servants, and each of them, in all capacities, releases and forever discharges Fiat, FAH, Fiat Auto, and each of their present or former Subsidiaries, predecessors, successors, Affiliates, parents,

transferees, assigns, officers, directors, general partners, limited partners, employees, managers, attorneys, accountants, agents, bonding companies, and servants in all capacities, from any and all Claims that GM has or may have as of the Effective Date under the Master Agreement, any Joint Venture Agreement or Project Agreement, or the formation or operation of any of their Joint Ventures, or in their past conduct toward each other in connection with these activities.

4. <u>Effective Date</u>. The Release shall become effective upon the payment by GM pursuant to Section 2.1 of the Termination Agreement (the "Effective Date").

5. <u>Covenant Not to Sue</u>. The Parties covenant and agree that they will never, individually or with any other person or entity, or through any agent, commence or prosecute against each other, any action or proceeding for any claim which is barred by the releases set forth in paragraphs 2 and 3 herein. This Release may be pled by any Party hereto as a full and complete defense to, and may be used as the basis for an injunction against, any action, suit, or other proceeding that may be instituted, prosecuted, or attempted by any other Party bound by this Release in contravention or breach of this Release.

6. <u>No Admission of Liability</u>. Nothing herein constitutes any admission or concession of liability whatsoever by either Party on account of any matter.

7. <u>Breach of Settlement or Warranty</u>. Notwithstanding any other language herein, the Parties expressly understand that any act, including assertion of claims, in breach of this Release is proscribed, and they agree that the breaching Party shall defend, indemnify and hold harmless the other Party from all claims, liens, demands, causes of action, obligations, damages, liabilities, judgments, litigation costs and attorney fees arising out of the conduct or claims of the Party that is in breach of this Release, including attorneys' fees, expenses and costs reasonably incurred in litigation or proceeding to enforce the terms of this Release.

8. <u>Entire Agreement and Modification</u>. The Parties each warrant and represent that no promise, inducement or agreement not expressed herein or in the Termination Agreement has been made in connection with this Release, and that this Release constitutes the entire agreement between the Parties with respect to its subject matter and supercedes any and all other agreements and negotiations, whether oral or in writing. It is expressly understood and agreed that this Release may not be altered, amended, modified or otherwise changed in any respect whatsoever except by a writing duly executed by the authorized representatives of each of the Parties. The Parties hereby agree and acknowledge that they will not claim at any time or place that this Release has been orally altered or modified or otherwise changed by oral communication of any kind or character.

9. <u>Attorneys' Fees</u>. In the event of any dispute in connection with the enforcement of this Release or any instrument or agreement required under this Release, the prevailing Party shall be entitled to reasonable attorneys' fees, costs and necessary disbursements incurred in connection with such action or proceeding, as determined by the court.

10. <u>Successors and Assigns</u>. This Release shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns.

11. <u>Illegality</u>. Should any provision of this Release be held invalid or illegal, such invalidity or illegality shall not invalidate the whole of this Release but, rather, the Release shall be construed as if it did not contain the invalid or illegal part, and the rights and obligations of the Parties shall be construed and enforced to carry out the remaining terms of the Release.

12. <u>Counterparts and Duplicate Originals</u>. This Release may be executed in counterparts and in duplicate originals, each of which is equally admissible in evidence. Copies of a duly executed Release may be used in lieu of the original, and such copies shall be admissible in evidence to the same extent that the original would be admissible in evidence.

13. <u>New York Law; Forum</u>. This Release shall be construed and enforced pursuant to the laws of the State of New York. The dispute resolution process set forth in the Termination Agreement shall not apply to disputes arising out of or in connection with this Release; such disputes shall be subject to the exclusive jurisdiction of the United States District Court for the Southern District of New York, located in the City and County of New York.

14. <u>Interpretation</u>. The Parties expressly acknowledge that this Release is a result of mutual negotiation and the language is not to be construed against any Party as the drafter of this Release. The Parties further acknowledge that the headings and captions herein are for ease and convenience only and should not be used or considered in interpreting this Release.

15. <u>Execution</u>. Each signatory represents that he or she is authorized to sign this Release on behalf of the Party for whom he or she signs and to bind that Party to the terms of this Release.

IN WITNESS WHEREOF, the Parties have executed this Release to be effective as provided herein.

Fiat S.p.A.

By: _____

Name: Sergio Marchionne
Title:   Chief Executive Officer

General Motors Corporation

By: _____

Name: G. Richard Wagoner, Jr.
Title:   Chairman and Chief Executive Officer

Fiat Auto Holdings B.V.

By: _____

Name: Sergio Marchionne
Title:   Chairman

Fiat Auto S.p.A.

By: _____

Name: Sergio Marchionne
Title:   Chairman

[Signature Page to Release]

# ICC

**International Chamber of Commerce**

*The world business organization*

# Rules of Arbitration

in force as from 1 January 1998

**Cost scales effective as of 1 January 2008**

**International Chamber of Commerce**
**International Court of Arbitration**
38, Cours Albert 1er
75008 Paris
France
Tel. +33 1 49 53 29 05
Fax +33 1 49 53 29 33
E-mail arb@iccwbo.org
**www.iccarbitration.org**

Rules of Arbitration

# RULES OF ARBITRATION

## INTRODUCTORY PROVISIONS

**Article 1**
**International Court of Arbitration**

1

The International Court of Arbitration (the "Court") of the International Chamber of Commerce (the "ICC") is the arbitration body attached to the ICC. The statutes of the Court are set forth in Appendix I. Members of the Court are appointed by the World Council of the ICC. The function of the Court is to provide for the settlement by arbitration of business disputes of an international character in accordance with the Rules of Arbitration of the International Chamber of Commerce (the "Rules"). If so empowered by an arbitration agreement, the Court shall also provide for the settlement by arbitration in accordance with these Rules of business disputes not of an international character.

2

The Court does not itself settle disputes. It has the function of ensuring the application of these Rules. It draws up its own Internal Rules (Appendix II).

3

The Chairman of the Court or, in the Chairman's absence or otherwise at his request, one of its Vice-Chairmen shall have the power to take urgent decisions on behalf of the Court, provided that any such decision is reported to the Court at its next session.

4

As provided for in its Internal Rules, the Court may delegate to one or more committees composed of its members the power to take certain decisions, provided that any such decision is reported to the Court at its next session.

5

The Secretariat of the Court (the "Secretariat") under the direction of its Secretary General (the "Secretary General") shall have its seat at the headquarters of the ICC.

**Article 2**
**Definitions**

In these Rules:

(i)     "Arbitral Tribunal" includes one or more arbitrators.

(ii)    "Claimant" includes one or more claimants and "Respondent" includes one or more respondents.

(iii)   "Award" includes, *inter alia*, an interim, partial or final Award.

**Article 3**
**Written Notifications or Communications;**
**Time Limits**

1

All pleadings and other written communications submitted by any party, as well as all documents annexed thereto, shall be supplied in a number of copies sufficient to provide one copy for each party, plus one for each arbitrator, and one for the Secretariat. A copy of any communication from the Arbitral Tribunal to the parties shall be sent to the Secretariat.

2

All notifications or communications from the Secretariat and the Arbitral Tribunal shall be made to the last address of the party or its representative for whom the same are intended, as notified either by the party in question or by the other party. Such notification or communication may be made by delivery against

Rules of Arbitration

The Secretariat shall send a copy of the Request and the documents annexed thereto to the Respondent for its Answer to the Request once the Secretariat has sufficient copies of the Request and the required advance payment.

6

When a party submits a Request in connection with a legal relationship in respect of which arbitration proceedings between the same parties are already pending under these Rules, the Court may, at the request of a party, decide to include the claims contained in the Request in the pending proceedings provided that the Terms of Reference have not been signed or approved by the Court. Once the Terms of Reference have been signed or approved by the Court, claims may only be included in the pending proceedings subject to the provisions of Article 19.

## Article 5
## Answer to the Request; Counterclaims

1

Within 30 days from the receipt of the Request from the Secretariat, the Respondent shall file an Answer (the "Answer") which shall, *inter alia*, contain the following information:

a)  its name in full, description and address;

b)  its comments as to the nature and circumstances of the dispute giving rise to the claim(s);

c)  its response to the relief sought;

d)  any comments concerning the number of arbitrators and their choice in light of the Claimant's proposals and in accordance with the provisions of Articles 8, 9 and 10, and any nomination of an arbitrator required thereby; and

e)  any comments as to the place of arbitration, the applicable rules of law and the language of the arbitration.

2

The Secretariat may grant the Respondent an extension of the time for filing the Answer, provided the application for such an extension contains the Respondent's comments concerning the number of arbitrators and their choice and, where required by Articles 8, 9 and 10, the nomination of an arbitrator. If the Respondent fails to do so, the Court shall proceed in accordance with these Rules.

3

The Answer shall be supplied to the Secretariat in the number of copies specified by Article 3(1).

4

A copy of the Answer and the documents annexed thereto shall be communicated by the Secretariat to the Claimant.

5

Any counterclaim(s) made by the Respondent shall be filed with its Answer and shall provide:

a)  a description of the nature and circumstances of the dispute giving rise to the counterclaim(s); and

b)  a statement of the relief sought, including, to the extent possible, an indication of any amount(s) counterclaimed.

6

The Claimant shall file a reply to any counterclaim within 30 days from the date of receipt of the counterclaim(s) communicated by the Secretariat. The Secretariat may grant the Claimant an extension of time for filing the reply.

## Article 6
## Effect of the Arbitration Agreement

1

Where the parties have agreed to submit to arbitration under the Rules, they shall be deemed to have submitted *ipso facto* to the Rules in effect on the date of commencement of the arbitration proceedings, unless they have agreed to submit to the Rules in effect on the date of their arbitration agreement.

Rules of Arbitration

**2**

If the Respondent does not file an Answer, as provided by Article 5, or if any party raises one or more pleas concerning the existence, validity or scope of the arbitration agreement, the Court may decide, without prejudice to the admissibility or merits of the plea or pleas, that the arbitration shall proceed if it is *prima facie* satisfied that an arbitration agreement under the Rules may exist. In such a case, any decision as to the jurisdiction of the Arbitral Tribunal shall be taken by the Arbitral Tribunal itself. If the Court is not so satisfied, the parties shall be notified that the arbitration cannot proceed. In such a case, any party retains the right to ask any court having jurisdiction whether or not there is a binding arbitration agreement.

**3**

If any of the parties refuses or fails to take part in the arbitration or any stage thereof, the arbitration shall proceed notwithstanding such refusal or failure.

**4**

Unless otherwise agreed, the Arbitral Tribunal shall not cease to have jurisdiction by reason of any claim that the contract is null and void or allegation that it is non-existent, provided that the Arbitral Tribunal upholds the validity of the arbitration agreement. The Arbitral Tribunal shall continue to have jurisdiction to determine the respective rights of the parties and to adjudicate their claims and pleas even though the contract itself may be non-existent or null and void.

## THE ARBITRAL TRIBUNAL

**Article 7**
**General Provisions**

**1**

Every arbitrator must be and remain independent of the parties involved in the arbitration.

**2**

Before appointment or confirmation, a prospective arbitrator shall sign a statement of independence and disclose in writing to the Secretariat any facts or circumstances which might be of such a nature as to call into question the arbitrator's independence in the eyes of the parties. The Secretariat shall provide such information to the parties in writing and fix a time limit for any comments from them.

**3**

An arbitrator shall immediately disclose in writing to the Secretariat and to the parties any facts or circumstances of a similar nature which may arise during the arbitration.

**4**

The decisions of the Court as to the appointment, confirmation, challenge or replacement of an arbitrator shall be final and the reasons for such decisions shall not be communicated.

**5**

By accepting to serve, every arbitrator undertakes to carry out his responsibilities in accordance with these Rules.

**6**

Insofar as the parties have not provided otherwise, the Arbitral Tribunal shall be constituted in accordance with the provisions of Articles 8, 9 and 10.

**Article 8**
**Number of Arbitrators**

**1**

The disputes shall be decided by a sole arbitrator or by three arbitrators.

**2**