UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

GENERAL MOTORS CORPORATION
AND ADAM OPEL GMBH,

                    Plaintiffs,

          -against-

FIAT S.p.A.; FIAT AUTO HOLDING B.V.;
and FIAT AUTO S.p.A.,

                    Defendants.

INDEX NO.  08 CV 4999 (DAB)

<u>MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO STAY OR
DISMISS AND IN SUPPORT OF PLAINTIFFS'
CROSS-MOTION FOR SUMMARY JUDGMENT</u>

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY ....................................................................... 1

STATEMENT OF UNDISPUTED FACTS ............................................................... 4

ARGUMENT ........................................................................................................... 10

    I.    THE COURT SHOULD DENY DEFENDANTS' MOTION TO STAY ........... 10

        A.    There Is No Need For A Stay To Determine Arbitrability Because Both Parties Agree This Dispute Is Arbitrable ........................................ 10

        B.    The Court Can And Should Determine Whether General Motors, As Master Of The Complaint, Has Properly Invoked The Dispute Resolution Procedure So The Parties Can Proceed In The Proper Forum ...................................................................................................... 13

        C.    The Court Should Exercise Its Authority To Resolve This Dispute ........ 15

    II.    THE COURT SHOULD DENY FIAT'S MOTION TO DISMISS AND GRANT GENERAL MOTORS' CROSS-MOTION FOR SUMMARY JUDGMENT BECAUSE IT IS INDISPUTABLE THAT THE COMMON INVESTMENT DISPUTE ARISES UNDER THE MASTER SEPARATION AGREEMENT ........................................................................ 16

        A.    The Common Investment Dispute Falls Squarely Within the Plain Language of the Master Separation Agreement....................................... 17

        B.    The Ancillary Cross Supply Agreement Does Not Supersede The Master Separation Agreement................................................................. 21

    III.    THE COURT HAS PERSONAL JURISDICTION OVER FIAT ...................... 23

CONCLUSION......................................................................................................... 25

# TABLE OF AUTHORITIES

**Page**

## CASES

*305 E. 40th Garage Corp. v. 305 E. 40th Owners Corp.*,
833 F. Supp. 991 (S.D.N.Y. 1993)............................................................ 21, 25

*AMF Inc. v. Brunswick Corp.*,
621 F. Supp. 456 (E.D.N.Y. 1985) ............................................................ 11

*Bradford-Scott Data Corp. v. Physician Computer Network, Inc.*,
136 F.3d 1156 (7th Cir. 1998) ................................................................... 15

*CB Richard Ellis, Inc. v. Am. Envtl. Waste Mgmt.*,
No. 98-CV-4183, 1998 U.S. Dist. LEXIS 20064, at *3-4 (E.D.N.Y. Dec. 4,
1998) ......................................................................................................... 11

*Chambers v. Time Warner, Inc.*,
282 F.3d 147 (2d Cir. 2002)................................................................. 3, 5, 6

*City of New York v. Cyco.net, Inc.*,
383 F. Supp. 2d 526 (S.D.N.Y. 2005)...................................................... 14

*Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*,
58 F.3d 16 (2d Cir. 1995) ......................................................................... 13

*Colo. River Water Conservation Dist. v. United States*,
424 U.S. 800 (1976).................................................................................. 16

*DaPuzzo v. Globalvest Mgmt. Co.*,
263 F. Supp. 2d 714 (S.D.N.Y. 2003).......................................... 12, 15, 21

*First City Nat'l Bank & Trust Co. v. Simmons*,
878 F.2d 76 (2d Cir. 1989)........................................................................ 14

*First Options of Chicago, Inc. v. Kaplan*,
514 U.S. 938 (1995) ................................................................................. 12

*Hanson v. McCaw Cellular Commc'ns, Inc.*,
77 F.3d 663 (2d Cir. 1996).................................................................. 17, 18

*Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*,
219 F.3d 104 (2d Cir. 2000)..................................................................... 17

*Holmes Group, Inc. v. Vornado Air Circulation Sys., Inc.*,
535 U.S. 826 (2002).................................................................................. 14

*Int'l Multifoods Corp. v. Commercial Union Ins. Co.*,
309 F.3d 76 (2d Cir. 2002)....................................................................... 21

*Janover v. Bernan Foods, Inc.*,
901 F. Supp. 695 (S.D.N.Y. 1995)........................................................... 18

*Liberty USA Corp. v. Buyer's Choice Ins. Agency LLC*,
386 F. Supp. 421 (SD.N.Y. 2005)............................................................ 23

*Ministry of Commerce v. Marine Tankers Corp.*,
194 F. Supp. 161 (S.D.N.Y. 1960) ........................................................... 15

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Nat'l Sch. Reporting Servs., Inc. v. Nat'l Schs. of California, Ltd.,*
   967 F. Supp. 127 (S.D.N.Y. 1997).................................................................. 18

*Nat'l Union Fire Ins. Co. v. Belco Petroleum Corp.,*
   88 F.3d 129 (2d Cir. 1996)............................................................................ 13

*O'Mahony v. Accenture Ltd.,*
   537 F. Supp. 2d 506 (S.D.N.Y. 2008)............................................................. 3

*RJE Corp. v. Northville Indus. Corp.,*
   329 F.3d 310 (2d Cir. 2003).......................................................................... 18

*Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan,*
   7 F.3d 1091 (2d Cir. 1993)............................................................................ 18

*Seiden Assocs., Inc. v. ANC Holdings, Inc.,*
   959 F.2d 425 (2d Cir. 1992).......................................................................... 17

*Shaw Group, Inc. v. Triplefine International Corp.,*
   322 F.3d 115 (2d Cir. 2003).......................................................................... 12

*Sierra Rutile Ltd. v. Katz,*
   937 F.2d 743 (2d Cir. 1991).......................................................................... 16

## STATUTES AND RULES

9 U.S.C. § 3........................................................................................................ 13

Fed. R. Civ. P. 56(c) ........................................................................................... 17

Plaintiffs General Motors Corporation and Adam Opel GmbH (collectively "General Motors") respectfully submit this Opposition to the motion to stay or dismiss filed by Defendants Fiat S.p.A., Fiat Auto Holding B.V., and Fiat Auto S.p.A. (collectively "Fiat"), and in support of their cross-motion for summary judgment.

## INTRODUCTION AND SUMMARY

General Motors and Fiat have a dispute regarding Fiat's obligation to pay common investment expenses (the "Common Investment Dispute"). General Motors has sought to resolve this dispute through the binding dispute resolution procedures contained in the Master Separation Agreement because of demonstrable efficiencies associated with those procedures. Fiat has refused to proceed with such dispute resolution, arguing that the procedure in the Master Separation Agreement cannot be used because the Common Investment Dispute must be resolved exclusively under the dispute resolution procedures of a different agreement, the Cross Supply Agreement.

The basic question this case presents is whether General Motors has the right to use the binding dispute resolution procedures of the Master Separation Agreement to resolve the Common Investment Dispute. The answer can be found in undisputed facts and the plain and unambiguous language of the parties' agreements: General Motors may use the Master Separation Agreement's dispute resolution procedures. Exhibit 3.1(a)(iv) to the Master Separation Agreement ("the Exhibit") expressly requires the payment of common expenses upon the early termination of product purchases, the very claim that is at issue in the Common Investment Dispute. Accordingly, General Motors has properly invoked the procedures contained in the Master Separation Agreement. The parties' agreements, applicable law and public policy in favor of the efficient arbitration of disputes all support GM's right to proceed with binding arbitration under the Master Separation Agreement, as explained below.

Fiat's contrary arguments are fundamentally flawed. Fiat requests this Court to stay the action to allow a panel of International Chamber of Commerce ("ICC") arbitrators in Geneva to determine whether this dispute is arbitrable. However, there is no basis for a stay because neither General Motors nor Fiat has ever contested the arbitrability of the Common Investment Dispute. The only question before this Court is whether General Motors may invoke the binding dispute resolution procedure in the Master Separation Agreement. Rather than stay the action, the Court should decide the merits of the parties' disagreement regarding *which* contractual alternative dispute resolution procedure governs their dispute. As precedent establishes, this Court can and should examine the parties' agreements to confirm that General Motors has appropriately selected the dispute resolution procedure in the Master Separation Agreement.

Fiat's position also ignores the traditional legal standard governing a Rule 12(b)(6) motion and assumes the truth of its alleged defense. However, in evaluating Fiat's motion to dismiss, this Court must accept General Motors' allegations as true and construe them in the light most favorable to General Motors. *See O'Mahony v. Accenture Ltd.*, 537 F. Supp. 2d 506, 509 (S.D.N.Y. 2008) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)). On the basis of those allegations, the Court should determine that the dispute resolution provisions of the Master Separation Agreement control the Common Investment Dispute because Fiat's obligation to pay the common investment expenses arises under the Master Separation Agreement. Thus, this Court should deny Fiat's motion to dismiss.

Indeed, on the undisputed plain language of the parties' agreements, General Motors is entitled to summary judgment as a matter of law that it has properly invoked the dispute resolution provision of the Master Separation Agreement to resolve the Common Investment Dispute. Exhibit 3.1(a)(iv), the document that goes to the very heart of the underlying dispute, is attached to the Master Separation Agreement. Logic and the law dictate that General Motors is

entitled to use the dispute resolution provisions of the Master Separation Agreement to determine whether the Master Separation Agreement obligates Fiat to reimburse common investment expenses.

Fiat's contrary arguments lack merit and are belied by the parties' clear and unambiguous written agreements.  First, Fiat contends that Exhibit 3.1(a)(iv) is "errant" and should simply be disregarded.  However, that Exhibit is entirely consistent with other portions of the parties' agreements and ignoring it would be inconsistent with fundamental principles of contract interpretation.  Second, Fiat contends that the ancillary Cross Supply Agreement supersedes the Master Separation Agreement.  However, the merger clause in the Cross Supply Agreement applies only to "prior agreements," and the Master Separation Agreement is a contemporaneous agreement signed on the same day.

In sum, Fiat's motion to stay or dismiss this action should be denied, and General Motors' cross-motion for summary judgment should be granted so that the parties may expeditiously proceed in the arbitration forum properly selected by GM.

## STATEMENT OF UNDISPUTED FACTS[1]

*The Parties' Joint Venture.*

Pursuant to a Master Agreement between General Motors Corporation and Fiat S.p.A. dated March 13, 2000 (the "2000 Agreement"), General Motors and Fiat agreed to enter into a series of agreements that combined various aspects of their operations and created the Powertrain Joint Venture, the Purchasing Joint Venture, and the Brazil Joint Venture (collectively, the "Joint Ventures"). (Millikin Decl. ¶ 2.)

*The Parties' Agreement to Liquidate The Joint Ventures.*

Disagreements arose between General Motors and Fiat, including disagreements as to the parties' rights and obligations under the 2000 Agreement. (*Id.* ¶ 3.) Following these disagreements, General Motors and Fiat entered into the Agreement to Liquidate Joint Ventures and Terminate Master Agreement, dated February 13, 2005 (the "Termination Agreement"). (*Id.* ¶ 4.) Pursuant to the Termination Agreement, General Motors and Fiat established a Liquidation Committee to oversee liquidation of the Joint Ventures. (*Id.* ¶ 5.) The Liquidation Committee was directed to prepare a Liquidation Plan within 90 days of the execution of the Termination Agreement. (*Id.*; Hardiman Aff. Ex. E § 5.1 at 3-4.)

*The Parties' Master Separation Agreement and Ancillary Agreements.*

Pursuant to their agreement to develop a Liquidation Plan, General Motors and Fiat reached further understandings and agreements regarding liquidation of the Joint Ventures,

---

[1] General Motors agrees that this Court may consider the key agreements between the parties referenced in the Complaint in connection with Fiat's motion to dismiss. (Defs.' Mot. 2 n.1.) Those same agreements also form the basis for General Motors' cross-motion for summary judgment. Accordingly, this statement of undisputed facts summarizes the key provisions of the applicable agreements and the handful of other undisputed facts material to the Court's resolution of the parties' motions, which are set forth in the accompanying separate statement of undisputed facts and Declaration of Michael P. Millikin ("Millikin Decl.").

which are documented in the Joint Ventures Separation Master Agreement, dated May 13, 2005

(the "Master Separation Agreement"). (Millikin Decl. ¶ 6.) In conjunction with the Master

Separation Agreement, the parties entered into a series of "Ancillary Agreements" to implement

provisions of the Termination Agreement, which the Master Separation Agreement defined to

include, among other agreements, a European Powertrain Cross Supply Agreement (the "Cross

Supply Agreement"), also dated May 13, 2005. (*Id.* ¶ 7; Hardiman Aff. Ex. A-1 § 1.1(a) at 4.)

As its name connotes, the Master Separation Agreement thus was the base or "umbrella"

document relating to unwinding of the parties' joint ventures, while the Ancillary Agreements,

including the Cross Supply Agreement, were entered into to implement specific provisions of the

Termination Agreement relating to particular operations. The Cross Supply Agreement related

to the liquidation of the Powertrain JV, which was a joint venture to produce powertrains in

Europe entered into among Fiat, Fiat Auto Holding B.V. ("FAH"), General Motors, and FIAT-

GM Powertrain B.V. ("FGP"). (Hardiman Aff. Ex. A-1 at 4-5; Ex. C-1 at 4.) The Cross Supply

Agreement refers to the Master Separation Agreement as the "Umbrella Agreement." (*Id.* Ex. C-

1 § 14.2 at 25.)

*Pertinent Provisions of the Cross Supply Agreement*.

Under the Cross Supply Agreement, the parties agreed to maintain purchase

arrangements on the same terms and conditions for a period of up to five years from the date of

completion of the liquidation of the Powertrain JV. (*Id.* at 4.) The Cross-Supply Agreement

terminates in 2010. (*Id.* § 14.1 at 25.) However, the Customer "may . . . discontinue to purchase

one or more Cross Supply Products upon one year prior written notice to Supplier." (*Id.* § 14.2

at 25.) In that event, the Customer is obligated to reimburse the Supplier for investment

expenses incurred in connection with supplying the products:

> Upon termination, in whole or in part, Customer guarantees to pay
> within 30 days from the expiry of the one year written notice
> period the net book value that has not been recovered in the piece
> price of the specific investments and capitalized FGP start-up and
> preproduction expenses that have been allocated to Customer on
> Cross Supply Products and Spare Parts as shown in Section 7 and
> Schedule 3.3B and 3.3C (based in part on Exhibit 3.1(v) and
> Schedule 3.1(a)(iv) of the Umbrella Agreement), but not yet fully
> paid for as part of the piece price.

(*Id.*)  Although the title of Schedule 3.3B is "Specific Investment Depreciation Summary," it

includes both specific and allocated (common) expenses.  (*Id*. Ex. C-2 Sch. 3.3B.)

The Cross Supply Agreement contains a choice of law clause providing its validity and

interpretation shall be governed by Swiss law.  (*Id.* Ex. C-1 § 27 at 28.)  It provides that any

dispute or claim arising out of or relating to the Agreement shall first be the subject of informal

dispute resolution (*id.* § 29 at 29) and, if not resolved within 30 days, by arbitration administered

by the ICC before a three-arbitrator panel in Geneva, Switzerland (*id.* § 30 at 29-30).

*Pertinent Provisions of the Master Separation Agreement.*

The Master Separation Agreement was entered into effective May 13, 2005,

contemporaneously with the Cross Supply Agreement and other Ancillary Agreements.  (*Id*. Ex.

A-1; Millikin Decl. ¶ 7.)  In an article entitled "Unwind of Powertrain Joint Venture," the Master

Separation Agreement recited that Fiat and General Motors "have resolved certain special items

relating to the Powertrain JV."  (Hardiman Aff. Ex. A-1 § 3.1(a) at 9.)  Among the listed items is

an agreement that "[s]pecific investments will be amortized in the piece price over five years as

provided in Schedule 3.1(v)."  (*Id.* at § 3.1(a)(iv) at 10.)  The referenced exhibit contains two

separate provisions obligating Fiat to pay certain investment expenses in the event of its partial

or full termination of the Cross Supply Agreement.  (*Id.* Ex. A-2, Ex. 3.1(a)(iv).)  One provision

governs the terminating customer's obligation to pay "specific" investments (that is, investments

that a particular party requested).  (*Id.* ¶ 1(b).)  The exhibit to the Master Separation Agreement

has a second, distinct provision relating to the recovery of "common" investments (that is,

investments that were not requested by a particular party but were otherwise implemented for the

benefit of both parties):

> In the event of partial or full termination of the Supply Agreement
> for any product family (ie: L850, Fam 1, F40, JTD, M20/32), the
> remaining net book value of the associated common investment
> that has not been recovered in piece price are guaranteed to be paid
> in full at the time of partial or full termination for the specific
> product family by the respective customer that is partially or fully
> terminating the supply of this product.

(*Id.* ¶ 3(a).)

Section 9.11 of the Master Separation Agreement provides that "[t]he dispute resolution

process is as provided in Article 16 of the Termination Agreement which is incorporated herein

by reference." (*Id*. Ex. A-1 § 9.11 at 26.)  Upon issuance of a written Request for Informal

Dispute Resolution, Article 16 of the Termination Agreement requires senior executives (or

other designees) of General Motors and Fiat to meet within 15 days to attempt in good faith to

resolve the dispute.  (Hardiman Aff. Ex. E § 16 at 11-12.)  If they are unable to resolve the

dispute within this 15-day period, either party may send a Request for Binding Dispute

Resolution, in which case the parties shall jointly select a Mediator to facilitate resolution of the

dispute in accordance with procedures set forth in Article 16.  (*Id*.)  Under those procedures, if

the parties are unable satisfactorily to resolve the dispute with the mediator's assistance, the

mediator is directed to decide upon the resolution of the dispute and to enter a final and binding

decision.  (*Id*. §16.2 at 12.)

Section 9.10 of the Master Separation Agreement provides that the "interpretation and

implementation of this Agreement shall be governed by and construed in accordance with the

Laws of New York, excluding any conflict of law provisions which would require application of

another law." (*Id*. Ex. A-1 § 9.10 at 26.)  Section 16.5 of the Termination Agreement provides

that "[t]he foregoing provisions of Section 16 do not preclude the disputing Parties from applying to the United States District Court for the Southern District of New York for preliminary or injunctive remedies to enforce this Section 16 . . . ." (*Id*. Ex. E § 16.5 at 12.) Section 20.9 of the Termination Agreement contains an explicit consent to jurisdiction clause: subject to the dispute resolution provisions of Article 16, "each of Fiat and General Motors irrevocably submits to the exclusive jurisdiction of the United States District Court for the Southern District of New York . . . ." (*Id*. § 20.9 at 17.) That provision remains in effect pursuant to Section 9.4 of the Master Separation Agreement, which lists the provisions of the Termination Agreement that were superseded by that Agreement and the Ancillary Agreements, and provides that all remaining provisions remain in effect. (*Id*. Ex. A-1 § 9.4 at 24.)

The Master Separation Agreement contains an express provision providing that "[a]ll rights and remedies of the Parties hereunder shall be in addition to all other legal rights and remedies belonging to them and the same shall be deemed to be cumulative and not alternative to such legal rights and remedies." (*Id.* § 9.3 at 24.)

*The Common Investment Dispute.*

On December 22, 2006, Fiat sent General Motors a letter referencing the Cross Supply Agreement to provide notice that it planned to stop purchasing Family 1 engines, effective December 31, 2007. (*Id*. Ex. D.) As the termination date approached, a dispute arose between the parties regarding Fiat's obligation to pay common investment expenses associated with those products. (Millikin Decl. ¶ 10.) For several months, the parties' business representatives tried to resolve the Common Investment Dispute. (*Id*. ¶ 11.) Following the effective date of the termination, on January 31, 2008, General Motors sent Fiat an invoice for payment of specific and common investment expenses, as well as certain start-up expenses. (*Id*. ¶ 12; Hardiman Aff.

Ex. D.)  Although Fiat paid the specific and start-up expenses, Fiat refused to pay the common

investment expenses.  (Millikin Decl. ¶ 12.)

On April 18, 2008, General Motors sent Fiat a written Request for Informal Dispute

Resolution regarding the Common Investment Dispute pursuant to Section 9.11 of the Master

Separation Agreement and Article 16 of the Termination Agreement.  (*Id.* ¶ 13, Ex. 1.)  On April

24, 2008, Fiat responded to General Motors' written Request for Informal Dispute Resolution

and stated its view that these dispute resolution provisions do not apply to the Common

Investment Dispute.  (*Id.* ¶ 14, Ex. 2.)

On April 29, 2008, counsel for General Motors and counsel for Fiat discussed the

applicability of the dispute resolution provisions.  (*Id.* ¶ 15.)  By letters dated April 30, 2008 and

May 5, 2008, General Motors and Fiat agreed to extend their informal discussions to May 10,

2008.  (*Id.*)  That date has passed without a resolution of the Common Investment Dispute.  (*Id.*)

In accordance with the dispute resolution provisions of Section 9.11, General Motors sent Fiat a

Request for Binding Dispute Resolution on May 30, 2008.  (*Id. ¶* 16, Ex. 3.)

Although Fiat has engaged in informal discussions with General Motors regarding a

possible settlement of the Common Investment Dispute, Fiat has taken the position that the

Common Investment Dispute is not subject to the dispute resolution provisions of Section 9.11.

(*Id.* ¶ 17.)  Accordingly, Fiat has declined to jointly select a "mediator" to facilitate a resolution

to the dispute or to arbitrate the dispute to a binding resolution, as required by those provisions.

(*Id.*)

On May 30, 2008, General Motors filed the instant action seeking declaratory and

injunctive relief to require Fiat to comply with the dispute resolution provisions of the Master

Separation Agreement.  (Compl. ¶ 2.)

On July 1, 2008, Fiat sent General Motors a Request for Informal Dispute Resolution pursuant to Section 29 of the Cross Supply Agreement. (Defs.' Mot. 14 n.7.) As of this date, the parties have not resolved the Common Investment Dispute and Fiat has not filed a demand for arbitration in the ICC.

## ARGUMENT

## I.    THE COURT SHOULD DENY DEFENDANTS' MOTION TO STAY.

Fiat argues first that this Court should stay this action until an ICC arbitration panel "decides whether this dispute is arbitrable." (*Id*. at 11-14.) That argument misstates the issue before the Court. The parties *agree* the Common Investment Dispute is arbitrable; they disagree only as to whether General Motors can invoke the dispute resolution procedures of the Master Separation Agreement to resolve that dispute or whether, as Fiat contends, it must be resolved only under the dispute resolution procedures of the Cross Supply Agreement. The Court can and should determine that issue in General Motors' favor.

### A.    There Is No Need For A Stay To Determine Arbitrability Because Both Parties Agree This Dispute Is Arbitrable.

Both General Motors and Fiat agree the Common Investment Dispute is arbitrable. Neither party has proposed litigation to resolve the Common Investment Dispute; in fact, both General Motors and Fiat have attempted to invoke different alternative dispute resolution procedures. (*See* Millikin Decl. ¶¶ 13, 16; Defs.' Mot. 14 n.7.) Consequently, there is no need for an arbitration panel to decide "whether this matter is arbitrable," as Fiat contends. (Defs.' Mot. at 14.) As Fiat admits, the issue presented here is not *whether* the dispute is arbitrable, but rather "which agreement applies to this dispute." (*Id.* at 11 n.5.)[2]

---

[2]It is not necessary that the binding dispute resolution process under the Master Separation Agreement employ the term "arbitration." "Case law . . . reflects unequivocal support of agreements to have third parties decide disputes – the essence of arbitration. No magic words (Continued…)

For this reason, the cases Fiat cites in support of its motion to stay are inapposite because they apply only where one of the parties contests arbitrability.  (*See id*. at 11-14.)  *See, e.g., First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 941 (1995) (respondents, owners of investment company, "denied that their disagreement with First Options was arbitrable and filed written objections to that effect with the arbitration panel"); *Shaw Group, Inc. v. Triplefine International Corp.*, 322 F.3d 115, 118 (2d Cir. 2003) (appellees asserted they were not bound by agreement to arbitrate and should not be required to arbitrate a claim then pending in the bankruptcy court).  Unlike these cases, this action does not present any contested issue of arbitrability.  There is no need for the question of arbitrability to be decided by the arbitrators because the parties agree on that question; this Court need decide only whether General Motors properly invoked the dispute resolution procedures of the Master Separation Agreement to initiate that arbitration.  *See DaPuzzo v. Globalvest Mgmt. Co.*, 263 F. Supp.  2d 714, 719 (S.D.N.Y. 2003) ("Here, the parties do not disagree that their dispute is subject to arbitration under the terms of the agreements that define their relationship and that govern the attendant investment transaction which gave rise to this action.  For the purposes of the motions now before the Court, the litigants' only relevant difference pertains to the venue and applicable arbitration rules").

---

such as 'arbitrate' or 'binding arbitration' or 'final dispute resolution' are needed to obtain the benefits of the [Federal Arbitration Act]."  *AMF Inc. v. Brunswick Corp.*, 621 F. Supp. 456, 460-61 (E.D.N.Y. 1985) (finding parties' agreement to obtain a non-binding advisory opinion should be characterized as an agreement to arbitrate because submission of the dispute to a third party will "settle" the issue); *see also, e.g., CB Richard Ellis, Inc. v. Am. Envtl. Waste Mgmt.*, No. 98-CV-4183**,** 1998 U.S. Dist. LEXIS 20064, at *3-4 (E.D.N.Y. Dec. 4, 1998) ("The [FAA] defines arbitration as a process that will 'settle' the controversy.  Because the mediation clause in the case at bar manifests the parties' intent to provide an alternative method to 'settle' controversies arising under the parties' 1997 agreement, this mediation clause fits within the Act's definition of arbitration").  Similarly here, submitting the Common Investment Dispute to a third party mediator empowered to decide the matter under the procedures contained in the Master Separation Agreement will conclusively settle the dispute.

Fiat makes the same analytical error in arguing that the strong federal policy favoring arbitration supports only the dispute resolution procedures in the Cross Supply Agreement. (*See* Defs.' Mot. 14-16.) The cases Fiat relies upon compare the virtues of arbitration with the alternative of resolving disputes through litigation in court and not, as here, against another alternative dispute resolution procedure. *See, e.g., See Nat'l Union Fire Ins. Co. v. Belco Petroleum Corp.*, 88 F.3d 129, 133 (2d Cir. 1996) ("The advantages of arbitration are well-known. Arbitration is 'usually cheaper and faster than litigation; . . . it normally minimizes hostility and is less disruptive of ongoing and future business dealings among the parties. . . .' Arbitration also helps to relieve crowded court dockets.") (internal citation omitted); *Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16 (2d Cir. 1995) (applying policy favoring arbitration where one of the contracts at issue lacked an arbitration clause). These cases are inapplicable to the instant matter where the disagreement concerns the applicability of different dispute resolution procedures. They do not support Fiat's position that the ancillary Cross Supply Agreement governs.

Finally, Fiat misplaces its reliance on the breadth of the arbitration clause in the Cross Supply Agreement. (Defs.' Mot. 11-13, 15-17.) The dispute resolution clause of the Master Separation Agreement is equally broad, applying as to it does to "any dispute, controversy or claim among the Parties arising out of or relating to this Agreement." (Hardiman Aff. Ex. A-1 § 9.11 at 26.) Accordingly, the "presumption of arbitrability" that Fiat contends flows from the dispute resolution clause in the Cross Supply Agreement (Defs.' Mot. 15) does not help it, because the very same presumption arises from the dispute resolution clause incorporated into the Master Separation Agreement.

In short, given the parties' agreement that the Common Investment Dispute is arbitrable, there is no reason for the Court to stay this action to allow the ICC arbitrators to determine that

issue. Simply put, there is no issue that is "referable to arbitration," as required by the provision authorizing stays of proceedings under the Federal Arbitration Act, 9 U.S.C. § 3.

> **B.**     **The Court Can And Should Determine Whether General Motors, As Master Of The Complaint, Has Properly Invoked The Dispute Resolution Procedure So The Parties Can Proceed In The Proper Forum.**

As the party seeking the remedy in this case, General Motors may appropriately choose which dispute resolution procedure it wishes to invoke. The "plaintiff is 'the master of the complaint.'" *Holmes Group, Inc. v. Vornado Air Circulation Sys., Inc.,* 535 U.S. 826, 831 (2002); *see also City of New York v. Cyco.net, Inc.*, 383 F. Supp. 2d 526, 545 (S.D.N.Y. 2005) ("a plaintiff's choice of forum is accorded significant weight").[3] A defendant cannot undermine a plaintiff's right to choose the forum by asserting a federal counterclaim to remove the case from state court. *Holmes Group, Inc.*, 535 U.S. at 831-32. Similarly here, General Motors has the right to choose where it wishes the dispute to be heard. Fiat cannot undermine General Motors simply by asserting it wishes to be heard in a different forum *after* General Motors elected to enforce its rights under the Master Separation Agreement.

Here, General Motors has opted to invoke the dispute resolution procedures outlined in the Master Separation Agreement.[4] Just as in other jurisdictional disputes, this Court may

---

[3]The Master Separation Agreement—unlike the Cross Supply Agreement—contains an express provision providing that "[a]ll rights and remedies of the Parties hereunder shall be in addition to all other legal rights and remedies belonging to them and the same shall be deemed to be cumulative and not alternative to such legal rights and remedies." (Hardiman Aff. Ex. A-1 § 9.3 at 24.) Consequently, General Motors properly elected to resolve the Common Investment Dispute under the Master Separation Agreement even if it could have also chosen to resolve the dispute under the Cross Supply Agreement. Absent some showing of special circumstances, General Motors' election to pursue resolution of the dispute under the Master Separation Agreement rather than the Cross Supply Agreement should be accorded deference. *Cf. First City Nat'l Bank & Trust Co. v. Simmons* , 878 F.2d 76, 79 (2d Cir. 1989) (citation omitted) (it is a "well-settled principle in [the Second] Circuit that 'where there are two competing lawsuits, the first suit should have priority, absent the showing of balance of convenience . . . or . . . special circumstances . . . giving priority to the second.'").

[4] General Motors has legitimate reasons for preferring to use the Master Separation Agreement dispute resolution procedure. First, given that an express obligation to pay common (Continued…)

determine whether General Motors appropriately exercised its power as master of the complaint in selecting the dispute resolution provisions outlined in the Master Separation Agreement. Making this determination will enable the parties to proceed in the proper forum.

In *Ministry of Commerce v. Marine Tankers Corp.*, 194 F. Supp. 161 (S.D.N.Y. 1960), for example, this Court analyzed competing arbitration provisions from different documents to determine which controlled the parties' dispute. Petitioner charterer sought to compel respondent ship owner to arbitrate a claim for cargo damage. *Id*. at 161. Relying on an arbitration provision contained in the voyage charter party signed by both parties, petitioner demanded arbitration, but respondent refused. *Id*. at 162. Respondent argued that subsequently issued bills of lading, which included references to arbitration, superseded the arbitration clause contained in the charter. *Id*. After analyzing both documents, the court held it was "unable to conclude that the parties intended the [bill of lading] arbitration clause to regulate their obligations with respect to the procedure for determination of claims such as the one asserted by petitioner." *Id*. at 164; *see also, e.g., Bradford-Scott Data Corp. v. Physician Computer Network, Inc.*, 136 F.3d 1156, 1158 (7th Cir. 1998) (denying defendant's motion to stay or dismiss action pending arbitration where arbitration clause in master license agreement controlled in event of any inconsistency with broad arbitration clause in prior agreement); *DaPuzzo*, 263 F. Supp. 2d at 734-35 (determining arbitration clause in a partnership agreement

---

expenses arises from the Master Separation Agreement, it is the logical procedure. Further, it is a procedure that was mutually developed by General Motors and Fiat and which previously has been successfully used by the parties. (Millikin Decl. ¶ 8.) In 2005 it was invoked by Fiat to resolve another dispute between the parties and it resulted in a quick resolution of the dispute – the mediator issued a ruling within three months of appointment. (*Id*.)

covered the parties' dispute rather than an apparently conflicting arbitration provision found in another document).[5]

Similarly here, General Motors initiated dispute resolution under the Master Separation Agreement, but Fiat argues the dispute resolution procedure in the Cross Supply Agreement exclusively governs the parties' dispute. As in these cases, this Court should analyze the pertinent documents to determine whether General Motors properly invoked the arbitration clause in the Master Separation Agreement to resolve the Common Investment Dispute.

**C.    The Court Should Exercise Its Authority To Resolve This Dispute.**

Both of the remedies Fiat seeks by its motion would effectively resolve this action in its favor. Fiat's request for a stay pending arbitration would grant Fiat the most relief it could obtain if it prevailed on the merits of this action: a green light to proceed with arbitration before the ICC while refusing to cooperate with General Motors' invocation of the binding mediation and arbitration procedures of the Master Separation Agreement. In the alternative, Fiat requests this Court to decide the merits of this case and determine that the dispute resolution procedures of the Master Separation Agreement do not apply to the parties' dispute. (Defs.' Mot. 14.)

Although it disagrees with Fiat's conclusion as to whether the Master Separation Agreement applies, General Motors agrees the Court can and should determine the key issue in this case on its merits. Federal courts have a "virtually unflagging obligation" to exercise the jurisdiction given them. *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976); *see also Sierra Rutile Ltd. v. Katz*, 937 F.2d 743, 745 (2d Cir. 1991) (district court's

---

[5]In *DaPuzzo*, although the court found the ICC arbitration provision in the partnership agreement covered the claims in the action, it nevertheless refused to compel arbitration in the Bahamas pursuant to that provision because that country was not a party to an international convention that would have made the resulting award enforceable in federal court. 263 F. Supp. 2d at 720-28. The court nevertheless granted defendants' motion to stay the litigation, leaving it to the parties to decide whether to pursue arbitration voluntarily. *Id.* at 735-45. No such unusual jurisdictional issue is presented here.

grant of stay pending arbitration contravened its obligation to exercise its jurisdiction). This Court should discharge this duty by exercising its authority to resolve this dispute by ruling on the parties' cross-motions rather than by abdicating its jurisdiction to a foreign arbitration panel. Indeed, as shown in the next section, the issue presented by this action can and should be decided as a matter of law on the basis of the plain language of the parties' agreements.

## II.    THE COURT SHOULD DENY FIAT'S MOTION TO DISMISS AND GRANT GENERAL MOTORS' CROSS-MOTION FOR SUMMARY JUDGMENT BECAUSE IT IS INDISPUTABLE THAT THE COMMON INVESTMENT DISPUTE ARISES UNDER THE MASTER SEPARATION AGREEMENT.

Fiat argues that "the only issue presented by the Complaint – whether the dispute arises under the [Master] Separation Agreement – can only be decided against GM based on its own allegations." (Defs.' Mot. 14.)  In fact, precisely the opposite is true: on the face of the plain and unambiguous language of the parties' agreements, the Common Investment Dispute arises under the Master Separation Agreement.  The dispute resolution procedures of that Agreement therefore apply, and Fiat's motion to dismiss should be denied.  Further, the plain language of the parties' agreements dictate that General Motors may invoke the dispute resolution procedures of the Master Separation Agreement to resolve the Common Investment Dispute, and there are no additional facts bearing on that issue, which can readily be decided as a matter of law. Consequently, the Court should grant General Motors' cross-motion for summary judgment.

A district court should grant summary judgment when there is "no genuine issue as to any material fact," and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *see also Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 107 (2d Cir. 2000).  "When the interpretation of a contract is at issue, summary judgment is proper where the language of the contract is unambiguous, lending itself to only one reasonable interpretation." *Hanson v. McCaw Cellular Commc'ns, Inc.*, 77 F.3d 663, 667 (2d Cir. 1996) (citations omitted);

*see also*, *e.g.*, *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992)

("When the question is a contract's proper construction, summary judgment may be granted

when its words convey a definite and precise meaning absent any ambiguity."). The question of

whether a contract is clear or ambiguous is to be decided by the Court as a matter of law. *See*

*Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1094 (2d Cir.

1993).

Where, as here, the applicable contract provision is unambiguous, courts have not

hesitated to grant summary judgment. *See*, *e.g.*, *RJE Corp. v. Northville Indus. Corp.*, 329 F.3d

310, 311-15 (2d Cir. 2003) (affirming summary judgment for plaintiff on the basis of "the plain

and unambiguous language of the contract"); *Hanson*, 77 F.3d at 667-70 (affirming summary

judgment on breach of contract claim where agreement was unambiguous and was not

reasonably susceptible of interpretation set forth in parol affidavit, and there "remained only one

feasible interpretation of the Agreement"); *Nat'l Sch. Reporting Servs., Inc. v. Nat'l Schs. of

California, Ltd.*, 967 F. Supp. 127, 129-31 (S.D.N.Y. 1997) (granting plaintiff's motion for

summary judgment for enforcement of promissory note and guarantees where defendants did not

dispute agreements' validity or enforceability); *Janover v. Bernan Foods, Inc.,* 901 F. Supp. 695,

700-02 (S.D.N.Y. 1995) (granting plaintiff's motion for partial summary judgment in action to

collect severance benefits where "it is clear" plaintiff's agreements with his employer increased

his severance benefits).

> **A.    The Common Investment Dispute Falls Squarely Within the Plain Language
> of the Master Separation Agreement.**

The Master Separation Agreement governs the underlying Common Investment Dispute

because that dispute falls squarely within the plain language of its attached Exhibit 3.1(a)(iv):

"In the event of . . . termination of the Supply Agreement for any product family [e.g., Family 1

engines – the product at issue here], the remaining net book value of the associated *common investment* . . . are guaranteed to be paid in full . . . ."  (*See* Hardiman Aff. Ex. A-2, Ex. 3.1(a)(iv) (emphasis added).)  As Fiat admits, this exhibit "does contain a paragraph that discusses common investment payments owed upon 'termination of the Supply Agreement.'"  (Defs.' Mot. 16.)  In fact, it does more than merely discuss such payments: it expressly obligates the very payment that General Motors seeks.  Thus, under the express language of the Master Separation Agreement, General Motors has a claim to recover common expenses upon the termination of purchases by Fiat, which is precisely what the underlying dispute is about.  Therefore, the terms of the Master Separation Agreement – including its dispute resolution provisions – apply.

Unable to avoid the inescapable conclusion that this plain language governs the parties' dispute, Fiat attempts to dismiss Exhibit 3.1(a)(iv) on several grounds, none of which has merit.

*First*, Fiat makes the remarkable assertion in a footnote that "[w]hether or not the paragraph in the exhibit to the Separation Agreement has any bearing on Fiat's obligations to GM is not an issue for this motion."  (Defs.' Mot. 17 n.8.)  To the contrary: whether the Common Investment Dispute is governed by the plain language of that Exhibit is the *key* issue presented by these cross-motions.  Under the well established standards governing this Court's resolution of a motion to dismiss, this Court may not disregard the allegations in the Complaint. Moreover, Fiat admits the existence and authenticity of the parties' agreements, the interpretation of which presents a pure question of law.  Both establish that the Common Investment Dispute "arises out of and relates to the Master Separation Agreement."  (Compl. ¶ 27.)

*Second*, Fiat derides Exhibit 3.1(a)(iv) as an  "errant" provision, apparently implying that the Court should ignore that provision because it purportedly is "not tied to any substantive clauses or mentioned in the body of the [Master] Separation Agreement."  (Defs.' Mot. 16-17.) Fiat is wrong: the Exhibit *is* tied to a substantive clause in the Master Separation Agreement;

-18-

Section 3.1(a)(iv) expressly refers to it.  (Hardiman Aff. Ex. A-1 § 3.1(a)(iv) at 10.)[6]  It is

attached to the Master Separation Agreement and initialed by Teresa Holderer and Giorgio

Fossatti, the signatories to the Master Separation Agreement.   (*See id*. Ex. A-2, Ex. 3.1(a)(iv).)

Indeed, as Fiat itself concedes, this so-called "errant" Exhibit is expressly referenced in Section

14.2 of the Cross Supply Agreement, the section of that Agreement dealing with early

termination.  (Defs.' Mot. 16-17 (citing Hardiman Aff. Ex. C-1 § 14.2 at 25).)  While Fiat

attempts to disparage the Exhibit, it never actually contests its authenticity; indeed, Fiat itself has

attached the Exhibit to its own submission and conceded that it is included in "a true and correct

copy of the schedules attached to the [Master] Separation Agreement."  (Hardiman Aff. ¶ 2.)[7]

*Third*, Fiat makes much ado about the invoice General Motors sent in response to Fiat's

termination of its purchases of Family 1 engines, pointing out that the invoice referenced

Schedule 3.3B of the Cross Supply Agreement rather than the Master Separation Agreement.

(See Defs.' Mot. 16.)  However, General Motors cited Schedule 3.3B (which lists common and

specific investment depreciation figures for the period 2005-2010) not as the basis for Fiat's

obligation, but simply because the figures in Schedule 3.3B form the basis for calculating the

---

[6]Although Section 3.1(a)(iv) refers to "Schedule 3.1(v)," it is clear from context that it intended to refer to Exhibit 3.1(a)(iv).  The Exhibit was previously headed "Exhibit 3.1(v)," and was corrected by hand to read Exhibit 3.1(a)(iv), thereby cross-referencing the corresponding provision in the body of the Master Separation Agreement.  (*See* Hardiman Aff. Ex. A-2, Ex. 3.1(a)(iv).)  Thus, Section 3.1(a)(iv) and Exhibit 3.1(a)(iv) have the same numbering and discuss the same subject matter.  In contrast, there is no Schedule 3.1(v) to the Agreement.

[7]Fiat's further implication that Exhibit 3.1(a)(iv) may not even relate to the Cross Supply Agreement because the term "Supply Agreement" is not explicitly defined in the Master Separation Agreement verges on the frivolous. (*See* Defs.' Mot. 16-17.)  The Master Separation Agreement lists all of the Ancillary Agreements.  (Hardiman Aff. Ex. A-1 §1.1(a) at 4-5.)  On its face, Exhibit 3.1(a)(iv) plainly relates to two supply agreements found in that list: the European Powertrain Cross Supply Agreement and a Brazilian Powertrain Supply Agreement.  (*Id*. Ex. A-2, Ex. 3.1(a)(iv).)  Thus, Page 2 of that exhibit, entitled "Cross Investments," refers to the "GRAND TOTAL EUROPE" for the net book value of investments in various specified products, including the engine family (Fam1) that is the subject of the instant dispute, and also refers to "TOTAL investments in Fiat Plants Brazil" and to "GRAND TOTAL EUROPE + BRAZIL."  (*Id*. Sch. 3.1(a)(iv).)

*amount* Fiat owes.  (*See* Hardiman Aff. Ex. C-2 Sch. 3.3B).  Fiat's *obligation* to pay the amount

outlined in Schedule 3.3B arises from the Master Separation Agreement.   (*See id*. Ex. A-2, Ex.

3.1(a)(iv).)  Given the plain language of the Master Separation Agreement, the Court should

reject Fiat's tortured inference that this invoice somehow constitutes an admission that General

Motors does not have a claim under the Master Separation Agreement.  More importantly, an

invoice cannot supersede or waive the parties' rights under their underlying written contracts.

Fiat's suggestion that this invoice somehow waived General Motors' right to invoke the dispute

resolution procedures of the Master Separation Agreement is insupportable as a matter of law.  In

fact, Fiat does not cite any authority for this extraordinary proposition.

Fiat's attempt to dismiss Exhibit 3.1(a)(iv) contravenes a standard canon of contract

interpretation:  courts must give effect to all provisions of parties' agreements, without rendering

any material portion of any agreement meaningless or surplusage.  "[I]t is a cardinal rule of

contractual interpretation that a court shall not interpret an agreement in a way which leaves a

part meaningless or ineffectual."  *305 E. 40th Garage Corp. v. 305 E. 40th Owners Corp.*, 833 F.

Supp. 991, 998 (S.D.N.Y. 1993) (internal citation omitted); *see also, e.g., DaPuzzo*, 263 F. Supp.

2d at 729 ("Equally settled is the doctrine that construing contractual language in a manner that

renders contract provisions superfluous is disfavored") (citing *Int'l Multifoods Corp. v.

Commercial Union Ins. Co.*, 309 F.3d 76, 86 (2d Cir. 2002)).  However, that is precisely what

Fiat is asking the Court to do here.  Fiat's interpretation of the parties' agreements would render

Exhibit 3.1(a)(iv) "meaningless or ineffectual" and would impermissibly alter the parties'

obligations to each other.  Exhibit 3.1(a)(iv) is part of the Master Separation Agreement, and

General Motors' claim falls squarely within the plain language of that exhibit.  It follows

inescapably that the Master Separation Agreement's dispute resolution mechanism controls.

**B.     The Ancillary Cross Supply Agreement Does Not Supersede The Master Separation Agreement.**

Fiat makes the even broader argument that the ancillary Cross Supply Agreement supersedes the Master Separation Agreement, thereby eliminating any supposed "ambiguity" over the applicability of the Exhibit to the Master Separation Agreement to the Common Investment Dispute.  (Defs.' Mot. 17-18.)[8]  However, that argument cannot be squared with the plain language of the two agreements.

The merger clause in the Cross Supply Agreement provided only that it shall "supersede all *prior* agreements, covenants, arrangements, communications, representations and warranties, whether oral or written."  (Hardiman Aff. Ex. A-1 § 24 at 28 (emphasis added).)  The Master Separation Agreement and the Cross Supply Agreement were entered into and effective as of the *same date*, May 13, 2005.  (*Id*. Ex. A-1; Ex. C-1.)  Thus, the Master Separation Agreement is not a "prior" agreement; rather, it is a contemporaneous agreement signed by the parties at the same location on the same day.  (*See id.*)

In any event, it is plain from the face of the Master Separation Agreement that the parties contemplated that both the Master Separation Agreement and the numerous Ancillary Agreements, including the Cross-Supply Agreement, would remain in effect following the Closing Date for the liquidation of their joint ventures.  For example, Section 9.4 of the Master Separation Agreement provided, "As of the Closing Date, this Agreement and the Ancillary Agreements supersedes" specified provisions of the Termination Agreement.  (*Id*. Ex. A-1 § 9.4 at 24.)  Thus, the parties plainly contemplated that the Master Separation Agreement would remain in effect following the Closing Date.

---

[8]As discussed above, there is no such "ambiguity"; rather, the Common Investment Dispute falls squarely within the plain language of the Exhibit to the Master Separation Agreement.

The Master Separation Agreement's definition of "Ancillary Agreements" (including the Cross Supply Agreement) as agreements "to be entered into" to implement the Termination Agreement does not compel a different result. As noted, the parties signed both contracts on the same day – May 13, 2005. (*Id*. Ex. A-1; Ex. C-1.) The parties would not have entered into an umbrella agreement creating express obligations – the Master Separation Agreement – only to have those obligations voided on the very same day by one of its ancillary agreements. Moreover, the Cross Supply Agreement expressly references the Master Separation Agreement, which confirms it is not superseded. (*See, e.g., id*. Ex. C-1 § 14.2 at 25 ("based in part on Exhibit 3.1(v) and Schedule 3.1(a)(iv) of the Umbrella Agreement").) The parties would not have referenced the Master Separation Agreement in the Cross Supply Agreement if they had believed that only the latter would survive the Closing Date.[9]

In short, this Court can readily resolve this case in its entirety as a matter of law on the basis of the plain language of the parties' agreements. There are no factual disputes that would require discovery or trial. Further, such a resolution is entirely consistent with the parties' own agreement to submit all disputes to alternative dispute resolution. The Court should grant General Motors' cross-motion for summary judgment, should determine that General Motors properly invoked the dispute resolution procedures of the Master Separation Agreement to

---

[9]As discussed above, the instant dispute arguably could be resolved under either of the applicable agreements. However, even if Fiat were correct that the dispute resolution provisions of one agreement superseded the other's, the Cross Supply Agreement's provisions necessarily would have been superseded because the Cross Supply Agreement is an Ancillary Agreement contemplated by and referenced in the umbrella Master Separation Agreement. *See Liberty USA Corp. v. Buyer's Choice Ins. Agency LLC*, 386 F. Supp. 421, 426 (SD.N.Y. 2005) (Ohio forum selection clause in asset purchase agreement superseded New York forum selection clause in promissory note, which was incorporated in the asset purchase agreement and was executed contemporaneously with that agreement by the same parties and for the same purpose). Here, likewise, the Cross Supply Agreement was "specifically cited as part of the consideration" for the Master Separation Agreement (*id.*), as full agreement on and execution of the Cross Supply Agreement was one of the conditions to closing of the Master Separation Agreement. (Hardiman Aff. Ex. A-1 §§ 4(b), 5.2(a)(iii)(a) at 15, 16.) It is General Motors' position, however, that neither agreement superseded the other.

resolve the Common Investment Dispute, and should direct Fiat to comply with those procedures, including by cooperating with General Motors to jointly select a mediator to facilitate a resolution to the parties' dispute.

## III.    THE COURT HAS PERSONAL JURISDICTION OVER FIAT.

Fiat briefly argues in the alternative at the end of its motion that this Court should dismiss this action for lack of personal jurisdiction.  (Defs.' Mot. 20-21.)  The argument is readily dismissed:  In light of the parties' express consent to this Court's jurisdiction to enforce the dispute resolution provisions of the Master Separation Agreement, as incorporated from the Termination Agreement, Fiat's argument fails.

Section 9.11 of the Master Separation Agreement provides that the dispute resolution procedure under that agreement "is as provided in Article 16 of the Termination Agreement which is incorporated herein by reference."  (Hardiman Aff. Ex. A-1 § 9.11 at 26.)  Thus, the Master Separation Agreement expressly incorporated Article 16 of the Termination Agreement in its entirety.  That Article includes a provision, Section 16.5, which entitles the parties to apply to this Court for preliminary or injunctive remedies to enforce Section 16, which is precisely the relief General Motors sought by filing this action:

> The foregoing provisions of Section 16 do not preclude the disputing Parties from applying to the United States District Court for the Southern District of New York for preliminary or injunctive remedies to enforce this Section 16, to preserve the status quo during the pendency of the Dispute resolution proceedings under this Section 16 or to enforce the decision of the Mediator.

(*See id*. Ex. E ¶ 16.5 at 12.)  Fiat makes the hypertechnical argument that this provision does not establish that the parties intended this Court would have jurisdiction to grant such relief, but only that the parties would not be precluded from *seeking* such relief.  (Defs.' Mot. 20-21).  In other words, Fiat would have the Court believe that the parties intentionally incorporated a detailed

dispute resolution process, but without any means to require compliance with that process. That argument does not pass the red-face test. It would render this Section meaningless or ineffectual, thereby violating a fundamental canon of contractual interpretation. *See 305 E. 40th Garage Corp.,* 833 F. Supp. at 998.

That the parties intended to confer jurisdiction on this Court to enforce the dispute resolution procedures they incorporated into the Master Separation Agreement is made explicit by another provision of Section 16 of the Termination Agreement which expressly refers to Section 20.9, the consent-to-jurisdiction clause of that Agreement. Section 16.2, which describes the binding resolution process, provides in pertinent part, "The decision of the Mediator is final and binding upon the Parties, the JV Shareholders and the Joint Ventures and enforceable *in accordance with Sections 16.5 and 20.9*." (Hardiman Aff. Ex. E § 16.2 at 12 (emphasis added).) Section 20.9, in turn, contains the express consent-to-jurisdiction clause:

> All Disputes, controversies or claims arising out of or in connection with this Agreement are to be resolved pursuant to Section 16. Subject to the foregoing, each of Fiat and General Motors hereby irrevocably submits to the exclusive jurisdiction of the United States District Court for the Southern District of New York, located in New York City, for the purpose of any action or proceeding arising out of or relating to this Agreement, and each of Fiat and General Motors hereby irrevocably agrees that all claims in respect to such action or proceeding may be heard and determined in such federal court.

(*Id*. ¶ 20.9(a) at 17.) In other words, by incorporating Section 16, which in turn incorporated the consent-to-jurisdiction clause, the parties agreed to submit to the jurisdiction of this Court for the purpose of "any action or proceeding arising out of or relating to this Agreement," including applications for interim injunctive relief under Section 16.5. Pursuant to Section 9.4 of the Master Separation Agreement, the parties expressly agreed that the consent-to-jurisdiction clause

would remain in effect.  (*See id*. Ex. A-1 ¶ 9.4.)  Fiat's request that this Court dismiss the action

for lack of jurisdiction therefore must be rejected.

### CONCLUSION

For the foregoing reasons, General Motors respectfully requests the Court deny Fiat's

motion to stay or dismiss.  Further, General Motors respectfully requests the Court grant its

cross-motion for summary judgment, and direct Fiat to comply with the binding dispute

resolution procedures of the Master Separation Agreement, including by promptly cooperating

with General Motors to jointly select a mediator to facilitate and/or adjudicate a binding

resolution to the parties' Common Investment Dispute.

Dated:  August 22, 2008                            Respectfully submitted,

                                                   FOLGER LEVIN & KAHN LLP
                                                   Embarcadero Center West
                                                   275 Battery Street, 23rd Floor
                                                   San Francisco, CA  94111
                                                   (415) 986-2800


                                                   By:_____/s/_____
                                                        Roger B. Mead (RM2676)

                                                        Attorneys for Plaintiffs
                                                        General Motors Corporation and
                                                        Adam Opel GmbH

38006\2006\615126.1

-25-